IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


```
* * * * * * * * * * * * *  CRIMINAL ACTION
UNITED STATES OF AMERICA  *  13-043S
                          *
VS.                       *  JANUARY 23, 2014
                          *
GERALD SILVA              *  PROVIDENCE, RI
* * * * * * * * * * * * *
```

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH

CHIEF JUDGE

(Defendant's Motions in Limine)

**VOLUME II**

**REDACTED**


**APPEARANCES**:

FOR THE GOVERNMENT:         TERRENCE P. DONNELLY, AUSA
                            U.S. Attorney's Office
                            50 Kennedy Plaza
                            Providence, RI  02903

FOR THE DEFENDANT:          ROBERT B. MANN, ESQ.
                            Mann & Mitchell
                            One Turks Head Place
                            Suite 610
                            Providence, RI  02903


Court Reporter:             Anne M. Clayton, RPR
                            One Exchange Terrace
                            Providence, RI  02903


Proceeding reported and produced by computer-aided
stenography

1    23 JANUARY 2014 -- 2:40 P.M.

2              THE COURT:  We're back on the record in the

3    matter of the United States versus Silva.

4              Let's have counsel identify themselves for the

5    record.

6              MR. DONNELLY:  Good afternoon, your Honor.

7    Terrence Donnelly for the United States.

8              MR. MANN:  Good afternoon.  Robert Mann for

9    Mr. Silva.

10             THE COURT:  All right.  What remains, I think,

11   is to hear argument on the three pending motions.

12   Unless you have anything else you'd like to bring up

13   first, we can proceed directly to that.

14             MR. MANN:  I don't.  I just want to make sure

15   the record is clear.  I think I made the record clear

16   yesterday.  If not, I'd make an offer of proof that

17   Professor Leo has now completed the review of all the

18   videos.  I think that came out yesterday, Judge, but --

19             THE COURT:  I think so, too.

20             So it's your motion, Mr. Mann, so let me hear

21   from you first.  We'll deal with your motion in limine

22   first, and then we'll move to the others.

23             MR. MANN:  Yes, your Honor.

24             As a starting point, of course, I would just

25   incorporate the memoranda that I already filed to avoid

1   sort of repeating everything in those memos.

2         THE COURT:  So let's start with -- if you don't

3   mind, I can ask you some questions to kind of focus the

4   argument because maybe that would be helpful.

5         The way I was thinking about this motion was to

6   try to figure out what are the elements that possibly

7   an expert would be potentially helpful on, and you talk

8   about this in your memo.  And I'm trying to make sense

9   out of the case law that interprets the statute here.

10  And the best that I've been able to sort of come up

11  with in kind of broad strokes is this:  That in the

12  First Circuit there's no law that says you need an

13  expert on the issue of whether this material is

14  lascivious, but there's no per se rule against it

15  either.

16        So I think we start with the proposition that

17  expert testimony is at least potentially possible.  And

18  the question becomes, as it always is, whether this is

19  something that is within the ken of the jury or not,

20  would it be helpful to the jury or not.

21        So then there are what are the things that the

22  jury is going to be required to consider in determining

23  whether the statute was violated.  And what I get out

24  of the case law is that we have the <u>Dost</u> factors

25  plus -- we're certainly not limited to the <u>Dost</u>

1    factors.  That's <u>Frabizio</u> makes that clear.  And I get

2    out of <u>Frabizio</u> further, and this isn't crystal clear,

3    in Judge Lynch's opinion:  "We do not hold that the

4    <u>Dost</u> factors may never be used.  We hold only that they

5    are not the equivalent of a statutory standard of

6    lascivious exhibition, and they are not to be used to

7    limit the statutory standard."

8        And I guess there is this question of beyond the

9    <u>Dost</u> factors could an expert be helpful with respect to

10   the circumstances of the production of the child

11   pornography or the alleged child pornography, and could

12   an expert be useful with respect to the question,

13   quoting from her opinion, "The very different question

14   of whether this objective reaction or intent of the

15   viewer should be taken into account in determining

16   whether an image is lascivious."

17       So these are all the kinds of things that I

18   guess potentially an expert could be useful for.

19       Now, I know this is a very long question, but

20   I'd like to set it up for you.  Out of that, I got out

21   of Professor Leo's testimony yesterday, he testified

22   that he does not know the purposes or reason why any

23   purchaser, presumably including this purchaser, would

24   purchase these videos.  He's taken that out by his own

25   testimony.  Do you agree with that?

1           MR. MANN:  I do.

2           THE COURT:  He also testified, I think, that he

3      doesn't really have any understanding as to why someone

4      would produce this movie or video.  And he said he has

5      an opinion that it's not child pornography and that he

6      wouldn't change his opinion if the allegations -- if he

7      had known these allegations of exploitation.

8           Do you agree that he's not being put forward as

9      an expert on that topic, the reason why or the intent

10     of the producer?

11          MR. MANN:  With only one slight caveat.  I think

12     the way you at one point phrased the question was he

13     didn't have any idea why anyone would produce this.  He

14     didn't have an idea why these particular films were

15     produced.  He wasn't asked by either party what the

16     reason might be for producing this genre.  He said he

17     had no knowledge as to why these particular films were

18     produced.  And I agree he said that, Judge.

19          THE COURT:  But you're not putting him on for

20     that.

21          MR. MANN:  I'm not putting him on for that

22     purpose anyway.

23          THE COURT:  We take those two things out of the

24     picture.  So now what we're left with, I think, is the

25     Dost factors, right?

1      MR. MANN:  The Dost factors and in my mind

2    whatever else the Court and the jury may consider

3    beyond the Dost factors, which Frabrizio and the model

4    jury instructions from the First Circuit both say exist

5    but then they don't elaborate on what those other

6    factors are.

7           THE COURT:  Like what?

8           MR. MANN:  Well, Judge, when I --

9           THE COURT:  Let's get to those in a minute.

10    Let's talk about the Dost factors for a second.  All

11    right?

12          So I go through these Dost factors, and I'm just

13    going to walk through them.

14          One, whether the genitals or pubic area are the

15    focal point of the image.

16          MR. MANN:  I think he helps clearly on that.

17          THE COURT:  How so?

18          MR. MANN:  First, he specifically talks about

19    where the camera zooms and where it doesn't zoom; how

20    the camera generally had pictures of the whole

21    scenario, that they didn't just focus on the genitals.

22    He said there were scenes where the genitals were

23    present.  He talked about how there were pictures of

24    faces.  I think he talked about how there were pictures

25    of everybody in the scene, for example.  He talked

1    about how often you had wider shots, Judge.

2         And much of this merges with the question of

3    whether he's describing the evidence.  And this gets to

4    the question of whether we played all these videos for

5    the jury, could they also pick that out or not.

6         THE COURT:  Let's just assume -- this is where I

7    am right now.  Maybe Mr. Donnelly can get me to change

8    my mind, but I think you've got to play -- you're

9    asking that all the videos be played, right?  Is that

10   your request?

11        MR. MANN:  As of now.  Some of this depends on

12   whether Professor Leo is allowed to testify as a 611 or

13   -- if he's allowed to testify as a witness, Judge,

14   under either 611 or 1006.

15        Even if I put on all the videos, the question

16   would be do I put on all parts of the videos.  That

17   might depend on what Mr. Donnelly shows.  But as of

18   now, I'm reserving the right to call all the videos and

19   play them in their entirety.  I would expect to play

20   them at a faster speed than normal.

21        THE COURT:  My feeling is if you ask that all

22   the videos be played, then they're all going to be

23   played.  That's totally in your control.  I'm not going

24   to stop you from presenting the videos as evidence.

25        MR. MANN:  But even if I play all the videos,

1    just focusing on the first factor, whether the genitals

2    or pubic area are the focal point of the image, the

3    whole point, I think, of my argument is that what

4    Professor Leo gives the jury is two things.  One, he

5    gives them an overview of all these movies.  It's hard

6    to inquire -- he took detailed notes while he was

7    looking at these things.  He's used to watching movies

8    critically, Judge.  He was probably able, based on his

9    background, to synthesize or understand what was in

10   these movies and grasp more of it than an average

11   juror.  He testified significantly --

12           THE COURT:  Look, I haven't seen the movies.  So

13   I could see the argument if there was some photo or

14   some scene or something where the Government was

15   clearly going to say that the genitals or pubic area is

16   clearly the focal point of this scene and you wanted to

17   use him to say -- using his expertise that, No, it

18   isn't; it's something else and here's why.  I get it.

19   You know, from a cinematography point of view or film

20   point of view that, you know, the real focal point is

21   something else and you just don't know that because you

22   don't know how to -- we don't know that or the jury

23   wouldn't know that because we don't know how to

24   critically watch films.  Okay.  I might give you that.

25   But from what I heard about the films, they're not like

1    that. They're just a static camera angle and all this

2    stuff that's going on.

3         MR. MANN: Well, there's a lot of movement.

4    There's a lot of movement in these films when you see

5    them, Judge, and my impression is that both the camera

6    moves and the actors move, but I'm less sure about the

7    camera moving. That's a point that Professor Leo would

8    make. But the whole point is that I suspect what the

9    Government is going to do is show some images, and

10   those images will show the genitalia of boys.

11        Now, we want to say that, with respect to number

12   one, that the genitals weren't the focal point of the

13   image, Judge. To view that, you've got to view the

14   film in context. Professor Leo can do that and he can

15   say, Look, it didn't zoom in just on the genitals.

16        Now, I can certainly argue that it didn't zoom

17   in on the genitals, but there's the case that I cite in

18   my memo that says the argument of counsel is likely to

19   be less persuasive than the statement of an expert

20   witness. That's what he brings to the table with

21   respect to that first factor, the very factor of

22   whether or not they were the focal point, Judge. He

23   can do it better, I suspect, than somebody without film

24   training. Not suspect. I would argue that he can very

25   clearly. That's one of the things he was looking for

1    when he did this.

2          This jury is not going to have, presumably, two

3    things that Professor Leo had.  They're not going to

4    have the advantage of knowing the <u>Dost</u> factors in

5    advance; and two, they don't have his background to

6    know what to look for, Judge.

7          THE COURT:  Well, knowing the <u>Dost</u> factors and

8    what other factors is something we can always talk

9    about instructing the jury on early.  That's a

10   possibility, but that's another matter.

11         So the second <u>Dost</u> factor is whether the setting

12   of the image is sexually suggestive; i.e., a location

13   generally associated with sexual activity.

14         Why can't the jury figure that out for

15   themselves?

16         MR. MANN:  I'll tell you exactly why.  They

17   could probably -- the question is, is a beach with nude

18   boys a sexually suggestive setting or is a beach with

19   nude boys a setting for naturalism or nudism?

20         Well, Professor Leo can say that some of these

21   settings -- I think he would say, Judge, he did say --

22   he does say in his summary, Judge, that there's nothing

23   sexually suggestive about that.

24         THE COURT:  I thought he said -- maybe it was on

25   cross-examination, that he had no special knowledge

1        about naturalism or nudism.  Did I get that wrong?

2              MR. MANN:  No.  But he did say, Judge, that --

3        he talked about the settings.  He clearly has a

4        knowledge of what "settings" are, and he clearly would

5        offer an opinion, Judge, that the settings -- and I

6        have this in the summary.  I just found it here.

7              He says on paragraph two of his summary:  "That

8        the settings of the videos are not sexually suggestive;

9        that even when the settings include beds they were not

10       sexually suggestive; that some of the scenes involved

11       massages, but the massages appeared to be more caring

12       than sexual.  Many of the setting such as the ones

13       involving food might be described as silly but not as

14       sexually suggestive."

15             THE COURT:  I don't understand why anything

16       about his expertise, his expertise in film studies

17       helps the jury -- he may have an opinion about that.

18       Fine.  You know, Mr. Donnelly may have a different

19       opinion.  We all may have opinions about it.  But why

20       is his opinion one that the jury should receive as an

21       expert's opinion?

22             MR. MANN:  Because he has this history of

23       knowledge not just of films but of films in this genre,

24       Judge, films involving issues involving sexuality.  And

25       he's sitting here and giving this jury an opinion that

1     says these settings aren't necessarily sexually

2     suggestive and that they're not necessarily, but they

3     aren't.

4          Sure, some of the things are obvious.  An

5     olympic-size pool is not a sexually suggestive setting.

6     I'm more concerned about the jury thinking, Oh, you see

7     nude boys in a sleeping car in a train, that's sexually

8     suggestive.

9          I think Professor Leo can bring something to the

10    table, a lot, when he says that's not a sexually

11    suggestive setting.  Now, the jury can accept or reject

12    his opinion, but it's based not just on his film

13    expertise but his film expertise in this genre, Judge,

14    and I think he does add a lot there.

15         THE COURT:  All right.  Unnatural poses or

16    inappropriate attire considering age.

17         MR. MANN:  Well, he talked about how -- there,

18    again, he talked, Judge, about the kids were playing

19    games.  They were having these mock sword fights.  He

20    talked about the silliness of the food fights.  And he

21    talked about the youths being playful, being

22    spontaneous.  He talked a whole lot about spontaneity

23    of the youths.  So when you look at that and you look

24    at number three, Judge --

25         THE COURT:  How is he an expert on that?  I

1    mean, I guess I'm not seeing that.  All he's doing is

2    repeating what he saw in the film.  The jurors can

3    watch the film and see the same thing.

4            MR. MANN:  Judge, let me give you a specific

5    example where I don't think the jurors will see the

6    same thing.

7            THE COURT:  Okay.

8            When he and I watched these films, and I had

9    very little knowledge of films, I did not pick up on

10   the use of implements as a method of the children

11   playing with each other, things like the swords, the

12   other things like that, Judge.  He picked up on that.

13   Now, maybe some jurors will pick it up; maybe some

14   won't.  He looks at this movie and he sees a scene and

15   he sees a bunch of different things all at once.  He

16   sees which way the camera is going.  He sees whether

17   the camera is focused on the genitals.  He sees whether

18   they're using implements to play games or things like

19   that, Judge.

20           He picks up on those things because he's trained

21   to look at films critically in the same way that he

22   would read Chaucer differently than I would read

23   Chaucer.  And that's the expertise that he brings to

24   this, Judge.  He adds to the jury's ability to

25   understand this film.  Could he teach these jurors in

1    one expert session to understand these films?  I don't

2    know.  It's a challenge.  He usually has a whole

3    semester or so to teach students, but he can at least

4    give them some guidance, Judge, and that's what he

5    gives them.

6         It would be hard for these jurors to see these

7    things for the first time and grasp all these different

8    points.  I think it would be like, to continue the

9    comparison, having them read Chaucer once and answer

10   questions about it.

11        THE COURT:  All right.  The next one is whether

12   the image suggests sexual coyness or willingness to

13   engage in sexual activity.  I didn't hear him testify

14   about that.  I don't know if it was in that summary.

15        MR. MANN:  Well, he clearly testified yesterday,

16   and I know the Government objects to the use of the

17   Calvin Klein photographs, Judge, but he clearly

18   compared the use here to what was going on in the

19   Calvin Klein photographs.

20        THE COURT:  I really don't get that whole

21   business about the Calvin Klein photographs.  I mean,

22   you could compare this to Playboy magazine and say,

23   Well, look, it's not Playboy magazine so it must not be

24   sexual.

25        MR. MANN:  No.  I agree you can make the same

1   comparison with Playboy.  I think that's the whole

2   point, that these photographs and the Calvin Klein

3   photographs that we have, and it wouldn't matter

4   whether they were Playboy or Calvin Klein, do not

5   depict people in the same manner that these films do.

6   They don't depict people in clearly sexually

7   provocative or coy images, Judge, the phrase that --

8   the language is sexual coyness or willingness to engage

9   in sexual activity.

10          Playboy in their spread or the Calvin Klein ads

11   clearly radiate sexuality, the bulges in the man's

12   pants, the bodies hanging onto each other, the

13   clinging.  Professor Leo described a little bit of

14   that.  He can talk about that and then he can say, Look

15   at these pictures, look at these images.  There's no

16   overt sexuality.  There's no coyness in there.  There's

17   no -- you have youths playing with each other.  That's

18   what he says, Judge, literally playing as opposed to

19   being involved in sexual activity.

20          Yes, he adds something to that.  Could some

21   jurors figure that out?  I don't know whether they

22   could or not.  Depends on what background they have in

23   film, Judge, and what they understand in film, what

24   their exposure to other matters is, but it's a

25   certainty that he adds to their information base for

1 making that sort of decision.

2   I mean, we're in effect asking every juror to

3 make a decision whether or not the images suggest

4 sexual coyness or a willingness to engage in sexual

5 activity.  Well, how are they going to do that?

6 They're not going to do that in the abstract.  They're

7 going to do that based on their -- you're going to give

8 them a standard instruction about life experiences,

9 things like that.

10   The jurors are in effect going to be making

11 these comparisons of their own, Judge.  Professor Leo

12 can add to the foundation by which they make them.

13   THE COURT:  The Court has said, the First

14 Circuit and other courts have said, as the Ninth

15 Circuit said in Arvin:  "This Circuit has held that

16 'lascivious' is a commonsensical term, and that whether

17 a given photo is lascivious is a question of fact.

18 There is a consensus among the courts whether the item

19 to be judged is lewd, lascivious or obscene is a

20 determination that lay persons can and should make."

21 And it cites a string of circuit court opinions for

22 that proposition.  And in Frabizio the First Circuit

23 seemed to adopt that point of view.

24   So I agree with everything you're saying.  The

25 jury is going to have to make those calls, but the

1    courts have said that that's something that is within

2    the ability and the common sense of the jury.

3         Let's talk about number six, whether the image

4    is intended or designed to elicit a sexual response in

5    the viewer.  I actually thought, before I heard

6    Professor Leo testify, I thought that might be an area

7    where his testimony could be helpful, but I have to say

8    after listening to him I'm less convinced.

9         MR. MANN:  Well, he does say, and it's in his

10   summary which he repeated yesterday, Judge, that -- not

11   repeated but adopted yesterday, that the movies might

12   be understood as seeking to elicit a desire to be nude.

13   That's very clear in the summary.

14        THE COURT:  Didn't you say a minute ago that you

15   were not putting him on for purposes of the intent of

16   the producer?  So wouldn't number six of the Dost

17   factors, whether it's intended or designed, that would

18   mean intended or designed by the person producing the

19   film, right?  I thought you just said that you weren't

20   putting him on for that purpose?

21        MR. MANN:  I'm going to retract that statement

22   then because -- I am going to retract that statement.

23        To the extent that he will say that one of the

24   -- he will say, Judge, that movies are designed to

25   elicit any number of responses in an audience.  And he

1     will also say, Judge, that these movies might be

2     understood as seeking to elicit a desire to be nude.

3     That's clear in his summary.  So to the extent that

4     that is describing what the purpose of the movies is I

5     withdraw what I said previously.

6              He will say that these movies, Judge -- and he

7     talks about this with respect to one of the other <u>Dost</u>

8     factors, too, when we talk about number four, whether

9     the child is partially clothed or nude -- I'm sorry,

10    when we talk about number three, whether the children

11    are in unnatural poses.  He talks about it there being

12    that the youths are depicted in a manner consistent

13    with the context of European nudism.

14             So that I think what he says -- and so what he

15    says clearly, Judge, is, Look, when you look at these

16    pictures, I can tell you something, Jury, that these

17    are consistent with European nudism, that these -- and

18    I did misspeak and I apologize for that -- that these

19    movies might elicit a desire to be nude, that nudism is

20    a form of expression.

21             He will also though -- what he most importantly

22    brings, Judge, I think, is this.  He helps the jury

23    understand these movies; and for the same reason that

24    students take a film course, these jurors are like

25    freshman in college.  They haven't had a film course,

1    presumably.  I mean, there might be -- I suppose in a

2    medical malpractice case you could have a doctor on the

3    jury who would know stuff, but then there's -- they

4    would normally be instructed they're supposed to be

5    limited to what they get in the way of evidence.

6         But assuming we have a jury that doesn't have

7    any experts in film, he's going to give these jurors

8    the equipment and the ability to assess what's in these

9    movies the same way he gives it to students.  And

10   that's what I think you really bring to the table.

11   That's what he testified he could do, Judge.  He's got

12   a breadth of experience to do that.  And in that sense,

13   I think his testimony clearly should be allowed.

14        I think Mr. Silva has a right to produce his

15   testimony in that regard.  I did mention -- I know

16   there's a First Circuit case that says there's not a

17   significant difference, but I do think he has a

18   constitutional right to produce this evidence, Judge.

19   I cite it in the memo.  And I -- so I think it's

20   hard -- if what you're saying is that or if the

21   Government argues that all of this could be observed by

22   the jury, in effect the Government is saying both sides

23   can sort of make all these observations.

24        Some of these observations are clearly beyond

25   the ken of the jury, Judge.  For example, when he talks

1     about these films can be viewed as educational films

2     about nudism and naturism, that this is an old European

3     practice that embraces feelings comfortable with one's

4     body, that this opinion is based on viewing videos

5     which are basically based on the indictment as well as

6     viewing the catalog of the distributor of these videos.

7          Later he says:  These videos might be understood

8     as seeking to elicit the desire to be nude.  Nudism is

9     a form of expression, and the nude body has long been a

10    form of expression in the arts and that this has been

11    controversial.  He will offer his opinion that the

12    images did not appear intended or designed to elicit a

13    sexual response of the viewer.  He'll compare the

14    images in the videos with various advertising which

15    employs young women.

16         Those are clearly things beyond the ken of the

17    jury, Judge.

18         THE COURT:  All right.  Let me hear from

19    Mr. Donnelly.

20         MR. DONNELLY:  Yes, your Honor.  I'm not sure

21    where the Court would like me to start.  You know, I

22    guess the big --

23         THE COURT:  Anywhere you want.

24         MR. DONNELLY:  Okay.  Well, I guess to start

25    with, your Honor --

1          MR. MANN:  Your Honor, I just want to make

2     clear, and I really apologize, I did submit a

3     supplemental basis referring to the Rules 611 and 1006

4     that those are alternative bases to --

5          THE COURT:  Yes.  I know you did.

6          MR. MANN:  I want to make clear that those are

7     alternative bases that I'm pressing to admit his

8     testimony in part.

9          THE COURT:  All right.

10         Go ahead.

11         MR. DONNELLY:  Yes, your Honor.  In a case where

12    whether a given image or video depicts the lascivious

13    exhibition of the genitals, the question is if in a

14    world where expert testimony should be allowed on that,

15    I suggest the First Circuit, Ninth Circuit, Seventh

16    Circuit, 10th Circuit I think it was, or 11th Circuit,

17    any court that's looked at this directly has rejected

18    it.  But in a world where somehow, some way an expert

19    could come forward and testify --

20         THE COURT:  I don't know if that statement is

21    exactly right.  Just so that we're clear, I thought the

22    First Circuit --

23         MR. DONNELLY:  Let me just say, Judge, the First

24    Circuit did not have this question before it.  It did

25    not.  But what it did have before it and so what I'm

1        saying is that <u>Arvin</u> certainly did.  The Ninth Circuit

2        in <u>Arvin</u> had the question before it:  Did the judge,

3        trial judge abuse his discretion when he excluded

4        proffered expert testimony on the issue of whether

5        images were lascivious or not.

6             THE COURT:  I just refer you to Footnote 8 of

7        <u>Frabizio</u>:  For this reason expert testimony is not

8        required on the subject, citing <u>Arvin</u>.  There is at the

9        same time no general rule that it is prohibited.

10            MR. DONNELLY:  Right.  But the question was not

11       before the Court.  And given Judge Lynch's opinion that

12       everything you just asked Mr. Mann about the First

13       Circuit's opinion, that all of that, lay people sitting

14       on a jury are capable of making those determinations,

15       one has to ask, well, what kind of expert then should

16       be allowed to testify about these matters.

17            What we have before us here I think helps make

18       your task easier because unlike the situation and I

19       think the name of the case was **United States versus**

20       **Johnson**, that was the Missouri case, where a state

21       trooper who had all kinds of experience with actual

22       child pornography tried to come in and testify and the

23       trial court excluded it because the people on the jury

24       didn't need that kind of help.

25            All Professor Leo, or at least the backbone of

1    what he wants to testify about are things that this

2    jury can see with their own eyeballs.  He's a professor

3    of English Literature at the University of Rhode Island

4    who since 2006 has had some kind of concentration

5    within the English Department at URI on films.

6           What you're going to see, your Honor, they're

7    not worthy of the word "film."  As Dr. Leo candidly in

8    a moment where reality, I think, broke through on him,

9    he admitted that these movies, they don't have

10   lighting, they don't have settings, they don't have

11   dialog, they don't have plot although he tried to tell

12   us that there was a plot here.  They're homemade

13   movies.  That's his words, homemade movies with an

14   adult in some personage -- and we put in the news story

15   exhibits so you would have some background on this

16   case, who these adults are and why these movies were

17   being produced.

18          And so Dr. Leo has no particular expertise about

19   homemade videos.  You might as well bring in an expert

20   about the Donnelly family picnic to tell us about

21   setting and lighting.  It offers no help to the jury,

22   no particular insight.

23          These jurors are going to have to sit here and

24   look at these images.  This is not the worst child

25   pornography case this Court has encountered or will

1   ever encounter.  These are pictures of naked boys that

2   it is the Government's position, it was the grand

3   jury's position, it's governments throughout the

4   world's position that they amount to child pornography.

5   But in the end, it's going to be the jury's call.

6   Mr. Mann is going to be able to tee up that issue and

7   argue it to his heart's delight about all the reasons

8   why these pictures should not amount to child

9   pornography.

10          The Government for its account will expect to

11   counter those arguments without the help of expert

12   testimony as well.  And that's what Frabizio says,

13   that's what Arvin says.  So there's a real danger here

14   that Professor Leo, who, based on what we heard

15   yesterday, is not going to be a real disciplined

16   witness about whatever his expertise is in.  He told us

17   yesterday about how Eastern European boys have

18   different muscle masses than other boys.  How can he

19   say that?  How does he know that?  And so he has an

20   opinion that when one 12-year-old boy is rubbing oil in

21   a sauna on the back of another boy that because he's

22   not touching his genitals or buttocks, rather touching

23   the middle and upper parts of his back, that that's not

24   a sexualized position.  I have a completely opposite

25   view myself that I plan and hope to argue to the jury

1    about what that image means and why it was put in there

2    by its maker.

3         And so he has no expertise in that.  That's the

4    something that Frabizio says is for a layman to decide.

5    They don't need Professor John Leo coming in and

6    saying, Well, that's not really a sexualized image.

7         A boy getting tied up, same thing.  Little boy

8    drag scenes, not sexualized.

9         These are the things that afford for the layman

10   -- the Court said -- the First Circuit is clear that

11   when it comes to expert testimony it's like any other

12   evidentiary ruling.  Mr. Mann raises a constitutional

13   issue.  Certainly he has a right to present a case, but

14   he has to do it within the Rules.  And this Court,

15   whatever your decision is, will be measured by the

16   abuse of discretion standard.  And it's very hard to

17   imagine after what the First Circuit said in Frabizio

18   in light of its adoption of Arvin that the Court would

19   find it to be an abuse of discretion.

20        THE COURT:  That I'm not too worried about.

21   That's not the point.  I'm going to do what is right --

22        MR. DONNELLY:  I understand, your Honor.

23        THE COURT:  -- you know, for the fairness to the

24   Defendant and consistent with the Rules.  That's what I

25   care about.  But --

1        MR. DONNELLY:  I don't mean to interrupt the

2   Court, but we ended our memorandum with Rule 403, and I

3   think given the fact that witness has no particular

4   expertise, he knew nothing about the child pornography

5   industry, your Honor, I would proffer to the Court that

6   these videos were made for the sexual pleasure of the

7   men who were purchasing them.

8        When I asked Professor Leo that question,

9   frankly, I had problems with his answer when he says, I

10  have no idea; it could be a million things.  Is that

11  why this particular Defendant bought 75 of these videos

12  on 22 different occasions spending $1500 of his own

13  money?  Is that why individuals who purchase these

14  videos are being prosecuted in Sweden, Mexico, Romania,

15  Switzerland, I believe, in several different countries.

16  This was a world-wide investigation, your Honor, and I

17  just think that to bring in somebody who styles himself

18  as an expert who is really maybe somebody who has more

19  enlightenment than most of us on films, filmmaking, but

20  he has zero knowledge about child pornography, how

21  children are used, groomed and how people profiteer

22  off of their exploitation in these movies, he's got

23  nothing to add on that.

24       Then go to this particular case.  He basically

25  insulated himself from the facts of the case that he's

1    testifying about, namely, this isn't a secret, the Azov

2    Films investigation.  And he claims he has no knowledge

3    of the makers, no knowledge of the producers, no

4    knowledge of prosecutions that I just mentioned.  No

5    knowledge that these boys who he told us, oh, they're

6    frolicking, they're having so much fun, how all of them

7    were from basically low income homes, who needed a

8    place to go and play, and who were told by the

9    filmmakers don't tell your parents that you're being

10   filmed nude.  I'll pay you if you don't tell your

11   parents that you're being filmed nude.  Don't tell the

12   police.  If you do, you're out of here, out of our

13   little camp, out of our little setting.

14        It wasn't until parents in Romania began

15   discovering it that complaints began being made against

16   Azov and the investigation was on, particularly in

17   Toronto by the Toronto Police Service.

18        So I think for all those reasons, your Honor, it

19   would be very prejudicial to the Government under 403

20   to allow this kind of testimony when it's completely

21   unnecessary and the witness is unqualified.  Thank you.

22        THE COURT:  So Mr. Mann also has made this 611

23   and 1001 -- 1011 -- do I have those numbers right?

24        MR. DONNELLY:  1006.

25        MR. MANN:  1006, I think.

1          THE COURT:  1006.

2          MR. DONNELLY:  Your Honor, I don't think those

3     cases have any pertinence here.  I think the argument

4     is a bootstrapping argument.  If this testimony is

5     excludable under 702 for the reasons the Government is

6     arguing, the fact that there are voluminous recordings,

7     or whether they are or not is another matter, but you

8     can't call an expert who is not otherwise allowed to

9     testify to summarize what's on these videos.

10          The Government for its part plans to just play

11     portions of these videos.  As the Court said, if

12     Mr. Mann wants to play the whole video disks, we're not

13     going to stand in his way.

14          THE COURT:  All right.  Thank you.

15          MR. DONNELLY:  Thank you.

16          THE COURT:  Okay.

17          MR. MANN:  Can I just respond very briefly?

18          THE COURT:  Sure.

19          MR. MANN:  There are three points I want to

20     make.  One is that even though I know the First Circuit

21     has said that the constitutional claim doesn't trump

22     the Rules of Evidence, I just want to press the Sixth

23     Amendment claim in addition to the evidentiary

24     arguments in support of using Dr. Leo.

25          The second thing I want to point out is that we

1    did go through Dr. Leo's impact on the so-called Dost

2    factors, Judge, but both the First Circuit and the

3    pattern jury instructions in many other courts have

4    said that the Dost factors are not exhaustive, and

5    they've also said that the jury may consider other

6    factors.  And to that extent, I would submit Professor

7    Leo's testimony is another factor which they could

8    consider.

9          And the third point I'd make is that whether

10   Professor Leo is called as an expert or as a lay

11   person, there's still a need in my mind to have

12   somebody summarize many, many hours of tapes and

13   whether he's qualified as an expert to do that or as a

14   lay observer, the fact is he has now viewed all of the

15   tapes and he should be allowed to present the summary

16   under either Rule 611 or 1006.  I think I've got the

17   right cites, but the ones I've cited in my memo.

18         THE COURT:  How many hours of video are there?

19         MR. MANN:  I don't know the precise number,

20   Judge, because we played them often at double speed or

21   sometimes even faster speeds.  I think it's comfortable

22   to say -- if I could get the list from the indictment,

23   Judge.  It's over 20 hours, I believe.  If Mr. Donnelly

24   wants to correct me -- could I have just a moment?

25         THE COURT:  Sure.

1          (Pause.)

2          MR. DONNELLY:  Your Honor, I haven't watched

3     every minute of these, but I would not quarrel with 28

4     hours being a ballpark figure.  That gives the Court

5     some idea.

6          MR. MANN:  For example, Count VII alone has --

7     and I know these numbers just because we happened to

8     have viewed them very recently, Judge.  Count VII had

9     five videos of varying length that were the basis for

10    it.  Count -- in the indictment -- excuse me.  Not the

11    indictment.

12         In a response to discovery, the Government lists

13    the various tapes that are the basis for each of the

14    first six counts.  For count -- and in that document,

15    the Government lists -- and then we made notes on it,

16    Judge.  I believe Count I has one disk, Count II has

17    two disks, Count III has two disks, Count IV has three

18    disks and Count V has two disks.  And I can't remember

19    exactly how many disks Count VI had, Judge.  So that's

20    five, eight, ten, not including five for Count VII plus

21    the ones for Count VI.  And in addition to that, Judge,

22    many of these disks had, quote, "bonus features" or

23    other things so the disks would go on.  Some were

24    short; some were long.  I'd stick with my estimate of

25    about 20 hours, possibly longer, Judge, if we play them

1     at regular speed.

2                THE COURT:  All right.  Thank you.

3            Let me just deal with this motion now.  First,

4     let me take up this argument that Professor Leo should

5     be allowed to testify as a form of summarization under

6     Rule 1006.

7            First of all, I don't think that this

8     necessarily qualifies as a situation where the content

9     of the recordings cannot conveniently be examined in

10    court.  I agree they may be lengthy, but it is not a

11    situation where it's extremely difficult for the jury

12    to put together all sorts of data that comes from

13    various kinds of records and places and would have to

14    make all sorts of independent calculations.  You

15    sometimes see a summary witness put all that data

16    together into a chart or a graph or whatever it may be.

17           This isn't that kind of situation.  It's just a

18    matter of how much time the jury and the Court and

19    everyone invests in watching and that's totally within

20    your call as advocates.  So I don't think it qualifies

21    at the outset as material that cannot be conveniently

22    examined in court.

23           Beyond that, after listening to Professor Leo's

24    testimony, there's not any chance that he would be

25    capable of succinctly presenting what's in those

1    videos.  He was rambling and unfocused, talking about

2    one video and another video, and he was all over the

3    place.  So I don't even think, if I did conclude that

4    the material could not be conveniently accessed in

5    court, that he would be an adequate summary witness.

6    So I'm going to deny the motion to allow him to be

7    presented in that fashion.

8            Now, with respect to his qualifications as an

9    expert, the Rule 702 standard that you've all cited to

10   talks about whether the -- if the expert is qualified,

11   and his knowledge would help the trier of fact

12   understand a fact in issue.

13           So as I understand it, Professor Leo is an

14   expert in film and filmmaking, assuming that that's his

15   expertise, I think that his testimony and the offer of

16   proof doesn't establish that he could be helpful to the

17   trier of fact on any of the issues that they're going

18   to have to consider.

19           Just pulling out of his own testimony, first of

20   all, he clearly stated as I mentioned in my questions

21   to Mr. Mann earlier, that he doesn't know any of the

22   purposes or reasons why a purchaser would purchase

23   these videos.  That's what he testified to.  So he

24   can't express an opinion on that.

25           So then I suppose there's the question of

1  whether he could testify on this issue of why someone

2  would produce such a video.  He did not express any

3  expertise that would allow him to help the jury on the

4  why or the intent of the producer.  He had some

5  opinions.  They were very vague.  And at some point I

6  think, as Mr. Donnelly said, he said something like,

7  well, there could be a lot of reasons, or as

8  Mr. Donnelly said, he took issue with this plot

9  question, sort of claimed there could be a narrative in

10  there someplace, but he basically characterized it as a

11  home movie.  It's not as if he, as I thought he might,

12  I thought he might be presented to testify as to some

13  genre of European film and nudity or something that

14  this could have fit into, but he doesn't appear to have

15  any opinions about that.  These are home movies,

16  essentially.

17       He also said he hasn't written on issues of

18  nudism, so I don't think he has any particular

19  expertise in that area.  He said something to the

20  effect that physicality is part of his study expertise.

21  I'm not even sure what that even means.  But the long

22  and the short of it is that I don't think he can

23  testify as to the reasons why someone would produce

24  this other than just giving essentially a lay opinion

25  on that.

1        I don't think there's anything about his area of

2    expertise that would inform the jury as to why, the

3    intent of the person producing the film.

4        So that knocks out that sixth _Dost_ factor and

5    issues that the Circuit talked about in the _Frabizio_

6    opinion that go beyond the _Dost_ factors.

7        So then when you look at the _Dost_ factors

8    themselves, as I go through them, whether the focal

9    point of the images are genitals or pubic area.  I

10   think the jury can figure that out for themselves.  I

11   don't think I heard anything in his testimony as to

12   anything about any particular film or part of a film

13   where what his understanding or expertise could really

14   inform the jury as to why those areas were not the

15   focal point even though they might have seemed to be

16   the focal point.  I didn't hear that from him.

17       His opinions about whether a setting is sexually

18   suggestive, I think Mr. Donnelly made the point he's

19   testifying that these various settings were not

20   sexually suggestive.  I think a juror might find that;

21   they might find differently, but there's nothing about

22   his expertise that tells us whether these settings are

23   sexually suggestive.  So I don't see him qualified or

24   helpful to the jury there.

25       Same with the third _Dost_ factor regarding

1   unnatural poses or inappropriate attire.

2        Fourth one, whether the child is partially

3   clothed or nude.  He's not offered for anything

4   relating to that.

5        The suggestion of sexual coyness or willingness

6   to engage in sexual activity, I didn't hear him talk

7   about that.  Again, that comes back to his sort of ipse

8   dixit opinions that these are not sexualized images or

9   evoke sexual connotations because he says they aren't,

10  and that's not what 702 allows.

11       So in a kind of summary fashion, those are the

12  reasons why I don't think his testimony would be

13  helpful to the jury.  I do agree that _Frabizio_ implies

14  to me that while not prohibited, there's certainly no

15  requirement and no compulsion to allow expert

16  testimony.  If there's any trend, from my reading of

17  the cases, it is against allowing expert testimony on

18  this issue of lasciviousness.

19       So for all the reasons that I've stated and

20  articulated in _Frabizio_ and in _Arvin_ and all the other

21  cases that have been cited, I'm going to deny the

22  motion to allow Professor Leo to testify.

23       So we can move on to the other motions.  There

24  is a motion, Mr. Mann, you've made that the term

25  "lascivious" is unconstitutionally vague, and then I

1     believe you also had a motion regarding Count VII

2     relating to the grand jury's viewing of the material.

3     Do you want to address those?

4          MR. MANN:  Which one do you want me to address

5     first?

6          THE COURT:  Why don't you take the

7     constitutional argument first.

8          MR. DONNELLY:  Judge, just so I'm clear,

9     Mr. Mann had filed a motion to dismiss based on

10    insufficient evidence being put before the grand jury

11    as to all the counts, I believe, and then followed it

12    up with Count VII.

13         THE COURT:  I thought he had -- maybe I

14    misunderstood.  What don't you clarify what your motion

15    is.

16         MR. MANN:  Mr. Donnelly is right.  I had

17    originally filed a motion challenging the sufficiency

18    of the evidence as to all counts.  Based on the Bill of

19    Particulars, I filed a further motion specifically

20    challenging Count VII, so I do challenge all seven

21    counts.  They are different arguments, but I'll address

22    the constitutional argument first.

23         THE COURT:  Okay.  Go ahead.

24         MR. MANN:  I can just get my notes, Judge?

25         THE COURT:  Sure.

1          (Pause.)

2          MR. MANN:  This is the Defendant's motion to

3     dismiss on the ground that the statute the Defendant's

4     charged with violating is unconstitutionally vague.  I

5     filed a fairly detailed memorandum and a fairly

6     detailed reply memorandum.  And at the opening, I would

7     just rely on all of those memoranda.  I've highlighted

8     certain points, but I want to make clear I'm relying on

9     both memoranda that the defense filed.

10          I think the issue is pretty clear.  The issue is

11    whether or not the term "sexually" -- the Defendant has

12    to be convicted of sexually explicit -- that the images

13    have to be sexually explicit conduct, and the question

14    in this case is whether the lascivious exhibition of

15    the genitals or pubic area of any person meets that is

16    unconstitutionally vague, Judge.  And in this case,

17    it's really the question of the lascivious exhibition

18    of the genitals.  That's what's alleged in the

19    indictment, Judge.

20          What's prohibited is the receipt of images of

21    sexually explicit conduct and then, as I said, in this

22    particular case I think it reduces itself to whether or

23    not the images constitute the lascivious exhibition.

24          Now, the argument that I make is this, that the

25    statute, that part of the statute that talks about

1   lascivious exhibition of the genitals is

2   unconstitutionally vague.  The United States Supreme

3   Court has held, Judge, that whether conduct is annoying

4   or indecent without a narrowing of those terms is

5   unconstitutionally vague.  That was **United States**

6   **versus Williams**, Judge, and they were citing to two

7   others, <u>Coates</u> and <u>Reno</u>.  And in **Reno versus American**

8   **Civil Liberties Union**, 521 U.S. 844, the Court was

9   faced with the question of whether the term "indecent"

10  was unconstitutionally vague.  And the essence of what

11  I'm saying is here "lascivious" is the same as

12  "indecent."  It's unconstitutionally vague.

13       The Government, Judge, comes back and argues

14  that the term "lascivious" has been upheld by some

15  courts, and they cite to <u>Miller</u>.  But the problem with

16  all that is this, that what saved the statute from

17  unconstitutionality in <u>Miller</u> was that there were other

18  prongs to the <u>Miller</u> test and the term "indecency"

19  wasn't limited just to that term.  The Government also

20  had to prove that taken as a whole that the material

21  appealed to the prurient interest and the lack of

22  serious artistic, political or scientific value, and

23  there are other factors that I discuss in my memo.

24  There's no qualifier here, Judge.  All you have is this

25  term "lascivious."  And there's no way, I would submit,

1    that a person can be on notice as to whether or not

2    their conduct does or does not violate the law.  That's

3    the essence of the issue in this case, and I don't

4    think that that issue has been decided by the United

5    States Supreme Court, Judge.

6         There's been a lot of talk about how "lewd" and

7    "lascivious" are parallel terms and the fact that

8    "lascivious" is substituted for the word "lewd" doesn't

9    change the argument, but the essence of the argument in

10   this case is that "lewd" doesn't provide notice in two

11   ways.  It doesn't tell the Defendant what he's

12   forbidden to do and not do, and it doesn't provide

13   guidance to the Government, Judge.

14        And when you look at the definitions that the

15   Court of Appeals, the First Circuit has given for the

16   proposed instructions to the jury, they talk about the

17   so-called Dost factors, and then they say other factors

18   that might exist but they don't define those other

19   factors.  Even in the hearing we had just a few moments

20   ago, Judge, there was discussion by Mr. Donnelly about

21   how in his opinion things might be sexually -- might

22   meet the standard of child pornography and somebody

23   else might have a different opinion, but there's no

24   criteria.  There's no way Mr. Silva could know what is

25   and what is not prohibited, Judge.  And that's what

1   makes the -- at the heart of it what makes these terms

2   unconstitutionally vague.

3        And I'm summarizing from my memorandum.  I want

4   to make it clear that I'm relying on the entire

5   memorandum.  I'm sure the Court has read it and I'm

6   sure the Court doesn't want me to repeat verbatim.

7        THE COURT:  What about X-Citement Video?

8        MR. MANN:  Let me turn to X-Citement Video.  I

9   think when you look at X-Citement Video, it becomes --

10  first, I don't think the Court in that case really

11  decided the issue that I'm raising here.  What the

12  Court did in X-Citement Video was said this:  First it

13  said because Congress replaced the term "lewd" with

14  "lascivious," that's an insubstantial difference and we

15  reject it for the same reasons stated by the Court of

16  Appeals.  Now you go to the Court of Appeals decision

17  in that case.  And the Court of Appeals decision in

18  that case relies on a case called Wiegand,

19  W-I-E-G-A-N-D, 812 Fed 2d at 1243.  Now, then you look

20  at Wiegand, and Wiegand then comes back and says that

21  "lascivious" is no different than the term "lewd."

22        So really what X-Citement is doing is saying

23  "lascivious" is no different than "lewd," but that

24  doesn't answer the question of whether or not the term

25  is unconstitutionally vague, Judge.  All it does is say

1      there's no difference between "lewd" and "lascivious,"

2      Judge.  That's why X-Citement, I don't think, controls

3      this case at all.

4           And in fact -- and then I cited in my reply

5      memoranda to the briefs by both the Government and the

6      Defendant or the other side, which also point to the

7      fact that what they were focusing on in X-Citement

8      really was this "lewd-lascivious" sort of dichotomy,

9      Judge.  Then you go back to looking at **Reno versus**

10     **American Civil Liberties**, which comes after X-Citement,

11     Judge, three years later.  And in Reno, which takes

12     place three years later, Judge, the Court rejects the

13     argument that the Government makes that basically said

14     -- and that's discussed in my first memo, that

15     basically says, Look, based on Miller, there's no --

16     let me back up for a second.

17          The Court in Reno basically said they rejected

18     the Government's argument where the Government tried to

19     base its argument on Miller, Judge.  And in effect,

20     that's in essence what the Government is trying to do

21     here.  Miller doesn't support the result, Judge, that

22     the Court is looking for for the same reasons that the

23     Government's reliance in Miller was rejected in Reno,

24     Judge.

25          And if I could just elaborate briefly on that.

1    In Reno, Judge, the Court was considering the

2    Communications Indecency Act of 1966.  They were

3    talking about the term "indecent" and the Court -- the

4    Government argued that the indecent standard was

5    constitutional because it was no more vague than the

6    second prong of the obscenity standard established in

7    Miller.  And the Court said, no, we don't accept that,

8    and the reason the Court didn't was because Miller had

9    other parts to the definition of "indecency," Judge, or

10    other definitions for other prongs to the definition of

11    "obscenity."  They were talking about whether the word

12    depicted conduct described by applicable state law and

13    then there were the other two factors that I mentioned

14    earlier.

15        So the very argument that X-Citement answers

16    this question I think is undermined by Reno, Judge.  If

17    I can sort of depart from the cases for a second, what

18    I understand them to be saying is, look, you need a

19    certain amount of definition.  In Miller, there was a

20    certain amount of definition because there were three

21    prongs to the use of the test.  You don't have these

22    three prongs here.  This is statutory language.  All

23    you have is this word "lascivious" with nothing else

24    that qualifies it.  You don't have state law qualifying

25    it.  You don't have any references to any other

1    standards at all.  And then you get to how is the Court

2    going to make a decision, Judge.

3         THE COURT:  How does that differ from words that

4    Congress uses in other contexts like "brandishing" when

5    it comes to a firearm?

6         MR. MANN:  My answer is that I think

7    "brandishing" is a lot easier to understand than the

8    term "lascivious," Judge.  I think if you asked a

9    hundred people what "brandishing" meant, you'd get a

10   pretty common answer.  People might vary a little bit

11   about whether carrying by the side of your arm versus

12   over your head is brandishing, but you'd get a pretty

13   standard answer about brandishing.  But when you look

14   at the term "lascivious," you could ask a hundred

15   people and get a hundred different answers, Judge.

16        I mean, how was Mr. Silva to know?  I would

17   submit that when you have a law that says

18   "brandishing," law enforcement and the defendant both

19   get a certain message you can't be brandishing a weapon

20   and people know what "brandishing" is.  "Lascivious"

21   could mean a hundred different things to a hundred

22   different people and how is either the defendant or law

23   enforcement on notice as to what it means?  That's the

24   vagueness of this statute, Judge.  And in that sense,

25   Judge, there is no notice to either law enforcement or

1    the defendant as to what's constitutional and what's

2    unconstitutional.

3            We don't quarrel, for example, Judge, it's not

4    applicable, but if you look at the other parts of the

5    definition of sexually explicit conduct, sexual

6    intercourse, that's pretty clear-cut.  Bestiality,

7    masturbation, sadistic or masochistic abuse.  But this

8    just says lascivious exhibition of the genitals.  It's

9    not just exhibition of genitals.  It's lascivious

10   exhibition.  So the question is what does the term

11   "lascivious" mean.  And we have these different factors

12   and then the Court of Appeals says, oh, but those

13   aren't inclusive or exclusive and you can consider

14   other factors but we don't define what those other

15   factors are.  And how is any lay person or any police

16   officer supposed to know what's prohibited and what's

17   not prohibited?  That's what's fundamentally flawed in

18   this statute, Judge.

19           THE COURT:  I have some sympathy for your

20   argument, but it seems like it's been rejected by every

21   Court of Appeals that's confronted the question, and I

22   don't know about district courts but I don't think you

23   cited me to any district court case or decision holding

24   that it's unconstitutionally vague, right?

25           MR. MANN:  I'd have to find my original memo,

1    but I accept the Court's memory and I certainly don't

2    remember any Court of Appeals decisions.  So I admit

3    and I concede in my memorandum that that are many

4    courts that have upheld the constitutionality of the

5    statute.  But I think often what the analysis has been,

6    unfortunately, it's been an analysis that sort of says

7    "lascivious" is no different than "lewd" therefore we

8    accept it without going further, Judge.  And I respect

9    the Government for pulling that phrase out of

10   X-Citement, but I don't think X-Citement really decided

11   this issue, Judge.  I think it's still a totally open

12   issue.  In fact, I think Reno very much supports the

13   argument, Judge.

14        And you asked me about brandishing and I guess

15   my best response would be, one of my responses would be

16   brandishing connotes a certain definiteness.  Indecency

17   alone didn't.  Lasciviousness  alone doesn't, Judge.

18   Maybe lascivious with other factors, Judge, other

19   conditions might, but they don't have them in this

20   case.  All you have is a cold statute.  It's not a

21   judicially crafted standard.

22        THE COURT:  Well, you do have the Dost factors

23   and other factors as the Court of Appeals has said.

24   That's the law that we're working with, right?

25        MR. MANN:  That's correct.  But I would argue

1    that when the First Circuit has said, as it has, the

2    <u>Dost</u> factors, but they're not inclusive or exclusive

3    and there are other factors, that adds to the argument

4    about the very uncertainty of the statute, Judge.

5    Because nobody then says, well, there's the six <u>Dost</u>

6    factors and these three other factors or these two

7    other factors.  We don't know whether there's one other

8    factor or ten other factors.  We don't know what those

9    other factors are, and that adds to the very

10    uncertainty.  And it applies, I want to emphasize, both

11    ways, both informing law enforcement as to what they

12    can arrest somebody for and the sort of corollary that

13    unless you have definiteness you can't prevent

14    arbitrary enforcement of the law, and giving the

15    defendant notice, Judge.  And beyond that, I just want

16    to make it clear that I'm relying on my memoranda.  I

17    go through these cases in some detail in my memoranda,

18    Judge.

19         THE COURT:  Okay.  Thank you, Mr. Mann.

20         Mr. Donnelly?

21         MR. DONNELLY:  Your Honor, outside of

22    incorporating our memorandum, I think the Court is

23    bound by the law of the Circuit.  At a minimum,

24    <u>Frabizio</u> answered this question with the Court holding

25    that the word "lascivious" was not unconstitutionally

1    vague or overbroad.  If that were not the case,

2    certainly X-Citement Video would bind all of us here on

3    the holding.  Until the Supreme Court speaks

4    differently, the First Circuit speaks differently, I

5    don't know what --

6         THE COURT:  Was the question directly in front

7    of the First Circuit in Frabizio?

8         MR. DONNELLY:  I believe it was, your Honor.

9    The X-Citement Video was cited, and I believe at page

10   85 of the Frabizio opinion, I don't have it here in the

11   courtroom, your Honor --

12        THE COURT:  I have it, but I thought the

13   procedural context of Frabizio was such that that

14   constitutional question would not really be before the

15   Court because this was a situation where Judge Gertner

16   had said that under the four corners, her four corners

17   review of these photographs, that it could not meet the

18   definition of "lasciviousness," and she cited the Dost

19   factors, and the Court of Appeals said that that was a

20   misuse of the Dost factors, that she relied too

21   exclusively on them and that that should be presented

22   to the jury.

23        I don't recall that they directly confronted

24   this question of the constitutionality of the term.

25   Now, I grant you that it was implied pretty strongly, I

1    suppose, that there was not a problem with the term.

2        MR. DONNELLY:  I just know in my memorandum

3    here, your Honor, I cited to page 85 where X-Citement

4    Video is noted, and then I quoted the Frabizio opinion

5    that courts are also in agreement that the term

6    "lascivious" is sufficiently well-defined to provide

7    persons of reasonable intelligence guided by common

8    understanding and practices notice of what is

9    permissible and what is impermissible.  That, of

10   course, is the constitutional standard for what is a

11   non-vague statute, but I don't have a copy of Frabizio

12   here.

13       Then Judge Lynch's opinion went on to state that

14   "The standard to be applied by the jury is the

15   statutory standard.  The statutory standard needs no

16   adornment."  And then she goes on about how the Supreme

17   Court has made clear that the constitutional standard

18   does not require additional glossing or narrowing of

19   the standard and that in child pornography cases you

20   don't go into the Miller three-part test, which is why

21   I think a lot of Mr. Mann's argument is inapposite to

22   this issue because he relies on obscenity cases where

23   those factors are important.

24       In any event, I think without having the opinion

25   in front of me, I think the Court did at least address

1    it.  Maybe it was dicta, but I'm pretty sure the issue

2    was squarely before them.

3         THE COURT:  Well, just for purposes of this

4    discussion, doesn't Mr. Mann have a point?  I was

5    trying to think of a situation that I could ask you

6    about, and it occurred to me what if somebody very

7    stupidly put pictures of their minor children in the

8    bathtub on their Facebook.  All right?

9         Now, to the parents of the children and the

10   relatives, that might look like just a cute picture.

11   All right?  But to someone with nefarious purposes who

12   could mine that picture off of Facebook and then

13   publish it on the Internet, that could have a very

14   deviant sexual purpose to it and intent.  So wouldn't

15   that in one context be not child pornography but in the

16   second context arguably is child pornography and the

17   question of -- and how does lasciviousness fit into

18   that?

19        MR. DONNELLY:  Judge, I think a hypothetical

20   like that is kind of difficult to answer without having

21   the full panoply of facts.

22        THE COURT:  I just gave you the facts.

23        MR. DONNELLY:  Right.  But what did the person

24   do with those pictures?

25        THE COURT:  Let's say he put them out on a

1    peer-to-peer exchange, you know, cute picture of

2    prepubescent girls in a bathtub for people who want

3    that kind of stuff.  We've all seen this stuff.

4         MR. DONNELLY:  I suppose, your Honor, I'm not

5    quite sure how to answer that question.  You know, I'm

6    not saying Mr. Mann is unreasonable in his complaints

7    here in the Court's querying, but I think with the Dost

8    factors and what light they shed on these various fact

9    patterns, I can only say that in the facts of this

10   particular case I don't think the Court is going to

11   have that problem.

12        THE COURT:  Reading Frabizio would suggest that

13   the intent of the producer, that is the person putting

14   it on the Internet, and the intent of the receiver, the

15   person downloading it, would seem to inform the

16   question of whether this meets the definition of

17   "lascivious," right?

18        MR. DONNELLY:  That's true.

19        THE COURT:  So that's a little hard to work

20   with.

21        MR. DONNELLY:  I agree.  These are tough cases,

22   Judge.  There's no doubt.  Like I said, I don't think

23   this one, although it depicts, as I said, not the most

24   offensive child pornography this Court will ever see, I

25   don't think this case is going to present that kind of

1    problem.

2            THE COURT:  All right.  Thank you.

3            Mr. Mann, I'm not unsympathetic to your

4    arguments.  I think there is vagueness that is inherent

5    in the statutory language, but I have to agree with

6    Mr. Donnelly that the holdings of the First Circuit in

7    <u>Frabizio</u>, while I don't think it was directly in front

8    of them, and that combined with the holdings of

9    <u>X-Citement Video</u> and the various circuit courts that

10   have confronted this question directly of whether this

11   is unconstitutionally vague all held that it's not, and

12   so I am going to deny the motion.  I think what the

13   case law teaches us is that we can work with this

14   statutory language informed by the case law, the <u>Dost</u>

15   factors and the other cases, pattern jury instructions,

16   such that the jury can make a common sense

17   determination of whether these movies meet the

18   statutory definition of "lascivious exhibition."  So

19   for that reason, I'm going to deny the motion.

20           Now, we can move on to your other motion.

21           MR. MANN:  Yes, your Honor.

22           Judge, I have a document I'm going to offer as

23   an exhibit to this motion.  It's part of the record.

24   It's the Government's response to the motion for a Bill

25   of Particulars.  It informs part of this argument.

1          THE COURT:  Fine.  All right.  Go ahead.  We'll

2      take that in as -- this is part of the record of the

3      case so --

4          MR. MANN:  Thank you.

5          THE COURT:  Go ahead.

6          MR. MANN:  I recognize, your Honor, as the

7      Government has argued, that generally speaking

8      challenges to the quality of evidence, the quantity of

9      evidence presented to a grand jury are not viewed

10     favorably.  I understand that's the law.

11         In this case, Judge, I originally filed a motion

12     challenging the evidentiary insufficiency of what was

13     presented to the grand jury.  I made as part of the

14     record the grand jury transcript, Judge.  I believe

15     that was introduced as an exhibit yesterday, Judge, and

16     I would just ask the Court to consider it as an exhibit

17     for this hearing.  Am I correct that we did introduce

18     that transcript yesterday?  I think we did, Judge.

19         THE COURT:  I think that was part of your

20     exhibits.

21         MR. MANN:  I assume the Court doesn't want

22     another copy for this motion.

23         THE COURT:  No.  Thank you.

24         MR. MANN:  So I think, Judge, the counts can be

25     divided into three categories, Judge, in this case.

1        If you look at, with respect to Counts I and II,

2    the grand jury saw what is described as seconds of the

3    video, Judge, okay?  So they saw something.  Apparently

4    very little, but they saw something.  I would argue

5    that at some point the evidence has to reach some level

6    before it constitutes evidence before the grand jury

7    and this was a very minimal showing, but I admit that

8    they saw some portions of those videos.

9        Now, with respect to Counts III through VI, the

10   argument becomes a little different.  The jury never

11   saw those videos at all.  With respect to those counts,

12   the grand jury heard a brief description of the videos

13   from the testifying agent, but they never actually

14   viewed those videos at all, Judge.

15       And what I argue is that -- and then with

16   respect to Count VII, there was no description of the

17   videos that are the basis of Count VII, nor did the

18   jury see those videos.  So that's the third category

19   with respect to the counts in terms of this motion.

20       I'll start with what I think is the Defendant's

21   easiest argument, which is Count VII.  Even conceding

22   the Government's points that you usually can't

23   challenge the quality or quantity of evidence presented

24   to a grand jury, there has to be, I would argue, some

25   evidence that is presented to the grand jury, Judge.

1    Unless the Fifth Amendment requirement that a person

2    shall not be held to answer for capital or otherwise

3    infamous crime unless on presentment or indictment of a

4    grand jury is meaningless, something has to go before

5    the grand jury on which they can base an indictment,

6    Judge.

7         And with respect to Count VII there is simply

8    nothing, I would argue, that went before this grand

9    jury upon which Count VII could be based.

10        In other words, if you look at the exhibit I

11   just submitted, and it's part of the record, the

12   Government's Answer to the Bill of the Particulars,

13   they list in Attachment 1 to the Answer of the Bill of

14   Particulars, the videos which are the basis for Count

15   VII.  If one reviews the grand jury testimony, there

16   was simply no reference to those videos in the grand

17   jury record either having been viewed by the grand jury

18   or having been described to by the grand jury.  There

19   is simply nothing with respect to Count VII, Judge.

20        And there is some case law that supports the

21   proposition that even if you can't challenge the

22   quality of the evidence and items like that, that the

23   Government still has to produce some evidence to

24   justify an indictment.  And they didn't for Count VII,

25   Judge.  And on that basis, I think the motion as to

1    Count VII should be granted.

2         The arguments with respect to Counts III through

3    VI and I and II, Judge, are a variation of the argument

4    with respect to Count VII.  They're basically an

5    argument that says it has to be more than de minimis

6    evidence, and what the grand jury had with respect to

7    Counts I through VI was de minimis evidence.

8         I argue in my memorandum, Judge, that the Fifth

9    Amendment has to have some substantive meaning.

10   There's some case law that supports the defense

11   argument, Judge.  And otherwise, I would rely on my

12   memorandum and incorporate both my original memoranda

13   and my supplemental memoranda.  Thank you.

14        THE COURT:  Mr. Donnelly.

15        MR. DONNELLY:  Yes, I think the Defendant's

16   motions are foreclosed by the Supreme Court's holdings

17   in Costello and Calandra.  I don't know if the Court

18   has any questions about that, but I think the issues --

19        THE COURT:  What about the Count VII issue?

20        MR. DONNELLY:  Count VII, Judge, I understand

21   what Mr. Mann is arguing, but this is why these

22   arguments are foreclosed.  The standard is probable

23   cause.  The grand jury can rely on direct evidence.

24   Mr. Mann I think is essentially advocating basically a

25   Rule 29 type of standard and that's just simply not the

1    case.  It is a probable cause standard.  The jury can

2    rely on rumor, innuendo, hearsay of all sorts in making

3    its decision.  Certainly the evidence that Inspector

4    Connelly when he testified would generate probable

5    cause as to Count VII where he testified at the grand

6    jury that they seized numerous of these types of the

7    same types of videos.  And the Court will see when

8    these videos are played, as Mr. Leo said yesterday, you

9    get bored watching them because they're the same type

10   of thing.  They're produced for people who like to

11   watch naked boys.

12        So I believe the totality of Inspector

13   Connelly's testimony along with the exhibits that were

14   introduced in light of the instructions that were given

15   to the grand jury more than would justify establishing

16   probable cause.

17        I want to say for the record I'm uncomfortable

18   even making that argument, your Honor, because it's an

19   argument a prosecutor outside of some outlandish

20   situation where the grand jury process is being

21   completely abused or somebody is being railroaded

22   through the grand jury, maybe a prosecutor has to come

23   and answer for what the grand jury did.  But under

24   Costello and Calandra I don't think we have to.  This

25   is a normal indictment issue in the normal course of

1    business, and Costello says that calls for a trial and

2    that's what we'll have.  Thank you.

3         THE COURT:  All right.  Thank you.

4         Okay.  Well, once again, I think the case law is

5    stacked very much against your arguments, Mr. Mann.

6    And while one might have a view that perhaps the

7    Government should produce more information to the grand

8    jury to support an indictment, that's a call that's

9    made by the prosecutor, not by the defendant or the

10   Court.  And I think the prosecutor has the discretion

11   to marshal the evidence that's going to be shown to the

12   grand jury or summarize for the grand jury in the way

13   that it believes efficiently utilizes the grand jury's

14   time subject to the probable cause standard.  And as

15   Mr. Donnelly has indicated, the Costello case seems to

16   foreclose the challenge that you've brought.  The Court

17   said, "An indictment returned by a legally constituted

18   and unbiased grand jury that's valid on its face is

19   enough to call for a trial of the charge on the merits

20   and the Fifth Amendment requires nothing more.  Other

21   courts have rejected similar challenges about the

22   sufficiency of the indictment where grand jurors viewed

23   only portions of the material alleged to constitute

24   child pornography.  The **United States versus Brose** in

25   the Western District of New York, again, a sampling of

1     some 1300 images.  **United States versus McLay** in the

2     District of Maine, similar challenge.  And it appears

3     from the grand jury transcript here that the grand

4     jurors did review snippets of these various films,

5     "Waterlogged" -- "FKK Waterlogged," "V█████ Remembered,

6     Volume I," and that they were provided with detailed

7     descriptions of all the additional films by the postal

8     inspector.  So I think that these cases, particularly

9     <u>Costello</u> combined with the evidence of what the grand

10    jury considered requires me to reject this challenge to

11    the indictment, so I'm going to deny the motion.

12         MR. MANN:  I understand the Court's ruling, but

13    I'm just concerned about one part of the Court's

14    ruling.

15         THE COURT:  Sure.

16         MR. MANN:  You said that the grand jury had been

17    provided -- a detailed description had been provided,

18    descriptions of all the films.  Just so the record is

19    clear, I thought I had made this clear, they were not

20    provided a description of the films that were the basis

21    of Count VII.

22         THE COURT:  Right.  And that then takes us back

23    to the Government's response on the Bill of

24    Particulars, right?

25         MR. MANN:  Right.  So my only point is that I

1   thought you had said they had been provided a

2   description of all the films.  I just wanted to make

3   the record clear that they had not been, and I thought

4   I made that clear both in my memo and I thought I made

5   it clear earlier.  I just want to point that out,

6   Judge.

7            THE COURT:  I think you're right.  It's not all

8   films.  I think it was a number of the films and the

9   Government --

10           MR. MANN:  None that were the basis of Count

11  VII.

12           THE COURT:  Well, the Government says in its

13  response to the Bill of Particulars that to prove Count

14  VII it will not rely on the images charged in Counts I

15  through VI of the indictment but will rely instead on

16  the items delineated on the attached charge.  Now,

17  you've submitted this charge, right?

18           MR. MANN:  Yes.

19           THE COURT:  So your point is as to Count VII,

20  the grand jury did not review snippets of those three

21  films that are referred to.  That's your point.

22           MR. MANN:  And that there was no description of

23  them.

24           THE COURT:  No description presented to the --

25           MR. MANN:  In other words, with respect to Count

1  VII, Judge, there simply was nothing before the grand

2  jury.  They didn't hear a description of those films;

3  they didn't see snippets of them.  I agree they had

4  descriptions with respect to Counts III through VI and

5  snippets of I and II, I think it was.  But on Count

6  VII, Judge, Mr. Donnelly provided an answer to the Bill

7  of Particulars.  It listed which films were the basis

8  for each count.  With respect to the ones for Count

9  VII, there's just no reference to it whatsoever.

10       THE COURT:  Well, correct me if I'm wrong, but

11  isn't the evidence that was before the grand jury that

12  these were all films that were procured from the same

13  producer, this Azov Films; is that right?

14       MR. MANN:  I think that's a fair, general

15  summary.

16       THE COURT:  All right.  So if the indictment

17  charges that the Defendant was in possession of these

18  films and these films were acquired from Azov Films,

19  then isn't that indictment given the same deference

20  that Costello requires?

21       MR. MANN:  And the reason I would say no is

22  this.  I think a fair reading of the grand jury

23  proceedings also indicates that they seized films that

24  the Government doesn't allege were child pornography.

25  At some point in some way the grand jury had to make a

1    decision about whether or not the films that are the

2    basis for Count VII were child pornography, and they

3    didn't know about those films.  They knew there were

4    films seized from Azov, some of which were described as

5    pornographic; some of which weren't, but there's no

6    reference whatsoever to the films that were the basis

7    for Count VII.  The argument as to Count VII is

8    demonstrably different than it is to Counts I through

9    VI.  Counts I through VI deal with de minimus evidence,

10   those sort of things.  Count VII says there's no

11   evidence, zero evidence before this grand jury as to

12   those films that are the basis for Count VII.  That's

13   why I think the argument is so compelling is that Count

14   VII -- and I apologize for standing up after your

15   decision, but the reason I did was because I thought

16   you had indicated they'd all been summarized for the

17   grand jury and the ones in Count VII clearly were not.

18        THE COURT:  If I said that, I didn't mean to

19   imply that those were -- and I should have listed the

20   ones that were summarized.

21        MR. MANN:  And that's my only point that I want

22   to make the record very clear and if the Court

23   reconsiders its decision based on that, fine; and if it

24   doesn't, I understand the Court's ruling but I just

25   wanted to make the record very clear as to what I think

1  it is.

2  THE COURT:  Right.  What do you say to that,

3  Mr. Donnelly?  I guess I'm not sure you really did

4  address that reality.

5  MR. DONNELLY:  I thought I did, your Honor.

6  One, as I cited in our initial memorandum, we just

7  shouldn't be here doing this.  In the **United States**

8  **versus Guerrier**, the First Circuit held when the same

9  types of claims were made there that we could do --

10  "Ultimately, we could do no better than repeat what the

11  Supreme Court said in a related context over 55 years

12  ago.  In the ordinary course of events, a technically

13  sufficient indictment," we have that here, nobody's

14  disputing that, "handed down by a duly impaneled grand

15  jury," we have that here, "is enough to call for a

16  trial of the charge on the merits."

17  And every time that defendants have raised

18  sufficiency arguments before the grand jury, they have

19  been rejected time and again particularly in this

20  Circuit.  I know of no instance in this Circuit where

21  such an argument as Mr. Mann has made has been allowed.

22  That's why I pointed out to the Court, however, if the

23  Court is concerned in any way, the fact that the

24  totality of the evidence here, given the standard that

25  is applied, probable cause, is more than enough to

1    generate probable cause for the grand jury to issue the

2    indictment.

3          THE COURT:  All right.  Okay.  Well, I think the

4    record has been made clear, Mr. Mann, and I think

5    ultimately I have to defer to the Costello case and the

6    progeny of Costello on this.  And so you've clarified

7    the record, and I stand corrected as to what I said,

8    but the motion to dismiss on that basis with respect to

9    Count VII is denied as well.

10         Okay.  I think that wraps it up.  Is there

11   anything else that we need to do today?

12         MR. DONNELLY:  Nothing from the Government, your

13   Honor.

14         MR. MANN:  Not for the defense.

15         THE COURT:  Let's go off the record.

16         (Discussion off the record.)

17         (Court concluded at 4:10 p.m.)

18

19

20

21

22

23

24

25

<u>C E R T I F I C A T I O N</u>

        I, Anne M. Clayton, RPR, certify that the
foregoing is a true and correct copy of the transcript
originally filed with the clerk on September 16, 2014,
and incorporating redactions of personal identifiers
requested by the following attorney of record:  Robert
B. Mann, in accordance with the Judicial Conference
policy.  Redacted characters appear as a black box in
the transcript.


                    /s/ Anne M. Clayton
        _____
                    Anne M. Clayton, RPR



                    October 16, 2014
        _____
                         Date