IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


```
* * * * * * * * * * * * *   CRIMINAL ACTION
UNITED STATES OF AMERICA  *   13-043S
                          *
VS.                       *   FEBRUARY 6, 2014
                          *
GERALD SILVA              *   PROVIDENCE, RI
* * * * * * * * * * * * *
```


HEARD BEFORE THE HONORABLE WILLIAM E. SMITH

CHIEF JUDGE

(Jury Trial)

**VOLUME I**

**REDACTED**


**APPEARANCES**:

FOR THE GOVERNMENT:          TERRENCE P. DONNELLY, AUSA
                             U.S. Attorney's Office
                             50 Kennedy Plaza
                             Providence, RI  02903

FOR THE DEFENDANT:           ROBERT B. MANN, ESQ.
                             Mann & Mitchell
                             One Turks Head Place
                             Suite 610
                             Providence, RI  02903


Court Reporter:              Anne M. Clayton, RPR
                             One Exchange Terrace
                             Providence, RI  02903


Proceeding reported and produced by computer-aided
stenography

I N D E X

GOVERNMENT WITNESS                                    PAGE

PAUL KRAWCZYK

    Direct Examination by Mr. Donnelly:           38
    Cross-Examination by Mr. Mann:                51
    Redirect Examination by Mr. Donnelly:         57
    Recross-Examination by Mr. Mann:              59

MATTHEW ROSS

    Direct Examination by Mr. Donnelly:           61
    Cross-Examination by Mr. Mann:                75

BRIAN BONE

    Direct Examination by Mr. Donnelly:           77
    Cross-Examination by Mr. Mann:                97
    Redirect Examination by Mr. Donnelly:        111

ELIAS PSYLLOS

    Direct Examination by Mr. Donnelly:          115
    Cross-Examination by Mr. Mann:               128
    Redirect Examination by Mr. Donnelly:        135
    Recross-Examination by Mr. Mann:             135

MICHAEL CONNELLY

    Direct Examination by Mr. Donnelly:          136
    Cross-Examination by Mr. Mann:               191

GOVERNMENT EXHIBITS

1-11        -                                     147
12          -                                      87
13 & 14     -                                     153
15          -                                     174
16          -                                     179
20          -                                     178
21          -                                      84
22          -                                     141
23          -                                      42
27          -                                     180
28          -                                      94
32          -                                     145
34          -                                     127
                  _____

1    6 FEBRUARY 2014 -- 9:10 A.M.

2         (Proceedings in the presence of the jury as

3    follows:)

4         THE COURT:  Good morning, ladies and gentlemen.

5    I want to welcome you back.  And we're going to begin

6    trial this morning, as you know, in the matter of the

7    United States versus Gerald Silva.

8         I wanted to just take a moment to both welcome

9    you and to tell you that yesterday I decided, as you

10   know, to cancel the trial for the day.  It's always a

11   difficult call to know whether to pull the plug on

12   something that's scheduled and we planned for, but in

13   speaking to folks here on site in the morning and the

14   Court Clerk, we were kind of monitoring the situation

15   with the roads inside of Providence.  It looked like

16   the highways were okay but inside of Providence even

17   late morning the roads were pretty tricky and so we

18   decided to call it so that we didn't have any issues

19   with you having to struggle to get in here, and I

20   certainly didn't want anybody falling and getting hurt

21   or anything like that.  So I think it turned out to be

22   the right decision.

23        I don't think there's anything to worry about in

24   terms of the timing of the trial.  I think we're going

25   to be on the course that I told you that we would be on

1    when we impaneled you, so I don't think there's any

2    difficulties there.

3         And from what I read this morning, the storm

4    that was predicted for Sunday to hit us on Monday seems

5    to be going in a different direction than they thought,

6    so I think that's good news, too.

7         So the first order of business, ladies and

8    gentlemen, is we need to get you sworn in as jurors in

9    this case.  So I'm going to ask all of you to stand up

10   and the clerk will administer the oath.

11        (Jurors sworn.)

12        THE COURT:  All right.  So ladies and gentlemen,

13   you've now been sworn in.  Let me just ask, I assume

14   that nobody has seen or read or done any research about

15   anything related to this case.  You followed my

16   instructions in that regard?

17        All right.  Now that you've been sworn, I'm

18   going to give you some instructions to guide you in the

19   performance of your duties as jurors in this case.

20        First and foremost, your job as jurors is to

21   determine what the facts of the case are, that is what

22   happened here.  And as you know from the explanation I

23   gave you at the beginning of the, or during the

24   impanelment process, you have an understanding of what

25   this case is about.  It's a seven-count indictment

1   against the Defendant charging him with six counts of

2   receipt of child pornography and one count of

3   possession of child pornography.  And the key issue

4   that you're going to have to decide as a factual matter

5   is whether the material that you're going to be shown

6   in the evidence that is presented in this trial meets

7   the legal definition of child pornography, that is,

8   lascivious exhibition.

9         That's the key question and so that's the job of

10  the jury to decide what the facts are.  You have to

11  decide that question.  Then, in order to do that, you

12  have to apply the law that I give you and as I explain

13  it to you.  Now, I've already done that in a little

14  more detail than in most cases in order to orient you

15  as to what your job as jurors in this case will be, and

16  I'll try to go through that again in a few minutes.

17        So you have to apply the law as I give it to

18  you; you have to decide what the facts are.  You have

19  to make your determination in this case in terms of

20  what the facts are from the evidence only and not from

21  anything else, not from anything you've heard or may

22  have seen or may have been exposed to outside the

23  courtroom, not from anything you believe in your past

24  experience.  You have to make it from the evidence

25  that's presented here in court and with the law that I

1    give to you.  That's what you have to do.

2           So the evidence that you're going to hear is

3    going to be composed of several things.  First, you're

4    going to hear testimony from witnesses who come to

5    court, testify under oath from the witness stand.

6    You're going to have various exhibits, photographs,

7    documents, other sorts of things, the films or videos

8    that are involved in the case; and you're going to have

9    things that we call stipulations, that is, agreements

10   by attorneys as to what a certain fact may be.  All

11   right?

12          There are certain things that are not evidence

13   and that must not be considered by you in determining

14   what the facts are.  First of all, statements,

15   arguments and questions by lawyers are not evidence.

16   Objections that lawyers make to questions are not

17   evidence.  Lawyers have an obligation, you should

18   understand this, they have an obligation to their

19   clients to make objections when they believe that

20   questions that are asked do not comply with the Federal

21   Rules of Evidence, that is the rules that we work by in

22   terms of what gets into evidence and what does not.

23          Now, you should not be influenced by the fact

24   that a lawyer objects to a question.  If I sustain the

25   objection, you should simply ignore it.  And if I

1    overrule the objection, you should treat the answer to

2    the question just like you would the answer to any

3    other question.  The point is that the objections

4    themselves are not evidence.  And just like statements

5    and arguments and other things said by lawyers are not

6    evidence, it's the answers to questions from witnesses,

7    that's what is the evidence.  It's what the witness

8    said.

9          Now, as I said, there's one exception to that

10   and that is what we call a stipulation, that is an

11   agreement by the attorneys that I've accepted as to

12   what a certain fact may be.

13         Now, testimony that I exclude from consideration

14   or I told you to disregard is not evidence and you must

15   not consider it.  Now and then a question gets asked,

16   there's an objection, I sustain the objection and

17   before I get all the words out of my mouth the witness

18   has said something.  So I might turn to you and say,

19   "Disregard what the witness has said."  All right?  You

20   may not consider that answer as evidence.  That is not

21   evidence.

22         And finally, anything that you may have seen or

23   heard outside of the courtroom from any source

24   whatsoever must be disregarded by you because it is not

25   evidence; and as I said, you're to decide this case

1      solely on the evidence that's presented here in court.

2            Now, there are two kinds of evidence that you

3      may consider.  There is what we call direct evidence,

4      and then there is circumstantial evidence.

5            Now, direct evidence is direct proof of a fact.

6      So for example, a document which is the document that

7      it purports to be or a photograph it purports to -- or

8      a thing, an item that is the thing that it's supposed

9      to be or the testimony of a witness who testifies

10     directly that he or she saw something or did something.

11     Okay?  That's direct evidence.

12           Circumstantial evidence is proof of a fact or a

13     series of facts from which you can infer that another

14     fact is true.  That may sound kind of complicated.

15     It's really not.  If you think about it, you go to bed

16     at night and everything is dry and you get up in the

17     morning, you look out the window and everything is

18     completely wet, sun is shining, the car is wet, the

19     grass is wet, the road is wet.  You can infer from what

20     you are personally observing that it rained overnight.

21     Now, you didn't see it rain so you don't have direct

22     evidence of that, but you have evidence of certain

23     facts from which you can infer another fact to be true.

24     That's what circumstantial evidence.  Certain facts

25     that you have direct evidence of from which you can

1     infer another fact to be true.

2           Now, it's up to you to decide whether to

3     conclude that a fact is true or not.  The law makes no

4     distinction in terms of direct evidence and

5     circumstantial evidence.  You may consider both in

6     determining what the facts of the case are and what

7     your verdict will be; and it's going to be up to you

8     decide which witnesses to believe, which witnesses not

9     to believe, how much of any witness's testimony to

10    accept or to reject.  As I said, you may consider both

11    kinds of evidence, direct and circumstantial.  And at

12    the end of the trial, I will give you some further

13    instructions to help you with your function of

14    determining the credibility of the witnesses, which is

15    one of the main functions of the jury.

16          Now, as you know, this is a criminal case, not a

17    civil case.  And as I said to you yesterday or the day

18    before yesterday when we were impaneling the jury,

19    there are certain rules that apply to criminal cases

20    that you absolutely must accept and that are the rules

21    that we live by in criminal cases.  And the first is

22    that a Defendant in a criminal case is presumed to be

23    innocent of the charges against him until he is proven

24    guilty.

25          The indictment against the Defendant, as I told

1    you at the beginning, is nothing more than an

2    accusation; it's nothing more than a formal document

3    that gets the process started and brings this case to

4    court to be resolved by you, the jury.  It is not

5    evidence of guilt.  It doesn't imply guilt.  You may

6    not infer guilt from it.  It's not evidence of

7    anything.

8         So you cannot consider the indictment for any

9    purpose other than understanding it to be the charge

10   that brings the Defendant to court.

11        So a defendant is presumed innocent and starts

12   out before you with a completely clean slate.  That's

13   the first rule.

14        The second rule is that the Government must

15   prove the Defendant's guilt by a standard that is known

16   as beyond a reasonable doubt.  Now, I will give you

17   some additional guidance on the term "reasonable doubt"

18   at the end of the trial, but you all know what doubt is

19   and you know what -- you're all reasonable people so

20   you have a fundamental, I think, understanding of that

21   term.

22        The key thing is that the burden of proof, that

23   is, to prove the Defendant guilty beyond a reasonable

24   doubt remains on the Government until the very end of

25   the case.  A defendant has no burden to prove his

1    innocence.  He has no burden to present any testimony

2    or any evidence of any kind.  He has no burden to

3    testify on his own behalf.  And since the defendant has

4    that constitutional right to remain silent, the law

5    prohibits you from considering a defendant's silence in

6    arriving at your verdict.

7         Now, as I said to you, I don't know if the

8    Defendant in this case is going to testify or not.  I

9    never know whether a defendant is going to testify or

10   not, but the point is that if the Defendant decides not

11   to testify, you may not interpret his silence or take

12   his silence and use it against him.

13        So the last rule, I've already stated it, is the

14   burden is beyond a reasonable doubt.  And as I told

15   you, I'll give you some further instructions on that at

16   the end of the trial.

17        Now, I don't want to go through all of the law

18   that I gave you when we were engaged in impanelment,

19   but I do want to just remind you -- I told you a

20   summary of what the seven charges are, six are receipt

21   and one of possession.  I'm just going to quickly

22   remind you of the elements of receipt of child

23   pornography.  One, that the Defendant knowingly

24   received a visual depiction by mail or interstate

25   commerce by any means, which could include a computer;

1   two, that the producing of the visual depiction

2   involved the use of a minor engaged in sexually

3   explicit conduct.  And that's the key term that you're

4   going to have to determine.  Three, that such visual

5   depiction is of such conduct; four, that the minor is a

6   real child under the age of 18; and five, that the

7   Defendant knew that at least one of the performers in

8   the visual depiction was a minor and knew that the

9   visual depiction of the minor was of a minor engaged in

10  sexually explicit conduct.

11          And then, with respect to Count VII, that is the

12  possession count, the elements are that the Defendant

13  knowingly possessed matter such as a computer file

14  which the Defendant knew contained a visual depiction

15  of a minor engaged in sexually explicit conduct; that

16  the Defendant knew that the -- this is the second

17  element, knew that the visual depiction contained in

18  the matter showed a minor engaged in sexually explicit

19  conduct; third, that the Defendant knew that the

20  production of the visual depiction involved the use of

21  a minor engaged in sexually explicit conduct; and

22  fourth, that the visual depiction had been mailed or

23  transported in interstate commerce or produced with

24  material that had been mailed or transported in

25  interstate commerce.

1          So as I told you two days ago, and as I've just

2     told you again, your job is going to be to determine

3     whether the material involved in this case involves a

4     photograph, film or video of sexually explicit conduct.

5     All right?

6          Sexually explicit conduct is defined by the

7     statute as having five potential characteristics.  I

8     told you that four of them have nothing to do with this

9     case.  I don't need to repeat what those are.  The

10    fifth one is the one that you need to be concerned

11    about and that is whether the material shows actual or

12    simulated lascivious exhibition of the genitals of any

13    person.  And I said to you, and I'll say to you again

14    so you can keep this in mind, that in considering that

15    question, lascivious exhibition, which is a question

16    for the jury, you may consider certain factors.  You're

17    not required to consider these factors but these are

18    the kinds of factors that you may consider in making

19    that determination.  One, whether the genitals are the

20    focal point of the image; two, whether the setting of

21    the image is sexually suggestive, for example, a

22    location generally associated with sexual activity;

23    three, whether the child is depicted in an unnatural

24    pose or inappropriate attire concerning the age of the

25    child; four, whether the child is fully or partially

1    clothed or nude; five, whether the image suggests

2    sexual coyness or a willingness to engage in sexual

3    activity; six, whether the image appears intended or

4    designed to elicit a sexual response in the viewer.

5          Now, I will give you those instructions again

6    and perhaps with a little more detail at the close of

7    the trial.  I want to tell you that you will have all

8    of my jury instructions that I give you at the close of

9    the trial with you in the jury room in written form so

10   you'll have all of that.  Don't have to worry about

11   taking all of those things down in your notes.  You'll

12   have all that in the jury room with you.  But at least

13   that should give you a framework within which to

14   consider the evidence that you're going to see during

15   the course of the trial.

16         Now, I want to remind you about a few words of

17   caution and instructions about your conduct as jurors.

18   I won't go into too much detail.  I already went

19   through all this with you the other day and you'll hear

20   me repeat it many times.  First, you're not to discuss

21   this case with anyone, family, friends, or even among

22   yourselves until the end of the trial when you return

23   to the jury room to deliberate on the case; second,

24   you're not to read or listen to or watch anything

25   related to this case of any kind; and third, you're not

1    to do any research of any kind, computers or any place

2    else, related to any issue that relates to this case in

3    any way; and finally, you're not to form any opinion on

4    the case until the very end.  You're to keep an open

5    mind until all of the evidence is in and you have

6    received my instructions and then you retire to the

7    jury room to deliberate on a verdict.

8        So now we're about to begin the trial.  Let me

9    just give you a couple of words about the order of a

10   trial.  First, the Government will make an opening

11   statement.  As I told you, statements by attorneys are

12   not evidence.  This is an outline of what the

13   Government expects to prove with the evidence that it

14   is going to present.  Then the Defendant through his

15   counsel, Mr. Mann, may make an opening statement if he

16   wishes to, but he's not required to.  The Defendant is

17   not required to do anything.

18       Once opening statements are completed, the

19   Government will call its witnesses, present its

20   evidence and then as each witness is presented, defense

21   counsel, Mr. Mann, will have an opportunity to

22   cross-examine the witnesses, and we'll proceed that way

23   until the close of evidence.  Then the Defendant may

24   present any evidence that he wishes to present.  As I

25   said, he's not required to prove anything or put any

1    evidence on.

2         Once all the evidence is on, the Government does

3    have an opportunity to put on rebuttal evidence if it

4    wishes to do so in response to what the Defendant has

5    presented.

6         Once all the evidence is in, then I will

7    instruct you on the law and then the attorneys will

8    make closing arguments to you about what they believe

9    the evidence has shown in light of the law as I've

10   instructed you.

11        All right?  So that's how the trial is going to

12   proceed.

13        So at this time, I'm going to ask Mr. Donnelly,

14   are you ready to proceed?

15        MR. MANN:  Could we approach just very briefly?

16        THE COURT:  Sure.

17        (Sidebar conference.)

18        MR. MANN:  I just want the record to reflect

19   that I understood the Judge's instructions particularly

20   with respect to "lascivious" to be preliminary

21   instructions, not the final and complete instruction

22   the Court would give.  And my not objecting to these

23   instructions doesn't mean that I wouldn't ask for more

24   when the Court gives final instructions.

25        THE COURT:  I thought I was clear about that.

1        MR. MANN:  I think you were, but I wanted to

2   make it abundantly clear on the record that I wasn't

3   waiving until -- I'm still waiting for the final

4   instructions and that these are just preliminary.

5        THE COURT:  Absolutely.  That's correct.

6        MR. MANN:  Thank you.

7        THE COURT:  Okay.  All set?

8        MR. MANN:  Thank you, yes.

9        THE COURT:  Are you giving an opening?

10        MR. MANN:  I am.

11        THE COURT:  Okay.  Good.

12        (End of sidebar conference.)

13        THE COURT:  All right.  Mr. Donnelly.

14        MR. DONNELLY:  Thank you, your Honor.

15        May it please the Court, ladies and gentlemen of

16   the jury, good morning.

17        In this case, the Defendant, Gerald Silva,

18   purchased dozens of DVDs containing illegal child

19   pornography.  These products were delivered to him from

20   Toronto, Canada using the United States mails and the

21   Defendant received them at his home in Coventry, Rhode

22   Island.  That's why you have before you the seven-count

23   indictment that is charged in this case.

24        As Judge Smith just indicated to you, this

25   indictment included six counts of receiving child

1    pornography and one count of possessing child

2    pornography.

3         You will hear evidence in this case,

4    particularly from Inspector Michael Connelly, who you

5    met yesterday, from the United States Postal Inspection

6    Service that dozens of DVDs were seized from the

7    Defendant's home pursuant to a search warrant issued by

8    this Court.

9         We're not presenting all of those before you but

10   a representative sample; and so for each of the counts,

11   there will be DVDs or DVD sets that are specified for

12   you to consider as the proof of those particular

13   counts.

14        As Judge Smith indicated, all of those counts of

15   child pornography receipt or possession are narrowed

16   down to allege that the images in those DVDs, in the

17   videos and in the package of still photographs that the

18   Defendant was in possession of and that he received at

19   his home, that parts of those show young boys exposing

20   their genitals in a lascivious way.

21        You will hear that at the time of these offenses

22   as I mentioned, ladies and gentlemen, that the

23   Defendant lived in Coventry, Rhode Island.  He lived by

24   himself.  He's single, living by himself at a

25   single-family house at ███████████████ in the Town of

1    Coventry.

2         At the time of the events that you'll hear

3    testified about in this case, the Defendant was

4    employed.  He was employed by the State of Rhode Island

5    as a state probation officer.  You may hear evidence

6    that he even ironically worked with those people who

7    had been convicted of sex offenses.

8         And through the Defendant's conduct, ladies and

9    gentlemen, you will get a glimpse inside the

10   international market in child pornography through one

11   of its customers, the Defendant, Gerald Silva.

12        You will hear evidence that the Defendant time

13   and again purchased DVDs from a Canadian website called

14   Azov Films, A-Z-O-V, azovfilms.com.  And as I

15   mentioned, those DVDs contained videos and photographs

16   containing countless scenes of young boys, mostly

17   prepubescent, almost always nude.  Well, is this lawful

18   or lascivious?  You're going to have to decide that at

19   the end of this case.  Is it mere nudity.

20        Well, by the end of this case, you'll have an

21   understanding about these videos.  There's no story.

22   There's no plot.  There's no script.  No family fun on

23   the beach, no family games of volleyball at the nudist

24   colony.  Just skinny Eastern European boys taking their

25   clothes off at private settings, playing for the

1   cameraman, lounging naked on beds, in saunas, sleeping

2   compartments on trains, taking showers together.

3   Lawful or lascivious?

4        Now, you're going to hear about how the

5   investigation in this particular case focused on the

6   Defendant.  And when Inspector Connelly and other law

7   enforcement agents went to his home and he confronted

8   him with the purchase of these DVDs, the Defendant told

9   them and admitted that he purchased all of these DVDs,

10  that he knew the Azov Films website was inappropriate

11  but that he was only doing research for a presentation

12  at work.

13       And you'll hear evidence in this case that will

14  help you consider the credibility of that assertion

15  about whether he was really doing a presentation for

16  work.

17       Now, as the Judge explained during jury

18  selection and as he just explained a few moments ago,

19  the burden of proof in this case rests with the

20  Government.  And in order to prove our case beyond a

21  reasonable doubt, we're going to have to show you some

22  of the evidence in this case.  We'll have to show you

23  portions of some of these videos.  We're going to try

24  and keep it to a minimum.  Nobody here is comfortable

25  with any of it.

1          So how did this case get started?  As we've

2     already mentioned, it began -- you heard me mention the

3     witnesses from Toronto, the Toronto Police Service.

4     This case originated with the main police department,

5     City of Toronto in Ontario, Canada, the Toronto Police

6     Service.  And you're going to hear from the supervising

7     case agent of the investigation as it began in Toronto.

8     His name is Detective Paul Krawczyk.

9          And Detective Krawczyk will tell you just in

10    general terms about the fact that he was conducting an

11    investigation into child exploitation and the

12    production and sale of these videos in Toronto and,

13    therefore, he sought and obtained a search warrant from

14    a Canadian judge in Toronto.  And he and other Toronto

15    Police Service officers then executed that search

16    warrant.

17         The date of it is kind of important in this

18    case, May 1st, 2011, that agents and went and executed

19    this search warrant at the business premises of Azov

20    Films.  Detective Krawczyk will tell you that the

21    actual business name of the company that existed was

22    4P5P.  So you'll hear that mentioned here, but they did

23    business on the Azov Films website; and for

24    convenience, I'll refer to it as Azov but you may see

25    the 4P5P designation, particularly on some of the

1    mailing materials.

2         One of the things that the Judge just explained

3    is we'll have to show that these images came either

4    through having an effect on interstate or foreign

5    commerce, we're going across international boundaries

6    in this case, or that they were delivered using the

7    mails.  We'll be proving both ways to you in this case

8    I submit, ladies and gentlemen.

9         Detective Krawczyk will tell you about the

10   execution of the search warrant at the Azov Films

11   business site, and he will describe to you and will

12   show you some photographs, just a few, of what he found

13   during the course of that search warrant.

14        But what you'll see is an entire production

15   facility whereby Azov Films received raw footage of

16   these boys in the scenes that they are involved in.

17   They loaded them onto a large computer that computer

18   guys call servers, and you'll hear about the computer

19   servers in this case; and that the digital footage of

20   these movies were all on these servers and that they

21   had set up an entire website, azovfilms.com, where

22   customers, kind of like going to Amazon or something

23   like that, you could go on, order a DVD, give them your

24   credit card and they would first burn the DVD, package

25   it in a colorful box and then ship it to the customer.

1    The way that things were shipped you'll hear from

2    Detective Krawczyk was that these DVDs were all for the

3    United States customers.  They have customers all over

4    the world, but for the United States customers, these

5    DVDs were put together in bulk and sent to a company in

6    North Tonawanda, New York, somewhere in upstate New

7    York, not far from Canada, a company known as a

8    reshipper.  And that company would then put the

9    individual DVDs in envelopes and put an address label

10   on them and put them into the United States mails.  And

11   that's how the Defendant in this particular case

12   received his DVDs.

13        And Detective Krawczyk will tell you that the

14   search warrant he was executing authorized them to

15   seize, amongst all the DVDs and everything else they

16   were seizing, authorized them to seize those large

17   computers, the servers that were operating the website

18   and contained many of the business records of Azov

19   Films.

20        He will tell you that he's not exactly a

21   computer expert but he had one with him, at least that

22   day.  His name is Matthew Ross.  Mr. Ross will be the

23   Government's second witness in this case.  Mr. Ross is

24   a bright young man, a computer forensics analyst with

25   the Toronto Police Service.  And in brief testimony

1    he'll tell you about what he did after seizing the Azov

2    Films server.  But he'll tell you that before seizing

3    it one of the first things he did was to disconnect the

4    Azov Films website from the Internet, and he did that,

5    again, on this date of May 1st, 2011.  I believe he

6    will testify that that was done in the evening hours.

7    And he will say that thereafter the website never went

8    up again and thereafter anybody trying to get onto the

9    Azov Films website would be greeted either through

10   their Internet Explorer or Google Chrome or whatever

11   web browser they were using, they'd be greeted with

12   some kind of error message, server not available, that

13   sort of thing.  You could not get back on the website

14   after May 1st, 2011.

15        He will tell you that he then -- we'll do this

16   briefly because as the judges, I don't think the

17   computer issues are really critical in this case, but

18   he'll explain how careful he was to make sure -- he's

19   going to testify that they don't work from the original

20   evidence in searching through these computers.  They

21   make what's called a forensic copy.  And a forensic

22   copy isn't like a Xerox copy that could look a little

23   different.  It's an exact bit-for-bit, down to the

24   tiniest piece of information on a computer, an exact

25   bit-for-bit copy.  And then the agents will work from

1   those copies knowing that they're exactly the same as

2   the computer that they're seizing, and then they can

3   work from them and not worry about messing up the

4   evidence, the original evidence.

5          And he'll tell you that he made several of these

6   forensic copies for other law enforcement agencies, one

7   of those being the United States Postal Inspection

8   Service.

9          And Mr. Ross will tell you that he passed on one

10  of these forensic copies of the Azov computers on to

11  the United States Postal Inspector Brian Bone.

12  Mr. Bone was the lead investigator on this particular

13  case for the United States part of it.  Mr. Silva was

14  not the only United States customer in this case.

15         And Mr. Bone will testify that it took some

16  time.  In fact, Inspector Connelly did not execute his

17  search warrant until a little over a year later,

18  September of 2012.  But after culling through the

19  evidence, Inspector Bone will tell you that after

20  sorting out United States customers, one of those

21  customers was a person by the name of Gerald Silva

22  living at ███████████████ in Coventry, Rhode Island.

23         Inspector Bone found the Azov Films invoices

24  that were created and are created each time a customer

25  makes a purchase.  And you'll see all of the invoices

1    in this case that relate to Mr. Silva.  It looked like

2    -- kind of like any other computer-generated invoice

3    when you do business online with a company, had the

4    Defendant's name, his address, states that he paid by

5    credit card and it lists the particular products he

6    purchased, videos called "FKK Waterlogged," "P███ &

7    C████'s Vacation," whatever the case may be, "V████'s

8    Cutting Room Floor."

9          Inspector Bone will tell you, as will Inspector

10   Connelly, that the records found of Mr. Silva's

11   purchases wasn't a one-time thing, wasn't a two-time

12   thing.  Twenty-two times he went to the Azov Films

13   website and purchased various DVDs, purchasing 75 items

14   over those 22 purchases.  He paid $1,589 over the

15   course from October of 2010 to April of 2011.

16         So Inspector Bone after culling out these

17   records passed them on to agents throughout the

18   country, including Inspector Connelly, who received the

19   evidence as to Defendant Gerald Silva.

20         Inspector Connelly, in turn, went to a judge in

21   this district to obtain and to ask for and he did

22   obtain a search warrant for the Defendant's home.

23         On September 27th, 2012, Inspector Connelly

24   along with other law enforcement agents went to the

25   Defendant's home and executed this search warrant.

1       And you'll hear about the Defendant's home.

2       Single-family home in Coventry I mentioned.  It's a

3       three-bedroom home.  The Defendant lives there alone.

4       Inspector Connelly will tell you about the general

5       condition of that house.  It was a mess, but they were

6       able to find the evidence they were looking for.  And

7       that one of the three bedrooms in the house was, for

8       lack of better term, a video room.  Large flat screen

9       TV with a DVD player or two and the strewn about the

10      room dozens of DVDs, dozens of movies.  Many of them

11      perfectly innocent movies, "Harry Potter," that sort of

12      thing.  But there were also dozens of the Azov Films

13      DVDs.  Some were unopened, hadn't been opened yet.

14      Those are not specifically before you for your

15      consideration in this case, but of the opened ones,

16      you'll have the DVDs that are charged in the indictment

17      in this particular case.

18          Inspector Connelly will also tell you that he

19      actually found several items of the mailing material

20      that hadn't been thrown away.  So you'll see those in

21      this case as well.

22          What about the videos?  I have to mention those

23      for a minute.  You'll get several of these, obviously,

24      as exhibits in this case, and they all follow a similar

25      pattern, ladies and gentlemen.  You're going to see if

1    you start and watch them from the beginning, they begin

2    with some text.  The text says:  "The United States

3    Supreme Court" -- I'm paraphrasing, I should add.

4    You'll see it for yourself.  "The United States Supreme

5    Court and the Canadian Supreme Court have found that

6    these materials do not violate any law," or words to

7    that effect.  And in this case, it will be your job to

8    determine whether that's a truthful statement or

9    self-serving nonsense.

10         After the usual DVD screen comes up where a

11   person can click on whether to play a movie, choose a

12   scene or whatever, if you click "Play Movie," another

13   piece of text comes on after that and you'll see a

14   beautiful beach and waves lopping on the beach.  No

15   real people around, or maybe somebody way in the

16   background.  And some more text coming down extolling

17   the virtues of nudism, particularly since the fall of

18   Communism.  And you may hear evidence in this case

19   about how these films were produced in Eastern Europe

20   and how beautiful nudism is and how particularly in its

21   European aspects.  You'll see this.

22         But after that there might be -- the movies

23   begin, and you may see a scene or two where the boys

24   involved if these movies are clothed in some way,

25   shorts, bathing suits, particularly if they're in

1   public they're usually clothed such as a big swimming

2   pool.  But after that the movies quickly transition

3   into private places, bedrooms as I mentioned, sleeping

4   compartments on trains, private pools, indoor pools,

5   private saunas.  And that's where you never see the

6   boys with clothes on.  And you'll have to decide,

7   lawful or lascivious?

8          As I mentioned, there won't be any plot; no

9   story for you to worry about following.  No script.  No

10  point to these movies except to show naked young boys

11  with their genitals in full view engaging in various

12  activities.  You won't see any moms; you won't see any

13  dads; you won't even see any girls in the naked parts

14  of these videos.  What you will see are scenes such as

15  one boy rubbing oil on the back of another boy.  Lawful

16  or lascivious?

17         You'll see boys -- you have to ask why they're

18  doing this, but you'll see boys with cupcakes naked,

19  putting cupcakes on basketballs and sitting on them,

20  their anal areas and genitals getting smeared with

21  cupcakes.  Lawful or lascivious?

22         You'll see boys, close-ups of boys lying down on

23  beds, legs spread, exposing their backside to the

24  camera, their genitals always.  Lawful or lascivious?

25  You decide.

1      Inspector Connelly will tell you that during the

2   course of executing the search warrant at the

3   Defendant's home, he asked to speak to the Defendant.

4   The Defendant was present at his home when Inspector

5   Connelly arrived and agreed to speak with him.  You'll

6   hear how Inspector Connelly first advised him of his

7   constitutional rights, the Miranda rights that you

8   probably heard of before.  And that during this

9   interview the Defendant admitted he did buy all these

10  videos.  It wasn't somebody else.  He lives alone.  He

11  used his own credit card.  He used his e-mail account,

12  his g-mail account to order these videos from Azov

13  Films.

14      And he'll tell -- Inspector Connelly will tell

15  you that during this interview the Defendant said the

16  website is inappropriate and the Defendant knew that

17  the boys in the films were being exploited, "But don't

18  get the wrong idea, Inspector Connelly, I was buying

19  these films because I had to do a presentation at

20  work."  And you'll hear evidence about whether that was

21  true.

22      And he told Inspector Connelly, in fact, "I had

23  even alerted a member of the Rhode Island State Police,

24  the head of the computer crime unit, Sergeant Ken Bell,

25  about this website.  I e-mailed."  And I expect you'll

1    have those e-mails to consider as well.

2          And in fact, he told Inspector Connelly that the

3    presentation he had been preparing, he had started to

4    prepare a PowerPoint presentation.  I expect you'll

5    have that before you as well.

6          But you'll have to ask yourself, too, when were

7    these things created?  You'll hear evidence that the

8    e-mail sent to Ken Bell was sent after the website was

9    shut down.  The PowerPoint presentations that were

10   found on his computer called "The Subtle Seduction of

11   Minors, With Special Emphasis on Males," again created

12   some two months after the Azov website was taken down.

13         You'll hear that from Postal Inspector --

14   another computer forensic analyst posted in New York

15   City.  His name is Elias Psyllos, a Greek name,

16   P-S-Y-L-L-O-S.  Mr. Psyllos will tell you about

17   something called the creation date on these files.  The

18   earliest of them was July of 2011.

19         That, ladies and gentlemen, in a nutshell is the

20   evidence that you'll hear in this case.

21         I make one request to you right now, and that's

22   that you pay close attention to the evidence in this

23   case.  It will serve you well later on.

24         At the end of this case, I expect I'm going to

25   have another opportunity to speak with you and at that

1       time I'll be asking you to find the Defendant guilty of

2       all of the offenses in the indictment.  Thank you.

3               THE COURT:  Thank you, Mr. Donnelly.

4               Mr. Mann, do you wish to make an opening

5       statement?

6               MR. MANN:  I do, please, your Honor.

7               THE COURT:  All right.  Now, before Mr. Mann

8       makes an opening statement, just a couple of things,

9       ladies and gentlemen.  One is I want to remind you

10      again that statements of attorneys are not evidence.

11              Secondly, I neglected to tell you anything about

12      your notebooks and note-taking.  We have provided you

13      with notebooks.  You're free to take notes or not take

14      notes as you wish.  Just keep in mind if you are a

15      note-taker that don't get so caught up in your

16      note-taking that you forget to listen to what the

17      witness is saying from the witness stand.  And keep in

18      mind during deliberations that notes are there to

19      assist you, but they are not definitive, but they're

20      definitely there to assist you.

21              And the last thing I want to tell you about

22      notes is we collect your notebooks at the end of the

23      day.  We hold them in a private, safe place.  Nobody

24      ever looks at your notes.  We don't review them, nobody

25      looks at them, the lawyers don't, I don't.  We lock

1    them up; we give them back and at the end of the trial

2    we destroy your notes.

3         And I also neglected to tell you about how we

4    take breaks.  We're going to take a break at 10:30, and

5    we'll take another one at noon, a lunch break, usually

6    goes to 1:30, and then we take an afternoon coffee

7    break at 3:00.  All right?  You can know that that will

8    be the case.

9         And finally, everything that's introduced as

10   evidence in this case will be with you in the jury

11   room, so you'll have an opportunity to -- you'll see

12   the evidence as it comes in, but you'll also have it

13   with you in the jury room to review as you need to.

14        Mr. Mann, you may proceed.

15        MR. MANN:  Thank you.

16        Good morning, ladies and gentlemen.  You all

17   know that I represent Mr. Silva.  My opening will be

18   somewhat briefer because this case is a little

19   different than some cases because the key evidence in

20   this case is the videos and the pictures, and you've

21   been told by the prosecutor and you've been told by the

22   Judge that you're ultimately going to have to make a

23   decision as to whether those videos constitute the

24   lascivious exhibition of genitals.  That's going to be

25   the key question in this case.

1          The Government is going to introduce those

2     videos as evidence, and I anticipate that they will

3     present snippets of those videos or parts of those

4     videos.

5          The defense evidence or a major part of the

6     defense evidence is those same videos because the

7     question is were those videos -- do those videos meet

8     the definition of child pornography, the lascivious

9     exhibition.

10          I anticipate that if the Government does not

11     play all of the videos, the defense will play much

12     longer portions if not the entirety of these videos.

13     That will take time, but it is our position that you

14     really have to view these videos in their entirety or

15     virtual entirety to get a full understanding of what

16     these videos really are about.

17          I say to you now that if you're upset by that or

18     if you're angry about that, be angry at me, but that's

19     not the issue before you, about whether or not it's

20     taking time to play these videos.  So most of the time

21     in the defense case will be spent showing these same

22     videos that the Government is going to introduce, and

23     then ultimately at the end of the case I'm going to

24     have the same opportunity or an opportunity to address

25     you again and to really ask you to address the

1    question, the same question Mr. Donnelly asked you, are

2    these videos lawful or not lawful based on the

3    instructions the Court is going to give you.

4         I will also tell you now that the other part of

5    the defense case, the other key part of the defense

6    case is that Mr. Silva will testify.  Mr. Silva will

7    tell you a little bit about his background.  I'm going

8    to touch on it very briefly because you'll hear about

9    it from him.  What you're going to learn is he's 59

10   years old.  As has already been mentioned, he's a

11   probation officer for the State of Rhode Island,

12   obviously suspended once this arrest took place, or

13   placed on administrative leave, something like that.

14   But he had been a probation officer for a number of

15   years.  And he'll basically tell you that for his life,

16   he has spent his life working with some of the most

17   difficult populations in this state.  He has functioned

18   in one way or another as a clinician, counselor, jobs

19   like that with a few different agencies for about 30

20   years, working sometimes with youths who have some of

21   the most difficult -- some of the youths with the most

22   difficult issues you can imagine.  Sometimes youths who

23   have been victims of sexual trauma.  Sometimes youths

24   who have their own issues.  And then he'll tell you

25   that for the last several years he's been a probation

1    officer working specifically with the sex offender

2    population.

3        You'll also learn that before he got into this

4    whole field he spent about ten years while he was doing

5    other jobs and going to school, committed a lot of his

6    time to the Boy Scouts where he was at the age of 18 an

7    assistant scout master and moved on in those ranks.

8        He will also tell you, unquestionably, that

9    there's no secret about these videos.  He ordered them.

10   He ordered them using his own name.  He'll tell you

11   that.  He ordered them using his own address.  He

12   ordered them using his own credit card, that everything

13   -- it was no different -- I think there was an allusion

14   to ordering it like ordering from Amazon.  He'll agree

15   that it was like ordering from any other website and

16   nothing was concealed at all.

17       He'll tell you that not only did he order all

18   these videos but once he got done ordering them he kept

19   them in his house.  He didn't try and throw them out.

20   He didn't try to conceal them or anything.

21       And he'll tell you that, obviously, he knew in

22   this field -- he was aware that you couldn't possess

23   child pornography.  He'll also tell you he's a

24   naturalist or naturist or a nudist.  He'll tell you

25   that that's a part of his lifestyle.  And he'll tell

1    you that that has been a part of his lifestyle for a

2    period of time.  He'll tell you he has property in

3    another state where he has a trailer and he attends a

4    nature camp there.

5         And he'll also tell you that he bought other

6    films.  I think there's been reference to that, too,

7    not just from Azov, but from other places, and

8    sometimes films but from other places, and sometimes

9    films from Azov that weren't necessarily produced from

10   Azov.

11        You'll hear from him directly about what he was

12   doing, and he'll talk about the presentation that was

13   briefly referenced, the PowerPoint representation.

14   He'll talk to you about how he came to work on that.

15   I'm not going to go into it in detail now because I

16   think the Government is going to introduce it.  If they

17   don't, we will; and he'll explain that then.

18        But in the end, he'll tell you that he always

19   used his own name for everything.  He always did this

20   completely above board.

21        And then finally, of course, I'm going to

22   conclude with asking you to look at these videos

23   because the key question in this case has already been

24   defined for you by everybody.  You're going to have to

25   decide at the end of this case looking at these videos

1    as a whole whether they meet the Court's definition of

2    what constitutes lascivious exhibition of genitals.

3         Thank you.

4         THE COURT:  All right.  Thank you, Mr. Mann.

5         Is the Government ready to call its first

6    witness?

7         MR. DONNELLY:  We are, your Honor.  Paul

8    Krawczyk.

9              **PAUL KRAWCZYK, GOVERNMENT WITNESS, SWORN**

10        THE CLERK:  Please state your name and spell

11   your last name for the record.

12        THE WITNESS:  Paul Krawczyk, K-R-A-W-C-Z-Y-K.

13        THE COURT:  Good morning, Mr. Krawczyk.

14        THE WITNESS:  Good morning.

15        THE COURT:  You may inquire, Mr. Donnelly.

16        MR. DONNELLY:  Thank you, your Honor.

17             **DIRECT EXAMINATION BY MR. DONNELLY**

18   **Q.**   Good morning, Detective.  You're employed?

19   **A.**   Yes, I am.

20   **Q.**   Would you please tell the ladies and gentlemen of

21   the jury how you're employed.

22   **A.**   I'm employed as a detective with the Toronto

23   Police Service in Toronto, Canada.  I've been so

24   employed since August of 1996.

25   **Q.**   What is your present rank and what are your

1    duties, sir?

2    **A.**    I'm a detective, a supervisor in the child

3    exploitation section of the Sex Crimes Unit in the

4    Toronto Police.

5    **Q.**    Now, Detective Krawczyk, your name is spelled a

6    little differently than it sounds; is that right?

7    **A.**    That's correct.

8    **Q.**    We're using the old Polish pronunciation?

9    **A.**    That's correct.

10    **Q.**    All right.  Detective Krawczyk, I'd like to direct

11    your attention, if I could, to a company called 4P5P.

12    Are you familiar with that company?

13    **A.**    Yes, I am.

14    **Q.**    When did you start to become familiar with that

15    company?

16    **A.**    I became familiar with that company in about

17    October of 2010.

18    **Q.**    What is that company or what was it?

19    **A.**    That company was a parent company for a few

20    websites, one of which was a website called Azov Films,

21    A-Z-O-V F-I-L-M-S dot com.

22    **Q.**    And was that website, I'll refer to it as Azov

23    Films here on out, was that conducting some kind of

24    business?

25    **A.**    Yes.  It was a website which allowed people to

1    purchase DVDs or picture DVDs or movie DVDs and either

2    digitally download those videos or pictures or have

3    them sent through the mail.

4    **Q.**    And at some point, did you begin investigating

5    whether the business of this website and 4P5P were

6    violating the laws of Canada?

7    **A.**    Yes.  Right around October of 2010.

8    **Q.**    Did you go to the website as part of your

9    investigation?

10   **A.**    We did.

11   **Q.**    And what kinds of things did you see that the

12   company was selling?

13   **A.**    Like I said, the company was selling it appeared

14   to be DVDs either by digital download or through the

15   mail, and these DVDs were of young boys.

16   **Q.**    Now, you -- would it be fair to just summarize

17   that different investigators, including American

18   investigators, made undercover purchases of some of the

19   video products of this company; is that correct?

20   **A.**    That is correct.

21   **Q.**    And based on those purchases, as well as the other

22   evidence that you gathered, did you seek to obtain a

23   search warrant for the Azov Films business premises?

24   **A.**    Yes, we did.

25   **Q.**    Were you successful in obtaining that search

1    warrant?

2    **A.**    Yes.

3    **Q.**    And did you execute the search warrant?

4    **A.**    Yes.

5    **Q.**    Were you part of the execution team?

6    **A.**    I was.

7    **Q.**    Okay.  There were many police officers who

8    participated with you on this day; is that right?

9    **A.**    Correct.

10   **Q.**    Do you remember the date that you executed the

11   search warrant in Toronto?

12   **A.**    Yes.  It was Sunday, May 1st, 2011.

13   **Q.**    And where in Toronto was this --

14   **A.**    Toronto geographically is a fairly large city.

15   This was towards the west end of the city.

16   **Q.**    What was the address?

17   **A.**    The address was 523 The Queen's Way.

18   **Q.**    And the particular premises, was it a series of

19   buildings, one building?

20   **A.**    It was one building on a corner and it was a

21   pretty nondescript building, sort of gray, and it had

22   different offices or warehouses within that building.

23            MR. DONNELLY:  May I have a moment, please, your

24   Honor?

25            THE COURT:  Yes.

1              (Pause.)

2              MR. DONNELLY:  Your Honor, I have a series of

3      photographs taken during the execution of the search

4      warrant at Azov Films.  It's Government's Exhibit 23.

5      I believe there's no objection from Mr. Mann to those

6      being marked full.

7              THE COURT:  The packet?

8              MR. DONNELLY:  Yes, your Honor.

9              THE COURT:  All right.  Is that correct,

10     Mr. Mann?

11             MR. MANN:  Could I just speak to Mr. Donnelly

12     for one second?

13             THE COURT:  Yes.

14             (Pause.)

15             MR. MANN:  There's no objection to these

16     photographs, Judge.

17             THE COURT:  Mr. Donnelly, you're just going to

18     introduce these as a single exhibit, a packet and not

19     separately number them; is that correct?

20             MR. DONNELLY:  That's correct.

21             THE COURT:  The group of photos will be full.

22     This is Exhibit 23.

23             (Government Exhibit 23 admitted in full.)

24             MR. DONNELLY:  With the Clerk's assistance and

25     Ms. Anderson's, if we could go to page one of

1    Government Exhibit 23.

2         Is that being displayed to the jury?

3    **Q.**   Okay.  Do you recognize what's in page one of

4    Government Exhibit 23, Detective?

5    **A.**   Yes.  I recognize that to be the building at 523

6    The Queen's Way in Toronto.

7    **Q.**   Were there other businesses in this building

8    besides Azov Films?

9    **A.**   There were.

10   **Q.**   And how do you access Azov Films?

11        THE COURT:  Just one minute.

12        Just proceed.  We'll get this looked at at the

13   break.  Go ahead.

14   **Q.**   And would one go along the right-hand side here to

15   get to the back where you access the business?

16   **A.**   Correct.

17   **Q.**   And if we go to page two, the next photograph, is

18   this the back of the building here?

19   **A.**   Correct.  And the main garage door that entered

20   the warehouse is where that -- that's a police truck

21   that's parked there, backed in.  That's how you would

22   enter Azov Films.

23   **Q.**   Right there you're referring to?  (Indicating.)

24   **A.**   Correct.

25        MR. DONNELLY:  Now, if we go to the next

1    photograph, please, Ms. Anderson.

2    **Q.**   This is without the police truck at the garage

3    door?

4    **A.**   Correct.  That's the main garage entrance, which

5    was used as the main entrance.  In fact, that door to

6    the left, which is a mirrored door, is an entrance but

7    was never used.

8    **Q.**   Now during the course of the search warrant

9    execution, you found all manner of packing materials;

10   is that fair to say?

11   **A.**   Correct.

12   **Q.**   And do we see some of those there through the

13   garage door?

14   **A.**   Yes.  Those white bins just at the front there,

15   they're United States Postal bins and lots of packing

16   material, boxes folded up there.

17         MR. DONNELLY:  Go to the next photograph,

18   please, Ms. Anderson.

19   **Q.**   Do you recognize what's depicted in this

20   photograph?

21   **A.**   I do.  That's the room they used as the server

22   room where the computers were housed that ran the

23   website, amongst other things.

24   **Q.**   So we're just looking at a portion of the servers

25   there, but this is through the door that you'd access.

1      MR. DONNELLY:  The next photo, please.

2  Q.   Are we looking at the same black box we were just

3  looking at?

4  A.   Correct.  Just from a different angle.

5  Q.   These are cabinets that -- what's in the cabinets?

6  A.   They are computers and servers as well as backup

7  tapes to help run the website, among other things.

8  Q.   On the left-hand side of the cabinet, does

9  there appear to be some white-ish or plastic boxes.

10  Are those the backup tapes?

11  A.   Those would be the backup tapes, correct.

12      MR. DONNELLY:  Next photograph, please.

13  Q.   And what are we looking at here, Detective?

14  A.   Those are the servers or computers used.  My

15  understanding is the one on the left was the one that

16  ran Azov Films.

17  Q.   The search warrant that you had, did it authorize

18  you to seize computers as well as other evidence?

19  A.   It did.

20  Q.   And these were seized?

21  A.   They were.

22  Q.   And were you being assisted by somebody with

23  specialized computer knowledge, law enforcement agents

24  with specialized computer knowledge at the scene of

25  this search?

1   **A.**   We were.

2   **Q.**   And one of your colleagues, I assume?

3   **A.**   Correct.

4   **Q.**   More of your colleagues but --

5   **A.**   Several.

6   **Q.**   One is here today; is that right?

7   **A.**   That's correct.

8   **Q.**   Who is that?

9   **A.**   That's Detective Constable Matthew Ross.

10  **Q.**   And he's a computer forensic analyst for the

11  Toronto Police Service?

12  **A.**   He's a computer forensic examiner, correct.

13  **Q.**   Okay.  And was it his particular responsibility to

14  take care of these servers, to seize them properly?

15  **A.**   Yes.  They have lots of training and know how to

16  properly dismantle things such as this.

17       MR. DONNELLY:  Could we go to the next

18  photograph, please.

19  **Q.**   Do you know what we're looking at here?

20  **A.**   I believe that's the fiber internet that came into

21  sort of a modem.

22       MR. DONNELLY:  One moment, please.

23       (Pause.)

24       MR. DONNELLY:  Next photograph, please.

25  **Q.**   What are we looking at here, Detective Krawczyk?

1    **A.**    This was another room located within the

2    warehouse, and this was what we called the sound room,

3    the editing room.  And if you can see on the back, the

4    whole room was covered with this kind of eggshell foam,

5    which my understanding helps with sound to deaden the

6    sound.  And this is where most of the videos, the raw

7    footage was put together and then made into a final

8    product.

9    **Q.**    So the raw footage, what are you talking about,

10   raw footage?

11   **A.**    There was the cameraman in Eastern Europe would

12   produce --

13        MR. MANN:  I'm going to object to this.

14        THE COURT:  Sustained.

15   **Q.**    But did you find physically raw footage at the

16   scene when you were there that day?

17   **A.**    We did.

18        MR. DONNELLY:  Next photograph, please.

19   **Q.**    What are we looking at here, Detective?

20   **A.**    This would be the system that would basically

21   print out the CDs or DVDs.  So if they wanted to create

22   a DVD for one of the movies, they had an order for it,

23   this basically would do it all and spit out a printed

24   out CD or DVD.

25   **Q.**    And looking at the next photograph, did you find

1    stacks of --

2    **A.**   Correct.

3    **Q.**   -- freshly minted DVDs?

4    **A.**   Yes.  Numerous DVDs that appear to have been

5    recently printed but not yet packaged.

6         MR. DONNELLY:  Could we go to the next

7    photograph.

8    **Q.**   What are we looking at here?

9    **A.**   This is sort of an overview of the main part of

10   the warehouse.  And these were plastic shelving units.

11   It's a little hard to see from far away, but you can

12   see stacks of DVD cases and then further toward the

13   back you can see stacks of just the white envelope-type

14   covers for the DVDs.  And beside or in front of that on

15   each of the plastic shelves there was a number and that

16   number corresponded to the product number from the

17   website.  So every DVD had a name associated to it that

18   had been purchased but I guess for the business

19   purposes there was also a product number and that was

20   what corresponded right in front of those DVD stacks.

21   **Q.**   Where was this company doing business?

22        MR. MANN:  Objection.

23        THE COURT:  Sustained.  Foundation.

24        MR. DONNELLY:  Just use one word, your Honor,

25   the commerce element.

1    THE COURT:  Foundation.

2    Q.   Do you know where this Azov Films was doing

3    business?  In other words, where they were selling

4    these DVDs?

5    A.   Our investigation showed that they were selling

6    DVDs to over 90 countries.

7    Q.   Including the United States?

8    A.   Correct.

9    Q.   Now, have you actually viewed some of the videos?

10   You're familiar with the videos that are charged in

11   this particular case; is that right?

12   A.   Correct.

13   Q.   Have you viewed those in the past?

14   A.   I viewed some of the videos.  I can't say for

15   certain whether I viewed the exact ones that are in

16   this case.

17   Q.   Would it be fair to say that the videos that

18   you've seen -- when I said videos, Azov Films-produced

19   videos, that they contain some textual material at the

20   beginning of the video?

21   A.   By that do you mean like --

22   Q.   Words.

23   A.   Yes.  Correct.

24   Q.   What is it that you see on each of these videos?

25   A.   I can't say for certain what's at the beginning.

1    It's been a while since I've looked at one so I

2    wouldn't want to guess, but --

3    Q.   Do you recall whether or not there was language to

4    the effect that the United States Supreme Court and the

5    Canadian Supreme Court have found nothing illegal with

6    the content of the videos?

7    A.   I remember there being words to the effect of it

8    not being illegal.  I just don't remember the exact

9    wording.

10   Q.   Do you remember the Canadian Supreme Court being

11   mentioned?

12   A.   I do not.

13   Q.   Do you know of any Canadian Supreme Court decision

14   that has ruled on the legality of the videos that you

15   seized on May 1st, 2011?

16   A.   There has not been to my knowledge.

17        MR. DONNELLY:  If we could go to the next

18   photograph, please.

19   Q.   Is this just a close-up of one of the shelves?

20   A.   Correct.

21   Q.   And the numbers underneath the DVDs that we see

22   here, are those the -- what are they called, product --

23   A.   I call them product identification numbers, yes.

24   Q.   And each number goes with a particular DVD or DVD

25   set?

1 **A.** Correct.  So for instance, at the front you can

2 see 90237.  The five DVD cases that are stacked there

3 would be identical.

4   MR. DONNELLY:  Could I have one moment, please?

5   THE COURT:  Yes.

6   (Pause.)

7   MR. DONNELLY:  No further questions.

8   THE COURT:  Thank you, Mr. Donnelly.

9   Mr. Mann.

10    <u>CROSS-EXAMINATION BY MR. MANN</u>

11 **Q.** Good morning, sir.

12 **A.** Good morning.

13 **Q.** You were just talking about a picture of a

14 warehouse that showed various videos stacked, right?

15 **A.** Correct.

16 **Q.** And at the time that you executed the warrant in

17 May of, what was it, 2011, I think?

18 **A.** Yes, it was.

19 **Q.** Do you know how many customers Azov had at that

20 point?

21 **A.** Wow.  Well, it would have been in the tens of

22 thousands, if not more.  I mean, there were numerous,

23 numerous customers.

24 **Q.** And you said that Azov had a -- we're referring to

25 Azov.  That's how we're all talking about it; is that

1  right?

2  **A.**   Correct.

3  **Q.**   It was owned by a parent company, apparently?

4  **A.**   Correct.

5  **Q.**   But Azov had a website, right?

6  **A.**   They did.

7  **Q.**   And the website used the term "Azov," not the name

8  of the parent company, right?

9  **A.**   Azovfilms.com, correct.

10  **Q.**   And I don't know whether you or -- let me ask you.

11  The website function -- did the website function like

12  any other website where you try and buy something?

13  **A.**   I mean, you could peruse what you were going to

14  buy and then if you chose you would select "purchase"

15  and then it would lead you to make a purchase.

16  **Q.**   Same as buying off Amazon or something like that?

17  **A.**   It would be similar, but I can't say it was exact.

18  **Q.**   Similar process, right?

19  **A.**   I would imagine it would be similar, but I didn't

20  make any purchases on the website.

21  **Q.**   Okay.  And the website had been up for a while,

22  hadn't it, sir?

23  **A.**   Yes.

24  **Q.**   Four years or so?

25  **A.**   Roughly from about 2005, we believe.

1    **Q.**    So maybe six years or so?

2    **A.**    Correct.

3    **Q.**    And do you know in the year 2009 about how many

4    visitors there were to that website?

5    **A.**    I'm not sure.

6    **Q.**    Have you seen any figures about that?

7    **A.**    I have not.

8    **Q.**    And I take it then that you don't know how many

9    visitors there were to the website in 2010 either?

10   **A.**    No, I'm sorry, I do not.

11   **Q.**    But you said that -- well, let me ask you.  Did

12   you ever seek to find out how many visitors there were

13   to the website?

14   **A.**    Me personally, I have not.

15   **Q.**    You said "me personally."  That implies someone

16   else did.

17   **A.**    No.  I don't know.  But I'm just saying myself in

18   this investigation, I have not asked how many visitors

19   there were to the website.

20   **Q.**    Have you read any articles that have identified

21   how many visitors there were to the website?

22   **A.**    I don't remember there being an article that I

23   read, no.

24   **Q.**    Did you read any of the articles about the

25   execution of the warrant in Toronto?

1    **A.**    Sorry.  By "articles" you mean --

2    **Q.**    Newspaper articles.

3    **A.**    Newspaper articles?  I mean, I've read some, yes.

4    **Q.**    You don't remember one that talked about the

5    number of visitors to the website?

6    **A.**    No, I don't.

7    **Q.**    Now, the website -- I think you said that the

8    website sold DVDs of some involving boys.  Did the

9    website sell all kinds of videos?

10   **A.**    To my knowledge, all the videos focused on young

11   boys.

12   **Q.**    Were any of them naturist videos?

13   **A.**    By naturist --

14   **Q.**    Nudism naturist videos.

15   **A.**    The videos -- there were so many videos that I

16   can't speak for them all, I haven't viewed them all but

17   I can say that numerous of the videos were what I

18   believe to be exploitive in nature.

19   **Q.**    But you don't know whether or not that website

20   also made available videos that would traditionally be

21   called naturist or nudism?

22   **A.**    They would have had numerous videos.  Some of them

23   I believe were -- even they were offering

24   Hollywood-produced videos, but several we believed to

25   be consistent with the Canadian Criminal Code

1    definition of child pornography.

2            MR. MANN:  I move that the last comment be

3    stricken.

4            THE COURT:  Well, I'm not going to strike the

5    comment, but I will instruct the jury that what's

6    before you is not the Canadian Code definition of child

7    pornography and -- let me take that back.

8            Disregard the witness's last answer.  It's not

9    relevant to the consideration of what you have before

10   you.

11           Go ahead.

12   Q.   You just mentioned that you could -- you thought

13   you could buy commercial videos through the website.

14   A.   He offered videos that were available elsewhere as

15   well.  Yeah.  There was numerous videos that were

16   offered.

17           MR. MANN:  Could I have just a moment, please.

18           THE COURT:  Sure.

19           (Pause.)

20   Q.   Do you have any idea of how many visitors there

21   were to the website in 2009 or 2010?

22   A.   No, I do not.

23   Q.   Not at all?

24   A.   No.  I wouldn't want to guess.

25   Q.   I'm going to show you an article and see if you've

1        read this article, sir.

2              MR. MANN:  Never mind.  I'll back off.

3    **Q.**    You said that they sold, that they had customers

4    that numbered probably tens of thousands, right?

5    **A.**    If not hundreds of thousands.  I don't have the

6    exact numbers.

7    **Q.**    Did you ever seek to determine the number?

8    **A.**    I may have known the number at some point.  I

9    don't recall it at this time.

10   **Q.**    You think you might have known the number at some

11   point of visitors to the website?

12   **A.**    I don't know.  I don't recall having the number

13   but, you know, I do -- I'm familiar with some of the

14   leads we sent out, numbers that way; but in terms of

15   numbers of people who purchased ever, I wouldn't know.

16   **Q.**    I want to show you a document and ask you if that

17   refreshes your recollection, if that's all right, sir.

18   **A.**    Sure.

19             MR. MANN:  I don't know if the Court wants this

20   marked for identification or not.  I want to show it to

21   him.

22             THE COURT:  I think you may just show it to him,

23   the document, and ask him if it refreshes his

24   recollection.

25             If you can tell me what the document is.

1    MR. MANN:  It's C in your book.

2    THE COURT:  All right.

3 Q.  Please do not read this out loud.  I'll simply ask

4 you to look at one section of this document, see if

5 this refreshes your recollection, sir.

6    Page four.

7    Does that refresh your recollection at all, sir?

8 A.  It's not -- I don't know those numbers.

9    MR. MANN:  Thank you, sir.

10    I have nothing further, your Honor.  Thank you.

11    THE COURT:  All right.  Thank you.

12    Mr. Donnelly, do you have any redirect?

13    MR. DONNELLY:  Just a couple.

14    **REDIRECT EXAMINATION BY MR. DONNELLY**

15 Q.  Detective Krawczyk, on cross-examination Mr. Mann

16 asked you, I think, a question to the effect of was the

17 website operating like a normal website like Amazon.

18 Do you recall that question?

19 A.  I do.

20 Q.  Were there aspects of the operation of this

21 website that were abnormal and unlike Amazon?

22 A.  Yes.  The content that was offered through the

23 website.

24 Q.  Was there any, to your knowledge, was there any

25 effort made by the website to block visitors, certain

1    visitors from purchasing or going to that website?

2    **A.**    Yes, there were.

3    **Q.**    What was that?

4    **A.**    The operator of the website blocked out blocks of

5    Internet protocol addresses or IP addresses.  IP

6    addresses are displayed -- when you go on a computer,

7    your IP address is displayed to websites and that's

8    provided by your Internet service provider.  IP

9    addresses for certain countries were blocked.  IP

10   addresses for Government or law enforcement agencies

11   were blocked.  For instance, the Toronto Police

12   Service's IPs.  So if someone from one of those

13   computers at those locations attempted to visit the

14   website, they wouldn't get a result.  It would not show

15   up.

16   **Q.**    Do you know if Amazon operates in that way?

17   **A.**    I don't believe they do.

18   **Q.**    Were there any other aspects, any other efforts

19   made by the website to filter out users?

20   **A.**    They were -- I know in certain cases when people

21   would purchase, there was efforts by the operator to

22   even do some open source checks online with the names

23   and addresses given, et cetera, and sometimes customers

24   were denied that way.  So they were very careful.

25         MR. DONNELLY:  Thank you.

1      THE COURT:  Thank you, Mr. Donnelly.

2      Recross.

3      **RECROSS-EXAMINATION BY MR. MANN**

4   **Q.**   If a customer were not blocked, in other words not

5   one of the blocked IP addresses, and they went on the

6   site and they bought stuff, whatever they bought, they

7   would not know what you just described to Mr. Donnelly,

8   there would be no way they could know that some IP

9   addresses like law enforcement were being blocked?

10  **A.**   I would think they would not know.

11  **Q.**   That they would not know?

12  **A.**   Right.  Correct.

13     MR. MANN:  Thank you, sir.

14     THE COURT:  All right.  Thank you, Detective

15  Krawczyk.  You may step down.

16     THE WITNESS:  Thank you very much.

17     THE COURT:  Thank you very much.

18     Ladies and gentlemen, I just want to pause one

19  moment before we put the next witness on the stand to

20  see if your snacks are here yet.  Charlie will be

21  reappearing in just a minute.

22     So ladies and gentlemen, we'll take our break

23  now, and you'll have the snacks momentarily in the jury

24  room with you.  Charlie will, hopefully, come back

25  through that door in just a minute and he'll escort you

1      into the jury room.

2              I just want to remind you of my instructions not

3      to have a discussion about the case among yourselves

4      during this break or at any other time.  So please keep

5      that instruction in mind.  So as soon as we can find

6      Charlie, you'll go to the jury room.

7              Okay, ladies and gentlemen, you may proceed to

8      the jury room.

9              (Proceedings out of the presence of the jury as

10     follows:)

11             THE COURT:  We'll take about 10, 15 minutes.

12     Okay?

13             ( Recess.)

14             (Proceedings in the presence of the jury as

15     follows:)

16             THE COURT:  Welcome back, ladies and gentlemen.

17             Mr. Donnelly, call your next witness.

18             MR. DONNELLY:  Thank you, your Honor.

19             The United States calls Matthew Ross.

20             **MATTHEW ROSS, GOVERNMENT WITNESS, SWORN**

21             THE CLERK:  Please state your name and spell

22     your last name for the record.

23             THE WITNESS:  Matthew Ross, R-O-S-S.

24             THE COURT:  Good morning, Mr. Ross.

25             THE WITNESS:  Good morning, your Honor.

1      THE COURT:  You may inquire, Mr. Donnelly.

2      MR. DONNELLY:  Thank you, your Honor.

3      **DIRECT EXAMINATION BY MR. DONNELLY**

4   Q.   Good morning, Mr. Ross.

5        Mr. Ross, would you tell the jury how you're

6   employed, sir.

7   A.   Yes.  I'm currently employed with the Toronto

8   Police Service.

9   Q.   And what is your title or what are your duties?

10  A.   My title currently is detective constable.  And

11  I'm currently working in the technological crime

12  section of the Toronto Police Service, and that section

13  deals primarily with the seizure and analysis of

14  digital evidence such as computers, cellphones, things

15  of that nature.

16  Q.   Okay.  I'm guessing you haven't been with the

17  Toronto Police Service for many years?

18  A.   Coming up to seven years.

19  Q.   And you were saying you're working with

20  technological evidence; is that right, digital

21  evidence?

22  A.   That's correct.

23  Q.   We don't need to get into all the details, but

24  have you been specially trained in that field,

25  Detective Ross?

1    **A.**    Yes, I have.

2    **Q.**    And where have you received training, just in

3    general?

4    **A.**    The Canadian Police College has several courses

5    for computer forensics, as well as the International

6    Association of Computer Investigative Specialists.

7    **Q.**    And would it be fair to say that you've been doing

8    this for seven years with Toronto Police or just

9    recently?

10   **A.**    So seven years with Toronto Police and coming up

11   to fours years with the technological crime section.

12   **Q.**    Detective Ross, were you part of a team --

13   directing your attention, if I might, to May 1st of

14   2011, were you part of a team that assisted in the

15   execution of the search warrant at the Azov Films

16   business premises?

17   **A.**    Yes, I was.

18   **Q.**    That was May 1st of 2011?

19   **A.**    That's correct.

20   **Q.**    And you were executing a search warrant?

21   **A.**    Yes.

22   **Q.**    And what was your particular role as part of the

23   team that day?

24   **A.**    So we were part of a four-member team from the

25   technological crime section to assist in the search and

1    seizure of anything related to digital evidence at

2    several locations for that warrant.

3    **Q.**    And did you find any at the -- when I say Azov

4    Films business premises, did you know it by that or by

5    the name 4P5P?

6    **A.**    By both names, yes.  It was the company name and

7    then the website they were doing business as.

8    **Q.**    So did you find any, for lack of a better --

9    digital media, computers, that sort of thing when you

10   went to the premises?

11   **A.**    Yes.  There was quite a number of computers,

12   servers, things of that nature, yes.

13   **Q.**    And what did you do as part of your securing or

14   seizing of the digital evidence?

15   **A.**    So on our first day there, we began with kind of

16   mapping out the layout of the computer network.  It was

17   operating as a small business so there were a number of

18   computers and servers throughout this warehouse

19   location where this business was operating, and we

20   began to make notes about how the computers and servers

21   were operating, how they were connected within that

22   premise.

23        We also wanted to ensure that any external

24   access to those servers was removed so we made -- we

25   disconnected basically the servers from the outside

1       world.  We disconnected it from the Internet so that

2       the website would no longer be active and nobody could

3       get in to make any changes or modifications to the

4       evidence that was in that warehouse location.  And we

5       continued that for several days.  It was a very large

6       business -- not a large business but a lot of computers

7       and things of that nature that we had to go and kind of

8       map out and learn how they were connected so that we

9       could properly seize them in a forensically-sound

10      manner to ensure that we were maintaining the evidence

11      according to our best practices.

12      **Q.**   Not being a computer guy myself if I misphrase

13      this question bear with me, but as part of your goal as

14      a computer forensic analyst when you're seizing

15      evidence is to try to ensure that your process of

16      taking computers and other digital media, you don't

17      destroy any evidence or change any evidence on the

18      computers; is that right?

19      **A.**   Correct.  That is our goal, yes.

20      **Q.**   And you followed those protocols in this case?

21      **A.**   Yes, I did.

22      **Q.**   Now, maybe it would be easier to start with some

23      of the photographs here.

24          MR. DONNELLY:  If we could go to I believe it's

25      page four of Government's Exhibit 23, please,

1    Ms. Anderson.  If we could publish it, please.

2    **Q.**   This photograph we're looking at as part of

3    Government's Exhibit 23, Detective Ross, do you

4    recognize that?

5    **A.**   Yes, I do.  It is the room in the warehouse

6    location where the servers for this business were

7    located.

8    **Q.**   Can you give us a layman's definition of what a

9    server is?

10   **A.**   A server is just basically a specialized computer.

11   Maybe it has a little bit more power than the computers

12   you'd have at home, more storage capabilities, things

13   of that nature, but its purpose is to serve an

14   application, for example a website, so it has that

15   extra power so it can provide that additional

16   functionality and allow other people to connect to it

17   for the purposes of whatever that server is meant to

18   do.  So it could be a file server to share files, or it

19   could be a web server to provide access to the Internet

20   for a website.

21   **Q.**   And in this particular case, you're aware that you

22   and your colleagues were investigating a website,

23   correct?

24   **A.**   Correct.

25   **Q.**   What was that website?

1    **A.**   Azovfilms.com.

2    **Q.**   And did you find in your searching of the company

3    there a server that was a web server for azovfilms.com?

4    **A.**   Yes.

5         MR. DONNELLY:   If we could go to the next page,

6    please, Ms. Anderson.

7    **Q.**   This is a different angle of the server cabinets;

8    is that correct?

9    **A.**   Correct.  Yes.

10        MR. DONNELLY:   And if we could go to the next

11   page.

12   **Q.**   Do you recognize what's depicted here, Detective

13   Ross?

14   **A.**   Yes.  These are two computer servers that were

15   operating within the business, and I recognize the

16   server on the left as the server that was operating the

17   azovfilms.com website.

18   **Q.**   So this one over here?  (Indicating.)

19   **A.**   Correct.

20   **Q.**   That's the Azov Films?

21   **A.**   Yes.

22   **Q.**   Now, you mentioned about cutting off the web

23   server or any other servers from the outside world by

24   cutting them off from the Internet; is that right?

25   **A.**   Correct.  Yes.

1        MR. DONNELLY:  If we could go to the next page,

2    please, Ms. Anderson.

3    **Q.**   Do you recognize what's depicted here?

4    **A.**   This is some networking equipment, which is

5    basically the equipment required to connect to the

6    Internet.  At the very top here I see the yellow cable,

7    which is the fiber link, which is provided by the

8    Internet service provider to provide access to the

9    Internet, which then connects into their firewall,

10   which then goes into the computer servers.

11   **Q.**   And on what day was it that you disconnected the

12   Azov Films web server from the Internet?

13   **A.**   It was the first day we were there.  It was

14   Sunday, May 1st, 2011.  I believe around 9:00 p.m. that

15   night we disconnected the Internet.

16   **Q.**   And that's still going on, right?  You can't get

17   to azovfilms.com now?

18   **A.**   No.  That's correct.

19   **Q.**   So if somebody tried to go to azovfilms.com,

20   either by typing it in or going to a favorite they used

21   to have or a bookmark, what would happen?  What would

22   the person see?

23   **A.**   Depending on the type of Internet browser that

24   they're using, they would receive some type of error

25   saying the page is not available.  The web browser

1    would attempt to contact the server but there wouldn't

2    be any server at the other end to respond to that

3    request.

4         MR. DONNELLY:  Could we go to the next page,

5    please.  The next photograph.

6    Q.   Do you recognize this particular -- did you work

7    with these pieces of equipment here?

8    A.   I wasn't the primary on them but I am familiar

9    with what they are, yes.

10   Q.   What are they?

11   A.   So these are two additional computers further back

12   in the office area of the warehouse, and we determined

13   that these computers, their primary purpose was to

14   create the DVDs.  So there would be files stored on the

15   computer network which related to the videos that were

16   being sold; and at this kind of publishing station, the

17   DVDs were actually being burned would be a term for

18   that.  So from a blank DVD, they could copy the video

19   onto that DVD, they could label it and then they could

20   sell it from there.  So this is the station that that

21   creation was taking place.

22   Q.   And Toronto Police Service was investigating the

23   production and distribution of DVDs that contained

24   images of nude boys, correct?

25   A.   Correct, yes.

1    **Q.**    From this website?

2    **A.**    Yes.

3    **Q.**    And so the videos that were being investigated,

4    those were actually stored in a digital format on the

5    web server or on other servers there?

6    **A.**    Yes, on servers from this location.

7    **Q.**    Did you work with or did you see or find out about

8    whether raw footage that was the root of these DVDs,

9    these videos was found at the Azov premises?

10    **A.**    Yes.  There were cassette tapes and things that

11    were located containing raw video that was then later

12    converted into a final product that was sold.

13    **Q.**    Okay.  And did you work with any of the equipment

14    that was used to convert that raw footage?

15    **A.**    No, I personally did not.

16        MR. DONNELLY:  One moment, please, your Honor.

17        (Pause.)

18    **Q.**    Now, I'd like to direct your attention to that

19    Azov Films web server.  The evidence that was on that

20    server, is that contained on a hard drive or how does

21    that work?

22    **A.**    Yes.  So within that computer server that we drew

23    the red line through, within that computer case there

24    was four hard drives in that case, so four different

25    pieces of digital media that we would then work with to

1    extract evidence from.

2    **Q.**   So you were talking about this photograph here?

3    (Indicating.)

4    **A.**   Correct.  So on the left side, when we take that

5    case apart, we found four hard drives contained within

6    that case.

7    **Q.**   Now, was the Toronto Police Service -- you were

8    working with several law enforcement agencies

9    internationally; is that fair to say?

10   **A.**   Yes.  Correct.

11   **Q.**   Was one of those United States Postal Inspection

12   Service?

13   **A.**   Yes, it was.

14   **Q.**   Did you take steps, forensic steps to be able to

15   share the evidence that was on this server with the

16   United States Postal Inspection Service?

17   **A.**   Yes, I did.

18   **Q.**   What did you do?

19   **A.**   So those four hard drives that I described in the

20   server there on the left, it's a normal practice for us

21   to create forensic images of those hard drives, and

22   those forensic images are basically just a digital

23   representation of that hard drive and contains the

24   entire bit-for-bit copy of what's contained on that

25   hard drive.

1    So it's an exact copy that we would then store

2    on our server, and from there we can then make

3    additional copies that basically exactly represent what

4    was contained on those hard drives from the computer,

5    and that's a forensic process that we would normally

6    do.

7    Q.   And as you do that process, are you using

8    equipment or following protocols to make sure that none

9    of the evidence that's on the computer is changed?

10   A.   Yes.  We use a forensic write-blocker, which is a

11   special device to ensure that nothing can be written to

12   that hard drive, nothing can be changed.  It only

13   allows us to read from that hard drive in order to make

14   a copy.

15   Q.   So you then put the original evidence in storage,

16   secure storage, correct?

17   A.   Correct.  Yes.

18   Q.   Following various protocols?

19   A.   Yes.

20   Q.   And then you work from these forensic images,

21   correct?

22   A.   Correct.

23   Q.   To look for evidence?

24   A.   Yes.

25   Q.   And these are exact representations of the

1   original evidence?

2   **A.**   Yes.

3   **Q.**   So when you got back to the office, for lack of a

4   better term, and made the forensic images, you made

5   additional copies of those for other law enforcement

6   agencies?

7   **A.**   Yes, I did.

8   **Q.**   Did you share one of those with the Postal

9   Inspection Service?

10  **A.**   Yes, I did.

11  **Q.**   And who from the Postal Inspector's Office did you

12  share it with?

13  **A.**   With Inspector Brian Bone.

14  **Q.**   And Inspector Bone was somebody who had been

15  working on this case as well on the United States side

16  of things?

17  **A.**   Correct, yes.

18       MR. DONNELLY:  May I have one moment, please,

19  your Honor.

20       THE COURT:  Yes.

21       (Pause.)

22  **Q.**   Detective Ross, did you note anything when you

23  were -- you looked at the evidence on the web server?

24  **A.**   Yes.

25  **Q.**   Was there anything unusual about IP addresses

1    being blocked?

2              MR. MANN:  Objection.  Relevance.

3              THE COURT:  I'll sustain the objection.

4              MR. DONNELLY:  Could I ask to be heard at

5    sidebar, your Honor?

6              THE COURT:  Okay.  Come up.

7              (Sidebar conference.)

8              THE COURT:  Some of this you already got in but

9    it wasn't objected to, but I do question the relevance.

10             MR. DONNELLY:  It's just that it was raised by

11   Mr. Mann in his opening and then it was raised on

12   cross-examination, so I expect he's going to be arguing

13   to the jury at the end how could this Defendant know

14   there was anything wrong.  Azov Films looked like any

15   normal website.  I just want to establish through the

16   guy who really knows that it wasn't run like any normal

17   website.

18             THE COURT:  I actually thought this came in

19   originally through your direct of the last witness.

20             MR. DONNELLY:  No.  Mr. Mann asked if the

21   website operated like a normal website.

22             MR. MANN:  He asked on redirect.

23             THE COURT:  On redirect you asked him more

24   questions --

25             MR. DONNELLY:  On redirect I did.

1    MR. MANN:  Then I got up and recrossed that the

2   normal person visiting the website wouldn't know that.

3    THE COURT:  Okay.  Whatever our recollections

4   are of whoever started it --

5    MR. MANN:  I think my point is I still think

6   this is irrelevant.

7    THE COURT:  I'm not sure I understand the

8   relevance.

9    MR. MANN:  Unless they can connect it to my

10   client.

11    THE COURT:  What is the relevance?

12    MR. DONNELLY:  That this was not being operated

13   as a, quote, normal website.  They were taking

14   evasive --

15    THE COURT:  What's a normal -- are you saying it

16   shows consciousness of guilt?  Is that what you're

17   saying?

18    MR. DONNELLY:  By the purveyors on the website.

19   I'm just trying to prevent a -- I'll withdraw the

20   question.

21    THE COURT:  Okay.

22    (End of sidebar conference.)

23    THE COURT:  Do you have any other questions,

24   Mr. Donnelly?

25    MR. DONNELLY:  I do not.  Thank you.

1          THE COURT:  All right.  Thank you.

2          Mr. Mann?

3          **CROSS-EXAMINATION BY MR. MANN**

4     **Q.**   Good morning.

5     **A.**   Good morning.

6     **Q.**   You testified that you were responsible or as part

7     of a team for making forensic copies of the computer,

8     the drives that you seized, right?

9     **A.**   That's correct.  Yes.

10    **Q.**   Now, were you also responsible for analyzing any

11    of the data?

12    **A.**   Yes, I was.

13    **Q.**   And did you analyze any data about the number of

14    visitors to the web page?

15    **A.**   We do have certain log information related to the

16    visitors that came to the website, but I don't have a

17    particular number off the top of my head.

18    **Q.**   Do you have any recollection of what the number of

19    visitors were in 2009 or 2010?

20    **A.**   I wouldn't have that specific information.

21    **Q.**   Did you at one point have information to that

22    effect?

23    **A.**   There would be information on the server that

24    would provide that information.  There are logs showing

25    the visitors that attend the website.

1    **Q.**    Did you see those numbers at some point?

2    **A.**    At some point, yes.

3    **Q.**    I'm going to show you a document and ask you if

4    this refreshes your recollection as to the number of

5    visitors to the website in 2009 and 2010, okay?

6    **A.**    Okay.

7    **Q.**    I don't want you to read this document out loud.

8    I just want to see if this refreshes your recollection

9    at all.

10   **A.**    I wouldn't be able to confirm those numbers.  I'm

11   not sure.

12   **Q.**    So you have no idea at all how many people visited

13   the website?

14   **A.**    I wouldn't be able to give a specific number, and

15   I wouldn't be comfortable without looking back at that

16   data.

17          MR. MANN:  Could I have just a moment, please.

18          THE COURT:  Yes.

19          (Pause.)

20          MR. MANN:  I have nothing further of Mr. Ross,

21   your Honor.

22          THE COURT:  Any redirect?

23          MR. DONNELLY:  No, your Honor.  Thank you.

24          THE COURT:  All right.  Then, Mr. Ross, your

25   testimony is complete.  You may step down.  Thank you

1    very much.

2            THE WITNESS:  Thank you, your Honor.

3            MR. DONNELLY:  Inspector Brian Bone, please.

4            **BRIAN BONE, GOVERNMENT WITNESS, SWORN**

5            THE CLERK:  Please state your name and spell

6    your last name for the record.

7            THE WITNESS:  Brian, B-R-I-A-N.  Last name Bone,

8    B-O-N-E.

9            THE COURT:  Good morning, Mr. Bone.

10           THE WITNESS:  Good morning, sir.

11           THE COURT:  You may inquire, Mr. Donnelly.

12           **DIRECT EXAMINATION BY MR. DONNELLY**

13   **Q.**   Good morning, Inspector.  If you can make sure

14   you're projecting into the microphone there, that would

15   be great.  Thank you.

16           Could you tell the jury how you're employed?

17   **A.**   I'm currently employed as a postal inspector.

18   **Q.**   How long have you been with the Postal Inspection

19   Service?

20   **A.**   I've worked there since 2007.

21   **Q.**   Did you have law enforcement background prior to

22   2007?

23   **A.**   Yes, I did.

24   **Q.**   Could you describe what you were doing essentially

25   during those years.

1    **A.**    Prior to that, I had been employed with Lake

2    County, Illinois Sheriff's Office as a sheriff's

3    deputy, then a detective, and I also worked with the

4    Lake County, Illinois State's Attorney's Office and I

5    was assigned to the Cyber Crimes Unit.  We worked child

6    exploitation cases and other types of cyber crimes.

7    During that time period not only did I conduct

8    investigations, but I also was a computer forensic

9    examiner.

10   **Q.**    Thank you, Inspector Bone.

11        Inspector, you have worked on this case, and

12   when I say "this case," I mean the investigation into

13   the production and distribution of DVDs bearing nude

14   boys by a company called Azov Films?

15   **A.**    That is correct.

16   **Q.**    How long had you been working on that

17   investigation?

18   **A.**    Since we were contacted in the end of 2010.

19   **Q.**    And have you worked with Detective Krawczyk,

20   Detective Ross and other detectives from the Toronto

21   Police Service on this investigation?

22   **A.**    Yes, I have.

23   **Q.**    Now, you actually have worked directly with

24   Detective Ross in the obtaining of information that was

25   seized during the execution of the May 1st, 2011,

1    search warrant; is that right?

2    **A.**   That is correct.

3    **Q.**   What did you get from Detective Ross?

4    **A.**   We got what's called image copies or forensic

5    images of computers that had been located at the

6    business in Toronto.

7    **Q.**   And did you examine the evidence that Detective

8    Ross gave you?

9    **A.**   Myself along with forensic agents at the

10   Department of Justice.  Currently, as part of my job,

11   I'm assigned to what's called the Department of Justice

12   Child Exploitation --

13         MR. MANN:  I'm going to object to this.

14         THE COURT:  I'm sorry?

15         MR. MANN:  I'm objecting to his answer while

16   he's in the middle of it.

17         THE COURT:  Yes.  So I'll sustain the objection.

18   You may follow-up with an additional question, if you

19   wish.

20   **Q.**   Did I hear you that you're working for a section

21   of the Department of Justice?

22   **A.**   Yes.

23   **Q.**   Special assignment there now?

24   **A.**   Yes.

25   **Q.**   What section is that?

1           MR. MANN:  Objection.

2           THE COURT:  Grounds?

3           MR. MANN:  Relevance, and Rule 403.

4           THE COURT:  Come up.

5           (Sidebar conference.)

6           THE COURT:  It's pretty unusual to object to a

7    witness explaining where he works.

8           MR. MANN:  I don't mind him saying he works at

9    the Department of Justice.  I think he's going to say

10   he's attached to something like the Child Exploitation

11   Unit or something.

12          MR. DONNELLY:  The Child Exploitation and

13   Obscenity Section.

14          THE COURT:  It is what it is.

15          MR. MANN:  It's sort of like somebody coming in

16   and saying they're assigned to the Public Integrity

17   Section or something like that, or the Anti-Terrorism

18   Section, Judge.

19          He's an investigator, and it gives him -- sort

20   of implies that this case is by definition a child

21   pornography case.

22          THE COURT:  I understand your point, but I'm

23   going to allow it.  I mean, it's background.  If you

24   want me to instruct the jury on it, I can.

25          MR. MANN:  No.

1      THE COURT:  I can tell them that just because he

2  works in a particular place doesn't prove anything if

3  you want me to.

4      MR. MANN:  I would like you to briefly say that,

5  sure.

6      THE COURT:  Okay.

7      (End of sidebar conference.)

8      THE COURT:  I'm going to overrule the objection

9  but I am going to tell you, ladies and gentlemen, just

10  in general, that various officers or agents who are

11  assigned to different units within a particular law

12  enforcement agency, the title of their agency or the

13  title of their job does not prove anything with respect

14  to the issues that you have to consider in this case.

15      So I just want you to keep that in mind as you

16  hear these various titles of organizations from

17  different law enforcement agencies.  Okay?

18      Go ahead, Mr. Donnelly.

19      MR. DONNELLY:  I don't believe he ever actually

20  answered the question.

21  **Q.**   So let me ask you again.  You're assigned where

22  now?

23  **A.**   I'm assigned to the Department of Justice, Child

24  Exploitation and Obscenity Section in Washington, D.C.

25  **Q.**   And you've been working on this case out of

1    Washington?

2    **A.**    Yes, I have.

3    **Q.**    Now, when you receive the evidence, forensic copy

4    or forensic image of the Azov Films web server, is that

5    what you got?

6    **A.**    Yes.

7    **Q.**    You got some other stuff, I guess, also?

8    **A.**    That is correct.

9    **Q.**    Did you examine that piece of evidence?

10   **A.**    Yes.  We examined it in conjunction with the

11   personnel at the section I work out of.

12   **Q.**    And what did you find?

13   **A.**    We found various business records pertaining to

14   the Azov Films.  Specific business records as to

15   shipping information, individuals who made purchases,

16   also what the website looked like.

17   **Q.**    And were you particularly looking for individuals

18   from the United States who had done business with Azov

19   Films?

20   **A.**    That is correct.

21   **Q.**    Did the evidence that Detective Ross gave you

22   reveal to you United States customers?

23   **A.**    Yes, it did.

24   **Q.**    Approximately how many?

25   **A.**    Would be over ten thousand.

1    **Q.**   Was it a long process of sorting through all this

2    evidence?

3    **A.**   Yes, it is.

4    **Q.**   And at some point, you identified a name of Gerald

5    Silva; is that right?

6    **A.**   That is correct.

7    **Q.**   And what did you find out from the evidence that

8    Detective Ross gave you about Gerald Silva?

9    **A.**   That there were numerous purchases by an

10   individual by that name using a certain e-mail address

11   along with an address who was associated with the name,

12   with the purchases.

13   **Q.**   What records did you see of these purchases?

14   **A.**   It would be their business records in which it

15   would be invoices that were produced by the company

16   within their computer systems.

17          MR. DONNELLY:  Could I have one moment, please,

18   your Honor.

19          (Pause.)

20   **Q.**   Now, did you -- as far as the -- shall we call

21   them invoices, the records you just described?

22   **A.**   I would say that that would be the best way to

23   describe the business records.

24   **Q.**   Did you sort of bring together all of the invoices

25   you could find as to Gerald Silva?

1    **A.**   Yes, I did.

2    **Q.**   And these are exact copies from the evidence you

3    got from the Canadian server; is that right?

4    **A.**   That is correct.

5         MR. DONNELLY:  Your Honor, I would move the

6    invoices, which are Government Exhibit 21 full.

7         THE COURT:  Any objection?

8         MR. MANN:  No objection.

9         THE COURT:  All right.  Government Exhibit 21

10   will be full.  You may publish it to the jury, if you

11   wish.

12        (Government Exhibit 21 admitted in full.)

13   **Q.**   Are you able to see at least in general terms what

14   this document is, Mr. Bone?

15   **A.**   Yes, I am.

16        MR. DONNELLY:  And Ms. Anderson, could we

17   enlarge the actual substance of the -- yes, thank you.

18   **Q.**   Now, is this a typical invoice that you saw?

19   **A.**   Yes.  It would be.

20   **Q.**   And you'd been investigating other customers; is

21   that right?

22   **A.**   That is correct.

23   **Q.**   And are they all pretty much the same?

24   **A.**   Yes.

25   **Q.**   And just so we can orient the jury a little bit,

1     at the top center we see an order number, correct?

2     **A.**    That is correct.

3     **Q.**    What was the order number?

4     **A.**    That was something that was unique that the

5     company would assign to purchases.

6     **Q.**    Then there's a date immediately beneath the order

7     number?

8     **A.**    That's correct.

9     **Q.**    What does that represent?

10     **A.**    That represents when the invoice -- goes to the

11     processing of it.

12     **Q.**    Did you learn during the course of the

13     investigation how Azov Films distributed their DVDs to

14     United States customers?

15     **A.**    Yes, I did.

16     **Q.**    And what was the general method of distribution?

17     **A.**    The general method would be they would package in

18     regular packaging, nondescript in Toronto, Canada.

19     They'd put a label on the outside of it.  And they then

20     would use a drop ship, or they would use a shipping

21     company that would then take it across the U.S. border

22     and take it to a mailing house.

23         At the mailing house, they would have or

24     pre-produced from the owners of the company a shipping

25     label that actually had the postage on it.  They would

1    then place it onto the envelope and drop it off at a

2    post office located in North Tonawanda, New York, and

3    it would end up going to the various customers.

4           MR. DONNELLY:  Could I have one moment, please,

5    your Honor?

6           THE COURT:  Yes.

7           (Pause.)

8    **Q.**    Inspector Bone --

9           MR. DONNELLY:  May I approach the witness,

10   please, your Honor?

11          THE COURT:  Yes.

12   **Q.**    -- showing you Government's Exhibit 12, would you

13   take a moment to examine that, please, just the outer

14   parts, the labels that you just described.

15          What do you recognize that to be?

16   **A.**    It appears to be one of the methods or ways that

17   the company would ship their product.

18          MR. DONNELLY:  Your Honor, there's some matter

19   inside of the envelope, but Mr. Mann and I are going to

20   discuss that later.  But for right now I would like to

21   move the envelope itself in full.  It's Government's

22   Exhibit 12.

23          MR. MANN:  No objection, your Honor.

24          THE COURT:  All right.  Government 12 will be

25   full.

1          (Government Exhibit 12 admitted in full.)

2          MR. DONNELLY:  Could I use the ELMO, please.

3    **Q.**   Inspector Bone, you just described this to us.

4    You stated that the first thing that would happen in

5    Toronto was that the items would be put in one of these

6    padded envelopes?

7    **A.**   Correct.

8    **Q.**   And a label affixed; is that correct?

9    **A.**   That is correct.

10   **Q.**   Can we see the label that was affixed in Canada on

11   this particular envelope?

12   **A.**   Yes.  If you look through the one that says, "USPS

13   First Class Mail," if you look directly under that you

14   can actually see another label.  That is the original

15   label that as placed on to the company in which it has

16   the individual that it's supposed to go to along with

17   an address.

18   **Q.**   Okay.  And are you able to read the name that

19   comes through that label?

20   **A.**   Yes.

21   **Q.**   What is it?

22   **A.**   It's Gerald Silva.

23   **Q.**   And then when it gets to upstate New York, this

24   larger label is put in?

25   **A.**   That is correct.

1   **Q.**   Where was the location in upstate New York?

2   **A.**   North Tonawanda.

3   **Q.**   Sorry?

4   **A.**   I believe it's pronounced North Tonawanda.  It's

5   just north of Buffalo, New York.  And probably with my

6   accent, I'm probably messing it up so I apologize.

7   **Q.**   And from there, labels again such as this label to

8   Gerald Silva, ███████████████, Coventry, Rhode Island

9   were affixed?

10  **A.**   That is correct.

11  **Q.**   And the re-shipper would put these items in the

12  United States mails?

13  **A.**   That is correct.

14  **Q.**   Now, I kind of got you sidetracked with how these

15  things were distributed, Inspector Bone, so getting

16  back to the invoicing method, the customer's name

17  appears as well?

18  **A.**   That is correct.

19  **Q.**   And an address?

20  **A.**   That is correct.

21  **Q.**   And a person's phone number; is that right?

22  **A.**   Correct.

23  **Q.**   And did Azov Films require an e-mail address?

24  **A.**   Yes, they did.

25  **Q.**   Okay.  And here we have

1    gerald.silva.home@gmail.com?

2    **A.**    That is correct.

3        MR. DONNELLY:  I'd like to, if we could,

4    Ms. Anderson, focus in on the first product that's

5    listed there.

6    **Q.**    What is this that was purchased?

7    **A.**    It's a DVD.

8    **Q.**    Okay.  And are you familiar with this particular

9    title, "BF v2.0 FKK Waterlogged"?

10   **A.**    Yes, I am.

11   **Q.**    Have you seen it?

12   **A.**    Yes, I have.

13   **Q.**    Have you seen many of the videos that were

14   involved in the investigation of this case, by that I

15   mean videos produced by Azov Films as Azov Films

16   products?

17   **A.**    Yes.  Myself and other attorneys and agents have

18   reviewed a lot of the material.

19   **Q.**    And just to ask you, are you familiar with right

20   from the get-go on all of these videos that there's a

21   textual disclaimer?

22   **A.**    Yes, I am.

23   **Q.**    What does that say?

24   **A.**    It states in general that this has been -- I

25   believe it says it's been reviewed by the Supreme Court

1    in Canada and the U.S. regarding the material.

2         MR. MANN:  Can I speak with Mr. Donnelly for one

3    second, your Honor?

4         THE COURT:  Sure.

5         (Pause.)

6         MR. MANN:  Can we approach?

7         (Sidebar conference.)

8         MR. DONNELLY:  I was just going to ask the

9    question, your Honor, Bob and I had spoken about this

10   previously that just so that you're aware of any

11   decision by either the United States Supreme Court or

12   the Canadian Supreme Court that reviewed these

13   materials and deemed them to be what the disclaimer

14   says.

15        THE COURT:  Do you have an objection?

16        MR. MANN:  I do.  I have two.  The Canadian

17   thing is irrelevant, but the U.S. thing there are lots

18   of problems.  One is, is an expert; and two, is he

19   offering an opinion --

20        THE COURT:  No.  I actually think -- you don't

21   have to go too far on this.  I don't think it's an

22   appropriate question.

23        MR. DONNELLY:  I'm not asking personally.

24        THE COURT:  Well, personal is two things.  I

25   think it's appropriate for him to answer whether it has

1    the disclaimer because I don't think that's hearsay.

2    The reason it's not hearsay is it's not for the truth.

3    Okay?

4         When you start asking him about whether it's

5    true or not, then you're sort of putting the truth of

6    the statement into play, and I think you are asking him

7    to give essentially an opinion.  It sounds to me he's

8    very close to an opinion on what the law is.  The law

9    is for me to tell them, they're to decide the facts.

10   So I'm not sure there's any space in between those

11   things.

12        MR. DONNELLY:  I ask you for an instruction

13   saying there's no such decision.  That would be fine.

14        THE COURT:  It's almost that it doesn't matter.

15   They're going to watch the films and they're going to

16   decide what they are.  What it says is beside the

17   point.  The only question I have about that is I don't

18   know if the jury could have the view that just because

19   it says it, it must be true.

20        MR. DONNELLY:  That's all I'm trying to correct.

21   I was just going to ask whether he was aware.  That's

22   all.

23        THE COURT:  I see your point.

24        MR. MANN:  I see the point.

25        MR. DONNELLY:  Could I just ask just yes or no,

1    are you aware of any such decision?

2         THE COURT:  "Are you aware of any decision that

3    could be the basis for that specific statement

4    regarding these films."

5         MR. MANN:  I don't think I have an objection.  I

6    just want to run it by my client for two seconds.

7         THE COURT:  You can do that, but I'd like you to

8    make the question specific to these films.

9         MR. DONNELLY:  Yes.

10        MR. MANN:  I just want to tell me client.  I'll

11   signal to Terry if that's all right.

12        THE COURT:  Okay.

13        MR. MANN:  Thank you.

14        (End of sidebar conference.)

15        THE COURT:  I apologize for the delay, ladies

16   and gentlemen.  I think I said this to you before but

17   now and then there are things that we need to take up,

18   matters of law typically that I need to talk to the

19   lawyers about.  My practice is to try to keep those as

20   minimal as possible but sometimes they're unavoidable.

21        All right.  Go ahead.

22        MR. DONNELLY:  Thank you.

23        THE COURT:  Why don't you rephrase your last

24   question.

25        MR. DONNELLY:  Thank you.

1    **Q.**   Inspector Bone, are you aware of any Supreme Court

2    decision, Canadian or United States, that has reviewed

3    the films in this case and determined that they

4    violated no law?

5    **A.**   I know of no cases that have said that.

6    **Q.**   Thank you.

7         Did you, after you gathered all of the invoices

8    together for Mr. Silva, were you able to determine how

9    many times he ordered DVDs from Azov Films?

10   **A.**   Yes, we were.

11   **Q.**   How many times did he do so?

12   **A.**   Off the top of my head, I'm not too sure.

13   **Q.**   More than once?

14   **A.**   Yes.

15   **Q.**   Okay.  Does the number 22 sound familiar?

16   **A.**   Quite probably, yes.

17   **Q.**   Would it be fair to say as that invoice indicated

18   that many of the invoices, not all, but many of the

19   invoices there were multiple products ordered?

20   **A.**   Yes.  Besides in the invoices we also had a spread

21   sheet that was produced by the same business software

22   that had details regarding the individual purchases.

23   **Q.**   Now, the evidence you got from Detective Ross, did

24   that also include the website as it existed on May 1st,

25   2011?

1    **A.**   Yes, in essence, it did.

2    **Q.**   Now, a customer perusing the Azov Films website,

3    would they see, if they were interested in a particular

4    title, were there descriptions of what was in those

5    titles?

6    **A.**   Yes, there was.

7    **Q.**   For instance, we just looked at the invoice where

8    the first movie listed was "FKK Waterlogged."  You're

9    familiar with that one?

10   **A.**   Yes, I am.

11   **Q.**   And that particular video is one of those that are

12   charged in this case; is that right?

13   **A.**   That is correct.

14   **Q.**   And have you looked at -- had a chance to look at

15   Exhibit 28, which are the catalog descriptions of the

16   movies, the DVDs that are charged in this case?

17   **A.**   Yes, I have.

18           MR. DONNELLY:  Your Honor, I would move

19   Government's Exhibit 28 full.

20           MR. MANN:  No objection.

21           THE COURT:  Twenty-eight will be full.

22           (Government Exhibit 28 admitted in full.)

23           MR. DONNELLY:  Could we bring up page one of 28.

24   **Q.**   So Inspector Bone, if somebody is on the website

25   and they click on a particular title, this is the type

1    of page they'd see?

2    **A.**    That is correct.

3    **Q.**    This is the page for "FKK Waterlogged"?

4    **A.**    That is correct.

5         MR. DONNELLY:  Ms. Anderson, can we just kind of

6    blow up the picture portion.  Thank you.

7    **Q.**    So is this an actual photograph of the back and

8    front and a little bit of the DVD of that particular

9    video?

10   **A.**    Yes.  That would be what they consider their

11   artwork DVD case that they would ship it in if chosen

12   by the customer.

13   **Q.**    And then we see a lot of text down below.  Is that

14   the description of the contents of the film?

15   **A.**    That is correct.

16   **Q.**    And for example, are there --

17         MR. DONNELLY:  Maybe if we could blow up this

18   paragraph that begins, "It's Sunday."

19         There are little descriptors of the things that

20   are in that particular video; is that right?

21   **A.**    That is correct.

22   **Q.**    And for example, we see lines like, "There's some

23   general horsing around and boys being boys that gives

24   way to some relaxing physical therapy in the form of a

25   deep massage to soothe those muscles that got quite a

1    workout a day earlier;" is that right?

2    A.   That is correct.

3    Q.   On this particular video, do you remember boys

4    massaging each other?

5    A.   Yes.

6         MR. DONNELLY:   Could I have one moment, please,

7    your Honor?

8         THE COURT:   Yes.

9         (Pause.)

10   Q.   Now, once you sort of put in a package, I guess,

11   for lack of a better term, the evidence that you

12   received from Detective Ross as it related to Gerald

13   Silva, did you move on to other investigative tasks in

14   this case and turned this evidence over to one of your

15   colleagues?

16   A.   Yes, I did.

17   Q.   Who was that?

18   A.   That would be Inspector Michael Connelly.

19   Q.   Approximately when did you give him the evidence

20   in this case, if you remember?

21   A.   I don't recall.  I would have to sit there and

22   look back.

23   Q.   Summer of 2012 sound about right?

24   A.   Approximately, I believe, that's when the first

25   groupings -- there were several groupings so it would

1    have depended on which grouping it was in.

2            MR. DONNELLY:  Thank you, Inspector Bone.

3            Nothing further.

4            THE COURT:  Thank you.

5            Mr. Mann?

6            **CROSS-EXAMINATION BY MR. MANN**

7    **Q.**  Good morning, sir.

8    **A.**  Good morning, sir.

9    **Q.**  You obviously received the image disk or drive,

10   whatever you want to call it, sometime after May of

11   2011, right?

12   **A.**  That is correct.

13   **Q.**  I take it you were aware of the investigation

14   before the execution of the warrant in Toronto in May

15   of 2011?

16   **A.**  Yes, I was involved in that.

17   **Q.**  When did your involvement in this investigation

18   begin, sir?

19   **A.**  It began in the fall of 2010.

20   **Q.**  Fall of 2010.  And --

21           MR. MANN:  Could I have just a moment, your

22   Honor.

23   **Q.**  And when you became aware of this investigation in

24   the fall of 2010, were you aware that Azov was a part

25   of the investigation?

1    **A.**    Yes, I was.

2    **Q.**    And I assume that shortly after you -- when you

3    first became aware of this, at some point you went on

4    the Azov website?

5    **A.**    That is correct.

6    **Q.**    And you looked at the Azov website, right?

7    **A.**    That is correct.

8    **Q.**    And did you also get access to some DVDs from Azov

9    early in the investigation?

10   **A.**    We made undercover purchases.

11   **Q.**    And that person provided it to law enforcement,

12   right?

13   **A.**    Well, it was law enforcement that made the

14   purchases.

15   **Q.**    And that was in the fall of 2010 or before that?

16   **A.**    It was subsequent to the fall of 2010.

17   **Q.**    When did law enforcement, to your knowledge, first

18   get access to a disk?

19   **A.**    Well, at various stages.  There was also customer

20   complaints or complaints from citizens that we were

21   reviewing from the National Center for Missing and

22   Exploited Children in which people stated that they

23   were selling child pornography on the website.

24   **Q.**    And you got copies of the disks, right?

25   **A.**    We got copies of what we made undercover

1    purchases.  When people log into the website through

2    the National Center for Missing and Exploited Children,

3    customers, regular citizens can sit there and make

4    complaints about whatever websites or items are being

5    sold on websites.

6    **Q.**   And when was it you first saw one of these disks

7    that had the warning on it about the United States and

8    the Canadian Supreme Court?

9    **A.**   That would have been probably the first purchase.

10   **Q.**   That would have been sometime when?

11   **A.**   That would have been -- well, we attempted to make

12   several purchases but by the methodology that the

13   company used to thwart law enforcement from being able

14   to purchase from them, it took us several months to

15   actually be able to get a undercover purchase for the

16   company.

17   **Q.**   Can you give me an approximate date as to when you

18   first saw a DVD -- when I say "you," I mean law

19   enforcement, not you personally, that had this warning

20   on it?

21   **A.**   I would say it would probably be January of 2011.

22   **Q.**   And at that point you see a DVD that has this

23   warning, and I'm paraphrasing, I'm not trying to repeat

24   it verbatim --

25   **A.**   Yeah.

1    **Q.**   -- but the warning that you were asked about by

2    Mr. Donnelly about the Canadian and U.S. Supreme

3    Courts, right?

4    **A.**   That is correct.

5    **Q.**   And when you saw that warning, did you take any

6    steps to get that warning off these DVDs so that people

7    buying them wouldn't see that warning?

8    **A.**   Well, in these types of investigations and

9    previous investigations, that's a methodology that

10   people used to try and thwart law enforcement from

11   being able to investigate or to sit there and say that

12   their product is legitimate.

13        In all kinds of operations I've been involved

14   in, I've never seen any commercial producer of child

15   pornography ever say we are selling you child

16   pornography.  This is child pornography and it's

17   illegal to have.

18   **Q.**   Let me go back to my question for a second.  My

19   question is at some point around January of 2011,

20   you're aware of the fact that they're selling DVDs and

21   the DVDs have on them a warning basically saying that

22   the Supreme Courts in the United States and Canada said

23   it's all right?

24   **A.**   That's correct.

25   **Q.**   That's a summary?

1    **A.**    Yes.

2    **Q.**    My question is, at that point, do you do anything

3    to get -- to stop those warnings from being placed on

4    the DVDs, or do you just continue with your

5    investigation until the eventual arrest, or whatever

6    you want to call it, on May 1st of 2011?

7    **A.**    We continued with the investigation.

8    **Q.**    And so for that period of time, those warnings

9    continue and the website remains operative for some

10   period of additional months, right?

11   **A.**    Yes.  In investigations that does happen.

12   **Q.**    Now, I think you said that you learned that there

13   were over ten thousand U.S. customers, right?

14   **A.**    That's correct.

15   **Q.**    What time period did that cover, sir?

16   **A.**    It covered several years.  I would say some of the

17   earliest business records that we recovered were

18   probably from late 2006, early 2007.

19   **Q.**    So clearly, Azov had been doing this for some

20   years back to 2006 or 7, clearly, right?

21   **A.**    Some of the videos as, obviously, as the company

22   starts, they grow and they continue to sell more and

23   more product and get additional product.

24   **Q.**    Did you learn from your review of the records

25   about how many visitors there were to the website, the

1    Azov website?

2    **A.**   I believe that there was -- as part of the logging

3    function, you'd know how many people went to the

4    website.

5    **Q.**   Do you know about how many there were?

6    **A.**   I have no idea.

7    **Q.**   Do you have any idea at all -- the arrest in

8    Toronto was May 1st, 2011, am I right?

9    **A.**   Correct.

10   **Q.**   So 2010 would have been the last full year that

11   Azov was in operation, right?

12   **A.**   That is correct.

13   **Q.**   Do you have any idea at all how many visitors

14   there were to that website in 2010?

15   **A.**   No, I do not, sir.

16   **Q.**   Any idea of how many visitors there were to that

17   website in 2009?

18   **A.**   No, I do not, sir.

19   **Q.**   Did you ever know how many visitors there were to

20   that website in those years?

21   **A.**   Looking at it, I don't think that I ever -- I

22   personally ever sat there and looked at that as a

23   statistic.

24   **Q.**   Have you ever seen any figures that revealed how

25   many visitors there were to that website?

1    **A.**   Off the top of my head, I might have, either from

2    another investigator maybe from Toronto.  I don't know.

3    **Q.**   Let me show you something and see if this

4    refreshes your recollection.

5         I'm not asking you to read this out loud.  I'm

6    asking you if this document refreshes your recollection

7    as to the number of visitors to the website.

8    **A.**   I have no idea where that came from.

9    **Q.**   It doesn't refresh your recollection then, right?

10   **A.**   No, it does not, sir.

11   **Q.**   Now, you were shown Exhibit -- I think it's 12,

12   the packaging material.  Do you remember that?

13   **A.**   Yes.

14        MR. MANN:  Could I just look at that.

15   **Q.**   There's an address both on the main address and

16   then you said there was an address underneath that,

17   right?

18   **A.**   That's correct, sir.

19   **Q.**   Those two addresses are the same, right?

20   **A.**   That is correct.

21   **Q.**   They use the name Gerald Silva, right?

22   **A.**   That is correct.

23   **Q.**   And then they have his home address and the town

24   he lived in, right?

25   **A.**   Yes.

1    **Q.**    And you know from your investigation that is, in

2    fact, his address, right?

3    **A.**    I believe so, yes.

4    **Q.**    Now, you were also shown a series of invoices,

5    correct, or some?

6    **A.**    I was shown the one, correct, yes.

7    **Q.**    You were shown one.  But you've looked at these

8    invoices before, right?

9    **A.**    That is correct, sir.

10   **Q.**    And I'll just take -- I think that you were

11   shown -- I think this is the one you were shown.  Were

12   you shown "FKK" --

13        THE COURT:  The Government can bring up the

14   document and show him.

15   **Q.**    Do you see that, sir?

16   **A.**    They haven't brought it up.  Now it's up, sir.

17   **Q.**    You're able to see that now, right?

18   **A.**    Yes, I am.

19   **Q.**    Now, that's -- you saw that, you basically saw

20   that on the image that you obtained from the Toronto

21   Police, right?

22   **A.**    That is correct.

23   **Q.**    That's an image of the computer or one of the

24   computers that was at Azov when they executed the

25   warrant on May 1st, right?

1  **A.**   That is correct.

2  **Q.**   And that, again, appears to have what you

3  understand to be Mr. Silva's address, right?

4  **A.**   That's correct.

5  **Q.**   And it has a phone number on there.  Do you have

6  any reason to doubt that that's his phone number?

7  **A.**   I would have to see the subpoena returns.

8  **Q.**   And it has an e-mail address, right?

9  **A.**   That is correct.

10 **Q.**   Do you have any reason to doubt that that's his

11 e-mail address?

12 **A.**   Off the top of my head, no, but I would have to

13 see the subpoena returns.

14 **Q.**   And it also, obviously, has the zip code of where

15 this product has gone, right?

16 **A.**   That's correct.

17 **Q.**   And would it be fair to say that that's generally

18 the format of these invoices, all these invoices, sir?

19 **A.**   Yes.  This is the general I would say format, yes.

20 **Q.**   And did you have an opportunity to actually look

21 at the invoices that were made out to Mr. Silva?

22 **A.**   At one point, yes.

23 **Q.**   At one point?

24 **A.**   Yes.

25 **Q.**   And Mr. Donnelly suggested and you accepted and it

1    seems reasonable that there were about 22 invoices; is

2    that correct, sir?

3    **A.**    That's correct.

4    **Q.**    All of those invoices had his name on it, right?

5    **A.**    Off the top of my head, that is correct.

6    **Q.**    They all had the same address and the same basic

7    identifying information, didn't they?

8    **A.**    As a general term, yes.

9    **Q.**    None of these invoices had like a separate PO box

10   or something it would be going to?

11   **A.**    I would have to review the stack of invoices to

12   see.

13   **Q.**    I'll just briefly show you Exhibit 21.  I think

14   it's Exhibit 21.

15   **A.**    Okay.

16         MR. MANN:  Did you not move 21, yet?

17         MR. DONNELLY:  We moved it.  It's just the hard

18   copy is here instead of with Nisshy.

19   **Q.**    So this is Exhibit 21, which is just the hard copy

20   of what you were reviewing on the computer.

21   **A.**    Okay.

22   **Q.**    Do you want to take a quick look?

23   **A.**    Sure.

24   **Q.**    Thank you.

25         (Witness reviews documents.)

1    **A.**    Okay.

2    **Q.**    They're all basically the same format, aren't

3    they, sir?

4    **A.**    That's correct.

5    **Q.**    None of them use an alternative mailing address or

6    an alternative name?

7    **A.**    No.

8    **Q.**    Now, the one that you were specifically looking at

9    that's on the screen, the first item in there is "FKK

10    Waterlogged," correct?

11    **A.**    That's correct.

12    **Q.**    Do you know what the "F-K-K" refers to?

13    **A.**    Off the top of my head, no.

14    **Q.**    Have you seen those three letters as an

15    abbreviation before with respect to any of your work?

16    **A.**    It's not one that I regularly run into.  Off the

17    top of my head, like I said, I --

18    **Q.**    Now, with respect to these invoices, sir, you said

19    there were -- we agree there are 22, right?

20    **A.**    I think there are some what is showed as cancelled

21    orders or whatever on here, unless I miscounted.  Did I

22    miscount or --

23    **Q.**    Well, are the ones that you have done

24    chronologically?

25    **A.**    It does appear starting October 14th, 23rd, 24th.

1    **Q.**    So could I ask you to move to the one for November

2    5th.

3    **A.**    Yes, sir.

4          MR. MANN:  Could we have that one up?  Page

5    five.

6    **Q.**    Could you briefly look at that one, sir.

7    **A.**    Yes.

8    **Q.**    And there are seven products on that one, right?

9    **A.**    That is correct.

10   **Q.**    Would you look now at the --

11         MR. MANN:  Could we have the next one up, 94118.

12   Well, let me back up for a second.

13   **Q.**    This one is dated November 5th; is that right?

14   **A.**    That's correct.

15         MR. MANN:  Could we look at the next one,

16   November 6th?

17   **Q.**    Do you see that one, sir?

18   **A.**    Yes.

19   **Q.**    If you look at these two together, would you agree

20   with me that the order for November 6th, one day after

21   the order for November 5, it appears to have six of the

22   seven products that were on November 5th?

23   **A.**    Yes, it does.

24   **Q.**    Now, when you look at the various products on

25   there, I think you already told us each number has a

1    separate -- each product is related to a particular

2    title; is that correct, sir?

3    **A.**    That's correct.

4    **Q.**    And would it be fair to say, sir, that some of

5    these titles refer to commercial titles?

6    **A.**    Well, what you would consider is -- I wouldn't say

7    commercial per se, but titles that might be sold

8    through other types of means.

9    **Q.**    And have you ever calculated how many of these

10   titles refer to other or commercial type of things?

11   **A.**    When you -- I'm not too sure what you mean by the

12   question.

13   **Q.**    Assume, and I agree with the suggestion of

14   Mr. Donnelly there were 22 invoices.  Many of these

15   invoices have more than one title, right?

16   **A.**    That's correct.

17   **Q.**    And except for the -- and let's assume also that

18   except for the two pages I just showed you where there

19   appears to be an overlap of six titles, that all the

20   other titles are different except for those two pages,

21   okay?

22   **A.**    Okay.

23   **Q.**    Now, my question for you is have you ever sort of

24   calculated how many of these titles are not Azov DVDs

25   but are simply being sold through Azov?

1    **A.**    For this customer, no.  During the course of the

2    investigation, what we did find is that some of these

3    titles that you might say are -- I think you're using

4    the term "commercial" but they had been previously sold

5    through either means, had been deemed child

6    exploitation material and people had been arrested for

7    them.

8           MR. MANN:  I move to strike.  I think that's

9    totally unresponsive.

10          THE COURT:  I'll grant that motion.  Strike the

11   last answer and instruct the jury to disregard it.

12          You may ask the question again or have it read

13   back and I'd ask you just listen carefully to the

14   question and answer just the question that's put to

15   you.

16          MR. MANN:  Could I have the last question read

17   back.

18          THE COURT:  Yes.

19          (Pending question read by the reporter.)

20   **A.**    No.

21   **Q.**    Not with respect to Mr. Silva?

22   **A.**    No.

23   **Q.**    You'll agree that some are clearly in that

24   category?

25   **A.**    Yes.

1        MR. MANN:  May I have a moment, please.

2        THE COURT:  Yes.

3        (Pause.)

4        MR. MANN:  I have nothing further.  Do you want

5   me to return this file to the Government?

6        THE COURT:  Bring it up to the clerk.  I think

7   it should be admitted in full.

8        Thank you very much, Mr. Mann.

9        Mr. Donnelly, do you have any redirect?

10        MR. DONNELLY:  Just a couple of questions, your

11   Honor.

12        First some bookkeeping.  I owe these to the

13   clerk.

14        **REDIRECT EXAMINATION BY MR. DONNELLY**

15   **Q.**   Inspector Bone, when Mr. Mann was cross-examining

16   you about when you first saw some of the videos, you

17   said you saw them through undercover purchases; is that

18   correct?

19   **A.**   That is correct.

20   **Q.**   You indicated that you had difficulties making

21   undercover purchases at first; is that right?

22   **A.**   That is correct.

23   **Q.**   What were those difficulties?

24        MR. MANN:  Objection.  Relevance.

25        THE COURT:  Come up.

1          (Sidebar conference.)

2          THE COURT:  When Bob asked whatever question he

3     asked, it elicited a response that method or means were

4     used.  He didn't object and move to strike.  He let it

5     roll.  But I don't see any basis for you to get up and

6     to reiterate that.  I think he could have asked that

7     those answers be stricken.  But what is it -- he's

8     already answered this question where he said this

9     information.  What's the point of going to add to it?

10         MR. DONNELLY:  It wasn't entirely clear to me

11    what the witness was trying to say.

12         (End of sidebar conference.)

13         MR. DONNELLY:  No further questions for this

14    witness.  Thank you, your Honor.

15         THE COURT:  Okay.  Thank you very much.

16         All right, then.  Mr. Bone, your testimony is

17    complete.  You may step down.  Thank you very much.

18         Ladies and gentlemen, this is probably a good

19    time to take our lunch break before we put on the next

20    witness.

21         I do want to take a minute before you go out to

22    lunch to just say a couple of things to you.  First of

23    all, we'll break until 1:30.  The afternoon session

24    will go from 1:30 to approximately 4:30, 4:45 depending

25    on a good breaking point.  All right?

1          While you're out, if you go out to get lunch,

2     some of you may have brought your lunches, but if you

3     go out to get lunch, you're given some jury badges.

4     You should wear those on the outside of your clothing.

5     The reason for that is there may be people associated

6     with this case that either you've seen here in the

7     courtroom or there could be other people who are going

8     to be witnesses.  They know that if you're wearing that

9     jury badge they should stay away from you and should

10    not have any contact with you.  That's what tells

11    people that you're on a jury.  And so it may seem a

12    little awkward, but you should wear that so that people

13    don't inadvertently have a conversation in front of you

14    that you shouldn't be listening to.  Okay?  That's the

15    purpose of that.  So I do ask if you go out that you

16    wear that jury badge on the outer part of your

17    clothing.

18          I want to remind you of my instructions not to

19    have any conversations with anyone about the case, not

20    to begin deliberating or talking with each other, not

21    to do any research if you're using your iPhones,

22    cellphones, whatever, you're not to do any research

23    about anything related to the case and not to read

24    anything or listen to anything relating to the case.  I

25    don't think there would be anything; but if there were,

1    not to expose yourself to that.

2         If you're out and about, be careful.  I don't

3    want anybody slipping or falling or anything like that.

4    Charlie will give you the instructions on when to be

5    back so we can start sharp at 1:30.

6         Charlie, show the jury out.  Thank you.

7         (Proceedings out of the presence of the jury as

8    follows:)

9         THE COURT:  Counsel come up just for a moment.

10        (Discussion off the record.)

11        (Lunch recess.)

12        THE COURT:  Are we ready to bring the jury in?

13   You have your next witness?

14        MR. DONNELLY:  We do.

15        THE COURT:  Okay.  Very good.  Let's get the

16   jury in.

17        (Proceedings in the presence of the jury as

18   follows:)

19        THE COURT:  Welcome back, ladies and gentlemen.

20   I hope you had an enjoyable lunch hour.  We're ready to

21   proceed.  The Government is ready to call its next

22   witness.

23        Mr. Donnelly?

24        MR. DONNELLY:  Thank you, your Honor.

25        The United States calls Elias Psyllos.

1          **ELIAS PSYLLOS, GOVERNMENT WITNESS, SWORN**

2               THE CLERK:  Please state your name and spell

3      your last name for the record.

4               THE WITNESS:  Elias Psyllos, P-S-Y-L-L-O-S.

5               THE COURT:  Good afternoon, Mr. Psyllos.

6               THE WITNESS:  Good afternoon.

7               THE COURT:  You may inquire.

8               **DIRECT EXAMINATION BY MR. DONNELLY**

9      **Q.**   Mr. Psyllos, we might need you to pull a little

10     closer to the microphone there so that everybody can

11     hear you.

12               You're employed by the United States Postal

13     Inspection Service?

14     **A.**   That's correct.

15     **Q.**   And in what capacity?

16     **A.**   I am a forensic computer analyst.

17     **Q.**   And how long have you been working in that

18     capacity for the Postal Inspection Service?

19     **A.**   A little less than two years.

20     **Q.**   Did you receive specialized training in order to

21     work in that capacity?

22     **A.**   I did.

23     **Q.**   In effect, did you work in the private sector as a

24     computer forensic analyst as well?

25     **A.**   I have, since 2008.

1    **Q.**    So you've been at this for a while?

2    **A.**    Yes.

3    **Q.**    Did you analyze digital evidence or computer

4    evidence that was given to you by Inspector Connelly?

5    **A.**    Yes, I did.

6    **Q.**    And what was it that Inspector Connelly gave you,

7    Mr. Psyllos?

8    **A.**    I received one Toshiba laptop and one PNY USB

9    thumb drive.

10   **Q.**    And in particular, did Inspector Connelly ask you

11   to look for certain items on the laptop to see whether

12   or not they were there?

13   **A.**    Yes, he did.

14   **Q.**    And when you do a forensic examination of a

15   computer, do you have standard protocols you follow to

16   do that examination?

17   **A.**    Yes, we do.  We first receive the evidence and

18   accept it in our chain of custody system.  We then take

19   from the Toshiba laptop, I remove the hard drive.  I

20   connected it to a Tableau TD1 Write Blocker, an imaging

21   tool.  This allows us to create a forensically sound

22   image of the original evidence.  The original evidence

23   is then placed back into the Toshiba laptop, placed

24   into an evidence container, sealed and placed into an

25   evidence locker.

1        I then took the PNY thumb drive, placed it into

2   a Tableau USB Write Blocker, performed a forensic image

3   of that, verified it, and placed the thumb drive into

4   an evidence container and back into the evidence

5   locker.

6   **Q.**   And what's the point of the write blocker?

7   **A.**   The write blocker protects the original data so it

8   allows us to read from it but not write to it so all

9   the data is secure.

10  **Q.**   So if the new copy you're making, something messes

11  up on that, the original evidence is fine?

12  **A.**   That is correct.

13  **Q.**   And you can always make another copy?

14  **A.**   Yes.

15  **Q.**   When you make a forensic image or forensic copy to

16  work from, it's exactly bit-for-bit a match with the

17  original evidence?

18  **A.**   That is correct.

19  **Q.**   You test it first to see whether everything worked

20  okay, right?

21  **A.**   That is correct.

22  **Q.**   Did you do that in this case before examining your

23  forensic image of the laptop?

24  **A.**   Yes, we did.

25  **Q.**   And you also were given a thumb drive, you say?

1    **A.**    That's correct.

2    **Q.**    Now, did Inspector Connelly ask you to look and to

3    use whatever forensic tools you have to determine

4    whether or not the Toshiba laptop had been used --

5    forgive me if I phrase the question wrong, but had been

6    used to access the website azovfilms.com?

7    **A.**    That is correct.

8    **Q.**    And did you find any digital evidence on the

9    laptop that it had indeed accessed that website?

10    **A.**    Yes, I did.

11    **Q.**    What kind of evidence did you find?

12    **A.**    We use a program called Internet Evidence Finder.

13    And what Internet Evidence Finder does is it searches

14    the forensic image which is an exact duplicate of the

15    original to search for Internet history.  It then

16    extracts that history and puts it into a report so that

17    we can view it.

18    **Q.**    And in the -- did the Internet evidence finder

19    tool that you used, it did indicate that the computer

20    had accessed the Azov Films website?

21    **A.**    Yes, it did.

22    **Q.**    And did it tell you exactly how many times it had

23    gone there?

24    **A.**    It does not.

25    **Q.**    It doesn't give you that detail of information; is

1    that correct?

2    **A.**   That's correct.

3    **Q.**   Did it give you a date range?

4    **A.**   Yes, it did.  The date range was from December

5    2010 through August 2012.

6    **Q.**   Now, that date range, what can you tell the jury

7    about -- supposed there's evidence in this case that

8    that a person using that laptop accessed

9    azovfilms.com -- is it possible that that computer

10   accessed azovfilms.com prior to December of 2010?

11   **A.**   Yes, it is.

12   **Q.**   How do you account for the fact that it wasn't in

13   the date range you saw in the Internet evidence that

14   you found?

15   **A.**   Internet evidence finder will search for the data

16   that's currently present for any HTML or web browsing

17   history at that point in time.  So it may have been

18   cleared out prior to that.  There's also defaults in

19   certain browsers that will clear out that cache and get

20   rid of those history results.

21   **Q.**   When the stenographer stopped you because we all

22   got caught on the phrase HTML --

23   **A.**   Yes.

24   **Q.**   -- what's a layman's understanding of that?

25   **A.**   It's a website.

1    Q.    And I believe -- let me ask another question.  You

2    used the word cache.  How do you spell that?

3    A.    C-A-C-H-E.

4    Q.    What's a cache?

5    A.    Essentially, in basic terms it's a log, and it

6    records web browsing activity that's happening on that

7    device.

8    Q.    And for example, can a user go to his or her cache

9    on her computer and simply delete that cache?

10         MR. MANN:  Objection, Judge.

11         THE COURT:  Grounds?

12         MR. MANN:  Can I -- well, relevance as to this

13    particular question.

14         THE COURT:  Are you objecting on the foundation,

15    relevance?  I'm not sure what you're --

16         MR. MANN:  Can I explain it briefly?

17         THE COURT:  Okay.

18         (Sidebar conference.)

19         MR. MANN:  If he's going to say just that a

20    person can, then it's irrelevant.  If he's going to say

21    my client did it, then I --

22         MR. DONNELLY:  I just wanted him to explain why

23    your client was obviously on Azov Films in October of

24    2010, the computer says December of 2010.  I'm just

25    trying to get him to explain ways -- based on his

1  expertise, ways that he knows that it could happen.

2  I'm not trying to say anything nefarious.

3  　　　　MR. MANN:  I was just worried about something I

4  didn't anticipate.

5  　　　　THE COURT:  All right.

6  　　　　(End of sidebar conference.)

7  　　　　THE COURT:  Go ahead and rephrase your question,

8  Mr. Donnelly.

9  　　　　MR. DONNELLY:  Thank you, your Honor.

10  **Q.**　　Mr. Psyllos, I think what I was trying to ask is

11  you just explained what a cache is.  I think I had

12  asked you earlier, as it regards to the cache on the

13  computer, that is some type of log of Internet

14  activity; is that correct?

15  **A.**　　That's correct.

16  **Q.**　　You found that the earliest date you had as far as

17  access to azovfilms.com was sometime in December of

18  2010?

19  **A.**　　That is correct.

20  **Q.**　　And I asked you could it have been earlier?

21  **A.**　　Yes.

22  **Q.**　　And the answer is yes?

23  **A.**　　Yes, it is.

24  **Q.**　　And what kinds of explanations are there that

25  would allow for that?

1    **A.**   A user could go in and just clear their cache

2    through their web browser, different computer could

3    have accessed it.

4    **Q.**   And sometimes I think you mentioned people have

5    the clearing of the cache set by default to happen at a

6    certain schedule; is that right?

7    **A.**   That is correct.

8    **Q.**   Some people do it daily; is that right?

9    **A.**   That is correct.

10   **Q.**   Does that help your computer work better when you

11   do things like that, for example?

12   **A.**   Yes, it can.

13   **Q.**   Now, you said that the outer date you found was

14   sometime in August of 2012.  Did I hear that right?

15   **A.**   That's correct.

16   **Q.**   Now, in this particular case, are you aware that

17   the Azov Films website was shut down on May 1st of

18   2011?

19   **A.**   Yes.

20   **Q.**   So what would explain why you saw evidence that

21   the computer had gone to azovfilms.com as late as

22   August of 2012?

23   **A.**   Just because a site is shut down or no longer

24   exists doesn't mean you can't actually type it in to a

25   URL and try to access that site.  You'll get an error

1    message back, but you can physically type it in and hit

2    enter and go to it.

3    **Q.**   Okay.  So if a person did that, typed

4    azovfilms.com into their browser or perhaps could it

5    have been a bookmark or a favorite for the person?

6    **A.**   Yes, it could have.

7    **Q.**   And whatever way they tried to go to

8    azovfilms.com, you'd still see the evidence that the

9    computer tried to access the site?

10   **A.**   That's correct.

11   **Q.**   But you might not see that the site was shut down?

12   **A.**   That's correct.

13        MR. DONNELLY:  One moment, please, your Honor.

14        (Pause.)

15   **Q.**   Did Inspector Connelly ask you to search the

16   Defendant's computer for PowerPoint presentations?

17   **A.**   Yes, he did.

18   **Q.**   For those who might not know, what does the word

19   "PowerPoint" mean?

20   **A.**   It's a Microsoft Office-based utility to create

21   presentations.

22   **Q.**   Like a slide presentation?

23   **A.**   That's correct.

24   **Q.**   Were you asked more specifically to look for

25   PowerPoint presentations that related to minors and the

1    seduction of minors?

2    **A.**    Yes.

3    **Q.**    And did you find anything like that on the

4    Defendant's computer?

5    **A.**    Yes, I did.

6    **Q.**    Did you find anything like that on the thumb

7    drive?

8    **A.**    Yes, I did.

9    **Q.**    In total, how many of these PowerPoints did you

10   find?

11   **A.**    Four of them.

12   **Q.**    How many were on the computer?

13   **A.**    Three of them were on the computer.

14   **Q.**    And one on the thumb drive?

15   **A.**    Yes.

16   **Q.**    And did you actually examine these PowerPoint

17   presentations?

18   **A.**    Yes, I did.

19   **Q.**    Did they all have the same first slide or title

20   slide, for the lack of a better word?

21   **A.**    Yes, they did.

22   **Q.**    And did it say something like:  The subtle

23   seduction of minors with a special emphasis on males?

24   **A.**    Yes.

25   **Q.**    Did they differ, however, a couple slides here and

1    there, these pre-draft presentations?

2    **A.**   Yes, some were short and some were longer.

3    **Q.**   And referring to the three on the computer that

4    you found, if a person started the computer up and

5    wanted to access them, where were they found on the

6    computer?

7    **A.**   Some were on the desktop and one was in a

8    presentations folder.

9    **Q.**   It was a folder called "Presentation"?

10   **A.**   That's correct.

11   **Q.**   And if you double-clicked on that, you'd find the

12   PowerPoint presentation?

13   **A.**   That's correct.

14   **Q.**   So two steps from the desktop?

15   **A.**   Yes.

16   **Q.**   And the others were directly on the desktop

17   itself?

18   **A.**   That's correct.

19   **Q.**   All right.  Now, when you're looking at any files,

20   including PowerPoint files, do they have a date

21   associated with their creation?

22   **A.**   Yes, they do.

23   **Q.**   What's it called?

24   **A.**   It's a created date.

25   **Q.**   Did you look for the created date for these three

1    PowerPoints?

2    **A.**   Yes, I did.

3    **Q.**   Can you tell the jury what the three dates were.

4    **A.**   The earliest one was 7/9/2011.

5    **Q.**   When you say 7/9, you mean July 9th of 2011?

6    **A.**   Yes.

7    **Q.**   And do you recall when the next one was created?

8    **A.**   I'd have to refer to my notes for that.

9    **Q.**   Does August of 2011 refresh your recollection?

10   **A.**   Yes.

11   **Q.**   And then do you recall the third one on the

12   computer, when that was created, if you know the month

13   and year?

14   **A.**   I believe it was in March.

15   **Q.**   Of what year?

16   **A.**   2011.

17   **Q.**   2011 or '12?

18   **A.**   I'm sorry.  2012.

19   **Q.**   And the PowerPoint you found on the thumb drive,

20   did you examine that for a created date?

21   **A.**   Yes, I did.

22   **Q.**   Was that also in March of 2012?

23   **A.**   That's correct.

24   **Q.**   Showing you Government's Exhibit 34 for

25   identification, Mr. Psyllos, just take a moment to look

1    at that.

2         I believe you stated that the earliest created

3    PowerPoint presentation was the one you found in the

4    folder marked "Presentation"?

5    **A.**   That's correct.

6    **Q.**   And that was from July of 2011, July 9th, I

7    believe you said; is that right?

8    **A.**   That's correct.

9    **Q.**   That was the one I just showed you; is that right?

10   **A.**   Yes.

11        MR. DONNELLY:  Your Honor, we move Government

12   Exhibit 34 full.

13        MR. MANN:  No objection.

14        THE COURT:  Thirty-four will be full.

15        (Government Exhibit 34 admitted in full.)

16        MR. DONNELLY:  One moment, please, your Honor.

17        Can we bring up page one from Exhibit 34 and

18   publish it, please.

19   **Q.**   So this was the PowerPoint presentation that you

20   saw.  And all four of the PowerPoints you saw had the

21   same title slide?

22   **A.**   Yes, they did.

23        MR. DONNELLY:  One more moment, your Honor.

24   **Q.**   Now, Mr. Psyllos, you testified that Inspector

25   Connelly -- you did these examinations at Inspector

1    Connelly's request; is that right?

2    **A.**   That's correct.

3    **Q.**   And whether it was in this case or any other case

4    where you were working with other postal inspector

5    investigating agents, after you fulfilled their request

6    and examined a computer, do you give them something?

7    **A.**   Yes.  We turn over a search results disk that

8    contains all the search results.

9    **Q.**   Did you do that in this case?

10   **A.**   Yes, I did.

11   **Q.**   Now, you used your expertise as a computer

12   forensics analyst to find these items that you put in

13   your results disk?

14   **A.**   That's correct.

15   **Q.**   But as far as Mr. Connelly is concerned or any of

16   the other agents, do you need any particular expertise

17   to go through your results and find items?

18   **A.**   No, you do not.

19       MR. DONNELLY:  Your Honor, I have no further

20   questions.

21       THE COURT:  Thank you.

22       Mr. Mann?

23       **CROSS-EXAMINATION BY MR. MANN**

24   **Q.**   Good afternoon, sir.

25   **A.**   Good afternoon.

1  **Q.**   When you were looking for whether or not the Azov

2  website had been accessed using your tool, I forgot

3  what you call it, but the tool to check whether the

4  Azov website had been accessed?

5  **A.**   The Internet evidence finder.

6  **Q.**   Sorry.  Thank you.  That tool allowed you to

7  discover that the Azov site had been accessed, right?

8  **A.**   That's correct.

9  **Q.**   And there wasn't any problem using that tool in

10  terms of being able to determine that the Azov website

11  had been accessed?

12  **A.**   No.

13  **Q.**   And you didn't have any -- did you have any

14  trouble getting into the computer to -- when I say the

15  computer, the drive that we're talking about?

16  **A.**   No, I did not.

17  **Q.**   There wasn't some super-secret password that you

18  needed or anything like that?

19  **A.**   No, I did not.

20  **Q.**   And did you -- you talked about how there are

21  different ways that cache can be emptied, right?

22  **A.**   That's correct.

23  **Q.**   And did you determine how it was emptied in this

24  particular case?

25  **A.**   No, I did not.

1    **Q.**    But in any event, you obtained this computer

2    sometime -- I assume sometime after September 2012,

3    this drive?

4    **A.**    Yes.

5    **Q.**    Because that was when they seized the computer,

6    right?

7    **A.**    That's correct.

8    **Q.**    And when you examined the drive that you had

9    obtained, you clearly were able to go back at least as

10   far as December 20th, 2010; is that correct?

11   **A.**    That's correct.

12   **Q.**    So there clearly wasn't any daily or weekly

13   clearing of the cache or anything like that?

14   **A.**    No.

15   **Q.**    Because you were able to go back close to two

16   years at a minimum, right?

17   **A.**    That's correct.  And then it depends on the

18   browser that you're using at that point in time.

19   **Q.**    In terms of how much cache is saved?

20   **A.**    And what's deleted if it's automated, if it's a

21   manual process.

22   **Q.**    But you didn't focus on that?  You didn't try to

23   determine what caused the cache to be deleted before

24   December?

25   **A.**    That's correct.

1    Q.   And we're talking December 2010?

2    A.   That's correct.

3    Q.   Now, you said that that examination indicated to

4    you that the Azov site either had been contacted or an

5    attempt had been made to contact it through August

6    2012, right?

7    A.   That's correct.

8    Q.   And did your tool allow you to determine whether

9    or not actual contact had been made or just whether an

10   attempt had been made?

11   A.   Whether an attempt had been made.

12   Q.   I think you told Mr. Donnelly, but I want to --

13   that you weren't able to tell from your tool -- when I

14   say "tool," the detection tool that you were using --

15   how often the site had been either connected to or had

16   been attempted to be connected to, right?

17   A.   That's correct.

18   Q.   You described four files that you identified that

19   were PowerPoint presentations; is that correct, sir?

20   A.   That is correct.

21   Q.   And you identified creation dates for each of

22   those four files; is that correct?

23   A.   That is correct.

24   Q.   And do I understand the creation date to be the

25   first date the file was created?

1    **A.**    On that specific directory.

2    **Q.**    On that specific directory?

3    **A.**    Yes.

4    **Q.**    Instead of my guessing, tell me what you mean by

5    saying on that specific directory?

6    **A.**    Sure.  You could take a file from a thumb drive,

7    let's say, and drag it over to your laptop or desktop

8    and the created date would change for the day that you

9    copied it over, because that's the date that it

10   actually was created on that directory or that digital

11   evidence.

12   **Q.**    And you -- could you tell from your analysis

13   whether -- let me back up.

14        The thumb thrive is one way you can move files

15   around, right?

16   **A.**    Right.

17   **Q.**    You can move a file to and from a thumb drive and

18   a hard drive with relative ease; is that fair to say,

19   sir?

20   **A.**    That's correct.

21   **Q.**    And I take it your analysis then tells us the

22   creation date of the PowerPoint on either the thumb

23   drive or the computer, but not whether or not an

24   earlier version had been created on some different

25   directory and then moved to either one of these, right?

1    A.    That's correct.

2    Q.    And so you can't -- if I understand you correctly,

3    you can't really tell out of these four presentations

4    which was actually created first?  You can only tell us

5    what the date was that they were created on either the

6    computer or the thumb drive as the case may be?

7    A.    That's correct.

8    Q.    And did your analysis -- let me back up.

9         After you create the PowerPoint drive on

10   whatever drive, let's just take the laptop -- not the

11   laptop because that was where Exhibit 34 was created,

12   right?

13   A.    Yes.

14   Q.    You can then, once it's on that directory, you can

15   obviously modify it, right?

16   A.    That is correct.

17   Q.    And there is really no limit to how many times you

18   can modify it, is there?

19   A.    That's correct.

20   Q.    Your analysis didn't give us dates of when it was

21   modified?

22   A.    I'd have to refer back to my notes.

23   Q.    That's not immediately available to you?  You'd

24   have to look at your notes?

25   A.    Yes.

1    **Q.**    But clearly, one could modify it on a date

2    subsequent to the date of creation?

3    **A.**    Yes, that's correct.

4    **Q.**    In fact, if you did anything to that item, the

5    PowerPoint after that date, it would by definition have

6    to be a date after the date of creation if you kept it

7    on the same directory?

8    **A.**    If you kept it on the same directory, yes.

9    **Q.**    And if I understood you correctly, there were

10   three PowerPoint files on the laptop; is that correct?

11   **A.**    Yes.

12   **Q.**    Did I understand you to say two were on the

13   desktop directly?

14   **A.**    That's correct.

15   **Q.**    They were an icon on the desktop, I take it?

16   **A.**    Yes.

17   **Q.**    And then the third one you said was in a

18   presentation folder?

19   **A.**    That's correct.

20   **Q.**    Was the presentation folder also an icon?

21   **A.**    Yes, it was.

22   **Q.**    So you'd have to go to "Presentation," click on

23   that, and from there you would get to the PowerPoint

24   within that?

25   **A.**    That's correct.

1          MR. MANN:  Could I have just a moment, please?

2          THE COURT:  Sure.

3          (Pause.)

4          MR. MANN:  Nothing further, thank you.

5          THE COURT:  Thank you, Mr. Mann.

6          Mr. Donnelly, redirect?

7          MR. DONNELLY:  Just one question, your Honor.

8          **REDIRECT EXAMINATION BY MR. DONNELLY**

9     **Q.**   Mr. Psyllos, I don't know if I heard correctly,

10    but you told us about the file creation dates; and if I

11    open that file or a person opens that file and you make

12    a change, that's called a modification?

13    **A.**   That's correct.

14    **Q.**   And you would see a modified date, last modified

15    date; is that right?

16    **A.**   That's correct.

17    **Q.**   Would you also still see the creation date?

18    **A.**   Yes, you would.

19          MR. DONNELLY:  Okay.  Thank you.

20          THE COURT:  Recross?

21          **RECROSS-EXAMINATION BY MR. MANN**

22    **Q.**   Just to be clear, you may know the modification

23    dates but you don't have them in front of you right

24    now?

25    **A.**   That's correct.

1          THE COURT:  Thank you.  Then, Mr. Psyllos, your

2     testimony is complete.  You may step down.  Thank you

3     very much.

4          THE WITNESS:  Thank you.

5          THE COURT:  Your next witness, Mr. Donnelly.

6          MR. DONNELLY:  The United States calls Michael

7     Connelly, your Honor.

8          **MICHAEL CONNELLY, GOVERNMENT WITNESS, SWORN**.

9          THE CLERK:  Please state your name and spell

10    your last name for the record.

11         THE WITNESS:  Michael Connelly, C-O-N-N-E-L-L-Y.

12         THE COURT:  Good afternoon, Mr. Connelly.

13         THE WITNESS:  Good afternoon, your Honor.

14         THE COURT:  You may inquire.

15         **DIRECT EXAMINATION BY MR. DONNELLY**

16    **Q.**   Good afternoon, Mr. Connelly.

17         You are employed by the United States Postal

18    Inspection Service?

19    **A.**   Yes, sir.

20    **Q.**   And for how long?

21    **A.**   Since 2007.

22    **Q.**   What are your current duties?

23    **A.**   For the last about two-and-a-half, almost three

24    years I've been assigned to work child exploitation

25    investigations full-time.

1    **Q.**   And in the course of that work, you've had the

2    occasion to meet and work with Inspector Brian Bone?

3    **A.**   On several occasions, yes.

4    **Q.**   And as regards this case, when did you first start

5    working with Inspector Bone?

6    **A.**   With regard to this case, I believe I received a

7    lead packet from him in around the summer of 2012.  I

8    apologize.  I have a number of cases.  I don't recall

9    the exact time.

10   **Q.**   Sometime in the summer of 2012?

11   **A.**   Yes, sir, approximately.

12   **Q.**   And a lead packet is just a description of what

13   the investigation is; is that right?

14   **A.**   Yes.

15   **Q.**   Some of the evidence itself.

16   **A.**   The investigation so far, the individual who is

17   under investigation and any information that's been

18   gathered to that point.

19   **Q.**   Okay.  And of the people that were referred to

20   you, one of those was the Defendant, Gerald Silva?

21   **A.**   That's correct.

22   **Q.**   The Defendant in the courtroom?

23   **A.**   Yes, sir.

24   **Q.**   Now, as part of --

25        MR. DONNELLY:  One moment, please.

1    **Q.**   Of that package, you heard Inspector Bone earlier

2    testify about the evidence he obtained from Canada,

3    from Toronto Police Service?

4    **A.**   Yes, sir, I did.

5    **Q.**   And he passed on and turned part of that evidence

6    to you, the part relating to Gerald Silva as it regards

7    this case?

8    **A.**   That's correct.

9    **Q.**   And did you get copies of the invoices that we

10   started to look at this morning?

11   **A.**   Among other things, yes, sir.

12   **Q.**   Just so we can try and get our numbers right, do

13   you know today how many orders the Defendant placed for

14   DVD products from Azov Films?

15   **A.**   I believe in total the Defendant placed 24 orders,

16   two of which were cancelled so a total of 22 orders

17   were fulfilled totaling I believe 75 products that were

18   individually ordered.

19   **Q.**   And do you know how much -- what was the date

20   range, approximate date range of those purchases?

21   **A.**   Approximately October 2010 through I want to say

22   March or early April 2011.

23   **Q.**   Did you add up how much he spent in those 22

24   invoices?

25   **A.**   Yes, sir.

1    **Q.**    How much was it?

2    **A.**    About $1,589, or thereabouts.

3    **Q.**    Now, based on the evidence you were able to gather

4    from the summer of 2012 into September, did you seek to

5    get a search warrant from this Court?

6    **A.**    Yes, I did.

7    **Q.**    And you got the search warrant?

8    **A.**    Yes, I did.

9    **Q.**    What was it for, what place?

10    **A.**    It was for the residence of the Defendant, Gerald

11    Silva, an address of ███████████████████████, in

12    Coventry, Rhode Island.

13    **Q.**    And sometime after that date, did you get the

14    assistance of other law enforcement officers and

15    proceed to the house to execute the search warrant?

16    **A.**    The very next morning, sir.

17    **Q.**    So I have the dates right, did you get the search

18    warrant on one day and go the next?

19    **A.**    Yes, sir.

20    **Q.**    So what date did you actually execute the warrant?

21    **A.**    I believe it was September 27, 2012.

22    **Q.**    Were you sort of the directing agent for the

23    execution of the search warrant?

24    **A.**    Yes.  I'm the case agent for this investigation.

25    **Q.**    And what time of the day or what part of the day

1    was it when you went to the Defendant's home?

2    **A.**    Early morning.  I'd say between six and seven

3    o'clock approximately.

4    **Q.**    And when you went to ███████████████ in Coventry,

5    was anybody there?

6    **A.**    Yes.

7    **Q.**    Who was there?

8    **A.**    Gerald Silva.

9    **Q.**    Does he live with anybody else at this residence?

10   **A.**    He does not.

11   **Q.**    Now, when you first got there, by the way, did you

12   give him any instructions or options as to what he

13   could do while you executed the search warrant?

14   **A.**    Yes.

15   **Q.**    What did you tell him?

16   **A.**    After we secured the premises for officer safety

17   as well as for Mr. Silva's, I informed him that he was

18   not under arrest, that we were there to execute a

19   Federal search warrant which had been authorized by

20   this Court on his residence.  I provided him with a

21   copy of that search warrant, and I told him he was free

22   to leave at any time but he couldn't walk around the

23   premises unescorted just for our safety.

24   **Q.**    Did he decide to leave?

25   **A.**    No, sir.  He stayed.

1   **Q.**   Now, was the search warrant documented by the

2   taking of photographs?

3   **A.**   Yes.

4        MR. DONNELLY:  Your Honor, the Government's

5   Exhibit 22 is a compilation of search warrant

6   photographs.  I don't believe the Defendant has an

7   objection so I would move them all full at this time.

8        MR. MANN:  That's correct.  No objection.

9        THE COURT:  All right.  Exhibit 22 will be full.

10        (Government Exhibit 22 admitted in full.)

11        THE COURT:  Do you wish to publish them to the

12   jury?

13        MR. DONNELLY:  Yes, your Honor.  We'll go

14   through them one at a time with the Court's permission.

15        THE COURT:  All right.

16        MR. DONNELLY:  If we could start with the first

17   one, please, Ms. Anderson.

18   **Q.**   What are we looking at here in page one of

19   Government's Exhibit 22?

20   **A.**   This is the front of the Defendant's residence, ███

21   ████████████  in Coventry.

22   **Q.**   Before we go further, could you describe the house

23   further for us, how many rooms there are, that sort of

24   thing?

25   **A.**   It's a single-family ranch-style house, three

1    bedrooms, one bathroom with an attached garage.  I

2    guess around 1500 square feet, 1400 maybe.

3         MR. DONNELLY:  If we could go to the next page,

4    please.

5    Q.   You mentioned the rooms in the house.  What room

6    is this?

7    A.   This is the living room.  So this picture was

8    taken as if you were standing in the front door of the

9    residence and looked slightly to the right.

10   Q.   Looks a little messy.  Is that caused by the

11   searchers, or was this the way you found it when you

12   got there?

13   A.   No, sir.  This is one of the original photos we

14   took upon entering of the residence.  No searching had

15   been conducted by this point.

16   Q.   Would it be fair to say that the house was --

17   there's a lot of stuff there?

18   A.   Yes, sir.

19        MR. DONNELLY:  Could we go to the next exhibit,

20   please.

21   Q.   What room is this?

22   A.   The is the kitchen and kitchen eat-in area.  So

23   this is in between the living room -- this would be the

24   next room back as you're walking from the street.

25        MR. DONNELLY:  Could we go to the next

1      photograph, please.

2      **Q.**   Do you recognize this room?

3      **A.**   Yes, sir, I do.

4      **Q.**   Is this one of the three bedrooms?

5      **A.**   It is.

6      **Q.**   Or three extra rooms there?

7      **A.**   Yes, sir.

8      **Q.**   Obviously not being used as a bedroom, I don't

9      think?

10     **A.**   I don't believe so, sir.

11     **Q.**   What's the significance of this particular room?

12     **A.**   This room was where we found a number of the

13     videos that we recovered which the Defendant had

14     purchased from Azov Films in the bookshelf along the

15     left side as well as in containers such as these and

16     various other places throughout this room.

17     **Q.**   Now, there were, for lack of a better term, sort

18     of regular mainstream videos that you found in this

19     room?

20     **A.**   Yes, sir.  If you want, you can say commercially

21     sold Hollywood-type movies, Harry Potter, Lord of the

22     Rings, things of that nature.

23     **Q.**   The search warrant authorized you to seek for

24     evidence regarding Azov Films though; is that correct?

25     **A.**   Correct.  And any other child pornography or child

1    exploitation material.

2    **Q.**    Okay.  Did you find any Azov Films materials in

3    this room?

4    **A.**    Quite a few.

5    **Q.**    You found DVD boxes with DVDs in them.

6    **A.**    Yes.  As well as accompanying photo CDs as well.

7    **Q.**    Were all of the Azov Films products you found

8    opened?

9    **A.**    No, not all of them were.

10   **Q.**    And you categorize it as unopened, how could you

11   tell whether it had been opened or unopened?

12   **A.**    All of the products had been opened from what they

13   would have been shipped in.  But, for example, a few of

14   the DVDs still had a cellophane wrapper around them so

15   it appeared that that DVD case had not been opened.

16   **Q.**    And you're familiar with the DVD products that had

17   been selected and specified for each of the Counts of

18   the indictment in this case?

19   **A.**    Yes, I am.

20   **Q.**    As to those, were they all opened or were some of

21   those unopened?

22   **A.**    All of them were opened.

23   **Q.**    Now, you heard Inspector Bone's testimony earlier

24   about the invoices, the Azov invoices that detailed the

25   Defendant's purchases from Azov Films?

1   **A.**   Yes, I did.

2   **Q.**   And before executing this search warrant, you had

3   those as well; is that right?

4   **A.**   I did.  He provided a copy to me, along with some

5   other materials as well.

6   **Q.**   And the videos that were listed in those invoices,

7   did you find many of those in the Defendant's home?

8   **A.**   Yes, we did.  Not all of them, but we found a good

9   number of them.

10  **Q.**   Were you or did you -- prior to coming to court

11  today, for the jury's convenience, did you create a

12  summary chart that sort of links the invoices with the

13  charged DVDs?

14  **A.**   Yes, sir, I did.

15       MR. DONNELLY:  That's Government's Exhibit 32,

16  your Honor.  I'd move it full.  I don't think there's

17  any objection.

18       THE COURT:  Any objection, Mr. Mann?

19       MR. MANN:  I'm sure there isn't.  Can I just

20  look?  I just need to look at it for a second.

21       I have no objection, Judge.

22       THE COURT:  32 will be full without objection.

23       (Government Exhibit 32 admitted in full.)

24       MR. DONNELLY:  I believe we were waiting on an

25  easel, your Honor.

1    **Q.**    Inspector Connelly, showing you Government's

2    Exhibit 32, this is the summary chart you prepared?

3    **A.**    Yes, sir.  I requested an analyst in my office to

4    prepare it for me, but yes.

5    **Q.**    This is to summarize which invoice and DVD goes

6    with which Counts; is that correct?

7    **A.**    That's correct.  The invoices which are around in

8    a semi-circle on the left-hand side represent Counts I

9    through VI.  The pink highlighted title is the specific

10   DVD that's charged.  The three invoices to the right

11   are the three individual DVDs in Count VII.

12   **Q.**    We can see the arrows coming off of the photograph

13   of Count I, that invoice; and Count II, that invoice,

14   and so on?

15   **A.**    Yes, sir.

16   **Q.**    And the charged videos are the ones highlighted in

17   pink?

18   **A.**    That's correct.

19        MR. DONNELLY:  That's all we have, your Honor,

20   on this exhibit.

21   **Q.**    Now, over the course of time, Inspector Connelly,

22   have you had the chance to view many of the Azov DVDs,

23   particularly the ones highlighted in pink that are

24   charged in this case?

25   **A.**    I have.

1    **Q.**    And could you tell the jury approximately how long

2    these videos are?

3    **A.**    I think the shortest one that I've seen is about

4    45 minutes, the longest one over two hours.

5    **Q.**    And you brought the charged DVDs and photo DVDs

6    here to Court with you today; is that right?

7    **A.**    Yes, it is.

8         MR. DONNELLY:   Your Honor, we have previously

9    marked those as Government's Exhibit 1 through 11.

10   Move them full now.

11        MR. MANN:   No objection.

12        THE COURT:   All right.   One through 11 will be

13   full.

14        (Government Exhibits 1 through 11 admitted in

15   full.)

16   **Q.**    Inspector Connelly, earlier in your testimony you

17   mentioned, I believe, that there are besides each of

18   these products -- let me the strike that and start

19   over.

20        Each of these products, the DVDs in particular,

21   when you opened the box, are there often more than one

22   disk?

23   **A.**    On a number of them, yes.

24   **Q.**    And I think you mentioned photo DVDs as well; is

25   that correct?

1    **A.**    Yes, sir.

2    **Q.**    What do you know about those?

3    **A.**    Generally speaking, it was an additional option or

4    an upgrade that a customer could make when ordering

5    from Azov Films' website.  There would be a title which

6    would correspond to the product identification number

7    which you saw in the order forms as well as in the

8    photographs from the Toronto search.  Then with the

9    title you could purchase that film or feature, for lack

10   of a better word.  You had the option to purchase

11   additional bonus footage or deleted scenes or things

12   like which you could find.  And additionally, on some

13   of them, you could purchase a photo DVD, which is

14   either still photographs or stills of the video on

15   just a separate disk in and of itself, which you could

16   play on a slide show on a computer or slide show on a

17   DVD player for that matter.  Each one was an

18   independent upgrade.

19              MR. DONNELLY:  Your Honor, may I have one

20   moment, please?

21              THE COURT:  Yes.

22              MR. DONNELLY:  Ms. Anderson, could we go back to

23   Exhibit 21.  I'm looking to go to order number 101404.

24   And can you circle the area on this particular invoice.

25   **Q.**    Does this invoice indicate that the Defendant had

1  chosen to order a photo DVD along with the actual video

2  DVDs?

3  **A.**   Yes, sir, it does.

4  **Q.**   Where is that?

5  **A.**   This portion right in here, the website defaulted

6  to "No, Thank You" as the option, so if you wanted to

7  get something additional you'd have to go into the box

8  and change that to "Yes, Please Add It."  And that was

9  added for an additional charge.

10 **Q.**   And in addition to this invoice, is there one

11 other that also came that chose to get a photo DVD?

12 **A.**   Yes, sir.

13 **Q.**   Of still images?

14 **A.**   Yes.

15      MR. DONNELLY:  Now, could we go back to the

16 search warrant photographs, Exhibit 23, please.  Not

17 23.  22, please.

18 **Q.**   I think you had described that this was a picture

19 of where videos were found?

20 **A.**   Yes.  This is the -- as you're looking at the

21 house from the street, this the rear bedroom to the

22 left-hand side.  So those windows would face out into

23 the side and backyard.

24 **Q.**   And this is the condition that you found this room

25 in?

1    A.    Yes, sir.

2         MR. DONNELLY:  Could we go to the next picture,

3    please.

4    Q.    What are we looking at here?

5    A.    On top you have a flat screen TV as well as right

6    here is a DVD player.  There were several speakers

7    around.  I believe there may have been a second DVD

8    player in this area but at this distance I don't

9    remember exactly.

10        MR. DONNELLY:  The next slide, please.

11   Q.    What is this?

12   A.    The same room just simply as if the person taking

13   the picture had just turned to the right a little bit.

14   It's a bookcase where there was a lot of DVDs found.

15        MR. DONNELLY:  Next photograph.

16   Q.    Did you find any evidence in this section of the

17   room?

18   A.    Yes.  Actually, specifically, right down here was

19   a container where two of the photo CDs were located as

20   well in this general area.

21   Q.    And when a person was ordering from the Azov Films

22   website, did they have to pay more if they wanted

23   artwork on the boxes?

24   A.    I believe it was -- I don't think they had to

25   individually pay more for that, but if you selected to

1    not get the artwork and full DVD case, in other words,

2    if you got it in just a paper sleeve, you'd save money

3    by getting a reduced shipping cost because it weighed

4    less.  I believe that's how it was but I'm not a

5    hundred percent certain.

6         MR. DONNELLY:  Could we go to the next slide.

7    **Q.**   Same room?

8    **A.**   I believe so, yes, sir.

9    **Q.**   Did you find evidence in this section?

10   **A.**   There really was pretty much just one giant

11   section so, yes, we did.

12        MR. DONNELLY:  Could we move on to the next

13   slide, please.

14   **Q.**   What are we looking at here?

15   **A.**   This is a Toshiba laptop and the picture was taken

16   I believe in the Defendant's bedroom, which would be

17   the front bedroom of the windows facing out into the

18   street directly across the hall from the previous

19   photographs.

20   **Q.**   The Toshiba laptop Mr. Psyllos testified about

21   that you sent to him?

22   **A.**   Yes.  That's correct.

23        MR. DONNELLY:  The next one, please.

24   **Q.**   What are we looking at here?

25   **A.**   That's the same laptop just flipped upside down.

1    We document the serial numbers just for evidence

2    reasons preferably with a photograph.  Makes it easier.

3         MR. DONNELLY:  Go to the next one, please.

4    **A.**   And that's the serial number I was referring to.

5         MR. DONNELLY:  Next photo.

6    **Q.**   Was there something of evidentiary value found

7    that can be seen in this picture?

8    **A.**   Yes, sir.  This is the clear plastic box that I

9    circled earlier.  This box right here was where two of

10   the photo CDs as well as a number of other Azov titles

11   were found.

12   **Q.**   Now, I see an envelope under there.  Was that

13   significant to you?

14   **A.**   Yes, sir, it was.  That was a priority mail

15   envelope which the return address was 4P5P Productions

16   in an address in upstate New York but I can't remember,

17   and the addressee was Gerald Silva at the subject

18   premises.

19   **Q.**   Was that one of the envelopes you seized?

20   **A.**   Yes, sir.

21   **Q.**   You found various items of evidence that the DVDs

22   had been mailed to Mr. Silva; is that right?

23   **A.**   Yes.  Both padded envelopes as well as cardboard

24   boxes for the larger orders.

25   **Q.**   I'm showing you Government's Exhibits 13 and 14.

1    Do you recognize these, Mr. Connelly?

2    **A.**   Yes, I do.

3    **Q.**   What are these?

4    **A.**   Those are some more of the packaging material that

5    Azov Films employed to mail the DVDs to the Defendant.

6    **Q.**   And as Inspector Bone testified about earlier, you

7    can see visible the initial Azov Films' address

8    underneath the larger sticker?

9    **A.**   You can.  And you can actually read the name

10   through as Inspector Bone did.

11        MR. DONNELLY:  I would move 13 and 14 full, your

12   Honor.

13        MR. MANN:  No objection.

14        THE COURT:  13 and 14 will be full.

15        (Government Exhibits 13 and 14 admitted in

16   full.)

17   **Q.**   Now, I asked you earlier, Inspector Connelly --

18        MR. DONNELLY:  Excuse me one minute.

19   **Q.**   What are we looking at here?

20   **A.**   That was one of the DVDs that was found within

21   that box.  That's not one of the photo CDs, but that's

22   another film titled "Water Boys," which was an Azov

23   produced video.

24        MR. DONNELLY:  Next photo, please.

25   **Q.**   Is this a photo of where you found the mailing

1    matter?

2    **A.**    Yes.  And that's one of the envelopes that we just

3    entered into evidence.

4    **Q.**    What are we looking at here?

5    **A.**    That's one of the larger boxes for the larger size

6    orders.  And right here is definitely an Azov title.

7    It's "Raw Rewind."  I believe it's Volume 2, which I

8    believe is Count VI of the indictment.

9    **Q.**    One of the titles is "Raw Rewind, Volume 2"?

10   **A.**    Correct.

11       MR. DONNELLY:  Could I see Government's Exhibit

12   1, please.

13   **Q.**    I'd like to show you the DVD that's Government's

14   Exhibit 1.  Do you recognize that?

15   **A.**    I do.

16       MR. DONNELLY:  And that's already full in

17   evidence.  If I could use the ELMO, please.

18   **Q.**    The light is causing some glare but can you tell

19   what title that is?

20   **A.**    That's "BF v2.0 FKK Waterlogged."

21   **Q.**    "Splishy-Splashy Fun" on the front?

22   **A.**    Yes, sir.

23   **Q.**    And this is the video associated with Count I of

24   the indictment?

25   **A.**    That's correct.

1    **Q.**   Now, you talked about you've seen many of these

2    videos?

3    **A.**   Quite a few, sir.

4    **Q.**   And you also heard Inspector Bone testify about

5    the statement about the Supreme Court decisions of each

6    country?

7    **A.**   Yes, sir.

8    **Q.**   You're not aware of any such decision, are you?

9         MR. MANN:  Objection.  That's already been asked

10   and answered.  Not by him but by --

11        THE COURT:  By a different witness.

12        I will allow it but rephrase your question to be

13   precise, please.

14        MR. DONNELLY:  Sorry, your Honor.

15   **Q.**   You've seen this particular video, Government's

16   Exhibit 1?

17   **A.**   I have.

18   **Q.**   Does it begin with a disclaimer or some text

19   message?

20   **A.**   It does.

21   **Q.**   Not having it in front of you -- we're going to

22   see it in a minute, correct?

23   **A.**   Correct.

24   **Q.**   What does it say?

25   **A.**   Words to the effect of that the contents has been,

1   obviously I'm paraphrasing, reviewed by the United

2   States and Canadian Supreme Courts and is deemed to be

3   legal.

4   **Q.**   Did you see that in mostly all the videos that you

5   watched?

6   **A.**   I believe so, yes, sir.

7   **Q.**   And is that followed up, once you start the movie

8   going, is that followed up by other textual matter?

9   **A.**   It is.  After the initial warning, it defaults to

10  the menu screen where you can choose either scene

11  selection, bonus features or just to play the feature

12  video.  Once you hit play, it then goes into a beach

13  scene with scrolling text talking about the joys of

14  naturism and nudism and things of that nature.

15  **Q.**   Now, in all the videos that you saw, did you ever

16  see any -- you saw a lot of naked boys, correct?

17  **A.**   Yes, sir.

18  **Q.**   Did you ever see the boys interacting with adults?

19       MR. MANN:  I'm going to object now.

20       THE COURT:  Grounds?

21       MR. MANN:  For the same reasons that at one of

22  our earlier hearings -- I think he's offering

23  testimony --

24       THE COURT:  Come up.

25       (Side-bar conference.)

1          MR. MANN:  Can I withdraw my objection?

2          THE COURT:  All right.

3          (End of side bar conference.)

4          THE COURT:  Do you remember the last question?

5          THE WITNESS:  No, sir, I'm sorry.

6          THE COURT:  We'll have the reporter read it

7      back.

8          (Pending question read by the reporter.)

9      **A.**   Yes, sir.  There may have been some passing

10     interaction in small portions of the films but for the

11     vast majority of it, it's strictly the boys themselves

12     in whatever particular area they're being filmed in.

13     **Q.**   Do you see the boys interacting with other nude

14     adults?

15     **A.**   No, sir.

16     **Q.**   Are there stories in these films?

17     **A.**   There's no stories.  There's no music.  There's no

18     discernible plot or theme.  There's no organized games.

19     There's nothing that -- the focus of the videos that I

20     have seen is primarily the boys and what they're

21     particularly doing at that moment in time and the fact

22     that they are nude.

23     **Q.**   You said there's no music.  Would it be fair to

24     say there's some music at the very beginnings of these

25     videos?

1    **A.**    Many of the videos start with a montage, for lack

2    of a better word, that's put together and set to music

3    that lasts between 15 and 30 seconds at the beginning

4    of the movie, and then it goes into whatever that

5    particular activity is in that video.

6    **Q.**    Now, for each of the Counts in the videos that are

7    charged, we show those Counts as per the summary chart,

8    did you prepare shorter excerpts or clips that come

9    directly from the exhibits we entered in such as

10   Government's Exhibit 1?

11   **A.**    Yes, sir, I did.

12   **Q.**    Now, for the first DVD, how many clips did you

13   prepare?

14   **A.**    I believe it was four in total.

15   **Q.**    Does the first one include this text, textual

16   message that you told us about?

17   **A.**    It does.  The first clip is what any average user

18   would see once you put it into a DVD player and simply

19   close the tray.  It automatically plays the original

20   disclaimer and then it goes to the menu screen.

21        MR. DONNELLY:  Could we play Clip 1 of

22   Government's Exhibit 1, please.

23        (Clip 1 played.)

24   **Q.**    So that concludes the first clip?

25   **A.**    Yes, sir.

1    **Q.**   Would it be fair to say that's the first three to

2    four minutes of Government's Exhibit 1?

3    **A.**   Yes, sir.

4    **Q.**   And you've seen this movie in its entirety?

5    **A.**   Yes.

6    **Q.**   The pool scene, approximately how long does that

7    go on for?

8    **A.**   I would say around maybe 17 or 20 minutes of -- I

9    believe it's an over two-hour video, if my memory is

10   correct.

11   **Q.**   And does the scene stay in the pool?

12   **A.**   No.  The original scene stays at the large

13   olympic-size swimming pool you saw there where everyone

14   is wearing a bathing suit or is at least clothed

15   normally.  It then cuts to the interior of an apartment

16   with the boys in bed in their underwear.  Shortly

17   thereafter, they strip out of their underwear and start

18   doing various things.  The montage in the beginning are

19   cut pieces of video from scenes that occurred

20   throughout the entire -- the latter half of the montage

21   is generally the content of the rest of the video.

22   **Q.**   There was, I believe, part of the montage looked

23   to be a boy rubbing another boy's back?

24   **A.**   Yes, sir.  I believe it was two boys rubbing one

25   who was laying down.

1    **Q.**   And did you make a clip of that?

2    **A.**   Yes, sir, I did.

3    **Q.**   And that comes later in the video?

4    **A.**   It does.

5         MR. DONNELLY:  Can we play Clip 2, please.

6         (Clip 2 played.)

7    **Q.**   The montage also showed some boys wrestling.  Did

8    you see boys wrestling on a bed?

9    **A.**   Yes, sir.

10   **Q.**   Did you make a clip of that, a brief clip?

11   **A.**   I did.

12        MR. DONNELLY:  Could we play Clip 3, please.

13        (Clip 3 played.)

14   **Q.**   And finally, is there a scene where -- I think I

15   might have seen it in the montage, three boys on a bed?

16   **A.**   Yes, sir.

17   **Q.**   Did you make a clip of that?

18   **A.**   I did.

19        (Clip 4 played.)

20   **Q.**   Those are the clips you prepared as to Count I?

21   **A.**   Yes.

22        MR. DONNELLY:  Could I have Government's Exhibit

23   2, please.

24   **Q.**   Showing you Government's Exhibit 2, what was the

25   title of the DVD package associated with Count II of

1    the indictment?

2    **A.**    It's "V███ Remembered, Volume 1."  V████████.

3    **Q.**    Is V████ a person?

4    **A.**    I believe so, yes, sir.

5    **Q.**    Show you the box.

6    **A.**    Yes, sir.  V████ being the boy who's depicted on

7    the box.

8    **Q.**    And some of the other DVDs is it fair to say that

9    they sort of depict other boys?  This is the one called

10   "████ and C████'s Trip" or something like that?

11   **A.**    These videos have, and I hate to use the word but

12   I can't think of a better one, their own stars and

13   their own following.  So the videos of particular boys

14   are particularly sought by people who prefer that

15   particular boy.

16          MR. DONNELLY:  Could we move to the video,

17   please.

18   **Q.**    And as to "V████ Remembered, Volume 1," you

19   prepared some clips?

20   **A.**    Yes, sir.

21   **Q.**    Do you recall how many disks are in that DVD?

22   **A.**    I believe that's a two-disk set within one volume.

23   **Q.**    All right.  And you prepared a number of clips; is

24   that correct?

25   **A.**    Yes, sir.

1      MR. DONNELLY:  Maybe if we could just go to Disk

2  2, Clip 1, Ms. Anderson.

3      (Clip 1 played.)

4  **Q.**   And did you prepare a second clip from Disk 2?

5  **A.**   Yes, sir.

6  **Q.**   There's a couple of boys on a bed?

7  **A.**   Yes.

8      MR. DONNELLY:  Could you play this one, please.

9      (Clip 2 played.)

10  **Q.**   This is "V███ Remembered, Volume 1."  Was there

11  a Volume 2?

12  **A.**   Yes, sir, there was.

13      MR. DONNELLY:  Could I have Government's Exhibit

14  3, please.

15  **Q.**   This is the box it came in?

16  **A.**   Yes.

17  **Q.**   Do you remember how many disks are in this

18  particular volume?

19  **A.**   I believe this is also a two-disk set.

20  **Q.**   And you prepared some clips of this one?

21  **A.**   Yes, I did.

22      MR. DONNELLY:  Maybe just one.  I think it's

23  Clip 2 of Disk 1.

24      (Clip 2 played.)

25  **Q.**   Did you also seize from the Defendant's home a DVD

1    set entitled "P███ and C████'s Home Video, Bucharest"?

2    **A.**   Yes, sir, I did, along with the accompanying photo

3    CD.

4    **Q.**   That's one of the ones that came with a photo CD

5    that the Defendant ordered?

6    **A.**   Yes, it is.

7          MR. DONNELLY:  Could I have Government's Exhibit

8    4.  Could I also have 5 and 5A, please.

9    **Q.**   Inspector Connelly, showing you Government's

10   Exhibit 5, the photo DVD, did that come in a box with

11   artwork?

12   **A.**   No, sir, it didn't.

13   **Q.**   And showing you the disk that's inside there,

14   that's how it looked to you when you seized it?

15   **A.**   Yes, minus the note and the sticker, but yes.

16   **Q.**   And Government's Exhibit 5A -- let me ask you

17   this.  Of Government's Exhibit 5, the photo DVD that

18   was ordered by the Defendant, do you remember

19   approximately how many pictures are on that photo DVD?

20   **A.**   I believe it was 289 still images or in that

21   neighborhood.

22   **Q.**   Rather than go through all of those, did you pick

23   a representative sample of photographs from that disk?

24   **A.**   Yes, sir, I did.

25   **Q.**   And showing you Government's 5A, is that where

1    those came from?

2    **A.**   Yes, it is.

3    **Q.**   And Government Exhibit 4, 5 and 5A are associated

4    with Count IV of the indictment; is that right?

5    **A.**   Yes.

6    **Q.**   This is what the box looks like?

7    **A.**   Yes.

8    **Q.**   "BF" -- do you know what "BF" is for?

9    **A.**   No.  Not particularly.

10   **Q.**   And "P███ and C████'s Home Video, Bucharest"?

11   **A.**   P███ and C████ are two of the boys that had their

12   own following.

13        MR. DONNELLY:  And if we could go to the clips

14   for Exhibit 4.  And if we could go to Clip 3 -- excuse

15   me.

16   **Q.**   How many disks were in this "P███ and C████'s Home

17   Video"?  I could show it to you if you need it.

18   **A.**   I believe it was a three-disk set with one disk

19   being the primarily the feature film for lack of a

20   better word, two disks of bonus supplemental material

21   and then in a separate case, the clear jeweled CD case

22   was the bonus photo DVD.

23   **Q.**   Okay.  And so you selected some clips from the

24   three disks here; is that right?

25   **A.**   From the three video disks, yes.

1    **Q.**   And you have a sampling of the photographs?

2    **A.**   Yes.

3         MR. DONNELLY:  Ms. Anderson, if we could go to

4    Clip 3 of Disk 1.

5         (Clip 3 played.)

6    **Q.**   Did the second disk depict boys in a sleeping

7    compartment on a train?

8    **A.**   Yes, sir, it did.

9         MR. DONNELLY:  Can we look at Clip 1 of Disk 2,

10   please.

11        (Clip 1 played.)

12   **A.**   Just for clarity's sake, the rest of that video,

13   those are bunks which are above basically three seats

14   across in an enclosed compartment on a train.  So you'd

15   have two benches which each seat three people and then

16   two bunk beds on top.  Those boys were sitting on top

17   of one of those bunk beds.  It's a little hard to see

18   from the clip.

19   **Q.**   Thank you.  Now, we talked about Government's

20   Exhibit 5A, the sort of culled out photos from the

21   photo DVD.

22        MR. DONNELLY:  Ms. Anderson, if we could go

23   through those photographs, please.

24   **Q.**   Those are the selections you made as to the photos

25   charged in Count IV?

1    **A.**   Yes, sir.  Those are about 12 out of the 290 or so

2    images that were on the disk.

3    **Q.**   Okay.  Do you know the title "Cutting Room Floor"?

4    **A.**   Yes.

5         MR. DONNELLY:  Could I have 6, 7 and 7A, please.

6    **Q.**   This is "Cutting Room Floor, V█████"?

7    **A.**   Yes, sir.  There's a separate disk which is just

8    entitled "Cutting Room Floor," but that's a totally

9    separate movie.

10   **Q.**   And is V█████ the name of one of the boys in the

11   movie?

12   **A.**   Yes, sir.

13   **Q.**   Did this particular DVD set, how many disks were

14   here on this one, do you recall?

15   **A.**   I believe it's a two-disk set, but it's been a

16   while.

17   **Q.**   Did the Defendant order a set of the still images?

18   **A.**   Yes, he did.  The bonus photo DVD.

19   **Q.**   As you did for the last exhibit, is this the

20   actual photo DVD that you found in his house?

21   **A.**   Yes, it is.

22   **Q.**   How many photos are on here, if you recall?

23   **A.**   I believe it's north of maybe 300.  Maybe 330,

24   340.  I don't recall exactly.

25   **Q.**   And you culled out a representative sample of

1    those photographs?

2    **A.**    Yes.   There are approximately 10 or 12.

3    **Q.**    And that's Government's Exhibit 7?

4    **A.**    Yes, sir.

5            MR. DONNELLY:  Why don't we just play one of the

6    clips from the videos, Ms. Anderson.  Clip 2 from Disk

7    2, please.

8            If we could just pause for one second.  I'm

9    sorry.

10   **Q.**    This particular one video, is this the one with

11   the cupcakes?

12   **A.**    Yes, sir.  This is the second disk of the

13   cupcakes.  The cupcakes I believe are Disk 1 with the

14   three boys in the interior of an apartment, which

15   basically it looks like the furniture may have been

16   removed.  They put down some mattresses on the floor.

17   They spread out a large, plastic tarp and unwrap dozens

18   of chocolate cupcakes.  One primary boy, who is the

19   same one who is depicted here, is videotaped and

20   photographed repeatedly sitting -- putting cupcakes on

21   a basketball and sitting on them.

22   **Q.**    We have some of the still images of those, too?

23   **A.**    Yes, we do.

24   **Q.**    This one doesn't have cupcakes, right?

25   **A.**    No.  This one has rotisserie chicken or something

1    it appears, in the same apartment but it's only one

2    child in this one.

3              MR. DONNELLY:  Could we play this clip, please.

4              (Clip 2 played.)

5              MR. DONNELLY:  And could we show the sampling of

6    the photographs from the photo DVD, please,

7    Ms. Anderson.

8              (Photographs shown.)

9    A.   This is the apartment I was describing earlier.

10             MR. DONNELLY:  Could I have Government's Exhibit

11   8, please.

12   Q.   The DVD product that is associated with Count VI

13   of the indictment, is it called "Raw Rewind, 2"?

14   A.   Volume 2, yes, sir.

15   Q.   "Raw Rewind, Volume 2," and this is it here; is

16   that right?

17   A.   Yes.  And that's actually the DVD that I pointed

18   out during the search warrant photographs that you

19   could partially see this portion in the box itself from

20   Azov Films.

21   Q.   Is this another two-disk set?

22   A.   I believe so, yes, sir.

23             MR. DONNELLY:  Ms. Anderson, if we could just

24   play Clip Number 1 from Disk 2, please.

25             (Clip 1 played.)

1       MR. DONNELLY:  If we could just pause there.

2    **Q.**   Did you see -- in your viewing of the films, we've

3    seen some bed-type areas, train compartment, apartment

4    the last scenes.  Did you also see sauna scenes in

5    these videos?

6    **A.**   Yes.  This is a fairly common formula, I suppose

7    you could say.  There will be boys between say 6 and

8    approximately 16 years old who will enter what appears

9    to be a private residence with a number of rooms in it,

10   strip off their clothes and they'll bounce back and

11   forth between some kind of small dunk tank, like about

12   a ten-by-ten pool, shower, a sauna and then a living

13   room where a lot of time there'll be snacks and other

14   food put out for them as well.

15       MR. DONNELLY:  So if we could play this clip.

16   Thank you.

17       (Clip 1 played.)

18   **Q.**   This was "Raw Rewind, Volume 2."  Was there a

19   Volume 1?

20   **A.**   Yes, there was.

21       MR. DONNELLY:  Could I have Government's Exhibit

22   9, please.

23   **Q.**   This is "Raw Rewind, Volume 1"?

24   **A.**   Yes, sir.

25   **Q.**   And just to back up a little bit, as to Count VII

1    as your summary chart pointed out, there were three

2    particular DVD sets associated with that Count?

3    **A.**    Yes.

4    **Q.**    That's the possession of child pornography Count?

5    **A.**    That's correct.

6    **Q.**    And did you pick clips for each of those products?

7    **A.**    Yes.

8    **Q.**    The first one is "Raw Rewind" and that's a

9    two-disk set?

10   **A.**    I believe so, yes, sir.

11        MR. DONNELLY:  Could we play Clip 3 from Disk 2.

12        (Clip 3 played.)

13        MR. DONNELLY:  Could I have Government's Exhibit

14   10 and 11.

15   **Q.**    There were two other DVD products associated with

16   Count VII; is that right?

17   **A.**    Yes, sir.

18        MR. DONNELLY:  And if I could have the ELMO.

19   **Q.**    Showing you Government's Exhibit 10, "FKK Ranch

20   Party Games," is that it?

21   **A.**    Yes, sir.

22   **Q.**    You might have heard Mr. Mann ask Inspector Bone

23   before, do you know what "FKK" is?

24   **A.**    I believe it's an abbreviation of either a German

25   or Russian word, but I don't really recall what it

1    means or how to pronounce it.

2    **Q.**   Did you select some clips off of this product?

3    **A.**   Yes, sir, I did.

4         MR. DONNELLY:  Ms. Anderson, if we could just

5    play Clip 1 from Disk 1.

6         (Clip 1 played.)

7    **Q.**   The third DVD product associated with Count VII,

8    is that the disk DVD "Scenes from Crimea, Volume 1"?

9    **A.**   Yes.  I believe that's the boy, V████, as

10   identified in one of the "V███ Remembered," Volume 1

11   and 2 as well.

12   **Q.**   In fact, it says here:  "With a special appearance

13   by V███;" is that right?

14   **A.**   Yep.  Didn't even see that.  My apologies.

15   **Q.**   How many DVDs in this one?

16   **A.**   Just one.

17   **Q.**   You selected some clips from here as well?

18   **A.**   Yes, sir, I did.

19        MR. DONNELLY:  If we could just play Clip 3 from

20   this first disk.

21        (Clip 3 played.)

22   **Q.**   That concludes our clips; is that correct?

23   **A.**   Yes, sir.

24        THE COURT:  So Mr. Donnelly, this will probably

25   be a good time -- I wanted to have you get through the

1    clips, but this would probably be a good time for our

2    afternoon break before you continue with your next line

3    of questioning.

4         Ladies and gentlemen, I'm going to have Charlie

5    show you to the jury room.  Just keep in mind all of my

6    instructions about not having any discussions or

7    deliberations about the case.  It's particularly

8    important that you not do that and so I just emphasize

9    that instruction to you at this point.  Okay?

10        Charlie, would you show them to the jury room.

11        (Proceedings out of the presence of the jury as

12   follows:)

13        THE COURT:  We'll take a break.  Counsel just

14   come up for a moment.

15        (Discussion off the record.)

16        (Recess.)

17        THE COURT:  Let's get the witness back in the

18   box and get the jury.

19        (Proceedings in the presence of the jury as

20   follows:)

21        THE COURT:  Welcome back, ladies and gentlemen.

22        And Mr. Donnelly, you may proceed with your

23   examination.

24        MR. DONNELLY:  Thank you, your Honor.

25   Q.   Inspector Connelly, I'd like to take you back, if

1   I could, to the execution of the search warrant.

2   **A.**   Yes.

3   **Q.**   You testified prior to the break about how you had

4   initially told the Defendant he was not under arrest.

5   He was free to leave, but he chose to stay, correct?

6   **A.**   That's correct.

7   **Q.**   So during the time while you and other agents were

8   executing the search warrant, did you and another

9   inspector from the Postal Service ask to speak to the

10  Defendant?

11  **A.**   Yes.  Myself and Inspector Scott Kelley,

12  K-E-L-L-E-Y.

13  **Q.**   And prior to speaking with the Defendant, did you

14  tell him anything or inform him of anything?

15  **A.**   We informed him that he was not under arrest, that

16  he was free to leave, that we were going to be

17  conducting a search of his residence but he couldn't

18  move around freely.  I asked him if he would like to

19  speak somewhere else to allow my team to both do their

20  work and also we could not be in the way.  I told him

21  that we'd basically be out of there as soon as we

22  could.

23       We went into the backyard behind a fence out of

24  view of neighbors and everybody else and asked if we

25  could talk to him about a few things.

1    **Q.**   Prior to speaking with him, did you inform him of

2    his rights?

3    **A.**   Yes.  We provided him Inspection Service Form

4    1067, which is entitled "Warning and Waiver of Rights."

5    The Defendant stated he could read and write English,

6    that hadn't had anything to drink or any drugs that

7    would impair him that day.  I gave him the form and a

8    pen, allowed him to read it.  I observed his eyes

9    moving from left to right as if reading.  He then

10   dated, timed and signed the warning portion of the

11   form.  Read through or at least appeared to read

12   through the waiver portion, the lower half of the form

13   and then dated and signed waiving his rights saying he

14   would be willing to speak with us.

15   **Q.**   And showing you Government's Exhibit 15, is this

16   the form you were testifying about?

17   **A.**   Yes, sir, it is.

18   **Q.**   Is this the original?

19   **A.**   It is.  It bears my signature and that of

20   Inspector Kelley as well as that of the Defendant.

21        MR. DONNELLY:  Move 15 full, please.

22        MR. MANN:  No objection.

23        THE COURT:  15 will be full.

24        (Government Exhibit 15 admitted in full.)

25   **Q.**   Now, the Defendant wasn't in custody?

1    **A.**   No, sir.

2    **Q.**   But you read him his rights anyway?

3    **A.**   Yes.

4         MR. DONNELLY:  If we could briefly bring up 15,

5    please.  And if we could go to the rights and the

6    signature.  Thank you.

7    **Q.**   And these are the familiar Miranda warnings; is

8    that correct?

9    **A.**   Yes, sir.

10   **Q.**   You went over those orally with him?

11   **A.**   I provided him the form and he read them himself.

12   **Q.**   Did he have any questions for you?

13   **A.**   No, sir, he didn't.

14   **Q.**   And he indicated he'd speak with you?

15   **A.**   He did.

16   **Q.**   Could you tell us about the interview, how did it

17   start?

18   **A.**   It started we basically told Mr. Silva that we'd

19   like to speak to him about a number of topics including

20   Azov Films.  The tone of it was cordial.  He was

21   responsive.  He said he was willing to stay and answer

22   questions with us.  We offered him water, I believe,

23   opportunities to use the bathroom, things of that

24   nature.  And we discussed a number of topics.

25   **Q.**   What was the first topic or among the first that

1    you discussed with him?

2    **A.**    As soon as we mentioned Azov Films, Mr. Silva

3    stated to us words to the effect that he knew why we

4    were here, that he had ordered videos from Azov Films

5    and that it wasn't what we thought, essentially. I'm

6    not quoting verbatim, but this was generally the

7    sentiment he was trying to convey, that the videos that

8    he had ordered were part of a presentation or research

9    project, PowerPoint of some sort that he purported was

10   to be used for law enforcement and for DCYF case

11   workers.

12   **Q.**    So he told you that was his reason for purchasing

13   the DVDs?

14   **A.**    Yes.

15        MR. MANN:  I'm going to object to him leading on

16   that.

17        MR. DONNELLY:  Okay.  Fine.

18        THE COURT:  Sustained.  Withdrawn.  Go ahead.

19   If the witness answered that question, you're to

20   disregard it.

21   **Q.**    Let me start with some basic stuff first.  Did you

22   have a copy of the Azov invoices with you when you

23   executed the search warrant?

24   **A.**    Yes.

25   **Q.**    Did you review those with the Defendant?

1    **A.**    I did.

2    **Q.**    Did he dispute them or anything like that, or did

3    he agree that this was him, that he had ordered all

4    these videos?

5    **A.**    Mr. Silva stated that the invoices that we showed

6    him were his name, address, telephone number, g-mail

7    account, which was gerald.silva.home@gmail.  He was

8    provided with copies of all of the completed orders,

9    the order receipts which have the order number, the

10   biographical information and then the individual titles

11   ordered.

12        I asked him to place his initials and the date

13   in the corner of each form that he remembered

14   receiving.  I believe he placed his initials on all but

15   two of them.  During that process he didn't say that

16   those particular two hadn't -- he didn't remember them.

17   It appeared to be more of an oversight as he just went

18   through them very quickly.

19   **Q.**    I just gave you those invoices that are initialed;

20   is that correct?

21   **A.**    That's correct, sir.

22   **Q.**    And they're marked Government Exhibit 20?

23   **A.**    Yes, sir.

24        MR. DONNELLY:  Would move 20 full, please, your

25   Honor.

1    MR. MANN:  No objection.

2    THE COURT:  20 will be full.

3    (Government Exhibit 20 admitted in full.)

4    MR. DONNELLY:  If we could bring up the first

5  page, Ms. Anderson, please.

6  **Q.**   And this is a sample of one of the invoices that

7  you showed him?

8  **A.**   It is.

9  **Q.**   And the initials are down in the lower right?

10  **A.**   They are.

11    MR. DONNELLY:  Could we try and expand on that,

12  please.

13  **Q.**   So the date appears of course, 9/27/12, the day

14  you executed the search warrant?

15  **A.**   That's correct.

16  **Q.**   The Defendant wrote that?

17  **A.**   He did.

18  **Q.**   And he did that on all those except two that got

19  overlooked?

20  **A.**   I believe so, yes.

21  **Q.**   Did you -- the e-mails -- the invoices all had an

22  e-mail address on it, correct?

23  **A.**   Correct.

24  **Q.**   What was that e-mail address?

25  **A.**   Gerald.silva.home@gmail.com.

1    **Q.**    Did you ask the Defendant for his permission for

2    you to access his g-mail account so that you could look

3    for Azov-related material?

4    **A.**    Yes, I did.

5    **Q.**    And how did he respond to that?

6    **A.**    He agreed to it.  I provided him a different

7    Inspection Service form which is entitled "A Consent to

8    Assume Online Identity."  I informed him if he allowed

9    me that I would take the password that he would give

10   me, I would view the contents of it and I would change

11   the password and that he would no longer have access to

12   the account, which he agreed to, provided me both the

13   user name and the password for that particular e-mail

14   address.

15   **Q.**    And this is the form that he filled out, showing

16   you Government Exhibit 16?

17   **A.**    Yes, it is.

18        MR. DONNELLY:  Move 16 full.

19        MR. MANN:  I have no objection.

20        THE COURT:  16 will be full.

21        You did say you had no objection; is that right?

22        MR. MANN:  I have no objection.

23        THE COURT:  Okay.  Thank you.

24        (Government Exhibit 16 admitted in full.)

25   **Q.**    Was it at some later point that you used the

1  Defendant's credentials to access his e-mail, or did

2  you do that right there and then?

3  **A.**  I didn't do it that minute, but I believe I

4  changed the password very shortly thereafter as soon as

5  I had the time to, and at some later point conducted a

6  review of the e-mails that were listed in the g-mail

7  account.

8  **Q.**  And showing you Government's Exhibit 27, did you

9  find a series of communications from Azov Films in the

10  Defendant's inbox?

11  **A.**  Yes, sir.  In the inbox as well as other folders

12  within the e-mail account, I believe.

13  **Q.**  Looking at Government's Exhibit 27, are those the

14  communications from Azov Films that went to the

15  Defendant's e-mail address?

16  **A.**  Yes, sir, that's correct.

17  MR. DONNELLY:  Move 27 full, please, your Honor.

18  MR. MANN:  No objection.

19  THE COURT:  Was it 27, did you say?

20  MR. DONNELLY:  Yes, your Honor.

21  THE COURT:  27 will be full.

22  (Government Exhibit 27 admitted in full.)

23  **Q.**  Inspector Connelly, did you speak with the

24  Defendant about whether he had Internet service or not?

25  **A.**  Yes, I did.

1    **Q.**   What did he tell you?

2    **A.**   I asked Mr. Silva whether he had Internet service

3    at the house, and he said that he did not.  He said

4    that he was able to pick up some unsecured or free

5    wi-fi or wireless Internet signals from some of his

6    neighbors on occasion.  He also said that he would go

7    to Starbucks, Panera, Tim Horton's when it was still in

8    business and typically use the free wi-fi there with

9    his personal laptop computer.

10   **Q.**   Did you -- now, you stated, testified at the

11   beginning of your interview of the Defendant there was

12   this statement, I know why you're here, it's not what

13   you think sort of thing?

14   **A.**   Essentially, yes, sir.

15   **Q.**   And he told you he was working on a presentation?

16   **A.**   Yes.

17   **Q.**   What did he tell you about the presentation?

18   **A.**   He said that it was entitled or concerned the

19   subtle seduction of minors, specifically young boys.

20   He described it as a progressive process and that it

21   wasn't snatch-and-grab, in his words.  And I believe he

22   said, If you don't know about it, it can happen to your

23   kids, too.  The auspices were ordering the Azov Films

24   was as a research portion of this presentation that he

25   had been creating.

1  **Q.**   So the explanation for why he purchased was the

2  research for the presentation?

3  **A.**   That's what he told us, yes, sir.

4  **Q.**   Did you ask him how he first came to find out or

5  visit the Azov website?

6  **A.**   Yes.  The interview went back and forth.  We

7  talked about a lot of different things at a lot of

8  different points.  One of the things that had come up

9  was how he had found it originally.  Mr. Silva stated

10  to us that he had been surfing online, Googling nudism,

11  naturism, something to that effect, that he was a

12  nudist himself and one of the links that he came across

13  was the Azov Films website.  He also came across

14  another one I believe was Russian Bare, B-A-R-E, as

15  well, but he basically stumbled upon Azov is what he

16  told us.

17  **Q.**   Did the Defendant tell you anything about the

18  children in the Azov Films?

19  **A.**   Yes.  He stated that he was concerned about a lot

20  of things surrounding Azov Films.  One of his concerns

21  was that he felt that the children may be being groomed

22  for something later on in a sexual nature within this

23  connotation.  He stated that he knew the children were

24  being exploited.  He talked in generalities on a lot of

25  things, that there was different levels to the videos

1  but he didn't go to the bad level.  When I asked him to

2  elaborate, he chose not to.  But he admitted to

3  ordering the videos that he had as part of his research

4  project.

5  Q.  Did he tell you about the boys in the films, how

6  old they were?

7  A.  Yes.  He remembered seeing boys I believe between

8  approximately 6 and 16 years old, but that the vast

9  majority were young teenagers around say 13 years old

10  so some being prepubescent, some being early pubescent

11  as well.

12  Q.  Did he indicate whether or not he felt Azov Films

13  had crossed the line, quote, unquote.

14  A.  Yes.

15  Q.  What did he --

16  A.  Those were his words.  He felt that Azov may have

17  crossed the line.  He also mentioned another website

18  which Azov had operated, the Boy Joy videos, which was

19  a separate adult hardcore sexual pornography site.  He

20  felt that there may have been -- the boys depicted in

21  the Azov Films website may be being groomed for

22  something later, but he stated that he was concerned

23  about it.  That's why he had ordered these things.

24  Q.  We just saw the clip of the "Cutting Room Floor,"

25  the cupcake and chicken set.  Did you discuss that with

1    him?

2    **A.**    I asked him if he recalled that particular

3    context.  I believe I said something to the effect of

4    do you remember the video with kids sitting on

5    chocolate cupcakes.  And Mr. Silva said, yes, that he

6    definitely remembered it.  And he said that it was

7    ridiculous, that it certainly wasn't nudism or anything

8    like that.  Then he said he couldn't believe that such

9    a thing existed.

10   **Q.**    Did you talk with the Defendant about whether he's

11   a nudist?

12   **A.**    Yes.

13   **Q.**    What did he tell you?

14   **A.**    He said he is a nudist.  He owns a small plot at a

15   nudist camp of some sort in I believe it's Woodstock,

16   Connecticut.  He also has a trailer on that spot.  And

17   he tries to go down there on the weekends.  He also

18   brings his laptop with him sometimes as the facility, I

19   believe, has free wi-fi.

20   **Q.**    Getting back to presentation he was supposedly

21   working on, did he tell you whether or not there was

22   any work product available?

23   **A.**    Yes.  He said he had a PowerPoint on his computer.

24   **Q.**    Did he give you any more detail about that at that

25   time?

1  **A.**  He said the PowerPoint he started working on it I

2  want to say in 2010 or so, so he had been working on

3  this PowerPoint, for, I don't know, around two years in

4  the making, in that neighborhood.  I asked him

5  specifically when we got into his employment history,

6  he told me that he was a probation officer working for

7  the Department of Corrections specifically working with

8  sex offenders.  I asked him specifically if anyone at

9  Probation had authorized him to conduct a research

10  project or had authorized him to possess child

11  pornography or anything of that nature, since Rhode

12  Island probation officers are not sworn law

13  enforcement, they're in my understanding they're un --

14  I'm sorry, strike that.  They are not allowed to

15  possess child pornography.  He said that there was no

16  one at the Department of Corrections who had authorized

17  him.  When I asked him if he could name even a single

18  person that he told about his research project, he

19  declined to answer the question and couldn't name a

20  single person.

21  So from what he told us he was working on it by

22  himself for all this time, paid for it out of his own

23  money and hadn't told anyone about it.

24  **Q.**  During the execution of the search warrant, did

25  you find a DVD there called -- it was a public, PBS,

1    public TV documentary called "The Dancing Boys of

2    Afghanistan?

3    **A.**    Yes, sir.

4    **Q.**    Where was that DVD found?

5    **A.**    It was in the residence.  I don't recall which

6    particular room.  If I had to guess, I'd say I believe

7    it's Room I, that back movie room, for lack of a better

8    word.

9    **Q.**    Did you discuss the possession of that particular

10   DVD with the Defendant?

11   **A.**    Yes.  We asked the Defendant basically what it

12   was.  It was something that was a little different than

13   a lot of the other DVDs.  It was a

14   commercially-produced legitimate PBS documentary, which

15   the Defendant had ordered.  And the subject matter was

16   I want to say Afghanistan in the late 2000's, and it

17   focused on one or two men who lived in the tribal

18   regions of Afghanistan and discussed about how it was

19   commonplace among certain tribes to keep a young boy or

20   a dancing boy for sexual purposes.

21         It deals with prostitution and the human

22   trafficking side of child exploitation in Afghanistan

23   within the context of that culture.

24   **Q.**    Did Mr. Silva during this interview ask you the

25   question about what happened to the people who produced

1    the Azov Films?

2    **A.**    Yes, sir, he did.

3    **Q.**    What was the question he asked you?

4    **A.**    He asked if the people who were actually on the

5    other end of the computer, if they were in prison.  I

6    told him that I believed so because this was fairly

7    early in the operation but --

8    **Q.**    If I could just stop you there.  You said people

9    on the other the end of the computer, what did he say,

10   to the best of your recollection?

11   **A.**    After I told him that I believed they were in

12   prison, he said, Good, they should be.

13   **Q.**    And the "they" he was asking about was who?

14   **A.**    The operators of the company.

15   **Q.**    Did the name of somebody by the name of Ken Bell

16   come up during your conversation with Mr. Silva?

17   **A.**    Yes, sir, it did.

18   **Q.**    What did he say?  How did it come up?

19   **A.**    It came up within the context of this research

20   project, for lack of a better word.  Ken Bell is

21   currently a retired state police sergeant detective and

22   a former Internet Crimes Against Children Task Force

23   commander.  At the time of the execution of the search

24   warrant -- which I'm a member of that task force as

25   well.

1       At the time of the search warrant, Mr. Silva

2   told us that he had sent an e-mail to Sergeant

3   Detective Bell around the time that the website had

4   shut down.  He located it around April or May, I

5   believe, in 2011.

6       MR. DONNELLY:  Could I have one moment, please,

7   your Honor.

8       THE COURT:  Yes.

9       (Pause.)

10  **Q.**   I'm sorry.  I might have missed it in what you

11  just said, Inspector Connelly, but in your discussion

12  about the e-mail that Defendant -- or e-mail or e-mails

13  that he sent to Ken Bell, did he say anything about

14  when it was in relationship to when the Azov Films

15  website was taken down?

16  **A.**   He wasn't certain of the exact date that it was

17  sent, but he said it was after the website had shut

18  down.

19  **Q.**   Now, you heard Elias Psyllos' testimony?

20  **A.**   Yes, sir.

21  **Q.**   You had submitted to him the Toshiba laptop and

22  the thumb drive that were seized from the house,

23  correct?

24  **A.**   That's correct.

25  **Q.**   And Mr. Psyllos, you asked him to find -- based on

1    your conversation with the Defendant, I assume, you

2    asked Mr. Psyllos if he could find PowerPoints on the

3    Defendant's computer, correct?

4    **A.**    Among other things, yes, sir.

5    **Q.**    And you have copies of the PowerPoints that he was

6    discussing, correct?

7    **A.**    I do.

8    **Q.**    And we've already had one of those in evidence as

9    Exhibit 34; is that right?

10   **A.**    That's correct.

11        MR. DONNELLY:  I just need one moment with

12   Ms. Anderson, please, your Honor.

13        THE COURT:  Yes.

14        (Pause.)

15        MR. DONNELLY:  Bring up page one of Exhibit 34,

16   please, Ms. Anderson.

17   **Q.**    While she's doing that, Inspector Connelly, was

18   there anything else significant that I didn't ask you

19   about from your interview of the Defendant that you can

20   recall?

21        MR. MANN:  I object to that broad a question.

22        THE COURT:  I'll sustain it.  You need to be

23   more specific.

24        MR. DONNELLY:  Withdraw that, your Honor.

25   **Q.**    You recognize this; is that right?

1    **A.**   Yes, sir.

2         MR. DONNELLY:   Could we go to page two, please.

3    **Q.**   This is the second slide of Exhibit 34?

4    **A.**   That's correct, sir.

5    **Q.**   It says in the bulleted part of it, "Produced by

6    Red Pill Production, Un-Inc., distributed by Ambush

7    Bay, Un-Inc."   Do you know what that is?

8    **A.**   I have no earthly idea, sir.

9    **Q.**   Have you ever heard of those organizations or

10   whatever, Un-Inc.s?

11   **A.**   I have not, sir.

12   **Q.**   You've read this PowerPoint --

13   **A.**   I have, sir.

14   **Q.**   -- fully through.   And would it be fair to say

15   that it talks about how adults might seek to lure

16   children into relationships and sexual relations?

17        MR. MANN:   It speaks for itself, Judge.

18        MR. DONNELLY:   Okay.

19        THE COURT:   So the question is withdrawn.   Go

20   ahead.

21        MR. DONNELLY:   I'll withdraw it.

22   **Q.**   Now, after several slides, this slide that is

23   likewise in Government's Exhibit 34, the PowerPoint

24   that Mr. Psyllos testified he found --

25   **A.**   Yes, sir.

1   **Q.**   -- and begins with "The natural state of a child

2   is."

3        MR. DONNELLY:  If we can go to the next slide.

4   Thank you.

5        Your Honor, I just need like a minute or two to

6   review the exhibit list before the witness --

7        THE COURT:  Fine.  Go ahead.

8        MR. DONNELLY:  No further questions of this

9   witness.  Thank you, your Honor.

10        THE COURT:  Thank you, Mr. Donnelly.

11        Mr. Mann, cross-examination.

12        **CROSS-EXAMINATION BY MR. MANN**

13   **Q.**   Good afternoon, sir.

14   **A.**   Good afternoon, sir.

15   **Q.**   It's fair to say that with respect to Mr. Silva's

16   case, you're the lead investigator?

17   **A.**   That's correct, sir.

18   **Q.**   And basically, the way some other witnesses

19   described it, the way you would buy a DVD from Azov

20   would be online, you would pay for it with a credit

21   card, it would be shipped from Canada to the United

22   States and then mailed to Mr. Silva; is that right?

23   **A.**   That's my understanding, sir.  I personally didn't

24   visit Azov Films but from the evidence I've seen and

25   the testimony of witnesses, I'm under the same

1    impression, yes.

2    **Q.**    It was your team that seized, for example, the

3    packing materials that have been introduced into

4    evidence; right, sir?

5    **A.**    That's correct.

6    **Q.**    And those were found in Mr. Silva's house on the

7    day of the search?

8    **A.**    They were.

9    **Q.**    They had his name, his address, all that stuff?

10    **A.**    Correct.

11    **Q.**    And you've also looked at the invoices that were

12    the orders for each of these, right?

13    **A.**    Yes, sir, I have.

14    **Q.**    And I don't have to put them back on the screen.

15    You remember they all had his name, his address,

16    sometimes they had -- they had his phone number on some

17    of them, didn't they?

18    **A.**    On most of them, I believe, sir.

19    **Q.**    That was his phone number, right?

20    **A.**    That's my understanding, yes.

21    **Q.**    His e-mail address, right?

22    **A.**    Correct.

23    **Q.**    Sometimes you would capture an IP address, his IP

24    address, right?

25    **A.**    Not his IP address.

1    Q.    He didn't have it but --

2    A.    There was one IP address captured.  Internet

3    protocol addresses are time-sensitive.  Most places

4    only capture a certain amount going back.  So for

5    example, if I were to try and find out what someone was

6    doing on a certain day and I had an IP address from

7    seven months ago, that company wouldn't be able to tell

8    me.  If I sent a subpoena to Cox, for example, saying

9    who was connected to that IP at that date and time,

10   they may only retain for three months.  So the most

11   recent orders we captured one IP address which result

12   back to Mr. Silva's neighbor.

13   Q.    When you executed the search, he admitted the Azov

14   materials were his, right?

15   A.    That's correct, sir.

16   Q.    Never denied that?

17   A.    No, sir, he didn't.

18   Q.    Now, I just want to ask you the question about the

19   actual invoices.  I think you told us there were 24

20   orders, two of which were cancelled, leaving 22 that

21   were not cancelled, right?

22   A.    I believe so, yes, sir.

23   Q.    If you need to look at the invoices, we can get

24   them.  But I think you said there were 75 titles,

25   right?

1     **A.**    I believe so, yes.

2           THE COURT:  Mr. Mann, would you just turn that

3     microphone toward you.

4           MR. MANN:  This microphone?

5           THE COURT:  Yes.  Just turn it toward you.

6     **Q.**    Now, just to keep the record straight, have you in

7     the last couple of days looked over these invoices and

8     realized that it appears that with respect to two of

9     the invoices six of the titles were duplicates?

10    **A.**    There are titles which appear more than once in

11    the order history, yes.  The numbers I'm not certain

12    of, though, off the top of my head.

13          MR. MANN:  If I could have Exhibit 21.

14    **Q.**    I'm going to show you Exhibit 21, sir.  Maybe I'll

15    stand over there and you'll be able to see it, too,

16    okay?

17    **A.**    Certainly.

18    **Q.**    If we look at page five of Exhibit 21, are you

19    able to see that, sir?

20    **A.**    Yes, I am.

21    **Q.**    And can you take a look at the titles on that

22    page, please.

23    **A.**    Yes.

24    **Q.**    There are seven titles on that page, aren't there?

25    **A.**    That's correct.

1    **Q.**    And the date of that page is November 5th, right?

2    **A.**    2010, that's correct.

3    **Q.**    Now, I don't know whether I'll be able to

4    juxtapose this, but let me put over page six.  Are you

5    able to see page six next to page five now?

6    **A.**    Yes, I am.

7    **Q.**    And that's dated one day later, right?

8    **A.**    That's correct.

9    **Q.**    Would it be fair to say, sir, that the six titles

10   on page five are duplicated on page six?  Six of the

11   titles on page five are duplicated on page six?

12   **A.**    It does appear that way, yes, sir.  And actually,

13   if you look at one order earlier than November 5th,

14   you'll see a number of the same titles and that order

15   was cancelled.  This order was listed as completed and

16   this order was listed as shipped in the Azov records

17   that we received.

18   **Q.**    Just so we're clear by numbers, which order was

19   listed as shipped?

20   **A.**    The order number that's covered, this one right

21   here.  94108, I believe, was listed as completed, and

22   94118, I believe, was listed as shipped.  So the third

23   order, which is even one day prior to whatever the

24   preceding one, had a number of similar titles and that

25   one was listed as cancelled.  Neither one of these two

1    were listed as cancelled.

2    **Q.**   We can agree that six of the titles were

3    duplicated here?

4    **A.**   Yes.

5    **Q.**   And when you calculated your number of 75, it was

6    before there was a recognition that these titles were

7    duplicated, right?

8    **A.**   I recognize that the titles are listed twice.  I

9    reject the premise of the statement that it appears

10   that your client ordered the same DVDs twice.  So I

11   counted them just as the number of shipments, not as

12   different titles.

13   **Q.**   And I had thought you said, if I misunderstood I

14   apologize, I thought you testified there were 75

15   individual titles.  There would be 75 individual

16   products with it appears 69 individual titles?

17   **A.**   That's correct.  I'm sorry, sir.  My language is I

18   use titles for individual line items on a receipt.

19   **Q.**   Now, if we stay with this exhibit for a moment --

20        MR. MANN:  Could I have a moment, Judge.

21        THE COURT:  Sure.

22        (Pause.)

23   **Q.**   Staying with this exhibit, sir, some of these

24   titles would involve commercially-produced films; is

25   that right?

1   **A.**   Some of them were produced by companies other than

2   Azov Films.   Whether they're commercial or not, I don't

3   know.   I have no film expertise.

4   **Q.**   Do you know which of these films were produced by

5   someone other than Azov?

6   **A.**   I have a general understanding but they had quite

7   a large catalog.   I certainly can't pick out each and

8   every title, but I know a variety of the ones that Azov

9   produced themselves.

10   **Q.**   Can I just show you some of these and see if you

11   can tell us if you know.   I'm starting with page one of

12   the exhibit.   Do you know if that one was produced by

13   Azov?

14   **A.**   That was not, I believe.

15   **Q.**   Show you page two.   I'm sorry, not page two.   Page

16   three, do you know if this one was produced by Azov?

17   **A.**   I don't believe it was.

18   **Q.**   Showing you page four, which lists a number of

19   titles, do you know if all of these were produced by

20   Azov or some of them?

21   **A.**   I believe some of them were.   I believe

22   "Barefooted in 2004" is an Azov title.   Again, I can

23   speak with certainty just from my own experience from

24   what I have seen.   I believe that the "Barefooted" may

25   have been Azov, but again I'm not certain without

1    looking at it.

2    **Q.**    And the others you're not sure of?

3    **A.**    The others I don't believe were.

4    **Q.**    Was this a cancelled order, by the way, 93804?

5    **A.**    There were a lot of orders and a lot of cases.

6    I'm sorry.  I don't recall the numbers immediately.  If

7    you can tell me which number it was from the top of the

8    list.  I believe the second and the fourth orders from

9    Mr. Silva's history were cancelled.

10   **Q.**    Certainly.  I'll tell you in a moment, sir.

11   **A.**    Within that exhibit, page two and four of the

12   order history would be cancelled orders, I believe.

13   **Q.**    And this would be page four so this would have

14   been a cancelled order?

15   **A.**    I believe so, yes.  I'd have to look back at the

16   shipping records to be certain, but that's my initial

17   impression.

18   **Q.**    I'll show you a document.  You recognize this

19   document?  You've seen this document before?

20   **A.**    I have seen it before, yes.

21   **Q.**    Can you confirm your recollection that the one we

22   were just talking about was one of the cancelled ones?

23   **A.**    Yes.  93804 is one of the cancelled ones, that's

24   correct.  And just for clarity sake, the cancelled

25   items were not counted within the 22 separate orders

1    that I've referenced.

2    **Q.**    I understand that.  In fact, there were 24

3    altogether, weren't there?

4    **A.**    Yes.

5    **Q.**    And you didn't count the two that were cancelled?

6    **A.**    That's correct.

7    **Q.**    I'll show you page five.  Do you know if any of

8    these were not produced by Azov?

9    **A.**    This is similar to the previous one.  I believe

10   the "Barefooted" may have been produced by Azov.  The

11   others I am not sure of.

12   **Q.**    What about "Capital Fellows," was that an Azov

13   production?

14   **A.**    I honestly don't remember.

15   **Q.**    Show you page six.  Do you know if any of these

16   were produced by Azov?

17   **A.**    Again, "Barefooted" appears.  Again, I believe

18   that one may be, and it's possible "Capital Fellows"

19   was but I don't recall.

20   **Q.**    But a number of these, for example, on this page

21   were clearly not produced by Azov?

22   **A.**    Yes.

23   **Q.**    I'm going to show you page seven.  That's an Azov

24   film, isn't it?

25   **A.**    Yes.

1   **Q.**   Show you page eight.  Is that another mixed one

2   where some are and some are not Azov?

3   **A.**   The first title listed, the "FKK Waterlogged" is

4   an Azov-produced film.  That's Count I of the

5   indictment.  The "Scenes From Crimea, Volume 6," I

6   believe is also another Azov DVD that I've come across.

7   The two that start in the 90,000 series on the bottom

8   two I'm not immediately familiar with so I don't know.

9   **Q.**   Showing you page -- I'm going to skip a page.

10  I'll go to page 10.  Do you recognize this as being a

11  non-Azov film?

12  **A.**   I don't believe that one is an Azov.

13  **Q.**   Go to page 11, are some of these Azov, some of

14  these non-Azov?

15  **A.**   The "Black Sea 2.0" is definitely an Azov film.

16  The "Angler" may be.  I'm not certain of the other

17  ones.  I don't believe I've seen the other three.

18  **Q.**   Page 12, again, would it be fair to say that some

19  of these are Azov and the bottom two are probably Azov

20  and the top four not?

21  **A.**   The bottom two certainly are.  The top four I've

22  never seen so I can't speak to it.

23  **Q.**   Going to page 13, does it look like all except the

24  bottom one are non-Azov?

25  **A.**   I believe "Puppy Dog Tails," I believe that's an

1    Azov-produced, and the other ones I do not believe are.

2    Q.   I'm not going to take you through the rest, unless

3    you want to.  Well --

4    A.   I'll agree with you that Azov Films or 4P5P

5    Productions sold material other than strictly what they

6    produced.

7    Q.   You can look at the rest of these if you want.  I

8    think that we've covered most of the commercial ones.

9    My question to you is this -- if not all of the

10   commercial ones.  In your number of 75, whether it's 75

11   or 69, whatever that number is, that included titles

12   regardless of whether they were produced by Azov or

13   not.  They were the titles that had been shipped

14   through Azov or purchased through Azov, right?

15   A.   That's correct.  They were purchased by Azov and

16   shipped by them.

17   Q.   Because, as you just said, you could buy other

18   things from Azov, other titles other than the ones Azov

19   had produced from Azov, right?

20   A.   Correct.

21         MR. MANN:  Thank you.

22         Let me return this exhibit.

23   Q.   Now, you said the search warrant was executed

24   early in the morning, would it be fair to say probably

25   before 7:00 a.m?

1   **A.**   I believe so, sir, but I don't have a clear

2   recollection.  That's typically when we do it, and I

3   remember it was early that morning.

4   **Q.**   And you looked at most if not all of the DVDs.

5   Did you look at all the DVDs that are the basis of this

6   indictment?

7   **A.**   Yes.

8   **Q.**   And you told us that -- let me ask you this.  You

9   found other DVDs than Azov DVDs there, right?

10  **A.**   There were quite a few DVDs in Mr. Silva's home,

11  sir.

12  **Q.**   And the DVDs that are the bases for these Counts

13  are DVDs that you identified as being so-called child

14  pornography DVDs, right?

15  **A.**   Yes.  Well, DVDs containing images of child

16  pornography.

17  **Q.**   You also found what you called child erotica DVDs

18  there, right?

19  **A.**   Yes.

20  **Q.**   What does "erotica" mean?

21  **A.**   Child erotica is a general term that's used

22  primarily to denote a different classification of

23  video.  A lot of times foreign videos or coming-of-age

24  videos, some what purport to be nudist videos can fall

25  into that category.  It's basically something that is

1    less than child pornography but still frequently

2    demonstrates a sexual interest in children.  And a

3    number of those type of videos, like the "Tender

4    Cousins" was one title that leaps to mind that

5    Mr. Silva purchased from Azov, that's what I would

6    classify as child erotica.

7    **Q.**    You would agree with me that erotica typically

8    refers as a connotation connected with sex?

9    **A.**    Yes.

10   **Q.**    So there are films that are called child erotica

11   and you differentiate them from the films that you

12   classify as child pornography for some of the reasons

13   that Mr. Donnelly asked you, they supposedly have a

14   plot?  Is that what you're talking about?

15   **A.**    Well, I would say they're connected with sex.  I

16   don't think the subject matter has to require the sex.

17   It has to do with the end goal of the user and what

18   that particular item is being used for.  However, the

19   factors of the setting of a video, whether it's, for

20   example, like in some of the clips we saw, a child, you

21   know, on a bed in an enclosed apartment nude is very

22   different from a child wearing a bathing suit in a

23   large communal swimming pool with families.  I would

24   consider those very different things.

25   **Q.**    A child in a bathing suit in a large swimming

1    pool, you wouldn't call that child erotica?

2    **A.**    Within the hypothetical world, anything is

3    possible.  But without seeing something specifically --

4    it certainly could be if it -- for example, Azov sold a

5    number of European Speedo series, which was primarily

6    young males between the ages of, you know, 6 and 16

7    wearing thong style bikini underwear, and the pictures

8    were strictly of them in close-up format.  While the

9    fact that they are clothed and in an outdoor setting

10   would be a consideration in determining whether they

11   are child pornography or not, I would classify them as

12   child erotica in that the end user in the same context

13   could purchase and use them for a similar purpose but

14   perhaps be safer in ordering them than some of the more

15   risqué, for lack of a better word.

16   **Q.**    Let's talk for a second about the example you just

17   gave.

18   **A.**    About which?  I'm sorry.

19   **Q.**    The example you just gave about young men in

20   Speedo bathing suits.  Okay?

21   **A.**    Yes, sir.

22   **Q.**    Just so we're clear, I assume Speedo bathing suits

23   are these very tight sort of bathing suits?

24   **A.**    Very small, yes.

25   **Q.**    And those are the ones that you're talking about

1    that you would classify as child erotica?

2    **A.**    That could be classified.  Each of them --

3    photographs are very difficult.  They're taken one at a

4    time in a proper context and interpreted within that

5    text.

6    **Q.**    Would some of those photographs of young men in

7    those bathing suits focus on their genital area?

8    **A.**    I would argue that the focus of the entire series

9    is on the children's sexuality.  How close up the

10   pictures could be, they vary.  There's hundreds of

11   pictures.

12   **Q.**    We're talking about the Speedo pictures now.

13   **A.**    I'm saying there are hundreds of Speedo pictures

14   in a whole wide variety of series that Azov produced

15   that I have seen.

16   **Q.**    And some of those pictures might even focus on a

17   bulge where a young boy's genitalia were, right?

18   **A.**    It could.

19   **Q.**    And that would be child erotica still, not child

20   pornography?

21   **A.**    That's a matter of fact for the jury on a

22   particular case.  This is a hypothetical situation.

23   **Q.**    I don't know if you were asked this, but you would

24   agree that in all the DVDs and pictures which are the

25   bases of these indictments, there's no sexual

1    intercourse, right?

2    **A.**   There is no sexual intercourse between either the

3    children or adults and children, that's correct.

4    **Q.**   And in fact, there are very few pictures of adults

5    in these videos; and if there are, they're almost

6    incidental rather than anything else.  Isn't that fair

7    to say, sir?

8    **A.**   Yes, sir.  I would agree.

9    **Q.**   Now, Mr. Donnelly asked you about the differences

10   in these videos and how you classify them.  I think you

11   talked about a plot, not having a plot or story or

12   anything like that; is that right?

13   **A.**   Yes.

14   **Q.**   And I think you also referred at one point to the

15   fact that some of the actors in these films, in fact,

16   had developed a following, I think.  Was that your

17   word, "a following"?

18   **A.**   For lack of a better word, yes, sir.

19          MR. MANN:  If we could look at exhibit I think

20   it's 28 -- no, it's not 28.  There's an exhibit with

21   the 11 images that covers the DVDs.  I can't find the

22   exhibit number.

23          THE CLERK:  28.

24          MR. MANN:  28?

25          THE CLERK:  I think so.

1          MR. MANN:  That's what I thought.

2     Q.   You remember looking at some of these, don't you,

3     sir?

4     A.   Yes, I do.

5     Q.   Now, these are the -- first, what are these?

6     A.   Those are images of the front and back and a

7     portion of the DVD for in this case Count I, "FKK

8     Waterlogged," and the text that's below it is what the

9     average user would see if they were to navigate to Azov

10    Films' website when it was still live or up on the

11    Internet.  That's what they could read and then they'd

12    make their selections based off of that.

13    Q.   So focusing on page one of this exhibit, is this a

14    composite document that shows both the covers and the

15    text?

16    A.   That's a screen shot of the reconstructed website,

17    which was forensically reconstructed prepared by

18    Inspector Bone.  And in the top corner, the product

19    detail, that's what you would see, essentially, the

20    more details about a specific title.  I believe the

21    previous page was just a thumbnail image of the DVD

22    cover and a short description.  So if you wanted more

23    information, you would click on that thumbnail image

24    and that would take you to this page.

25    Q.   And if you look at this page, it gives you a

1   description of what's going to take place in the DVD,

2   right?

3   **A.**   Generally speaking, sir.  That's what the Azov

4   Films producers wanted to say the DVD was about.  I

5   think the DVDs speak for themselves.

6   **Q.**   And there's a story here about a boy being a

7   masseuse, right?

8   **A.**   I'm sorry.  Where are you looking from, sir?  Yes,

9   I see.  "A███ is a master masseuse."

10  **Q.**   Right.  And it's basically a story about young

11  boys being in a water situation, right?

12  **A.**   That's what the context -- I mean some of it says.

13  It also talks about boys giving boys massages, spend

14  the day inside.

15  **Q.**   This is what you would see when you ordered it,

16  right?

17  **A.**   Yes, sir.

18  **Q.**   And if look at page two, for example, they talk

19  there about one of the young men now being an adult,

20  don't they?

21  **A.**   It says V████ is all grown up.  It doesn't say

22  that he's an adult, sir.

23  **Q.**   Does it say on the second line:  On December 9,

24  2008, he officially became an adult, turned 18 years

25  old?  The second line of the second paragraph?

1    **A.**    Yes, sir.  I see where you're reading.  My

2    apologies.

3    **Q.**    No problem.  And what they're saying there is that

4    this is sort of a compilation of what this actor's done

5    for people who followed him over the years, right?

6    **A.**    Essentially, yes, sir.

7    **Q.**    Except everybody's nude?

8    **A.**    Yes.

9    **Q.**    Showing you page three, we have something again

10   somewhat similar.  They're talking again about what

11   they call Crimea's most famous naturist.

12   **A.**    Yes, sir, that's what it says.

13   **Q.**    So these weren't faceless boys.  In every case,

14   the faces of the youths are there, right?

15   **A.**    Primarily speaking, yes.  You can see their faces

16   as well as the rest of their bodies.

17   **Q.**    We don't have to go through all of these, but

18   there's a summary -- in each one of these pages is sort

19   of a summary of what Azov says you'll see when you buy

20   the DVD, right?

21   **A.**    Yes, sir.

22   **Q.**    And you were asked about there was one scene that

23   involved sitting on a basketball with a chicken and all

24   that?

25   **A.**    Yes, sir.

1    **Q.**    Basically, another version of a food fight, right?

2    **A.**    Not in my opinion, sir.  I wouldn't call that a

3    food fight.

4    **Q.**    Well, aren't there scenes in one of those videos

5    connected with the food where the boys are throwing

6    food at each other?

7    **A.**    There may be a brief portion that they're throwing

8    food at each other.  The primary focus is the one

9    child, who I believe is referred to as V█████, sitting

10   on food, cramming food into his anus and then showing

11   it to the camera.  I wouldn't call that a food fight.

12   **Q.**    The excerpts that you showed that were just shown

13   were excerpts from the overall showing, right?

14   **A.**    I'm sorry.  I didn't hear you.

15   **Q.**    The excerpts that were just shown were just that,

16   they were excerpts from the film, right?

17   **A.**    Yes, sir.  They were clips, not the entire film,

18   obviously.

19   **Q.**    And you spoke to Mr. Silva about one of those

20   excerpts involving the food, right?

21   **A.**    About that particular video, the "Cutting Room

22   Floor, V██████."

23   **Q.**    And that was the one that he said that was

24   ridiculous, right?

25   **A.**    Yes, sir.

1   **Q.**   And did he also say it was rude or something like

2   that?

3   **A.**   He said it wasn't nudism or naturism and he said

4   it was ridiculous.  That's what I immediately recall.

5   **Q.**   But he didn't say it was pornography.  He said it

6   was ridiculous.

7   **A.**   No.  Mr. Silva wouldn't classify anything of it as

8   child pornography.  He used the word "inappropriate."

9   **Q.**   Did he use the word at some point, did he say it

10  was rude, crude and obnoxious, or something like that?

11  **A.**   He could have.  I don't recall that.

12  **Q.**   Okay.  But in any event, he said it was

13  ridiculous?

14  **A.**   He said that particular video that we were

15  discussing at that time was, yes, sir.

16  **Q.**   Now, are you familiar with a movie called "Pool

17  Buddies"?

18  **A.**   I believe I've seen a little bit of one of it,

19  yes, sir.

20  **Q.**   Would that be classified as child erotica or

21  erotica?

22  **A.**   I wouldn't immediately put a classification on it.

23  I've only thumbed through a few seconds here and there

24  of the video.  I haven't formed an opinion on it.

25  **Q.**   What about a movie called "Mountain Man"?

1    **A.**   "Mountain Men" I believe is the same.  I looked

2    through it over a matter of 30 seconds.

3    **Q.**   And you're not prepared to classify it?

4    **A.**   I wouldn't without having actually reviewing the

5    material in depth.

6    **Q.**   Mr. Silva told you he was a nudist, right?

7    **A.**   That's correct, sir.

8    **Q.**   And told you he owned property that he had a

9    trailer on in Connecticut, right?

10    **A.**   Yes, sir.

11    **Q.**   When you were interviewing him on the morning of

12    the execution of the warrant, this was obviously before

13    anybody had done any forensic examination of his

14    computer or thumb drive, right?

15    **A.**   There was two members of the Rhode Island State

16    Police, one who was a forensic examiner, did a

17    preliminary examination on scene using a tox forensics

18    tool, but there was no in-depth look.  That was on just

19    a preliminary look at the computer.

20    **Q.**   My question to you should have been he volunteered

21    the information that there was a PowerPoint

22    presentation, didn't he?

23    **A.**   I believe he stated that there was a PowerPoint,

24    yes.

25    **Q.**   He also volunteered the information that he had

1    sent an e-mail to Mr. Bell, right, Sergeant Bell?

2    **A.**   Yes.  In all fairness, I did have a computer

3    forensic examiner looking at his computer as we were

4    doing this so he knew that.  He did volunteer that he

5    sent an e-mail to then Sergeant Bell.

6            MR. MANN:  Could I have a moment, please, Judge.

7            THE COURT:  Sure.

8            (Pause.)

9            THE COURT:  Mr. Mann, maybe I could interrupt

10   you.  How much longer do you think you have?  A little

11   while?

12           MR. MANN:  Not very long at all, Judge.

13           THE COURT:  All right.  Then let's go ahead and

14   get the question.  Go ahead.

15   **Q.**   Among the DVDs that were seized that were Azov

16   productions, some of them were re-releases, right?

17   **A.**   I'm honestly not certain whether they were

18   re-released or secondary release.  I don't know.

19           MR. MANN:  Thank you very much.

20           I have nothing further, Judge.

21           THE COURT:  All right.  Thank you, Mr. Mann.

22           Do you have any redirect, Mr. Donnelly?

23           MR. DONNELLY:  No, questions, your Honor.

24           THE COURT:  All right, then.  Mr. Connelly, your

25   testimony is complete.  You may step down.

1          THE WITNESS:  Thank you, your Honor.

2          THE COURT:  Thank you very much.

3          Ladies and gentlemen, it seems like timed this

4    just right to land right at 4:30.  I promised.  It's a

5    well-oiled machine around here.

6          All right.  So I think the best thing we can do

7    is at this point break for the day, let you go for the

8    day.  I have consulted with the attorneys while you

9    were at lunch just to see how we were progressing

10   time-wise.  We're making very good time.  Everything is

11   on track or even slightly ahead of schedule so I think

12   that we're very much on the track in terms of the time

13   of the trial that I gave you at the time of impanelment

14   so everything is going very well in that regard.

15         I want to remind you of all my instructions to

16   not have any discussions about the case with anyone.  I

17   know it's tempting and particularly at this point where

18   you're going home, you see family, your friends and

19   they want to know what happened in court today and

20   you're going to want to talk about it.  I'm just going

21   to ask you to exercise the discipline that I spoke

22   about before.  It's going to be a short trial.  Please

23   exercise that discipline.  Don't talk about the case

24   and make it clear that you will be free to talk about

25   it in a few days.  Okay?

1          Also don't talk about it among yourselves and

2     absolutely obey my instruction about no research or

3     investigation of any kind about anything related to the

4     case.

5          At this point in a trial you've now started to

6     see the information and the evidence and up to the

7     start of the trial is just talk about what the trial is

8     about.  Now you're actually seeing the stuff the trial

9     is about.  So it's very important that you exercise

10    discipline on these instructions so that you only

11    decide this case based on what's presented here in the

12    courtroom.  And of course, don't watch any media or

13    other accounts of the case.  I don't think there will

14    be any, but in case there were, don't expose yourself

15    to that.

16         So with that, I'll say good night and we'll see

17    you tomorrow morning.  We'll begin at nine o'clock.

18    Have a good night.

19         Leave your notebooks.  They'll be gathered by

20    the clerk and given back to you in the morning.

21         (Proceedings out of the presence of the jury as

22    follows:)

23         THE COURT:  All right.  Is there anything we

24    need to talk about before we recess?

25         MR. DONNELLY:  Not from the Government, your

1    Honor.  Thank you.

2         MR. MANN:  Nothing beyond the issue of how we

3    play --

4         THE COURT:  Let's get that on the record.  I'm

5    sorry.  And one other thing that was on my --

6         MR. MANN:  Judge, could we close this door

7    first?

8         THE COURT:  I thought it was closed.

9         MR. MANN:  It's not.  Can I close it?

10        THE COURT:  Nisshy will do it.

11        Did you resolve that issue about whatever was

12   inside of Exhibit 12?

13        MR. DONNELLY:  Your Honor, Exhibit 12 when

14   Inspector Connelly -- I forgot to go back to it --

15   Inspector Connelly seized it, had a -- I think it was

16   an Azov video?  It has an Azov video inside.  It's not

17   one of the charged ones, but we just left it there

18   because that's how it was found.  We can remove it and

19   I can give it back to Inspector Connelly to take into

20   his possession if Mr. Mann has no objection.

21        MR. MANN:  That's what I would prefer.  I think

22   that's most appropriate.

23        THE COURT:  Okay.  Let's do that.

24        Now, let me talk to you about this speeding up

25   of the videos.  Mr. Mann, explain to me what you want

1      to do.  Let's start with that.

2              MR. MANN:  I want to start with Count I with the

3      first DVD and play it at normal speed for a few

4      minutes, and then speed it up to double speed or

5      quadruple speed.  I'm not sure exactly what this DVD

6      player will do.  I want to continue playing it.  I have

7      no objection to somebody saying stop or play it at a

8      slower speed, but I would envision continuing to play

9      it until the end of the DVD.

10             When I viewed these DVDs with Mr. Leo, Professor

11     Leo, after he reviewed the first couple of videos at

12     regular speed or normal speed, Judge, we often viewed

13     them at a higher speed, sometimes stopping them to be

14     sure -- replay a small portion.

15             I then would proceed, and I just can't remember

16     off the top of my head what the first DVD has on it.  I

17     know it's "FKK Waterlogged," but there are bonus

18     features on some of these DVDs, like either photo pack

19     or some other written stuff.

20             I would go to the next document, so to speak, on

21     the DVD, play it at normal speed.  If it was text or

22     anything like that, I would continue to play it at

23     normal speed.  If it was photos, after a brief minute

24     or two I would probably move it -- not probably.  I

25     would plan to move it to double speed or quadruple

1    speed.  When I got done with the first exhibit, I think

2    it's Exhibit Number 1, then I would move to Exhibit

3    Number 2 and go through the same process again.

4         I certainly think that if I did that, the

5    Government would have the opportunity to replay any

6    portions of the DVD that they thought weren't properly

7    captured by playing it at high speed.

8         I'm willing to play them at regular speed,

9    Judge.  I will tell you I think it becomes very, very

10   tedious, having reviewed these videos.

11        THE COURT:  Let me ask you a question or two.

12   Are you planning to use a witness to do this, or are

13   you asking simply to play them with no witness on the

14   stand?

15        MR. MANN:  I'm planning to play them with no

16   witness, Judge.  They're full exhibits.

17        THE COURT:  Okay.

18        MR. MANN:  I might just add, Judge, that

19   whatever distortion comes from playing them at a higher

20   speed, I know the courts have said you can use excerpts

21   from videos, things like that, but I don't think

22   there's any more distortion.  In fact, I would say

23   there's less.  It is true you don't capture the sound

24   when you do play it at a higher speed.  That is

25   absolutely correct.  At least that's my experience with

1    it.

2         THE COURT:  Well, there's going to be nobody on

3    the stand to ask you to stop or slow down at this

4    particular time or another, right?  So basically, you

5    would be controlling the speed, you'd put it at double

6    speed, then you'd put it at quadruple speed and just

7    let it run to the end.

8         MR. MANN:  I mean, if it's more acceptable to

9    the Government, frankly, I would think, I have not

10   thought about this, but I could certainly re-call

11   Inspector Connelly and play them through him.

12        THE COURT:  Right.  That's a possibility I had

13   thought of as well.

14        All right.  Let me get the Government's view on

15   the record.

16        MR. DONNELLY:  Your Honor, without having a

17   chance to research this question, I don't know if we'd

18   find any law on it, but at first blush it appears to be

19   maybe a Rule 611 type situation where the Court

20   controls the mode of presenting evidence to the jury.

21   Subsection 1 says, "So as to make those procedures

22   effective for determining the truth."

23        The second one is avoid wasting time and perhaps

24   that's what Mr. Mann is thinking about.  But it just

25   seems to me that to play -- the evidentiary value and

1    the distortion involved in speeding it up, nobody plays

2    them that way.  They're not intended to be played that

3    way.

4          THE COURT:  How do you know that?  There's no

5    evidence of that.  There's nothing in the record that

6    says, you know, nobody ever speeds up a video that they

7    buy from Azov Films.  You're just saying it's true

8    because you say it.  Who knows how this Defendant or

9    anybody else watches these videos?

10         MR. DONNELLY:  It's impossible to respond to

11   that particular argument.  I guess I would concede it,

12   your Honor, but what I am saying is arguing from the

13   common experience of folks who buy and use DVDs that

14   obviously from the considerable care that went into

15   manufacturing these DVDs, the literature surrounding

16   them, they're meant to be watched and enjoyed at a

17   normal human speed as opposed to a speed that I think

18   if we took a poll of filmmakers they would say, no,

19   this is intended to be played at normal speed.

20         THE COURT:  Maybe so, but that's not in the

21   record.

22         MR. DONNELLY:  I don't think it has to be to

23   make the legal argument that I'm making now, Judge.

24         THE COURT:  But nobody watches these films in

25   excerpts either.

1          MR. DONNELLY:  No.

2          THE COURT:  So it's okay for the Government to

3     present it the way nobody watches it, but it's not okay

4     for the Defendant to present it the way nobody watches

5     it?

6          MR. DONNELLY:  I think that argument is a red

7     herring, with all due respect, your Honor.  Mr. Mann

8     has made it a couple of times.  The reason it's a red

9     herring is if we have 200 minutes of perfectly legal

10    video and we have 15 seconds of an adult having sex

11    with a minor, who cares about the other 200 minutes.

12    The only thing that's of concern to this Court is the

13    15 seconds where the adult is having sex with the

14    minor, correct?  That's why I think flipping the

15    argument that way -- there's no distortion in playing

16    clips.

17         THE COURT:  But if the Defendant, if you had

18    those kinds of videos and the Defendant for some crazy

19    reason wanted to play the whole video, I think I would

20    be hard-pressed to say that we shouldn't do that or we

21    could not allow him to do that.  Maybe I could prohibit

22    it because I want to protect the jury and I could

23    exercise my discretion to do that.  But that's the red

24    herring.  This isn't those kind of videos.

25         So the defense has some point that they believe

1    can be gleaned from the presentation of the whole video

2    and that accelerating it could facilitate that and not

3    waste the jury's time.

4         So I think I'm going to allow it.  I've thought

5    about it, and I can't think of any reason why they

6    shouldn't be allowed to do it that way if the

7    Government is allowed to present excerpts.

8         MR. DONNELLY:  Judge, I was just going to say,

9    just a reminder, the fact that besides the visual

10   distortion that comes up with a speeded up film and the

11   fact that the jurors are sitting there, I just think

12   it's not fair to them that there would be this visual

13   distortion but there's going to be an aural, A-U-R-A-L,

14   distortion because whatever sound is there, whatever

15   relevance it might have for the jurors will be

16   completely eliminated.  You're basically tearing apart

17   an exhibit by allowing the speeded-up play.

18        THE COURT:  What is there about the sound?  I

19   didn't hear anything in the sound part of the videos

20   that related to the statutory definition.

21        MR. DONNELLY:  Well, I mean I'm certainly going

22   to use it.  It's not a big part of my argument, but

23   I'll certainly be talking about it in my closing

24   argument as to how it fits into the Dost factors.

25        THE COURT:  How?  How does it?

1        MR. DONNELLY:  Well, I don't feel like

2    previewing my argument right now, Judge, but I think

3    the fact of the attitude of the kids during various

4    scenes, about whether there's sexual coyness, et

5    cetera.

6        THE COURT:  Okay.  I'm just not sure I saw that

7    out of the verbal parts of the film, but, in any event,

8    that's my inclination.  If you can show me some

9    authority by tomorrow that explains to me that I'm

10    wrong about that, then I'll reconsider my ruling.

11        MR. DONNELLY:  Thank you, your Honor.

12        THE COURT:  But my initial reaction is that it

13    is within my discretion; and I think in fairness to the

14    Defendant, I'm going to allow them to present the whole

15    video and, in fairness to the jury, I think, and

16    everyone in the court, speeding it up is helpful and

17    doesn't prolong the presentation.

18        Now, I think, though, Mr. Mann, that you need a

19    witness to do this.  And I think you probably should

20    re-call Agent Connelly to do it and otherwise I worry

21    that it's you -- it borders on you testifying.

22        MR. MANN:  If the Government will make Agent

23    Connelly available, Judge, I have no problem.

24        THE COURT:  He's the case agent.  He's

25    available.

1      MR. DONNELLY:  He'll be here.

2      MR. MANN:  He's here.  I have no problem

3   recalling him and starting off by saying, "Do you

4   recognize this as Exhibit 1?"  And then sticking in the

5   DVD.

6      THE COURT:  Right.  And then if you think that

7   there's a point at which you want to slow it down or

8   have him focus on some particular excerpt that's

9   different, I don't know if you want to do that, but if

10  you did you could do it and then you have a witness to

11  do it with rather than slowing down at a certain point

12  and saying, well, I want the jury to focus on this.

13  That becomes you testifying.

14     MR. MANN:  I hadn't thought much about using the

15  agent but what I would envision doing as we go through

16  -- for example, I can envision starting it off at

17  normal speed and then saying, "Agent Connelly, I'm now

18  going to switch this to a higher speed, putting it on a

19  higher speed."  Most of the points when I would want to

20  slow it down will probably be at the very end of the

21  video and when we start a new video.  I would say to

22  Agent Connelly, "Does that appear to you, Agent

23  Connelly, to be the end of that video?"

24     THE COURT:  You direct him however you wish, but

25  I just don't want to be in a position -- I'd like a

1    witness on the stand that you're doing this with as

2    opposed to you slowing it down and then you talking to

3    the jury about "Here, look at this.  Focus on this

4    part."  I don't want that.

5         MR. MANN:  I can do it through Agent Connelly.

6    I'll think about it overnight.

7         THE COURT:  Or you can do it through your

8    witness, I mean, your client if you wish.

9         MR. MANN:  I was just thinking that, too, Judge.

10   I'll have to think that through.

11        THE COURT:  All right.  Anything else that we

12   need to talk about?

13        MR. DONNELLY:  No.  Thank you, your Honor.

14        MR. MANN:  No.  No, thank you.

15        THE COURT:  Okay.  Then we'll be in recess.

16   I'll see you tomorrow morning.

17             (Court concluded at 4:45 p.m.)

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

        I, Anne M. Clayton, RPR, certify that the
foregoing is a true and correct copy of the transcript
originally filed with the clerk on September 16, 2014,
and incorporating redactions of personal identifiers
requested by the following attorney of record:  Robert
B. Mann, in accordance with the Judicial Conference
policy.  Redacted characters appear as a black box in
the transcript.


                    /s/ Anne M. Clayton
        _____
                    Anne M. Clayton, RPR



                    October 16, 2014
        _____
                         Date