IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


```
* * * * * * * * * * * * *   CRIMINAL ACTION
UNITED STATES OF AMERICA  *  13-043S
                          *
VS.                       *  FEBRUARY 7, 2014
                          *
GERALD SILVA              *  PROVIDENCE, RI
* * * * * * * * * * * * *
```


HEARD BEFORE THE HONORABLE WILLIAM E. SMITH

CHIEF JUDGE

(Jury Trial)

**Volume II**

**REDACTED**


**APPEARANCES**:

FOR THE GOVERNMENT:        TERRENCE P. DONNELLY, AUSA
                           U.S. Attorney's Office
                           50 Kennedy Plaza
                           Providence, RI  02903

FOR THE DEFENDANT:         ROBERT B. MANN, ESQ.
                           Mann & Mitchell
                           One Turks Head Place
                           Suite 610
                           Providence, RI  02903


Court Reporter:            Anne M. Clayton, RPR
                           One Exchange Terrace
                           Providence, RI  02903


Proceeding reported and produced by computer-aided
stenography

<u>I N D E X</u>

<u>GOVERNMENT WITNESS</u>                                    <u>PAGE</u>

CHRISTINE IMBRIGLIO

  Direct Examination by Mr. Donnelly:        6
  Cross-Examination by Mr. Mann:            20
  Redirect Examination by Mr. Donnelly:     28
  Recross-Examination by Mr. Mann:          30

KENNETH BELL

  Direct Examination by Mr. Donnelly:       33
  Cross-Examination by Mr. Mann:            47
  Redirect Examination by Mr. Donnelly:     52

<u>DEFENDANT'S WITNESS</u>

GERALD SILVA

  Direct Examination by Mr. Mann:           66

<u>GOVERNMENT EXHIBITS</u>

29, 30 & 31   -                                 37
33            -                                  8
38            -                                 14
39            -                                 15

_____

1    7 FEBRUARY 2014 -- 9:00 A.M.

2              (Proceedings out of the presence of the jury as

3    follows:)

4              THE COURT:  Good morning.

5              MR. DONNELLY:  Good morning, your Honor.  I just

6    have one housekeeping issue to bring before the Court.

7    The Government has two, as I indicated yesterday, has

8    brief witnesses before resting this morning.  The first

9    of those is a Department of Corrections witness, who I

10   hope to introduce some written policies through.  I

11   believe there are three of them.  I believe I

12   miscommunicated this morning, your Honor, and one of

13   those exhibits I only have my own copy here.  I messed

14   up.  So we don't have extra copies at the moment.

15   They'll be easily obtainable at the morning break, if

16   that's okay with the Court.

17             THE COURT:  That's fine.  So that's all you have

18   and then you intend to rest?

19             MR. DONNELLY:  Yes, your Honor.

20             THE COURT:  Okay.  So Mr. Mann, your plan then?

21             MR. MANN:  I'd make a JA motion after he rests.

22   And after that, I spoke to Mr. Donnelly, if the Court

23   approves what I'll do is I would call my client, but I

24   would spend the rest of the day realistically playing

25   videos through him with this sort of one item that I'd

1    like to place on the record.

2          Mr. Donnelly said, if I'm correct, he has no

3    objection.  I wouldn't want that to interfere with my

4    ability to work with my client over the weekend on the

5    remainder of the direct, the remainder of the case.

6          THE COURT:  So you don't anticipate you'll get

7    through that direct today, is that what you're saying?

8          MR. MANN:  I can't imagine it, Judge, if we're

9    going to play the videos even at high speed.

10          THE COURT:  Okay.

11          So Mr. Donnelly, do you have any objection to

12    that?

13          MR. DONNELLY:  Absolutely none.

14          THE COURT:  All right.  So that's on the record

15    and I think you're fine then.

16          MR. MANN:  Thank you.

17          THE COURT:  All right.  So if that's it then,

18    let's get the jury in.

19          (Proceedings in the presence of the jury as

20    follows:)

21          THE COURT:  Good morning, ladies and gentlemen.

22    Welcome back.  Good to see you this morning.  I trust

23    everyone has abided by the instructions I gave you

24    yesterday.  Nobody has done any independent research or

25    anything like that in this case.  We're going to be

1    heading into the weekend.  All the more important you

2    abide by the instructions as well as not having any

3    conversations.

4         We're doing well in terms of the timing of the

5    trial.  So there may be one or two things this morning

6    that require me to send you into the jury room.

7    Hopefully, it will be around the same time as the

8    break; but, if not, I might need to do that.  In a

9    trial there's some legal issues I always have to deal

10   with with the attorneys at various points so don't be

11   surprised if we do that.  And I think we're on track in

12   terms of, as I said, the timing of the trial to be able

13   to complete the trial early next week.  Okay?

14        So Mr. Donnelly, I think you're ready to call

15   your next witness?

16        MR. DONNELLY:  Yes, your Honor.  The United

17   States calls Christine Imbriglio.

18        **CHRISTINE IMBRIGLIO, GOVERNMENT WITNESS, SWORN**

19        THE CLERK:  Please state your name and spell

20   your last name for the record.

21        THE WITNESS:  Christine Imbriglio.  That's

22   I-M-B-R-I-G-L-I-O.

23        THE COURT:  Good morning, Ms. Imbriglio.

24        THE WITNESS:  Good morning, Your Honor.

25        THE COURT:  You may inquire, Mr. Donnelly.

1           MR. DONNELLY:  Thank you, your Honor.

2              **DIRECT EXAMINATION BY MR. DONNELLY**

3    **Q.**   Good morning, Ms. Imbriglio.  Are you employed?

4    **A.**   Yes, I am.

5    **Q.**   Could you tell the jury how you're employed?

6    **A.**   I'm employed by State of Rhode Island, Department

7    of Corrections.

8    **Q.**   And what part of the Department of Corrections do

9    you work in?

10   **A.**   I'm sorry?  Can you repeat that.

11   **Q.**   Sure.  What part of the Department of Corrections

12   do you work in?

13   **A.**   I'm employed under Rehabilitative Services, the

14   Division of Adult Probation and Parole.

15   **Q.**   And so how long have you been with Adult

16   Probation?

17   **A.**   I have worked for the State of Rhode Island for 25

18   years; 18 years I have worked for the Department of

19   Corrections, 9 years as a probation officer, 9 years as

20   a supervisor and the last -- almost the last year has

21   been as the acting Assistant Administrator.

22   **Q.**   Let me start with this.  Do you know the Defendant

23   on trial, Gerald Silva?

24   **A.**   Yes, I do.

25   **Q.**   How long have you known Mr. Silva?

1    **A.**    Approximately ten years.

2    **Q.**    And are you familiar with the Department of

3    Corrections' policies and the like?

4    **A.**    Yes, I am.

5    **Q.**    And could you explain to the jury a little bit

6    about what is the role of a State of Rhode Island

7    probation officer, just in brief?

8    **A.**    Sure.  The role of the probation and parole

9    officer in the State of Rhode Island is a fine balance

10   between offender accountability, keeping the victim in

11   the community safe as well as insuring rehabilitation

12   of the offender.  So it's a combination of law

13   enforcement and social work.

14   **Q.**    And you're not sworn law enforcement officers,

15   however; is that correct?

16   **A.**    No, we're not.

17   **Q.**    Do you carry weapons?

18   **A.**    We do not.

19   **Q.**    In Rhode Island at least -- I know it's different

20   in other states, but in Rhode Island at least do you

21   have the power to arrest?

22   **A.**    No, we do not.

23   **Q.**    Okay.  And do you investigate crimes?

24   **A.**    We do not.

25   **Q.**    And that -- you gave in summary fashion some of

1     the limitations on the role of a probation officer.  Is

2     there a policy on that that you shared with us in this

3     case?

4     **A.**   Yes.

5     **Q.**   I'd like to show you, Ms. Imbriglio --

6          MR. DONNELLY:  If I can approach the witness,

7     your Honor?

8          THE COURT:  Yes.

9     **Q.**   -- Government Exhibit 33.  If you could just take

10    a brief moment to look at that.

11         Do you recognize that document?

12    **A.**   Yes, I do.

13    **Q.**   What do you recognize it to be?

14    **A.**   These are the roles and functions of the adult

15    probation on parole officer.

16    **Q.**   It's an official document of the Probation

17    Department?

18    **A.**   That's correct.

19         MR. DONNELLY:  Your Honor, I'd move Government's

20    Exhibit 33 full, please.

21         MR. MANN:  No objection.

22         THE COURT:  33 will be full.

23         (Government Exhibit 33 admitted in full.)

24         MR. DONNELLY:  Could I have a moment.

25         (Pause.)

1          MR. DONNELLY:  Now, if we could bring up the

2     first page of that for the jury, please, Ms. Anderson.

3     **Q.**   This is just showing you a computer copy of what

4     you just looked at, Ms. Imbriglio.  And this is the

5     first page of the document we just looked at, correct?

6     **A.**   Yes, it is.

7          MR. DONNELLY:  Could we go to the next page,

8     please, Ms. Anderson.

9          THE COURT:  Okay.  We'll go back and make sure

10    all of the screens are working.

11    **Q.**   So while we have the first page up, Ms. Imbriglio,

12    the title of this document is "The Roles and Functions

13    of the Probation and Parole Officer;" is that right?

14    **A.**   That's correct.

15    **Q.**   Sort of a listing of what probation officers do

16    and what they're not supposed to do, correct?

17    **A.**   Yes.

18         MR. DONNELLY:  And now, if we could go to page

19    two, please.

20         And Ms. Anderson, if we could expand on the

21    bottom half here that's in bold.

22    **Q.**   I just asked you about this part of a probation

23    officer's job but as the first line of this section of

24    the documents says, "Some activities that PO's" -- what

25    does "PO" stand for?

1    **A.**    Probation officers.

2    **Q.**    -- "that probation officers in Rhode Island do not

3    do that are associated with POs in other

4    jurisdictions."  In other words, Rhode Island probation

5    officers have a different role than maybe they in Texas

6    or that sort of thing; is that correct?

7    **A.**    Correct.

8    **Q.**    One of the limits is not -- you don't get to take

9    people into custody or carry any sort of offensive

10   weapon; is that right?

11   **A.**    Yes.

12   **Q.**    And probation officers are not to confiscate

13   contraband, illegal or illicit items.  What's

14   contraband or illegal or illicit items?

15   **A.**    Contraband would be something that is brought into

16   the institution that is not allowed to be brought into

17   the Department, drugs or weapons or anything that would

18   pose a threat to the safety of the department.  And

19   illegal or illicit items are things that are against

20   the law.

21   **Q.**    Would that include child pornography?

22   **A.**    Yes.

23       MR. MANN:  Objection.

24       THE COURT:  Grounds.

25       MR. MANN:  There's no evidence of that taking

1    place in this case.

2            THE COURT:  All right.  I'm going to overrule

3    the objection.

4    **Q.**   And referring your attention to the one after the

5    one we just reviewed, this one right here, one of the

6    things Rhode Island probation officers do not do is

7    investigate criminal behavior; is that right?

8    **A.**   Correct.

9    **Q.**   If a probation officer sees child pornography, for

10   instance -- let me back up.

11           Do probation officers make home visits as a

12   regular part of your duties as a probation officer?

13   **A.**   Yes.

14   **Q.**   And if a court has ordered that regular searches

15   of that person's computer should be done for such

16   things as child pornography, how does that task that

17   the Court has ordered, a state judge typically, how

18   does that task get done?  Do the probation officers

19   search the computer?

20   **A.**   No, they do not.  They're not authorized.

21   **Q.**   They're not authorized?

22   **A.**   The officers have not been trained and the

23   Department does not allow probation officers to do

24   searches of computers.

25   **Q.**   And if, for example, you're on a home visit and

1    you see contraband, things that are just illegal to

2    possess, like drugs or child pornography, and a

3    probation officer sees it sitting on a table or on a

4    computer, what is the probation officer to do?

5    **A.**    Probation officer is not authorized to confiscate

6    it or to seize it in any way, shape or manner.  We have

7    to notify the police department; or if we're doing

8    joint home visits with a probation officer and a police

9    officer, the police officer takes jurisdiction and

10   takes over that.

11   **Q.**    Now, are you familiar -- one second.

12        (Pause.)

13        Are you familiar -- does the Department of

14   Corrections Adult Probation and Parole have policies as

15   to research and public presentations?

16   **A.**    Yes.

17   **Q.**    And as to research, could you describe to the jury

18   what is the basic rules of the road, so to speak, that

19   the written policies of the Department of Corrections

20   provide for?

21   **A.**    The research policy is to ensure that the research

22   that is being done is appropriate within guidelines of

23   HIPAA and that ensure that it's appropriate research

24   treatment being done consistent with the mission of the

25   Department.

1    **Q.**    So some people do medical research?  Is that why

2    you mentioned HIPAA?

3    **A.**    Yes.

4    **Q.**    And sometimes people do non-medical research,

5    correct?

6    **A.**    Correct.

7    **Q.**    The people doing non-medical research, is

8    permission of a supervisor required under the written

9    policy?

10   **A.**    The policy spells out what the process is to do

11   research in the Department, yes.  It begins with a form

12   that has to be completed and submitted to the

13   supervisor, who pre-approves that and then it gets

14   moved up the chain of command.  It goes to the

15   Associate Director of Planning and Research.

16   **Q.**    I'd like to show you what's been marked as

17   Government's Exhibit 38 for identification.

18        MR. DONNELLY:  Your Honor, I'm going to show the

19   witness Government Exhibit 38.  I don't believe

20   Mr. Mann has an objection.  I would move it full.

21        MR. MANN:  That's correct.  No objection.

22        THE COURT:  All right.  38 will be full.

23        MR. DONNELLY:  Ms. Anderson, we don't have that

24   on the computer, right, at this point?  Okay.

25        THE COURT:  If it's full, you can use the ELMO

1    and that way the jury can see it.

2         (Government Exhibit 38 admitted in full.)

3    **Q.**   I guess we're looking at half of the first page of

4    Government Exhibit 38, Ms. Imbriglio.  Do you recognize

5    that?

6    **A.**   Yes, I do.

7    **Q.**   And is this the policy on research you were just

8    mentioning?

9    **A.**   Yes, it is.

10   **Q.**   Now, to get permission, is it done orally or does

11   the person have to fill out a form of some sort?

12   **A.**   A form has to be filled out.

13   **Q.**   And as to non-medical research, showing you what

14   has been marked as the policy appears to be 11 pages

15   long and then the forms come after that; is that right?

16   **A.**   Yes.

17   **Q.**   Showing you the first form that's a part of

18   Government's Exhibit 38, is this the form a person has

19   to fill out if they want to do non-medical research?

20   **A.**   Yes, it is.

21   **Q.**   At what level does the final approval come from?

22   **A.**   Director Wall.

23   **Q.**   Now, as to making public presentations as an

24   employee of the Rhode Island Department of Corrections,

25   is there a policy on that?

1    **A.**   Yes, there is.

2         MR. DONNELLY:  Your Honor, as to this exhibit, I

3    have extra copies for the Court.

4    **Q.**   Let me show you Government's Exhibit 39.

5         MR. DONNELLY:  Your Honor, I don't believe

6    there's an objection to it.  I would move it full.

7         MR. MANN:  No objection.

8         THE COURT:  So this is --

9         MR. DONNELLY:  39.

10        THE COURT:  -- 39.  39 will be full without

11   objection.

12        (Government Exhibit 39 admitted in full.)

13   **Q.**   Is this the policy on public presentations that

14   was in effect from 2009 through 2012?

15   **A.**   Yes, it is.

16   **Q.**   It's my understanding that this policy was

17   recently revised, some minor revisions were made?

18   **A.**   That is correct.

19   **Q.**   But what is the general rule for a Department of

20   Corrections employee if they want to make a public

21   presentation?  What is the rule?  What do they have to

22   do?

23   **A.**   The Department of Corrections has a public

24   presentation policy in place to ensure that the

25   presentations that are being done are consistent with

1    upholding the public image of the Department of

2    Corrections in the community, that the information

3    presented is accurate and that it reflects the

4    Department's mission appropriately.

5         MR. DONNELLY:  Your Honor, if we can publish

6    this to the jury through the computer.

7         THE COURT:  Sure.

8    **Q.**   This is the first page of it, Ms. Imbriglio?

9    **A.**   Yes, it is.

10   **Q.**   Do you have to fill out a form for this as well to

11   get the permission?

12   **A.**   Yes, we do.

13        MR. DONNELLY:  Could we go to the second to the

14   last page, please.

15   **Q.**   Is this a form if you want to do a one-time

16   presentation?

17   **A.**   Yes, it is.

18   **Q.**   There's a different form if you want to teach a

19   course; is that right?

20   **A.**   That is correct.

21   **Q.**   An academic course?

22   **A.**   Correct.

23   **Q.**   Now, you are in a supervisory role in the

24   Department of Adult Probation and Parole?  You're

25   familiar with the records and how they're kept over

1    there?

2    **A.**    Yes.

3    **Q.**    And did you cause a search to be done of these

4    forms as to either research or presentation permission

5    that was sought by Mr. Silva during the years 2010 to

6    2012?

7    **A.**    Yes, I did.

8    **Q.**    Did you find any records that he had ever

9    submitted, a request for permission to do research or

10   make a presentation?

11   **A.**    No, they did not.

12   **Q.**    There were no records of that; is that correct?

13   **A.**    Yes.

14   **Q.**    Are computers issued to each and every probation

15   officer?

16   **A.**    Yes, they are.

17   **Q.**    Laptop computers?

18   **A.**    Officers have desktop computers.  We have laptops

19   that are assigned to the units or to the offices but

20   not to individual probation officers.

21   **Q.**    Okay.  Now, I've asked you whether there were any

22   records of this.  You've known Mr. Silva for how long?

23   **A.**    Almost ten years.

24   **Q.**    Was there ever a time when you were his

25   supervisor, direct supervisor?

1    **A.**    When he worked in the courthouse for -- back in I

2    think it was 2012, I was the courthouse supervisor so

3    when he came to cover court, he would be under my

4    supervision.

5    **Q.**    When he was out in the field, he was under

6    somebody's else's supervision?

7    **A.**    Correct.

8    **Q.**    Who is that?

9    **A.**    That would be Jean Embrey.

10   **Q.**    If you were not his direct supervisor, were you

11   Jean Embrey's supervisor at this time?

12   **A.**    I was the courthouse supervisor, so I handled the

13   courthouse operations for the officers coming in to

14   cover court, and she was handling the office in

15   Cranston.

16   **Q.**    In the time frame directing you to 2010, 2012,

17   would you see Mr. Silva from time to time?

18   **A.**    Yes, I did.

19   **Q.**    And in what context would you see him?

20   **A.**    Mr. Silva was assigned to the Cranston probation

21   unit, which was housed -- that houses the main

22   administration office.  That's where we have our mail

23   and that's our main hub so I would constantly be going

24   in and out of the office to get my mail, to speak with

25   my administrators, et cetera.

1  **Q.**   Would you from time to time have conversations

2  with Mr. Silva?

3  **A.**   Yes.

4  **Q.**   Did you ever work with him in the area -- did

5  Mr. Silva work with sex offenders?

6  **A.**   Yes, he did.

7  **Q.**   Did you as well?

8  **A.**   As an officer or as a supervisor?

9  **Q.**   Both.

10  **A.**   Yes.

11  **Q.**   Okay.  So you're familiar with that aspect of

12  probation supervision?

13  **A.**   Yes, I am.

14  **Q.**   And during that time, directing you to 2010 to

15  2012, did Mr. Silva ever mention to you that he was

16  doing research into a topic related to the seduction of

17  minors by adults?

18  **A.**   No.

19  **Q.**   Did he ever mention to you he wanted to do a

20  presentation on that kind of thing?

21  **A.**   No.

22       MR. DONNELLY:  One moment, please, your Honor.

23       (Pause.)

24       That's all I have.  Thank you.

25       THE COURT:  Thank you, Mr. Donnelly.

1    MR. MANN:  Could I have a moment?

2    THE COURT:  Sure.

3    (Pause.)

4    MR. MANN:  Could I ask Mr. Donnelly one

5  question?

6    THE COURT:  Yes.

7    **CROSS-EXAMINATION BY MR. MANN**

8  **Q.**   Good morning.

9  **A.**   Good morning, Mr. Mann.

10  **Q.**   Now, you were asked some questions about the roles

11  and functions of the probation and parole officer in

12  Rhode Island?

13  **A.**   Yes, sir.

14  **Q.**   And in fact, as the policy or the document that

15  was admitted as Exhibit 33 indicates, the title was

16  recently changed but for a long time the title was

17  "Probation and Parole Counselor," wasn't it?

18  **A.**   Back in the '80's and probably '80's, '90's, yes.

19  **Q.**   Then it was changed to "Probation and Parole

20  Officer," right?

21  **A.**   Yes.

22  **Q.**   But I think as you indicated, the role is sort of

23  a multifaceted role, part of the role is accountability

24  and part of the role is also to help rehabilitate the

25  offender?

1    **A.**    Yes.

2    **Q.**    And Rhode Island -- within that document, it

3    spells out many of the things that probation officers

4    are to do to help their caseload, the people on their

5    caseload, right?

6    **A.**    Yes.

7           MR. MANN:   And if I could have Exhibit 33,

8    briefly.

9    **Q.**    If I just show you page one of 33, toward the

10   bottom it begins to identify some of the roles, some of

11   the things a probation officer is expected to do with

12   respect to rehabilitation, right?

13   **A.**    Yes.

14   **Q.**    And then if we went to the next page, there would

15   be a further elaboration of some of those factors,

16   right?

17   **A.**    Yes.

18   **Q.**    And Mr. Silva worked with a specific caseload,

19   right?

20   **A.**    Yes.

21   **Q.**    That was the sex offender caseload, right?

22   **A.**    Yes.

23   **Q.**    And that caseload was handled differently in the

24   Probation and Parole Office than the typical caseload,

25   right?

1    **A.**    Yes.

2    **Q.**    And one of the differences, for example, was

3    probation officers had a lower number of people that

4    they were supervising; is that correct?

5    **A.**    Correct.

6    **Q.**    And are you familiar with Mr. Silva's professional

7    background before he became a probation officer?

8    **A.**    Very limited.  Not really.

9    **Q.**    Would you agree with me that particularly to be a

10   probation officer for sex offenders, it would be

11   helpful if you had a background in counseling and

12   clinical work?

13   **A.**    Our probation officers are not assigned as

14   sex-offender-specific based on their background.  It is

15   all done based on bidding, which is based on seniority.

16   **Q.**    But would you agree with me, generally, that it

17   would be help for a probation officer, particularly

18   somebody dealing with sex offenders, to have a

19   background in dealing with clinical issues?

20   **A.**    Yes.

21   **Q.**    And if a person had a background in dealing with

22   people who had either been the victims of sexual abuse

23   or had been traumatized themselves or perhaps had been

24   offenders, that would also be helpful, wouldn't it?

25   **A.**    Yes.

1    **Q.**    Thank you.

2         Now, you talked about a policy with respect to

3    research; is that correct?

4    **A.**    Yes.

5    **Q.**    And I think that was Exhibit 38, if I'm not

6    mistaken.

7         If we look at the second page, second or third

8    page of this document, you're able to see that

9    document, right?

10   **A.**    Yes.

11   **Q.**    And it talks about behavioral medical research,

12   right?

13   **A.**    Yes.

14   **Q.**    And then it talks about non-medical research?

15   **A.**    Yes.

16   **Q.**    And when it talks about non-medical research, it

17   talks about the compilation, analysis and distribution

18   of statistical information, et cetera, affecting the

19   Rhode Island Department of Corrections, right?

20   **A.**    Yes.

21   **Q.**    So that's clearly talking about doing research

22   involving things like the population at the ACI, data

23   about the population and things like that, right?

24   **A.**    Partially, yes.

25   **Q.**    Now, if a person were an employee of the

1    Department of Corrections, is it your understanding of

2    this policy that if they were doing research that did

3    not involve the utilization of any Department of

4    Corrections data or inmate information that they would

5    still need permission to do research?

6    **A.**    If the research is based on having to do with the

7    Department of Corrections, yes, you would need to have

8    permission.

9    **Q.**    If it's based on what?

10   **A.**    If it's based on information or anything having to

11   do with the Department of Corrections, yes, you would

12   need that permission.

13   **Q.**    So if you were using information from the

14   Department of Corrections, even statistical

15   information, you would need permission to do that

16   research.  Is that your position?

17   **A.**    If it pertains to the Department or if it has to

18   do with the Department of Corrections, yes.

19   **Q.**    So that, clearly, if somebody wanted to do

20   research on the demographic makeup of the population of

21   the ACI, they would need permission according to your

22   understanding of this policy, right?

23   **A.**    Yes.

24   **Q.**    And if they wanted to do -- you see this term

25   "behavioral research."  Can you tell us briefly what

1    behavioral research is?

2    **A.**   If they were looking at anything with the

3    population, with behavior changes, with, for example,

4    programming that's brought in to see if there's any

5    change in recidivism or in the behavior of individuals.

6    **Q.**   So if you had an outside program teaching a course

7    at the ACI and then you wanted to see whether there was

8    a change of behavior following the utilization of that

9    course you would need permission because you were

10   utilizing data based on what happened at the Department

11   of Corrections, right?

12   **A.**   Yes.

13   **Q.**   Now, supposing somebody wanted to do research that

14   didn't involve data from the ACI.  They wouldn't need

15   Department of Corrections' permission, would they?

16   **A.**   If you're not doing it for the Department on your

17   own?

18   **Q.**   Yes.

19   **A.**   If it doesn't apply to the Department of

20   Corrections, then no.

21   **Q.**   Then you don't need permission from anybody?

22   **A.**   If it's not under the Department of Corrections or

23   you're not doing it on behalf of the Department of

24   Corrections.

25   **Q.**   So assume you're not doing it on behalf of the

1    Department of Corrections, right, and you're not using

2    Department of Corrections data, then you don't need the

3    Department of Corrections' permission to do research.

4    Pretty clear, isn't it?

5    **A.**   Yes.

6    **Q.**   Now, Exhibit 39, I think, was the exhibit that

7    dealt with public presentations, right?  Do you want me

8    to show it to you?  I'm sorry.

9    **A.**   Yes, please.

10   **Q.**   This is the policy that deals with public

11   presentations, right?

12   **A.**   Yes.

13   **Q.**   And that requires somebody to obtain advanced

14   permission before they make a public presentation,

15   right?

16   **A.**   Yes.

17   **Q.**   And are there -- and there's a suggestion in this

18   policy, isn't there, that you do it with a certain

19   period of time in advance of when the employee would

20   want to make a presentation, right?

21   **A.**   Right.

22   **Q.**   And it doesn't specify an exact time.  But can you

23   tell us how much time is generally requested -- or does

24   it specify an exact time?

25   **A.**   I would have to go back to read the policy because

1    I don't recall exactly.

2             MR. MANN:  May I approach the witness?

3             THE COURT:  Yes.

4    **Q.**   I'm showing you the last exhibit.  Okay?

5             I'm happy to direct your attention to page three

6    where it seems to have a time frame for subsequent

7    approval, but is there any specific time frame for how

8    far in advance an employee should request permission?

9    **A.**   Preferably at least ten working days prior to the

10   presentation.  Under B2.

11   **Q.**   Is your understanding that it's then basically the

12   preference is ten days in advance, right?

13   **A.**   Yes.

14   **Q.**   And just so we're clear, I'm asking you on that

15   paragraph that you were just reading from, it reads

16   something about -- well, let's put it up.  I'll put up

17   my copy of it.  Is it the employee is supposed to ask

18   ten days in advance or is that the time in which it's

19   supposed to be forwarded to the next level?  This is

20   the paragraph you're talking about, number two, right?

21   **A.**   Yes.  That's correct.

22   **Q.**   Let me ask you another question.  Is it generally

23   your understanding that employees are supposed to give

24   ten days advanced notice before they want to make a

25   public presentation?

1    **A.**   At least ten working days.

2    **Q.**   At least ten working days.  And do you know from

3    your experience how far in advance do employees

4    typically ask, two or three weeks, four weeks?

5    **A.**   I would say so.

6    **Q.**   And so you never -- not never, but people don't

7    usually ask months in advance for something, do they?

8    **A.**   You could.

9    **Q.**   But it's not the norm and not required?

10   **A.**   Depending -- not normal, not required but

11   depending on how involved the project is.

12   **Q.**   But the point is that you have to give some

13   advanced notice and typically people ask you said,

14   what, three, four weeks in advance?

15   **A.**   Yes.

16   **Q.**   Thank you.

17        MR. MANN:  Could I have just a moment, please.

18        THE COURT:  Yes.

19        (Pause.)

20        MR. MANN:  I don't have anything further.

21        THE COURT:  Thank you, Mr. Mann.

22        Mr. Donnelly, redirect?

23        <u>**REDIRECT EXAMINATION BY MR. DONNELLY**</u>

24   **Q.**   Ms. Imbriglio, on cross-examination, I think

25   Mr. Mann's questions about whether you have to get

1    permission for research or not were framed in terms of

2    research concerning the ACI, correct?

3    **A.**    Yes.

4    **Q.**    The ACI is a part of the operations of the

5    Department of Corrections, correct?

6    **A.**    Yes.

7    **Q.**    Does this research policy apply outside of the

8    context of the ACI?

9    **A.**    It applies to the entire Department of

10   Corrections, which is the institutional side as well as

11   rehabilitation services, yes.

12   **Q.**    And if I heard you correctly on cross-examination,

13   did you testify that if somebody wants to do research

14   that's related to their employment with the Department

15   of Corrections, then the research policy applies?

16   **A.**    Yes.

17   **Q.**    And so if somebody wants to do research or do a

18   presentation that's based on their work with sex

19   offenders as a probation officer, would the policy

20   apply to that?

21   **A.**    Yes.

22        MR. DONNELLY:  Nothing further.

23        THE COURT:  Thank you.

24        Mr. Mann?

25

1    **<u>RECROSS-EXAMINATION BY MR. MANN</u>**

2    **Q.**   If I use the word "ACI" instead of the Department

3    of Corrections, if I reworded my question and made it

4    the Department of Corrections, would that change any of

5    your answers?

6         Mr. Donnelly pointed out that I apparently went

7    back and forth between the terms "Department of

8    Corrections" and "ACI."  You and I know "ACI" stands

9    for Adult Correctional Institutions, right?

10   **A.**   Yes.

11   **Q.**   And that's part of the Department of Corrections?

12   **A.**   Yes.

13   **Q.**   And the Department of Corrections also includes

14   probation and parole, right?

15   **A.**   Correct.

16   **Q.**   And would any of the questions I asked you have

17   been different if I had used the word "Department of

18   Corrections" instead of "ACI," would any of your

19   answers have been different?

20   **A.**   No.

21        MR. DONNELLY:  Objection.

22        THE COURT:  Overruled.

23   **Q.**   Now, Mr. Donnelly just asked you some questions

24   about if a person was doing research on sex offenders.

25   Would the policy about research apply if they were

1    supervising sex offenders?  If a person were a

2    probation officer and they were doing research that

3    used data from the population they were servicing,

4    information about that, then the policy would clearly

5    apply, right?

6    **A.**    Yes.

7    **Q.**    Now, if the person were doing research that didn't

8    employ or use the data from the population they were

9    servicing and it made -- didn't use any information

10   that would in any way connect or identify any of the

11   people at the ACI or Department of Corrections,

12   parolees, probationers, the policy wouldn't apply,

13   would it?

14   **A.**    You just lost me with the --

15   **Q.**    Okay.  Let me back up.

16         If a probation officer were supervising sex

17   offenders, clearly if they used information about the

18   sex offenders they were supervising in their research,

19   the research policy would apply, correct?

20   **A.**    Yes.

21   **Q.**    If they were doing research that didn't in any way

22   identify, connect to their population but instead were

23   doing theoretical research about sex offenders, the

24   policy wouldn't apply, would it?

25   **A.**    If it involved work for the Department or research

1   involving the Department, yes.  If it doesn't, no.

2   **Q.**   So it just depends on whether it involves work

3   related to the Department, working for the Department

4   or if it's work that's not for the Department, right?

5   **A.**   Yes.

6   **Q.**   And if it's not work for the Department, then the

7   policy doesn't apply?

8   **A.**   No.

9   **Q.**   No, meaning you agree that the policy doesn't

10  apply?

11  **A.**   Yes.

12          MR. MANN:  Thank you.  Nothing further.

13          MR. DONNELLY:  Nothing further, your Honor.

14          THE COURT:  Okay.  Thank you very much.

15  Ms. Imbriglio, your testimony is complete.  You may

16  step down.  Thank you.

17          THE WITNESS:  Thank you, your Honor.

18          MR. DONNELLY:  The United States calls Kenneth

19  Bell, your Honor.

20          **KENNETH BELL, GOVERNMENT WITNESS, SWORN**

21          THE CLERK:  Please state your name and spell

22  your last name for the record.

23          THE WITNESS:  My name is Ken Bell, B-E-L-L.

24          THE COURT:  Good morning, Mr. Bell.

25          THE WITNESS:  Good morning.

1    THE COURT:  And you may inquire, Mr. Donnelly.

2    MR. DONNELLY:  Thank you, your Honor.

3    **DIRECT EXAMINATION BY MR. DONNELLY**

4  **Q.**   Mr. Bell, could you tell the jury how you're

5  presently employed?

6  **A.**   I'm currently employed at Raytheon Company, and

7  I'm a senior intelligence analyst with the Enterprise

8  Risk Group there.

9  **Q.**   And as a senior what?

10 **A.**   Intelligence analyst.

11 **Q.**   Do you have a role in the cyber security of the

12 systems at Raytheon computer systems?

13 **A.**   Yes, I do.

14 **Q.**   How long have you been with Raytheon?

15 **A.**   Just over a year-and-a-half now.

16 **Q.**   What were you doing prior to that?

17 **A.**   I was working with the Rhode Island State Police.

18 **Q.**   And how long were you a state trooper?

19 **A.**   Just over 20 years.

20 **Q.**   And for the -- directing you to the latter part of

21 your career with the state police -- well, you retired

22 after 20 years; is that correct?

23 **A.**   That's correct.

24 **Q.**   When you retired, what was your rank, title,

25 duties?

1    **A.**   I was a detective sergeant.  I was actually in

2    charge of the Computer Crimes Unit, which comprised two

3    different units, one being the Internet Crimes Against

4    Children Task Force, and also we had a Cyber Security

5    Task Force so I supervised both those units.

6    **Q.**   And would it be fair to say that over to the

7    years -- when did you begin receiving training in the

8    computer side of law enforcement work, approximately?

9    **A.**   Well over ten years ago, I would say.

10   **Q.**   Do you know the Defendant on trial, Gerald Silva?

11   **A.**   Yes, I do.

12   **Q.**   And how long have you known Mr. Silva?

13   **A.**   Several years.

14   **Q.**   Okay.  Did you come to know him while you were

15   working with the Computer Crimes Unit of the state

16   police?

17   **A.**   Yes, I did.

18   **Q.**   In what capacity?

19   **A.**   Jerry was a probation officer who had a sex

20   offender caseload.  And as part of what we started to

21   do to kind of do some proactive work with that unit was

22   we'd actually go out with Jerry and other members of

23   probation and parole and actually do home checks on the

24   sex offenders to make sure that they were actually

25   doing what they were supposed to do; and more

1    specifically related to Internet and computers, we'd

2    actually go to their houses and actually conduct

3    computer checks to see the type of activity they were

4    doing online.

5    **Q.**   And the computer checks, were those often done

6    pursuant to the court placing a condition of probation

7    on that particular person?

8    **A.**   Yes, that's correct.

9    **Q.**   And that one of those conditions was you have to

10   allow law enforcement to look at your computer every

11   now and then?

12   **A.**   That's correct.

13   **Q.**   And why was it that you went along or a state

14   trooper from the Computer Crimes Unit would go along

15   with the probation officer?

16   **A.**   In order to do those checks, it takes a

17   specialized skill.  So even though you might think you

18   just turn on someone's computer, we actually had to use

19   specialized software, specialized hardware in order to

20   do that.  So it took a certain level of skill.

21        The other thing is from a safety standpoint you

22   wanted a law enforcement officer there for safety

23   reasons.  You're in someone else's home.  And the other

24   part of that was from the direction of the Department

25   of Corrections, the probation officers didn't have

1    authorization to actually conduct those type of checks

2    at defendants' residences.

3    **Q.**    What do you mean "those kinds of checks"?

4    **A.**    Computer checks to actually do the onsite forensic

5    preview of the computer.

6    **Q.**    What was your understanding as to whether

7    probation officers could look for child pornography on

8    somebody else's computer and what they had to do if

9    they found it?

10   **A.**    So I knew that probation officers were not allowed

11   to do that and that was the reason why we had to go out

12   as the state police.

13   **Q.**    Probably after you retired, did Inspector Connelly

14   of the Postal Inspection Service contact you about this

15   case?

16   **A.**    Yes, he did.

17   **Q.**    And did he make a request of you?

18   **A.**    Yes, he did.

19   **Q.**    What was that request?

20   **A.**    He requested that if I could come back to the

21   state police and actually look at my e-mail account and

22   see if there were any e-mails from the Defendant to

23   myself.

24   **Q.**    Were you particularly asked to see if there were

25   any e-mails relating to the Defendant e-mailing you

1   about a company called Azov Films?

2   **A.**   That's correct.

3   **Q.**   Did you do that?

4   **A.**   Yes, I did.

5   **Q.**   Did you turn over all the e-mails that you found

6   to Inspector Connelly?

7   **A.**   Yes, I did.

8   **Q.**   And prior to coming into court here today, did you

9   have an opportunity to review those e-mails?

10  **A.**   Yes, I did.

11  **Q.**   And showing you Government's Exhibit 29, 30 and

12  31, were these the exhibits you were shown before

13  coming into court this morning?

14  **A.**   That is correct.

15          MR. DONNELLY:  Your Honor, I would move Exhibits

16  29, 30 and 31 full.

17          MR. MANN:  No objection, your Honor.

18          THE COURT:  All right.  29, 30 and 31 will be

19  full.

20          (Government Exhibits 29, 30 and 31 admitted in

21  full.)

22          MR. DONNELLY:  And if we could switch over to

23  the computer, please, and bring up Government's Exhibit

24  29.

25  **Q.**   Is this the first e-mail you found that related --

1    that was from Mr. Silva and related to what he

2    eventually identified to you as Azov Films?

3    **A.**    That's correct.

4    **Q.**    And referring to this particular e-mail, did he

5    start the discussion by saying, "I have some info that

6    I think might be of interest to you"?

7    **A.**    That's correct.

8         MR. DONNELLY:  Could we go to Government's

9    Exhibit 30, please.

10   **Q.**    Mr. Bell, this is a printout of an e-mail thread.

11   Is it fair to say that if we want to read these

12   chronologically, we should start with the second to the

13   last page and work our way forward?

14   **A.**    That's correct.

15        MR. DONNELLY:  Could we go the page two, please.

16   **Q.**    The original e-mail that was sent, what was the

17   date that you received the original one that I just

18   reviewed with you?

19   **A.**    Well, the time that it was sent was May 11, 2011,

20   at approximately 11:17 a.m.

21   **Q.**    May 11th of 2011.  And then did you write back to

22   Mr. Silva?

23   **A.**    That's correct.

24   **Q.**    And I believe the header on this is on page one

25   but this is the content of what you wrote to him; is

1    that right?

2    **A.**    That's correct.

3    **Q.**    Simply that Mr. Silva had the right e-mail address

4    for you?

5    **A.**    That's correct.

6           MR. DONNELLY:   Could we go to page one now,

7    please.

8    **Q.**    It was from you to Mr. Silva, correct?

9    **A.**    That's correct.

10   **Q.**    Now, as to the top part of the e-mail --

11          MR. DONNELLY:   Could we blow up the header up

12   there, please.

13   **Q.**    And when was this e-mail sent by Mr. Silva?

14   **A.**    That was May 12th, 2011, approximately 12:02 p.m.

15   **Q.**    Directing your attention to the second paragraph

16   there that begins:   "FYI, I discovered a website called

17   Azov," do you recall this e-mail?

18   **A.**    So at the time I did not.  But after reading it,

19   it kind of -- it's very -- after reading it, when I was

20   first asked about this e-mail by Inspector Connelly, I

21   didn't recall it.

22          MR. MANN:   Objection.

23          THE COURT:   I'll sustain the objection.  Just

24   focus on the question that he asked and just try to

25   answer only the question that's been asked; and if you

1    need it reread, I can do that for you.

2         THE WITNESS:  Thank you, your Honor.

3         THE COURT:  Would you like it reread?

4         THE WITNESS:  No, your Honor.

5         MR. DONNELLY:  I'll start a new question.

6    **Q.**    When you were first asked by Inspector Connelly,

7    did you recall getting these e-mails?

8    **A.**    No, I do not.

9    **Q.**    All right.  And once you searched for them and

10   found them, did that refresh your recollection?

11   **A.**    Yes, they did.

12   **Q.**    And was -- did you communicate with Mr. Silva a

13   lot by e-mail?

14   **A.**    No, I did not.

15   **Q.**    Did Mr. Silva ever tell you about his use of

16   computers?

17   **A.**    We had a conversation about his use of computers,

18   correct.

19   **Q.**    What did he say to you?

20   **A.**    He said that he didn't own a computer, and he was

21   very -- he didn't know much about computers, and I

22   think at one point he may have purchased a computer

23   which was from the specs that his partner had also

24   received one, Heidi.  So that was my first knowledge of

25   him possibly owning a computer.

1    **Q.**    Do you recall this e-mail that begins, "FYI, I

2    discovered a website called Azov.  They claim to be a

3    European naturist website.  However, the only naturist

4    films that they have are of nude boys.  They sell

5    mainstream films as well.  I suspect they do this to

6    provide an air of legitimacy.  They provide brief

7    previews of the movies that they sell.  None of them

8    appear to 'cross the line' into pornography though I

9    think they definitely flirt with the line."

10        Do you recall him writing that to you?

11   **A.**    Yes, I do.

12        MR. DONNELLY:  If we could go on to the next

13   paragraph.

14   **Q.**    "It appears that it is administered by Russians.

15   I believe that they will cross the line at some point

16   if they haven't already.  They have 'special offers' on

17   for 'special customers.'  I don't know what they are

18   and I do not intend to find out.  They have a link that

19   they recently installed on the bottom left of the home

20   page that had a purple heart called 'Boy Joy.'  The

21   link goes to Triple X young adult male sex films.  Once

22   again, I haven't explored this site in depth; however,

23   one of the 'teaser' pages gives the name of a male

24   'actor' with the phrase 'all grown up.'"  And it goes

25   on.

1          In fact the next paragraph says, "I suspect (no

2     proof of evidence) that the boys featured in their

3     'naturist' films are being groomed to perform in the

4     pornographic adult films when they come of age."

5          Did you ever write back to Mr. Silva?  Did you

6     check to see whether you had any items in your "Sent"

7     items where you responded back to him?

8     **A.**    Yes, I did.

9     **Q.**    Did you ever write back to him about this e-mail?

10    **A.**    No, I did not.

11    **Q.**    Now, he says that he suspects the website was

12    being administered by Russians.  Is this the kind of

13    investigation that you would -- what did you do after

14    receiving this e-mail?

15         MR. MANN:  Objection.

16         THE COURT:  Well, the last question is not

17    inappropriate so overruled.

18    **A.**    I did nothing.

19    **Q.**    Can you -- why didn't you act on this?

20         MR. MANN:  I object now.

21         THE COURT:  Come up.

22         (Sidebar conference.)

23         THE COURT:  What's the objection?

24         MR. MANN:  What his state of mind is and what

25    this then detective did or did not do has nothing to do

1    with whether Silva is guilty or not.  He can't -- I

2    mean, I don't know what he's going to say for sure, but

3    if he's going to make comments about Silva, those are

4    just opinion comments.

5            MR. DONNELLY:  No, he's not.

6            THE COURT:  I think I get your point.

7            MR. DONNELLY:  It's just going to be actually

8    fairly simply.  He's just going to say we're incredibly

9    busy; we were just so backed up investigating Rhode

10   Islanders I just didn't have time to look into an

11   international --

12           MR. MANN:  I have no objection to that.

13           THE COURT:  Okay.  Thank you.

14           (End of sidebar conference.)

15           MR. MANN:  I withdraw the objection.

16           THE COURT:  Thank you.

17   Q.   I think the question pending was you said you

18   didn't follow-up on this particular e-mail; is that

19   right?

20   A.   That's correct.

21   Q.   And were you doing other things?  How come you

22   didn't follow-up on it?

23   A.   There's no actionable information contained in

24   that e-mail that I could actually investigate.

25   Q.   Were you -- could you just describe for the jury,

1    you had other duties at the time, correct?

2    **A.**   Absolutely.

3    **Q.**   You were supervising both sides of the Cyber Unit,

4    the Internet Crimes Against Children Task Force as well

5    as the cyber security aspect of it?

6    **A.**   That's correct.

7    **Q.**   And how many cases was the Cyber Crime Unit

8    working on at any given time?

9    **A.**   We had hundreds of cases, more cases than we could

10   actually investigate that year.  We probably arrested

11   close to 60 people, which is at least, you know, more

12   than one person per week.  And we're also responsible

13   for the computer forensics not only for those cases but

14   for every single police department and most federal law

15   enforcement agencies in the state.  So we're a very

16   busy unit.

17   **Q.**   If a computer is seized by the South Kingstown

18   Police Department, they would bring it to you; is that

19   right?

20   **A.**   That's correct.

21   **Q.**   And they don't have their own computer forensic

22   people, correct?

23   **A.**   That's correct.

24   **Q.**   By and large.  So you had other real cases

25   involving Rhode Island targets at that time, correct?

1    **A.**    More than we could handle.

2          MR. DONNELLY:  Could we go to the final e-mail.

3    Government's 31.

4    **Q.**    Mr. Bell, referring you to this e-mail, when was

5    this e-mail sent to you?

6    **A.**    This was sent looks like June 3rd, 2011,

7    approximately 3:56 p.m.

8    **Q.**    A few weeks after the May 12th one we were just

9    looking at?

10   **A.**    That's correct.

11   **Q.**    And referring you to the second paragraph here,

12   regarding the website issue, "I cruised by Starbucks

13   yesterday and borrowed their wi-fi.  I don't know if

14   you had anything to do with it, take the credit

15   anyways, but it appears to have disappeared off the

16   face of the planet.  I just hope that the Russians are

17   not scurrying back to their home turf to reestablish

18   themselves.  I hope that the authorities are all over

19   them."

20          Did you know what he was talking about in this

21   e-mail?

22   **A.**    No, I did not.

23   **Q.**    Did you know he was referring to the Azov Films

24   website?

25   **A.**    Not at that point.

1    **Q.**    You know that now?

2    **A.**    Yes, I do.

3    **Q.**    Did you know that the website had been taken off

4    by other law enforcement authorities in Canada?

5    **A.**    No, I did not.

6    **Q.**    In your interactions with Mr. Silva, did he ever

7    tell you that he was doing a research project on the

8    topic of the seduction of minors by adults?

9    **A.**    Never.

10   **Q.**    And did he ever tell you to your face or on a

11   telephone call outside of these e-mails that he had

12   found a website, Azov Films, that contained pictures of

13   nude boys?

14   **A.**    Never.

15   **Q.**    Or that he was doing research for a presentation

16   at work about the seduction of minors?

17   **A.**    Never.

18         MR. DONNELLY:  One moment please, your Honor.

19         (Pause.)

20         MR. DONNELLY:  Bring up page one of Exhibit 30,

21   I believe.

22   **Q.**    You were mentioning about your conversation with

23   Mr. Silva about his use of computers.  Do you see the

24   first paragraph that we have on this particular screen,

25   "I do not have the Internet, nor do I intend to

1    purchase it."

2          Did Mr. Silva tell you at any time in any form

3    that he had made over $1500 in purchases from this Azov

4    Films website?

5          MR. MANN:  Objection.  I withdraw.

6          THE COURT:  All right.  You may answer.

7    A.   No, he did not.

8          MR. DONNELLY:  Thank you, your Honor.  No

9    further questions.

10         THE COURT:  Thank you, Mr. Donnelly.

11         Mr. Mann.

12         <u>**CROSS-EXAMINATION BY MR. MANN**</u>

13   Q.   Good morning, sir.

14   A.   Good morning.

15         MR. MANN:  Could I have the three exhibits,

16   please.  I'm sorry.  Could this be published to the

17   jury?

18   Q.   This is the first e-mail that initiates all this

19   stuff, right?

20   A.   That's correct.

21   Q.   And you look at the second paragraph here, it says

22   also, "Heidi and I signed up for your seminar on May

23   25th.  We look forward to seeing you then."  Is that

24   correct, sir?

25   A.   That's correct.

1    **Q.**   I assume you were scheduled to teach a seminar on

2    May 25th?

3    **A.**   That's correct.

4    **Q.**   Do you remember what it was about?

5    **A.**   It was a seminar that I was teaching on behalf of

6    the Department of -- it wasn't Department.  It was Day

7    One.  So it was Day One had sponsored a day seminar and

8    I was actually instructing on that day.

9    **Q.**   Do you remember generally what you were going to

10   be instructing about?

11   **A.**   I don't recall the particulars, but from what I

12   recall it was something to -- it was instruction to

13   police officers, also probation officers, and also

14   people in the healthcare profession.  And basically, it

15   was about our work with sex offenders.

16   **Q.**   Now, if I show you the next e-mail, it starts --

17   at the bottom of the e-mail where you send an e-mail

18   back to Mr. Silva, it appears to be about 8:29 on May

19   12th, right?

20   **A.**   That's correct.

21   **Q.**   And this is the actual e-mail, isn't it?

22   **A.**   That's correct.

23   **Q.**   And to back up for a second, in the first e-mail

24   he said to you words to the effect he wanted to make

25   sure he had the right e-mail address before he sent you

1    everything.

2    **A.**    That's correct.

3    **Q.**    And this is your response right there, isn't it?

4    **A.**    That's correct.

5    **Q.**    The second sentence is, "This is my correct e-mail

6    address," right?

7    **A.**    That's correct.

8    **Q.**    You're just confirming that he has your correct

9    address.

10   **A.**    Sure.

11   **Q.**    And the first sentence of that response is "You

12   and Heidi can probably teach the class," correct?

13   **A.**    Absolutely.

14   **Q.**    First, do you remember, who is Heidi?  Is that

15   Heidi Dupre?

16   **A.**    Yes.

17   **Q.**    And do you remember, was she also a probation

18   officer?

19   **A.**    Yes, she was.

20   **Q.**    Did you know that she worked sometimes with

21   Mr. Silva?

22   **A.**    Yes, very often.

23   **Q.**    And you say, "You and Heidi can probably teach the

24   class."  What did you mean by that?

25   **A.**    Well, Heidi and Jerry, we worked very closely.

1    They had a sex offender caseload, and I had done

2    several checks with them on their sex offender caseload

3    as it relates to going out and doing checks and

4    actually computer checks at the residences of sex

5    offenders.  And basically my presentation was going to

6    be on sex offenders so most of the stuff that was

7    related to there was actually activity that Jerry had

8    been along with me and also Heidi had been along with

9    me, and we had made several arrests during those checks

10   related to child pornography on sex offenders'

11   computers.

12   **Q.**   Now, if I show you the third e-mail, this is the

13   third e-mail dated June 3rd, right?

14   **A.**   Sure.

15   **Q.**   And in that e-mail Mr. Silva says that it appears

16   to have disappeared off the face of the planet, right?

17   **A.**   That's correct.

18   **Q.**   Did I understand that when you -- in response to

19   one of Mr. Donnelly's questions, you said that at that

20   point you did not know that Azov had been shut down?

21   **A.**   No, I did not.

22   **Q.**   Thank you.

23       Now, you mentioned something about at one point

24   Mr. Silva didn't have a computer and you were aware

25   that he was getting a computer; is that right?

1   **A.**   There was some talk, I remember, like I said we

2   spent a lot of time together, me, the Defendant and

3   also Heidi Dupre, conducting sex offenders checks.  So

4   we spent a lot of time together.

5   **Q.**   And did you give him advice or help him in any way

6   with sort of getting the right computer or getting the

7   right software on it or something?

8   **A.**   So at one point I remember that in the office that

9   I and another detective had just ordered new laptops,

10  and I think we had given the specs to Heidi and I think

11  Heidi may have passed those specs to Jerry.  I'm not

12  sure if he actually did purchase that same identical

13  computer that I know myself, another detective and also

14  Heidi had purchased at one time.

15  **Q.**   Are you able to place a date on that at all, sir?

16  **A.**   No, I'm not.

17       MR. MANN:  Fair enough.

18       Could I have just one moment, please.

19       THE COURT:  Sure.

20       (Pause.)

21       MR. MANN:  I have nothing further of Mr. Bell,

22  Sergeant Bell.

23       THE COURT:  Thank you, Mr. Mann.

24       Mr. Donnelly, do you have any redirect?

25       MR. DONNELLY:  Just one area.

1    **REDIRECT EXAMINATION BY MR. DONNELLY**

2    **Q.**   Mr. Bell, Mr. Mann just asked you about the phrase

3    in your responsive e-mail that "You and Heidi can teach

4    the class"?

5    **A.**   Sure.

6    **Q.**   And I think you said that, well, they had been

7    along with me on a lot of checks at offenders' homes?

8    **A.**   That's correct.

9    **Q.**   So did you mean by that that they had seen a lot

10   of what you were going to talk about?

11   **A.**   Yes.  They were part and party to most of it.  It

12   was actually their offenders.  They actually had -- it

13   was their caseload so I was there at their direction.

14   **Q.**   Was this the first seminar you had ever taught?

15   **A.**   No.

16   **Q.**   You've taught quite a bit, haven't you --

17   **A.**   That's correct.

18   **Q.**   -- these seminars?  You teach academically as

19   well; is that correct?

20   **A.**   That's correct.

21   **Q.**   Where is that?

22   **A.**   At Salve Regina University.

23   **Q.**   Did you ever attend a seminar taught by the

24   Defendant?

25   **A.**   Never.

1    **Q.**    Have you ever seen him or heard of him teaching at

2    all?

3    **A.**    Never.

4            MR. DONNELLY:  Nothing further.

5            THE COURT:  Recross, Mr. Mann?

6            MR. MANN:  Nothing, your Honor.

7            THE COURT:  Okay.  Thank you.

8            All right.  Mr. Bell, your testimony is

9    complete.  You may step down.  Thank you very much.

10            THE WITNESS:  Thank you.

11            MR. DONNELLY:  While he exits, may I have one

12    moment with Ms. Anderson?

13            THE COURT:  Yes.

14            (Pause.)

15            MR. DONNELLY:  Thank you, your Honor.

16            Your Honor, at this time the United States rests

17    its case against the Defendant.

18            THE COURT:  Thank you, Mr. Donnelly.

19            All right.  Ladies and gentlemen, we're going to

20    take our morning break now.  The break will be a little

21    bit longer than usual because there are a couple of

22    legal issues I have to take up with counsel at this

23    time.  We've arranged for the morning snacks to be

24    delivered a little bit earlier so they're there in the

25    jury room waiting for you.

1          I want to remind you of all my instructions not

2     to have any conversations about the case until you're

3     prepared to deliberate the case after all the evidence

4     is closed.

5          Charlie will show you to the jury room.  Thank

6     you very much.

7          (Proceedings out of the presence of the jury as

8     follows:)

9          THE COURT:  Mr. Mann, you have a motion.

10         MR. MANN:  Yes, your Honor.  I have a motion

11    under Rule 29 of the Rules of Criminal Procedure for

12    judgment of acquittal.

13         I'll address first, Judge, Counts I through VI,

14    which are the six receipt counts.

15         For the Government to prove receipt of child

16    pornography in Counts I through VI, your Honor, many of

17    the legal issues in this case have already been

18    identified, but I want to focus on a few of them that

19    are specifically relevant to the judgment of acquittal.

20         The Government has to show, first of all, that

21    the images that are the basis for Counts I through VI

22    constitute child pornography; and as the Court has

23    already explained to the jury, in this case that comes

24    down to a determination of whether or not the images

25    constitute the lascivious exhibition of the genitals of

1    any person and that's based on -- and that is a

2    statutory term and the First Circuit has said that it

3    is informed but not determined by the Dost factors,

4    Judge.

5         So my first argument is that all you have seen

6    so far is nudity and that mere nudity is not enough to

7    constitute the lascivious exhibition of the genitals;

8    and that with respect to those counts, Judge, since all

9    that you have seen is mere nudity and that is all that

10   is in the record, that is insufficient to establish the

11   lascivious exhibition of the genitals.

12        If one looks at the so-called Dost factors,

13   which are informative but not determinative, the first

14   factor is whether the genitals are the focal point of

15   the image.  And I would submit to you that they are

16   not.  Certainly the genitals are visible.  You can

17   certainly see them, but they're not the focal point,

18   Judge.  In fact, every single picture appears to

19   include -- it's either a full picture of the person or

20   their face.  In the case you may not see their face if

21   it's a picture of their back, but there's no effort to

22   conceal the identity of the person.  And more to the

23   point generally speaking what you see is an entire

24   person or, if they're wrestling, their whole body in

25   the wrestling mask, the front and back, but you

1    basically see the whole person, Judge.

2         The second factor is whether or not the setting

3    of the image is sexually suggestive, and I would

4    suggest to you that none of the settings that you saw

5    were sexually suggestive.  They all had multiple

6    people.  They're all young boys, young meaning

7    generally in the neighborhood of 6 to 16 or 17, Judge.

8    But there was nothing sexually suggestive in any of

9    those settings.  There were some on the bed, for

10   example, but the bed was more used as a place for

11   jumping up and down and rough-housing or giving a

12   massage than it was for anything sexual.

13        The third factor is whether the child was

14   depicted in an unnatural or inappropriate act in

15   unnatural pose or inappropriate attire.  There wasn't

16   any real posing in these cases.  It's all boys acting

17   out, Judge, and doing things that boys would do.  And

18   frankly, all these photographs if the boys had had

19   clothes on them, nobody would think a thing of them.

20   With respect to the pictures of the video with the boy

21   sitting on the basketball with the chicken, it was

22   crude and not very much fun to look at but it certainly

23   wasn't sexually suggestive.  I can't imagine that

24   invoking any sort of sexual response, Judge, and it

25   certainly wasn't the kind of attire or pose that would

1   be sexual.

2        Fourth factor is whether the child is partially

3   clothed or nude.  Generally speaking the boys were nude

4   or if they were clothed they were in bathing suits, for

5   example, if they were swimming.  It's not inappropriate

6   attire going back to number three, too.

7        The fifth factor is whether the image suggests

8   sexual coyness or a willingness to engage in sexual

9   activity.  There's nothing in any of these exhibits

10  that suggest sexual coyness.  You don't have -- to my

11  recollection, you don't see a single item that would

12  suggest sexuality.  In fact, if you compared what we

13  saw with the verbal description given by Officer

14  Connelly about kids in Speedo, boys in Speedo bathing

15  suits, that's what might be sexually suggestive, a

16  person in a bathing suit with a bulge in their groin

17  area.  You saw nudity, but again, you didn't see

18  anything, I would suggest, sexually suggestive.  You

19  didn't see a single erection.  You didn't see the use

20  of sex toys.  There was nothing except that they were

21  nude, Judge.  And there's nothing to suggest a

22  willingness to engage in sexual activity.

23        The sixth factor is that the image is intended

24  to elicit a sexual response in the viewer.  There

25  again, I would suggest there's nothing to suggest that

1    these images were intended to elicit a sexual response.

2    I can't imagine a boy sitting on a basketball was

3    intended to elicit a sexual response.  It's nudity, but

4    there's nothing there that suggest there's an intent to

5    elicit a sexual response.

6         Now, I think the Court of Appeals has said you

7    can consider these factors, they're not determinative,

8    you can consider other factors, too.  Certainly one of

9    the other the factors that you could consider in this

10   case I would suggest at this stage is there's not a bit

11   of evidence in this case that Mr. Silva ever responded

12   to these images in a sexual way, ever used these images

13   sexually, ever used these images for any sexual

14   stimulation or anything like that at all.

15        I think when you add up all that, the Government

16   fails, even in the light most favorable to the

17   Government, of being able to prove that these images

18   constitute a lascivious exhibit of the genitals.

19   That's part one of the motion with respect to the first

20   six counts.

21        There's a second part of the argument with

22   respect to Counts I through VI.  The Government has to

23   prove that Mr. Silva knew the videotape or the images

24   contained an image of child pornography, and then you

25   go back to the definition of what child pornography is,

1    which is a lascivious exhibition of the genitals.

2         And I would say to the Court that there's no way

3    the Government can prove or has proved that when

4    Mr. Silva received these materials that he knew at that

5    point that they contained an image of child

6    pornography, Judge.

7         When he received these images, first we know

8    that when he received these images, they were in

9    packages basically -- not basically.  They were in

10   mailing packages.  Even if you get beyond the mailing

11   package and you get to the actual DVDs, the DVD is in a

12   DVD case.  There's no way he can know at that point

13   whether or not the images therein are lascivious or

14   not.  He can't possibly know until he looks at the

15   images, if he can even know then.  But certainly at the

16   time when he receives them, he can't know that these

17   images are lascivious.  And I harken back to the

18   comment on Mr. Connelly yesterday when I asked him

19   about two other videos, "Mountain Men" and "Pool

20   Buddies," and he said he would have had to view them

21   more than just a little bit, I'm paraphrasing, in order

22   to determine whether or not they constituted child

23   pornography or child erotica.

24        Mr. Silva gets these DVDs.  There's no dispute

25   that he receives them.  How can he know, which is part

1    of the Government's proof, how can he know at that

2    point that the DVDs have lascivious exhibition of the

3    genitals.  You just can't know.

4         Now, the second part of that argument is that

5    even after he views them, I would argue he can't know,

6    A, because I would argue, A, because they're not

7    lascivious, that's the argument I just made; and B,

8    because the definition of "lascivious" is so vague.  I

9    would just reference back to the argument I made on the

10   motion to dismiss for vagueness, Judge.

11        So for all of those reasons, I would move for

12   judgment of acquittal on Counts I through VI.

13        Now, with respect to Count VII, Judge, the

14   argument about whether the photos are lascivious is the

15   exact same argument as it is with respect to Counts I

16   through VI and I just incorporate it by reference,

17   whether they're lascivious, the same definition for

18   possession and receipt.  The difference is only whether

19   or not with respect to Count VII that Mr. Silva knew

20   when he possessed them that they were lascivious,

21   Judge.  And there the problem the Government faces is,

22   again, proving that he actually knew that they were

23   lascivious, Judge.

24        Now, I suspect the Government will argue that he

25   had those in his possession, Judge, but they certainly

1    haven't proven that he viewed those parts of the DVDs

2    which they claim are lascivious.  All they have proven

3    is that he had them in his possession.

4         I would also say with respect to Counts I

5    through VI, they haven't proven that he viewed those

6    parts of any of those DVDs.  Obviously they think some

7    of that is lascivious.  They haven't proved that he

8    viewed those.  They proved that he received them.  So

9    for all of those reasons, I would press the motion for

10   judgment of acquittal of all the counts, Judge.

11        THE COURT:  Is it your position that the

12   Government is required to prove that he reviewed or

13   viewed the material in order to prove possession?

14        MR. MANN:  No.  That he had to know that they

15   were lascivious.  In other words, my understanding of

16   the count of possession is that the Government has to

17   prove that he knew the images -- the Government is

18   going to argue, I anticipate, that you could infer that

19   he knew because they were in his possession.  And my

20   argument there, Judge, is that they have to prove that

21   he knowingly possessed the material, that he knew it

22   contained a visual depiction of a person engaging in

23   sexual conduct.  All they've shown is that he had

24   those.  They haven't shown that he actually knew that

25   they included child pornography.  I acknowledge that

1     the argument is stronger with respect to Counts I

2     through VI.  With respect to Counts I through VI, I

3     don't see how the Government gets to proving that when

4     he received them he knew they had child pornography.

5           With respect to Count VII, I at least understand

6     the Government's argument or what I anticipate the

7     argument to be.

8           THE COURT:  All right.  Let's hear from

9     Mr. Donnelly.

10          MR. DONNELLY:  Your Honor, the United States

11    starts as far as the lascivious argument, which is the

12    same as to Counts I through VI as well as Count VII,

13    the Government relies on **United States versus Frabizio**,

14    particularly its statement that "lascivious" is a

15    commonsensical term and whether a given depiction is

16    lascivious is a question of fact for the jury.  I don't

17    know how much argument the Court wants on the

18    lascivious --

19          THE COURT:  I think I've already ruled on that

20    in the pretrial motions so I don't think you need to

21    argue that one.

22          MR. DONNELLY:  Okay.  As to the knowledge issue,

23    your Honor, the Government has to show that the

24    Defendant knowingly received these videos.  I think

25    we've presented more than enough evidence, probably

1   overwhelming evidence that the Defendant knew exactly

2   what he was receiving.

3          The Court will note that -- I can't remember

4   what page it was from Government's Exhibit 21, that's

5   the invoices exhibits, that the first charged Azov

6   Films receipt is that of "FKK Waterlogged," which is

7   charged and specified in Count I.  There were several

8   orders that took place before that.  You know, if the

9   Defendant ordered one DVD and that was it, I doubt we'd

10  be here today for a number of reasons, among them

11  including we might not be able to show he didn't know

12  what he was ordering or what he was getting.  But you

13  take the fact that he had previously ordered several

14  videos in several orders, combine it with the fact that

15  the Azov website provided previews of what's coming in

16  the form of I believe Inspector Connelly or Inspector

17  Bone testified that there are preview photographs, but

18  more than that we have as a full exhibit Government's

19  Exhibit 28, which is the catalog of all of the charged

20  videos, the catalog entries.

21         So somebody on the website certainly has more

22  than a small idea of what they're going to get in these

23  videos.  After you get the first one, there might be an

24  innocent explanation for the first one but once you

25  start getting all the others and you start taking

1    affirmative actions, when you pay extra money for still

2    images, that goes to the Defendant's state of mind, why

3    do we want still images, most of which are cropped

4    photographs of boys sitting with their legs spread

5    exposing their genitals.  I think we go well beyond the

6    minimum knowledge that is required under the statute

7    particularly at this stage of the proceedings.

8            THE COURT:  Thank you, Mr. Donnelly.

9            MR. MANN:  Can I just respond very briefly?

10           THE COURT:  Very briefly.

11           MR. MANN:  I don't think the Government's proved

12   that he saw the catalog.  We agree those are the

13   catalogs.  I don't think the Government proved that he

14   saw those.

15           THE COURT:  That may be true but the Government

16   did put on evidence of the invoices that Mr. Donnelly

17   described, I believe.

18           So I'm going to deny the Rule 29 motion for

19   judgment as a matter of law.  I believe the Government

20   has more than met its burden taking the evidence in the

21   light most favorable to the Government at this stage of

22   the proceedings, both to meet the statutory element of

23   lascivious exhibition.  As noted by Mr. Donnelly, the

24   Frabizio case clearly indicates that that is a term

25   that is a common sense term that is within the ken of

1    the jury to determine and the <u>Dost</u> factors may be

2    considered but are not determinative.  There's more

3    than enough evidence here from which the jury could

4    conclude that the films meet the statutory definition

5    of lascivious exhibition.

6            With respect to the issue of whether the

7    Government has proven the element of knowing receipt or

8    knowing possession, I believe Mr. Donnelly has

9    correctly outlined the circumstantial evidence from

10   which the jury could infer that he, the Defendant, knew

11   that the materials that he was ordering and receiving

12   and possessing were indeed child pornography.

13           So for all of those reasons, I'm going to deny

14   the Defendant's Rule 29 motion.

15           We'll take a break for ten minutes and when we

16   return, Mr. Mann, I take it you'll be calling the

17   Defendant as your first witness.

18           MR. MANN:  Calling the Defendant.  We're going

19   to start to play the videos, and I've already put on

20   the record my understanding about being able to confer

21   with my client.

22           THE COURT:  Yes.  Okay.  Very well.  We'll see

23   you in ten minutes.

24           (Recess.)

25           (Proceedings in the presence of the jury as

1    follows:)

2         THE COURT:  Welcome back, ladies and gentlemen.

3    So as you heard before we broke, the Government has

4    rested its case.  So now is the opportunity for the

5    Defendant to present evidence if he wishes to do so.

6    You remember I explained to you at the beginning of the

7    trial the Defendant has no obligation to do that.  My

8    understanding is Mr. Mann does have witnesses he wishes

9    to call.  So I'm going to turn it over to Mr. Mann.

10        Are you ready to call your witness?

11        MR. MANN:  I am, your Honor.  Thank you.  The

12   defense calls Mr. Silva.

13        **GERALD SILVA, DEFENDANT'S WITNESS, SWORN**

14        THE CLERK:  Please state your name and spell

15   your last name for the record.

16        THE WITNESS:  Gerald Silva, S-I-L-V-A.

17        THE COURT:  Good morning, Mr. Silva.

18        THE WITNESS:  Good morning.

19        THE COURT:  You may inquire, Mr. Mann.

20        **DIRECT EXAMINATION BY MR. MANN**

21   **Q.**   Good morning, Mr. Silva.

22   **A.**   Good morning.

23   **Q.**   Mr. Silva, I'm showing you Government's Exhibit 1.

24   Do you see that, sir?

25   **A.**   Yes, sir.

1    **Q.**   Mr. Silva, at this point, I'm going to play

2    Government's Exhibit 1, okay?

3    **A.**   Okay.

4         (Pause.)

5    **Q.**   At this point, Mr. Silva, I'm going to hit the

6    play button to play Exhibit 1.

7    **A.**   Okay.

8         (Video played.)

9    **Q.**   Mr. Silva, I'm going to try and play it at a

10   faster speed.  Okay?

11   **A.**   Please do.

12        (Video played.)

13   **Q.**   Mr. Silva, I'm going to adjust the speed on this

14   further.

15   **A.**   Please do.

16        (Video played.)

17   **Q.**   Mr. Silva, I'm now going to go to the bonus

18   feature.  Okay?

19   **A.**   Thank you.

20        MR. DONNELLY:  Your Honor, may we approach at

21   this point?

22        THE COURT:  Sure.

23        (Sidebar conference.)

24        MR. DONNELLY:  I didn't renew my objection under

25   Rule 611 about playing the video at a speeded up

1    format; however, now since the Defendant wants to look

2    at these bonus features that is going to be pure text

3    having nothing to do with the images and sort of the

4    indoctrination in naturism, I just think it's a waste

5    of the jury's time.  I object.

6          THE COURT:  I'm going to let him present it as

7    he wants to.  I understand.

8          MR. DONNELLY:  Thank you.

9          (End of sidebar conference.)

10         (Video played.)

11   **Q.**   Mr. Silva, I'm now going to move to the previous

12   section.  I'm now going to speed up this section.

13         THE COURT:  We can't have you ask questions and

14   play the video at the same time.  So stop it and

15   proceed.  Unless it's played at a higher speed and the

16   video is off.

17         MR. MANN:  I understand.

18   **Q.**   I'm now going to play the video at a higher speed.

19   **A.**   Thank you.

20         (Video played.)

21   **Q.**   Mr. Silva, I'm now going to exit this disk.

22   **A.**   Thank you.

23         MR. MANN:  I'm returning Exhibit 1, and I'll now

24   ask for Exhibit 2.

25   **Q.**   Mr. Silva, looking at Exhibit 2, what is the name

1    of that exhibit?

2    **A.**    "V█████, Volume 1."

3    **Q.**    Mr. Silva, how many disks are in that volume?

4    **A.**    Two.

5    **Q.**    Thank you.

6           THE COURT:  Mr. Mann, if you're getting ready to

7    play this, we're getting ready to take a lunch break in

8    about ten minutes.  Whenever there's a convenient point

9    to stop, let's stop.

10          MR. MANN:  Wherever the Court wants me to, I'll

11   pause it.  I'll stop.

12          And may the record reflect this is disk one of

13   the two disks.

14          (Video played.)

15   **Q.**    I'm going to move this to a higher speed, okay,

16   Mr. Silva?

17   **A.**    Thank you.

18          (Video played.)

19          MR. DONNELLY:  Mr. Mann, can you tell me what

20   speed this is.

21          MR. MANN:  I think four-speed.  I'm not

22   positive.

23          MR. DONNELLY:  Thank you.

24          THE COURT:  Okay.  Why don't we stop there.  Is

25   that the end of the disk, the first disk?

1          MR. MANN:  That is the end of the first disk,

2     that is correct, your Honor.

3          THE COURT:  Ladies and gentlemen, let's take our

4     lunch break at this point.  I want to remind you again

5     about my instructions to not have any conversations

6     about the case, not to do any research, not to expose

7     yourself to any information about the case.  Keep in

8     mind if you're outside during the lunch hour to wear

9     those jurors buttons on the outside of your garment,

10    and we will reconvene the trial at 1:30.

11         So Charlie will show you out.

12         (Proceedings out of the presence of the jury as

13    follows:)

14         THE COURT:  Is there another disk as part of

15    that exhibit?

16         MR. MANN:  There is.  So I took the disk out of

17    the player, and I'm returning to the clerk the exhibit

18    with both disks in it.

19         THE COURT:  Okay.  So we'll take our lunch

20    recess.  Just so I understand what we're going to be

21    doing, what you're going to be doing, Mr. Mann, is

22    you're going to go through all the disks in this

23    manner?  Is that the plan?

24         MR. MANN:  That's right.  Could I approach

25    briefly with Mr. Donnelly?

1          (Discussion off the record.)

2          (Lunch recess.)

3          THE COURT:  All right.  Counsel, are we ready to

4     bring the jury in?

5          MR. MANN:  Yes, your Honor.

6          THE COURT:  The plan remains the same?

7          MR. MANN:  Yes.  I was going to ask, Judge, do

8     you mind when I play this I step back after a while or

9     something?

10          THE COURT:  You do what you need to do.

11          Bring the jury in.

12          (Proceedings in the presence of the jury as

13     follows:)

14          THE COURT:  Welcome back, ladies and gentlemen.

15     Hope you had a pleasant lunch hour.  I think we're

16     ready to proceed.  Mr. Mann, I think, is proceeding

17     with the next video.

18          Mr. Mann, you may proceed.

19          MR. MANN:  Thank you.  I'd ask the clerk for

20     Exhibit 2, disk two.

21     Q.   Mr. Silva, do you see that this is Exhibit 2, disk

22     two?

23     A.   Yes, it is.

24     Q.   Thank you.  Mr. Silva, I'm going to speed this up.

25     Okay?

1    **A.**    Thank you.

2            (Video played.)

3    **Q.**    Mr. Silva, I'm going to try to speed it up a

4    little bit.

5    **A.**    Thank you.

6            (Video played.)

7    **Q.**    I'm going to move to the trailers now.

8            I'm going to speed this up.

9    **A.**    Thank you.

10   **Q.**    I'm going to remove this disk, Mr. Silva.

11   **A.**    Thank you.

12           MR. MANN:   I'm returning Exhibit 2 to the clerk.

13   I'll ask for Exhibit 3, please.

14   **Q.**    Mr. Silva, you see this is Exhibit 3?

15   **A.**    Yes, I do.

16   **Q.**    Has two disks?

17   **A.**    Two disks.

18   **Q.**    Showing you Volume 2, disk one?

19   **A.**    That's correct.

20   **Q.**    I'm inserting that disk now.  Mr. Silva, I'm going

21   to play this at a higher speed, okay?

22   **A.**    Thank you.

23           (Video played.)

24   **Q.**    Mr. Silva, I'm going to insert the second disk.

25   **A.**    Thank you.

1    **Q.**   I'm going to play that also at a higher speed,

2    sir.

3    **A.**   Thank you.

4          (Video played.)

5    **Q.**   Mr. Silva, I'm going to skip the history of

6    naturism, okay?

7    **A.**   Yes.

8          MR. DONNELLY:  Are they a different set or are

9    they cumulative?

10         MR. MANN:  I don't know.  If the Government

11   represents to me they're the same, I will skip the

12   trailers, too.

13   **Q.**   I'm going to play them at a very high speed.  I'm

14   also going to put that at a higher speed, okay,

15   Mr. Silva?

16   **A.**   Thank you.

17   **Q.**   See if I can speed it up a little bit more,

18   Mr. Silva.

19   **A.**   Thank you.

20         MR. MANN:  Returning Exhibit 3 and would ask for

21   Exhibit 4, please.

22   **Q.**   Showing you Exhibit 4, do you recognize that?  Is

23   that a two-disk exhibit?

24   **A.**   Yes, it is.

25   **Q.**   I'm going to put in this first disk, not the bonus

1    disk initially.

2    **A.**   Okay.

3    **Q.**   Mr. Silva, I'm going to play these again at a

4    higher speed.

5    **A.**   Okay.

6    **Q.**   Mr. Silva, I'm going to skip the video about

7    naturism, sir.

8    **A.**   Thank you.

9    **Q.**   I'm going to stick in the bonus disk, sir.

10   **A.**   Thank you.

11   **Q.**   I'm going to play that at a high speed, too, sir.

12   **A.**   Thank you.

13        (Video played.)

14        MR. MANN:   The Government pointed out to me,

15   thank you, that there's a third disk.

16   **Q.**   You see this Bonus Disk 2?

17   **A.**   Yes, I do.

18   **Q.**   Thank you.  I'll insert that now.  Mr. Silva, I'm

19   going to play this at high speed again.

20   **A.**   Thank you.

21        (Video played.)

22        MR. MANN:   I'm now returning Exhibit 4 of all

23   three disks.  I'll take Exhibit 5 now.

24        THE COURT:   Mr. Mann and Mr. Donnelly, can you

25   just come up for a moment, please.

1          (Sidebar conference.)

2          THE COURT:  How many disks total are there?

3          MR. MANN:  Your Honor, I think I had 14 more

4    disks after lunch.  We just finished Exhibit 4.

5          MR. DONNELLY:  He's skipping the photo disk for

6    Count IV.  That's Exhibit 4A.

7          MR. MANN:  Is there a 4A?  I missed it.

8          MR. DONNELLY:  I should have made clear on the

9    last one, I'm just letting you know you're missing

10   something.

11         MR. MANN:  I was doing them by number.  I'll go

12   back to 4A.

13         MR. DONNELLY:  My list here, Judge, is that the

14   next exhibit has two disks plus a photo DVD.

15         THE COURT:  Then how many more do you have after

16   that?

17         MR. DONNELLY:  Seven.

18         MR. MANN:  If I play them at four-speed, they

19   get done pretty quickly.

20         THE COURT:  I'd kind of like to discuss this

21   with you more, but I don't really want to do it with

22   the jury sitting in the box.  So I'm going to have them

23   sent into the jury room for a few minutes.  I think the

24   snacks will be here momentarily, because they're

25   scheduled to come at 3:00.  Okay?  So why don't you go

1     back, and we'll do that.

2          MR. MANN:  Just go back to counsel table?

3          THE COURT:  Yes.

4          (End of sidebar conference.)

5          THE COURT:  All right.  Ladies and gentlemen,

6     there's something I need to talk to the attorneys

7     about, and I don't want to keep you sitting in the jury

8     box.  We're almost at the time for our afternoon break

9     so I'm going to send you to the jury room.  The snacks

10    should be arriving momentarily.

11         So assuming that they do, we'll give you enough

12    time that you can have your snacks and a cup of coffee

13    and then have you return.  So Charlie will show you

14    out.  Just keep in mind all of my instructions.

15         (Proceedings out of the presence of the jury as

16    follows:)

17         THE COURT:  You can step down to the table.

18         THE DEFENDANT:  Thank you, your Honor.

19         THE COURT:  Counsel can come back up.

20         (Sidebar conference.)

21         THE COURT:  All right.  I think I've reached a

22    limit on this, but before I pull the trigger on Rule

23    611 and say that I'm going to stop this, I want to give

24    you an opportunity to articulate why it would make any

25    sense to keep going.  After watching how many disks,

1  five or six disks I think we've watched at this point,

2  it strikes me that there is just so much repetition,

3  the same kind of thing over and over that I can't

4  envision what you could possibly accomplish by showing

5  all of the rest of the disks in terms of either what

6  the jury would see or what your argument might be.

7      So I can't see it so I wanted to give you a

8  chance to explain it.

9      MR. MANN:  The major point of my argument is

10  that these videos are boring, not lascivious; and that

11  viewed in their entirety, each disk, if you look at

12  each disk, the single word that leaps out is "boring."

13  I made an opening where I said they would see -- I

14  think I said most if not all, the majority of, I can't

15  remember the exact words I used, but basically said

16  that they would see an awful lot of these.

17      The problem is, Judge, that -- I'm happy to show

18  them at four-speed where it's taking about ten minutes

19  a disk, I think.  I haven't timed it exactly because I

20  don't have a clock in front of me.  I suspect it will

21  take about another hour-and-a-half to show the rest of

22  the disks at the speed that I'm doing them at.  Some of

23  it is taking longer in the beginning because I showed a

24  lot of the first one at regular speed and then I showed

25  the history of naturalism at regular speed, but I

1    haven't played that again, Judge.

2         THE COURT:  That's fine.  I'm not complaining

3    about that.

4         MR. MANN:  It seems to me if I'm going to make

5    an argument to the jury and in effect I almost force

6    myself to become -- I can't become a witness but yet

7    how can I represent to the jury what's in these disks

8    without having some record of it, Judge?  I'm not

9    willing to rely on the excerpts the Government has

10   provided.

11        THE COURT:  Well, we've gone way, way beyond

12   that.  Basically, that's why I gave you the opportunity

13   to do it.

14        MR. MANN:  And I appreciate that, but I relied

15   on the opportunity of -- I think that if I don't play

16   the rest of them -- playing them at four-speed is a

17   compromise for me because it is very fast, Judge.  I

18   initially started this afternoon off at three-speed.

19        THE COURT:  I haven't dictated what speed.

20        MR. MANN:  No.  I thought four-speed was more

21   appropriate after they've seen some of it.  I'm content

22   to continue to go along at four-speed.  If I don't go

23   along at four-speed, what happens is my argument to the

24   jury, I make my argument that all these videos are

25   boring, they show that they are repetitive and all

1    that.  But the only basis for me making that argument

2    is that I've seen them, Judge.

3          THE COURT:  No.  I think actually you've proven

4    that point with what you've shown.  We've watched how

5    many hours of these videos now?

6          MR. DONNELLY:  I could be off one or two either

7    way, but I think there's a total of 15 disks.

8          THE COURT:  Total.

9          MR. DONNELLY:  So the Court understands, there's

10   11 disk exhibits.  The last one, "P███ & C███'s

11   Bucharest," I think, there's three actual disks, one

12   main disk and two bonus ones, and then the Defendant

13   ordered a photo disk on top of it.  So by my count,

14   we've gone through 8 of 15.

15         I neglected yesterday to cite also Rule 403

16   which says the Court can exclude evidence where it

17   needlessly wastes time or is the needless presentation

18   of cumulative evidence.  I understand Mr. Mann's point

19   better now that he's explained it, but I think we've

20   reached that point.

21         THE COURT:  One thing I'm struggling with is I

22   don't see how boring is a defense.

23         MR. MANN:  The defense is not that it's just

24   boring.  The defense is that it's not lascivious

25   because when you look at these things, they are boring.

1    They are not lascivious.

2            THE COURT:  Boring is not part of the standard

3    or any of the factors --

4            MR. MANN:  I can certainly argue to the jury

5    that when you take these things in context and that's

6    what the pattern -- I can get out the wording out of

7    the pattern instruction but it's something either in

8    content or in context, Judge.

9            For them to see them isolated, in fact I was

10   going to argue that excerpt -- I understand high speed

11   is not the same as regular speed, but I was going to

12   argue it's no more selective and maybe less selective

13   than using excerpts.  The additional problem that

14   occurs to me, and I just am thinking out loud, is that

15   now I'm in a position where I presented the videos as

16   to some of the counts but not as to other counts, so I

17   have a fair argument with respect to the counts that

18   are covered by disks one through four.

19           THE COURT:  I have to tell you, Bob, I'm not on

20   the jury, obviously, so I don't know how the jury sees

21   it, but I actually think for those counts that you've

22   shown the full videos for that the evidence is now

23   stronger for the Government in terms of the definition

24   of "lascivious exhibition" because there's more -- just

25   more examples of the exhibition.

1     MR. MANN:  We recognized when we played these

2     videos that there was a risk that we're showing them

3     more images, so to speak.  We understand that's a risk.

4     When I say "we," the defense.  But I think when you

5     look at the disks as a whole, and I think you have to

6     look at at least the disks for each count as a whole, I

7     can't make an argument that you look at all six counts

8     together or all seven counts, but I can certainly make

9     an argument that you look at the disks that would

10    support Count I as a whole.

11         My view is that looked at as a whole they are

12    much more naturist than they are lascivious.  You don't

13    get that all from the excerpts.  And the only way I can

14    convey that is by playing it.  I have zero faith that

15    anybody in this jury is going to ask to play these

16    videos while they're in the jury room.  And even if

17    they do, my great fear, quite seriously, is the other

18    jurors will persuade them not to.  I suspect that

19    nobody wants to look at these videos anymore.

20         THE COURT:  So the naturist argument is what

21    goes to the factor of whether it's designed to elicit a

22    sexual response?

23         MR. MANN:  It goes to whether it's lascivious,

24    Judge.

25         THE COURT:  That's part of it, right?

1          MR. MANN:  I mean, that's part of it but it's

2     also -- these nude pictures are nude pictures of

3     primarily boys often in very naturist settings.  Some

4     of them are in the sleeping car in a train car.  I

5     recognize that some are in a bedroom, Judge, but my

6     argument is that it's all boys horsing around, boys

7     playing around, not the lascivious exhibition of

8     genitals.

9          Now, the jury may not accept that.  I realize

10    that, Judge.  That's the argument.  And there's no

11    context at all if they just see the excerpts.

12         I do want to put on the record that I think -- I

13    agree that I've played I believe it is eight disks.  I

14    agree with Mr. Donnelly that my count is eight disks

15    right now.  I'm willing to accept Mr. Donnelly's count

16    that that would leave seven more.  That would probably

17    leave us about an hour-and-a-half more to play, Judge.

18    Unless somebody else can correct me, I think they're

19    taking about ten minutes a disk.

20         THE COURT:  No.  I think you're -- I'm hopeful

21    it's no more than that.

22         MR. MANN:  I mean, I'm playing them all at

23    four-speed right now, Judge.  And I do think it really

24    puts the defense at a disadvantage now if we don't get

25    to play them.  I'm doing them with no commentary

1  basically except to establish what disks we're putting

2  in.  And there's sort of a gap -- not sort of.  There's

3  a huge gap in the defense case right now.  I have

4  different arguments for different counts now if I do it

5  that way.  I have to go back to the jury and sort of

6  say we'll place this in context, but I've got no

7  context for the ones -- and I'd have to double check my

8  notes how far  Exhibit 4 goes as to which count it

9  covers.  I would just have to compare my notes.  It

10  would take me a moment to marry up the exhibits to the

11  counts, Judge.

12       THE COURT:  Well, I'm also just worried about

13  the restlessness of the jury watching this on and on

14  and on.

15       MR. DONNELLY:  You asked for suggestions

16  earlier, Bob.  The only thing I can think of here, you

17  make a very cogent argument as always, do you have to

18  play every second?  Can you play at a high speed for a

19  minute or two minutes?  Everybody gets the general

20  picture.

21       MR. MANN:  I am comfortable with a stipulation

22  that the trailers -- I think we can work out some sort

23  of stipulation --

24       THE COURT:  The trailers are all repetitive.

25       MR. MANN:  The trailers are repetitive and

1    nothing in the trailers that hasn't been shown reveal

2    anything new.  I'm happy to make a stipulation like

3    that.

4         MR. DONNELLY:  I don't understand that

5    stipulation --

6         THE COURT:  One thing you could do is ask him,

7    you know, have you seen the trailers on all of these

8    films, are they basically the same as the earlier ones?

9         MR. MANN:  I don't think he even knows, Judge.

10        THE COURT:  Well, if he hasn't seen them, then

11   he wouldn't know, right?

12        MR. MANN:  The last trailer is a few minutes,

13   Judge.  I'm happy to stipulate away to the trailers.  I

14   really am, Judge.  I've taken out the history.  We did

15   that once.  I'm happy to get rid of the trailers if we

16   can reach some sort of stipulation.

17        THE COURT:  All right.  I guess I'll let you do

18   it.

19        MR. MANN:  I feel like I have to do it.

20        THE COURT:  We can go off the record, I guess.

21        (Discussion off the record.)

22        (End of sidebar conference.)

23        (Recess.)

24        THE COURT:  Ready to bring the jury back?

25        MR. MANN:  Yes.

1       THE COURT:  All right.  Charlie, let's bring

2  them in.

3       (Proceedings in the presence of the jury as

4  follows:)

5       THE COURT:  All right.  Ladies and gentlemen,

6  welcome back.  So Mr. Mann is about to proceed with

7  showing the rest of the disks.  I have consulted with

8  counsel and just for your benefit I will tell you that

9  this portion of the defense's case is going to last the

10  rest of today.  We're going to finish the presentation

11  of these disks by 4:30 and then I'm going to let you go

12  for the day and then Mr. Mann will pick up with his

13  continued examination of the Defendant when we return

14  on Monday morning.  All right?

15       Go ahead, Mr. Mann.

16       MR. MANN:  Thank you.

17  **Q.**   Exhibit 6 has two disks, right, sir?

18  **A.**   Yes.

19  **Q.**   Just to save time, I'm going to play the rest of

20  the disks at high speed, okay, Mr. Silva?

21  **A.**   Yes, please.

22  **Q.**   This is Disk 1.

23       (Video played.)

24  **Q.**   Mr. Silva, I'm now going to insert Disk 2.

25  **A.**   Thank you.

1    **Q.**    Load the bonus features now, sir.

2    **A.**    Thank you.

3    **Q.**    You've seen the section previews?

4    **A.**    Yes.

5    **Q.**    You've seen the previews in these, right?

6    **A.**    Yes.

7    **Q.**    Are the previews about the same?

8    **A.**    Yes.

9    **Q.**    I'm going to skip the previews.

10   **A.**    That would be fine.

11          MR. MANN:  I'm going to return Exhibit 6 and ask

12   for Exhibit 8.

13   **Q.**    Two disks again, sir?

14   **A.**    Two disks.

15   **Q.**    I'm going to put in Disk 1.  Again I'm going to

16   continue to play these at high speed, sir.

17   **A.**    Thank you.

18   **Q.**    I've extracted Disk 1, Mr. Silva.  I'm going to

19   insert Disk 2 of this exhibit.  I'm going to skip the

20   history again.

21   **A.**    Very good.

22          MR. MANN:  Returning Exhibit 8.  I'd ask for

23   Exhibit 9.

24   **Q.**    Exhibit 9, two disks, sir?

25   **A.**    Two disks.

1  **Q.**   Starting Disk 1.  I'm now starting Disk 2, sir.

2  **A.**   Thank you.

3        MR. MANN:  Still Exhibit 9.

4        MR. DONNELLY:  Thank you.

5        MR. MANN:  This is Disk 2 that I'm now inserting

6  of Exhibit 9.

7        Seems to be taking longer than normal.  I'm

8  going to try to remove the disk and reinsert the disk.

9        THE COURT:  Maybe that disk isn't working

10 properly, Mr. Mann.  Perhaps you can move on.

11       MR. MANN:  I'm going to return Exhibit 9 to the

12 clerk and note that I have not played Disk 2 and ask

13 the clerk if I can have Exhibit 10.

14 **Q.**   Mr. Silva, I'm showing you Exhibit 10.  You see it

15 has one, two -- two disks, sir?

16 **A.**   Two disks.

17 **Q.**   I'm going to play the first disk.

18       (Video played.)

19 **Q.**   We'll skip previews again, Mr. Silva.

20 **A.**   Yes.

21 **Q.**   We're obviously going to skip the history of

22 naturism again.

23 **A.**   Yes.

24 **Q.**   I'm going to put in a second disk labeled

25 "Supplemental Material," sir.

1  **A.**   Thank you.

2  **Q.**   Mr. Silva, we're going to skip the next two items

3  we discussed.

4  **A.**   Very good.

5       MR. MANN:   Returning Exhibit 10 with two disks.

6  I'd ask for Exhibit 11, please.

7  **Q.**   Mr. Silva, I want to show you this.  It appears to

8  have one disk in it.

9  **A.**   Right.

10  **Q.**   I'll now play the deleted scene now, sir, at the

11  same high speed.

12  **A.**   Thank you.

13  **Q.**   Just like the previews, the trailers are generally

14  the same for all these, aren't they?

15  **A.**   I believe so.

16  **Q.**   You haven't seen them all but you'd say they're

17  generally the same?

18  **A.**   I believe so.

19  **Q.**   I'm not going to play them all.

20       MR. MANN:   Let me return Exhibit 11.  I'd ask

21  for Exhibit 5 now.

22  **Q.**   Showing you Exhibit 5, it's a DVD, sir?

23  **A.**   Okay.

24       THE CLERK:   I don't think we can play that on

25  the DVD player.

1    MR. MANN:  It has to be played on a computer?

2    May I confer with Government counsel for just a

3  second?

4    THE COURT:  Yes.

5    (Pause.)

6    THE COURT:  Why don't you play the next thing

7  and let the Government figure out if that can be done.

8    MR. MANN:  I think if we go back to Disk 2 of

9  Exhibit 9 is the only one that didn't work.  That's the

10  only other video that I have to do, Judge.

11    THE COURT:  All right.

12  **Q.**    This is Disk 2 of Exhibit 9, sir?

13  **A.**    Yes.

14  **Q.**    I'm going to play this at high speed again, sir.

15  **A.**    Thank you.

16    (Video played.)

17    THE COURT:  Didn't you already play this?

18    MR. MANN:  This is Disk 2.  I played Disk 1,

19  Judge.  I'll double check.  My notes were Disk 1 played

20  but Disk 2 did not.

21    (Video played.)

22    MR. MANN:  I'm returning Exhibit 9, both disks

23  to the clerk.

24    Could I speak to the Government for one second,

25  Judge.

1          (Pause.)

2          MR. MANN:  So the Government now has Exhibit 5,

3     Judge, which I would have permission to publish to the

4     jury in the fashion similar to what we've been doing in

5     high speed.

6          THE COURT:  Fine.

7          MR. MANN:  I'll return Exhibit 5 and ask for

8     Exhibit 7.

9          (Video played.)

10         MR. MANN:  I'm returning Exhibit 7 to the clerk.

11    I believe that completes the video and image evidence

12    the defense intends to present with respect to the

13    Government's documents.

14         THE COURT:  So that's it with respect to all of

15    the video and --

16         MR. MANN:  All the images that the Government

17    has presented for evidence.

18         THE COURT:  Would counsel just come up for a

19    moment, please.

20         (Side bar conference off the record.)

21         THE COURT:  Ladies and gentlemen, having

22    consulted with counsel, I think what makes the most

23    sense at this point is to stop for the day and let you

24    go home now.  Mr. Mann has a full examination of the

25    witness, the Defendant, that he wishes to do but I

1    think it's best if we start that fresh on Monday

2    morning so that we don't end up just chopping it off at

3    some random point.  There's some things I need to do

4    with the attorneys with respect to the charge on the

5    law, which we do in every case, and I can utilize the

6    rest of the afternoon to do that and don't have to keep

7    you here.  I'm going to send you home.

8           I'm going to remind you of all the instructions

9    I mentioned previously.  I do recognize it's a burden

10   on you to not talk about the case.  I do recognize

11   that.  In fairness to the Defendant as well as the

12   Government, I have to ask you to resist from that

13   discussion about the case.  I also reiterate my

14   instruction not to do any research of any kind about

15   the case that has come up as well as not watch or

16   listen or read anything regarding the case in any

17   medium at all.

18          So with that I'm going to wish you a good

19   weekend and we'll see you Monday morning.  We'll begin

20   at 9:00 a.m.

21          Thank you.

22          (Proceedings out of the presence of the jury as

23   follows:)

24          THE COURT:  Counsel, I'll see you upstairs and

25   take five or ten minutes.

1          MR. MANN:  Thank you.

2          THE COURT:  Thank you.

3          (Court concluded at 4:10 p.m.)

C E R T I F I C A T I O N

       I, Anne M. Clayton, RPR, certify that the foregoing is a true and correct copy of the transcript originally filed with the clerk on September 16, 2014, and incorporating redactions of personal identifiers requested by the following attorney of record:  Robert B. Mann, in accordance with the Judicial Conference policy.  Redacted characters appear as a black box in the transcript.


       /s/ Anne M. Clayton
_____
       Anne M. Clayton, RPR


       October 16, 2014
_____
       Date