IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


```
* * * * * * * * * * * * *   CRIMINAL ACTION
UNITED STATES OF AMERICA  *   13-043S
                          *
VS.                       *   FEBRUARY 10, 2014
                          *
GERALD SILVA              *   PROVIDENCE, RI
* * * * * * * * * * * * *
```


HEARD BEFORE THE HONORABLE WILLIAM E. SMITH

CHIEF JUDGE

(Jury Trial)

**VOLUME III**

**REDACTED**


**APPEARANCES**:

```
FOR THE GOVERNMENT:        TERRENCE P. DONNELLY, AUSA
                           U.S. Attorney's Office
                           50 Kennedy Plaza
                           Providence, RI  02903

FOR THE DEFENDANT:         ROBERT B. MANN, ESQ.
                           Mann & Mitchell
                           One Turks Head Place
                           Suite 610
                           Providence, RI  02903


Court Reporter:            Anne M. Clayton, RPR
                           One Exchange Terrace
                           Providence, RI  02903
```


Proceeding reported and produced by computer-aided
stenography

I N D E X

WITNESS                                    PAGE

GERALD SILVA

   Continuation of Direct Examination
   by Mr. Mann:                               3
   Cross-Examination by Mr. Donnelly:        88
   Redirect Examination by Mr. Mann:        143


DEFENDANT'S EXHIBITS                ID        FULL

D     -                             68         69

_____

1    10 FEBRUARY 2014 -- 9:20 A.M.

2            (Proceedings in the presence of the jury as

3    follows:)

4            THE COURT:  Good morning, ladies and gentlemen,

5    and welcome back.  I hope you had an enjoyable weekend.

6    Sorry for the delay in getting started this morning.  I

7    had a few things I needed to take up with counsel and

8    hopefully will make the remaining part of the trial go

9    more smoothly.  So I think we're ready to go forward

10   with Mr. Mann's continued examination of his client,

11   Mr. Silva.

12           Are you ready to go forward, Mr. Mann?

13           MR. MANN:  Yes, I am, your Honor.

14           THE COURT:  All right.  Let's get Mr. Silva back

15   on the witness stand.

16   **GERALD SILVA**, Resumes stand.

17           THE COURT:  You've already been sworn.

18           THE DEFENDANT:  Yes.

19           THE COURT:  Go ahead, Mr. Mann.

20           MR. MANN:  Thank you, your Honor.

21           **CONTINUATION OF DIRECT EXAMINATION BY MR. MANN**

22   **Q.**   Mr. Silva, can you tell us how old you are?

23   **A.**   Fifty-nine years old.

24   **Q.**   Where were you born, sir?

25   **A.**   Providence, Rhode Island.

1    **Q.**   And where did you grow up?

2    **A.**   East Providence, Rhode Island.

3    **Q.**   With whom?

4    **A.**   My biological parents, my maternal grandparents

5    and my siblings.

6    **Q.**   Can you describe generally the living

7    arrangements.

8    **A.**   I lived upstairs with my mother, my father and my

9    siblings, and my maternal grandparents lived

10   downstairs.

11   **Q.**   What did your mother and father do?

12   **A.**   My mother was a homemaker, and my father worked

13   for Bird and Son as a boiler operator.

14   **Q.**   Where did you go to school?

15   **A.**   Sacred Hearts School and LaSalle Academy.

16   **Q.**   When did you graduate from high school?

17   **A.**   1972.

18   **Q.**   After high school, did you go to college?

19   **A.**   Yes, I did.

20   **Q.**   Where?

21   **A.**   I went to Providence College for one year pre-med,

22   and then I went to Johnson & Wales Business College.

23   **Q.**   And how long did you go to Johnson & Wales?

24   **A.**   Four years.

25   **Q.**   Did you get any degrees from Johnson & Wales?

1    **A.**   Yes, I did.

2    **Q.**   What degrees?

3    **A.**   I got a baccalaureate in Business Management and

4    associate in Business Management and associate in

5    Business Administration.

6    **Q.**   How did it come to be that you obtained three

7    degrees, sir?

8    **A.**   I got a second associate's when you have options

9    to take other courses, instead of taking liberal arts,

10   I took general sciences course which rendered me a

11   second degree.

12   **Q.**   When did you get your BS in Business Management?

13   **A.**   1977.

14   **Q.**   Did you get any post-graduate degrees, sir?

15   **A.**   Yes, I did.

16   **Q.**   When?

17   **A.**   I got an MSW in 1994.

18   **Q.**   And --

19   **A.**   That's a master's in Social Work.

20   **Q.**   What was that a master's in?

21   **A.**   Master's in Social Work.

22   **Q.**   Where did you get that degree from?

23   **A.**   Rhode Island College.

24   **Q.**   And you said you got it from 1990 to 1994, why did

25   it take four years?

1   **A.**   I did it part-time while I was working.

2   **Q.**   Did you obtain any professional credentials?

3   **A.**   I have a state license.  It's called LICSW, which

4   is Licensed Individual Clinical Social Worker.  I also

5   have an ACSW, which is Accredited Clinical Social

6   Worker through the NASW.

7   **Q.**   What is the NASW?

8   **A.**   National Association of Social Workers.

9   **Q.**   Are these certifications current, sir?

10  **A.**   The ACSW is, but the LICSW is not because you have

11  to use a computer to renew it and right now I have no

12  access to a computer.

13  **Q.**   Can you describe generally your childhood.

14  **A.**   Yes.  I grew up, as I mentioned, with my parents.

15  They never divorced.  I lived in the same house.  I was

16  in the Boy Scouts, Little League, Columbus Squires,

17  different organizations like that.

18  **Q.**   Are both your parents still alive?

19  **A.**   My father passed away in 1996.  My mom is still

20  alive.

21  **Q.**   Are you still close with her?

22  **A.**   Yes, I am.

23  **Q.**   Now, you said you engaged in some activities as a

24  child including Little League, Columbus Squires and Boy

25  Scouts.  What is Columbus Squires?

1    **A.**    Columbus Squires is a youth group organization run

2    by the Knights of Columbus as kind of a junior program.

3    It was an activity-based program.

4    **Q.**    And did you have any positions in that program?

5    **A.**    I was the Chief Columbus Squire for the council in

6    East Providence, and I was the state Chief Columbus

7    Squire for the State of Rhode Island.

8    **Q.**    What did it mean to be the state chief squire?

9    **A.**    You coordinate with all the different councils'

10    activities, the different Columbus Squire programs in

11    the different councils throughout the state.

12    **Q.**    You said you were involved with the Boy Scouts.

13    When did you start out with the Scouts?

14    **A.**    As a Cub Scout.

15    **Q.**    What was the highest rank you attained?

16    **A.**    Eagle scout with a gold palm.

17    **Q.**    What does the "gold palm" mean?

18    **A.**    Beyond rank of eagle scout, there was additional

19    badges I earned, merit badges to get the gold palm.

20    **Q.**    As a Boy Scout, were you associated with a

21    particular troop?

22    **A.**    Troop 29 in East Providence.

23    **Q.**    After you graduated from high school, did you

24    continue your involvement with scouting?

25    **A.**    Yes, I did.

1  **Q.**    How did that happen?

2  **A.**    The scout leader had left.  There was no one to

3  replace him, and so I took over the troop.  One of the

4  fathers of one the former scouts signed up as scout

5  leader and -- because he couldn't do it either and so I

6  took over the scout troop when I was 18.

7  **Q.**    Now, were you able to formally be the scout master

8  when you were 18?

9  **A.**    No.  You can't be scout master at 18.  You have to

10  be 21.  So I signed up as the assistant scout master.

11  **Q.**    And as the assistant scout master, did you

12  effectively run the troop anyway?

13  **A.**    Yes, I did.  I ran the troop.

14  **Q.**    How did that come to be?

15  **A.**    Say again?

16  **Q.**    How was it you were able to run the troop?  What

17  happened to the scout master?

18  **A.**    There wasn't anybody available for a scout master.

19  So one of the former scout's father signed the papers

20  as a scout leader and let me run the troop.

21  **Q.**    About how long did you run the troop?

22  **A.**    About ten years.

23  **Q.**    When you were 21, did something change?

24  **A.**    I was able to sign up as scout master.

25  **Q.**    During that ten-year period when you were running

1    the troop, did you also hold positions with any other

2    scout troops?

3    **A.**   Yes.  I briefly held position as scout master for

4    Troop 6, New Haven Methodist Church.  They had lost

5    their scout leader.  They asked me to take over the

6    troop for a while until they could locate a new scout

7    master.  They weren't able to do that so we folded

8    their troop into mine.

9         And I also held a position as a committee

10   chairperson for Troop 63 Rehoboth.  It was like a

11   brother unit to us.  We used to travel with them and do

12   different things with that troop.

13   **Q.**   The troop from Haven Methodist Church, did that

14   actually merge with your troop?

15   **A.**   Yes.  They couldn't find a scout leader so

16   whatever boys wanted to stay in scouting they had the

17   opportunity to come in as part of our troop.

18   **Q.**   During the ten years that you were scout master,

19   can you describe some of the activities that your troop

20   did?

21        MR. DONNELLY:  Your Honor, I think I'd just

22   object to the relevance at this point.  I don't mind

23   some background but --

24        THE COURT:  Overruled.

25   **A.**   We actually went to Bermuda.  We had our own bus.

1    Went to national jamborees.  Traveled to Washington,

2    D.C., various places like that.  We had an Indian dance

3    team, a rifle team, a rifle drill team.  It was a very

4    active scout troop.

5    **Q.**   Why did you stop being the scout leader after ten

6    years?

7    **A.**   I got a job with the Eckert Foundation.

8    **Q.**   Do you know what happened with your troop after

9    you left?

10   **A.**   About a year later it folded.

11   **Q.**   It what?

12   **A.**   It ended about a year after I left.

13   **Q.**   You said you got a job with the Eckert Foundation.

14   What was the Eckert Foundation?

15   **A.**   The Eckert Foundation was an organization for

16   troubled youth.  It was primarily boys at that time.

17   It was established by Mr. and Mrs. Eckert.  They had

18   run the Eckert chain down in Florida.  They sold their

19   chain.  They had a lot of money.  They wanted to do

20   something good for the community so they started a

21   residential wilderness treatment program for troubled

22   youth.

23   **Q.**   And what was the population that they addressed?

24   **A.**   The population at the time was all male ranging in

25   age from roughly 12 to up to 18 years of age.

1          THE COURT:  Put the mike a little closer to you.

2          THE DEFENDANT:  I'm sorry, your Honor.

3          THE COURT:  Thank you.

4     **Q.**   How old were you when you started with the Eckert

5     Foundation?

6     **A.**   About 28.

7     **Q.**   Prior to working at Eckert, had you had previous

8     work experience?

9     **A.**   I worked at a New York System and Sear's

10    Department Stores.

11    **Q.**   What was your first position at Eckert?

12    **A.**   As a counselor.

13    **Q.**   Was there a screening process prior to being

14    hired?

15    **A.**   Yes, there was.

16    **Q.**   Can you just briefly summarize it.

17         MR. DONNELLY:  I object to this, your Honor.

18         THE COURT:  Come up.

19         (Sidebar conference.)

20         THE COURT:  All right.  What's the substance of

21    this going to be?

22         MR. MANN:  That there was a screening process

23    and first there were interviews in Rhode Island and

24    then there was a second part of the process where he

25    gets interviewed by psychologists and psychiatrists and

1    others and then after he was hired there was training.

2          What I'm going to eventually argue to this jury,

3    I hope, is that this is a man that's had 39 years of

4    experience, and if you include the scouting experience

5    in this, which -- difficult population, starting the

6    populations.  I already almost provided the

7    populations.  But he's been in the system for a long

8    time and that that's a factor that should be considered

9    in assessing who he is and I think this is just part of

10   the background.

11         I think it's probably pretty obvious that

12   anybody that gets hired as a counselor at any of these

13   facilities or programs gets interviewed, goes through a

14   vetting process of some sort.

15         MR. DONNELLY:  I think the objection at this

16   point is to the fact that the question is calling for

17   the witness to bootstrap hearsay into the record;

18   namely, people in Florida and the proof that Bob just

19   made.  I'm not going to object if he wants to go

20   through his various professional roles with boys, but I

21   think just trying to get into what other people thought

22   or said it's hearsay.

23         THE COURT:  Only if it's being admitted for its

24   truth.  And I guess --

25         MR. DONNELLY:  I don't see any other purpose.

1          MR. MANN:  I'm not going to ask him what those

2     people said.

3          THE COURT:  Or what they concluded?

4          MR. MANN:  No.  I'm going to ask him did you go

5     through a screening process, what did the process

6     consist of.  And one way or the other I'm going to end

7     up arguing at the end of this case that he interviewed

8     for jobs that involved dealing with either youths or

9     finally adults when he was a probation officer and that

10    by definition that it's --

11         THE COURT:  I'm going to allow it.  You can deal

12    with it on cross-examination.

13         (End of sidebar conference.)

14         THE COURT:  All right.  The objection is

15    overruled.

16         Do you remember the last question?

17         THE DEFENDANT:  I'd like to have it repeated,

18    please.

19         THE COURT:  All right.  Go ahead.

20         (Pending question read by the reporter.)

21    **A.**   Yes, there's an interview process here up in Rhode

22    Island.  Once you passed -- you went through that

23    interview process, you spent a few days at the camp to

24    be observed.  Then I went down to Florida.  In Florida

25    there's like a three-day evaluation with various

1    interviews, including psychologists, psychiatrists,

2    social workers and so on.

3    Q.    After -- I'm sorry.  Have you completed --

4    A.    After you went down to Florida.  After I was

5    interviewed in Rhode Island, I went down to Florida for

6    a screening down there.

7    Q.    And were you hired?

8    A.    Yes, I was.

9    Q.    And after you were hired, was there training?

10   A.    Yes, there was.

11   Q.    What was the training?

12   A.    The initial training was there's a six-week

13   program where you went down, you were still down in

14   Florida, and you lived as -- the class were called

15   campers.  And we lived as a camper, we lived as the

16   client.  We lived in the program to get an

17   understanding of what life was like.  And two senior

18   counselors came in from other camps to be the adults,

19   so to speak, and the instructors.  So there was a

20   six-week training period.

21        MR. MANN:  Mr. Silva, could I ask you to speak

22   more into the microphone because at one point --

23        THE DEFENDANT:  Yes.  Sorry about that.

24   Q.    Now, after the training program, did you return to

25   Rhode Island?

1    **A.**   Yes, I did.

2    **Q.**   And what did you do when you returned to Rhode

3    Island?

4    **A.**   I went to help supervise a group of ten boys as a

5    counselor with another counselor.

6    **Q.**   Can you describe the work conditions.

7    **A.**   It was a therapeutic wilderness program and you

8    worked 5 days a week, 24 hours a day with 2 days off.

9    **Q.**   Where did this work actually physically take

10   place?

11   **A.**   It was in Exeter, Rhode Island.

12   **Q.**   Was it a particular -- can you describe the

13   environment?

14   **A.**   It was a therapeutic wilderness environment where

15   the boys lived in semi-permanent tents.

16   **Q.**   Were there times when the work schedule was

17   different than the five days on, two days off?

18   **A.**   Periodically, we would take trips down to like

19   Florida, Georgia, places like that.  We'd take canoe

20   trips on the Suwannee River or take hiking trips up in

21   the mountains and that would require me to work six

22   weeks at a time.

23   **Q.**   Were you working full-time during those six weeks?

24   **A.**   Twenty-four-hour days, six, seven days a week, six

25   weeks.

1    **Q.**   When you were doing this kind of work and living

2    at the camp, where were you living?

3    **A.**   In a semi-permanent tent with the group at a camp

4    site.

5    **Q.**   How long were you a counselor?

6    **A.**   As a counselor, about six months.

7    **Q.**   What happened after that?

8    **A.**   I became a senior counselor.

9    **Q.**   What was the job of the senior counselor?

10   **A.**   The senior counselor was the person most

11   responsible for the group and for the training of the

12   more junior counselor, the continued training of.

13   **Q.**   How big was the group?

14   **A.**   Ten boys.

15   **Q.**   How long were you senior counselor?

16   **A.**   About a year.

17   **Q.**   What happened after that?

18   **A.**   I became a group work supervisor.

19   **Q.**   What was that position?

20   **A.**   It was supervising the senior counselors and the

21   regular counselors to make sure that the program was

22   being implemented properly in the program.

23   **Q.**   How long were you a group work counselor?

24   **A.**   About a year or two.

25   **Q.**   What was your next position?

1    **A.**    Program specialist.

2    **Q.**    What was that job?

3    **A.**    To coordinate -- to develop and coordinate the

4    program between the group works supervisor and the

5    program director to make sure the program was

6    therapeutic and being implemented appropriately.

7    **Q.**    How long were you in that position?

8    **A.**    It was about a year or two there, too.

9    **Q.**    Did you move then to another position?

10   **A.**    I moved into the position of program director.

11   **Q.**    Where were you a program director?

12   **A.**    In New Hampshire.

13   **Q.**    Was that still part of the same Eckert Foundation

14   setup?

15   **A.**    Yes, it was.

16   **Q.**    Why did you move to New Hampshire?

17   **A.**    They were starting a new program there from

18   scratch.  There was no program in New Hampshire.  There

19   was just land.  So I went up with the resident director

20   to develop the program, develop the staff.

21   **Q.**    How long did you stay in New Hampshire?

22   **A.**    Two years.

23   **Q.**    Tell us briefly what your duties were in New

24   Hampshire.

25   **A.**    As program director, I was second-in-charge of the

1    overall program, and to get -- ensure the program was

2    safe and secure for the kids and that it was being

3    properly administered through the program specialist

4    and the group work supervisor, the counselors, and we

5    also had educational staff there as well.

6    **Q.**    Did you move from that position after about two

7    years?

8    **A.**    Yes.  I returned to Rhode Island as camp director.

9    **Q.**    Where was that, Camp E Huntee?

10   **A.**    Camp E Huntee, yep.

11   **Q.**    And what was the job as the camp director at Camp

12   E Huntee?

13   **A.**    The senior-most person responsible for the

14   operation of the program.  I oversaw the staff of about

15   33 people and 56 clients.

16   **Q.**    How long did you remain at Camp E Huntee as a

17   director?

18   **A.**    Two years.

19   **Q.**    You left after about two years as director?

20   **A.**    Yeah, after about two years.

21   **Q.**    Why did you leave Eckert?

22   **A.**    I had lost confidence in the program.

23   **Q.**    Can you explain what you mean.

24   **A.**    Seemed to become more about the money than about

25   the program itself.  We were paid on a per diem basis,

1    which means that if a child is in a bed, we get paid.

2    If the bed is empty, we don't get paid; and it was

3    getting to the point where the referrals weren't what

4    they should be, and I was under a lot of pressure to

5    bring kids into the program that I didn't think were

6    safe for the rest of the population of the camp.

7    **Q.**    How old were you when you left Camp E Huntee?

8    **A.**    About 35.

9    **Q.**    Where did you go from Camp E Huntee?

10    **A.**    I went to Kent County Mental Health Center.

11    **Q.**    What is Kent County Mental Health Center?

12    **A.**    It's located in Warwick, Rhode Island.

13    **Q.**    What is it?

14    **A.**    What is it?  It's a community-based mental health

15    center that deals with families that have difficulties,

16    especially mental health issues, behavioral issues.

17    **Q.**    What was your job?

18    **A.**    My job was a case manager.

19    **Q.**    What were your duties there as a case manager?

20    **A.**    To work with adolescent males primarily, who were

21    having difficulty in home and school and community.

22    **Q.**    Did you focus on a subpopulation of adolescent

23    males?

24    **A.**    They were usually aggressive adolescent males.

25    **Q.**    Can you tell us what you actually did in this

1    position.

2    **A.**    Basically, my job was to bring the boys out, give

3    them some activities in the community, whether go to

4    the mall, back then they had arcades.  We'd go to the

5    arcades.  Someplace where they could relax and talk at

6    the same time about their particular issues.  And I'd

7    also work with the clinician.  A clinician is a

8    licensed therapist who dealt with the parents and the

9    family as a whole.

10   **Q.**    How long did you hold this job?

11   **A.**    For about four or five years roughly.

12   **Q.**    While you were holding this job, were you also

13   going to school?

14   **A.**    Yes, I was.

15   **Q.**    Where was that?

16   **A.**    That was at Rhode Island College for my master's

17   in Social Work.

18   **Q.**    Were you going to school part-time?

19   **A.**    Yes.

20   **Q.**    When you graduated -- when did you graduate from

21   Rhode Island College?

22   **A.**    1994.

23   **Q.**    At some point after you received your degree from

24   Rhode Island College, did you begin to look for

25   alternative work?

1    **A.**    Yes, I did.

2    **Q.**    Why was that?

3    **A.**    I had my license.  I was looking for better pay

4    and different working conditions.

5    **Q.**    Did you get an offer to work shortly after you

6    received your master's from another program?

7    **A.**    Yes.  I was hired by Gateway Mental Health Center,

8    which is located in Johnston, Rhode Island.  Same type

9    of program as Kent County Mental Health Center.

10   **Q.**    What was your position at Gateway?

11   **A.**    As a clinician.  With my master's degree, I was

12   able to do therapy for the family as well as for the

13   youth, for the parents as well.

14   **Q.**    Did you specialize in a certain population there?

15   **A.**    I dealt with -- at that time, I also brought on

16   adolescent females so adolescent females and adolescent

17   males was my primary caseload.  And again, I

18   specialized in aggressive adolescent males.

19   **Q.**    At some point, did you assume greater

20   responsibilities at Gateway?

21   **A.**    Yes.  I became a team leader.

22   **Q.**    What is a team leader?

23   **A.**    A team leader works with other clinicians to

24   coordinate meetings and information and to be a

25   resource for other clinicians and case managers.

1    **Q.**    And did you also have responsibility for

2    supervising meetings with other people?

3    **A.**    With other clinicians and case managers, yes.

4    **Q.**    How long were you at Gateway?

5    **A.**    Until about 2004.

6    **Q.**    About eight-and-a-half years?

7    **A.**    Roughly, yes.

8    **Q.**    And why did you leave?

9    **A.**    I got a job as a probation officer.

10   **Q.**    And was that with Rhode Island?

11   **A.**    Rhode Island.

12   **Q.**    How did you get to become a probation officer?

13   **A.**    Basically, I took an examination, passed the

14   examination, and then went through an interview

15   process.

16   **Q.**    What did that process cover?

17   **A.**    It covered my experience, my credentials, things

18   like that, and as well as the openings that were

19   available at the Department of Corrections.

20   **Q.**    And did you learn what types of openings were

21   available?

22   **A.**    Yes, I did.

23   **Q.**    What types of openings were available?

24   **A.**    There were two primary positions open.  One was

25   for what they call a generic caseload.  Generic

1    caseloads have about 430 people on them at that time.

2    And then they had the opening in the Sex Offender Unit,

3    which had a maximum of 70 probationers per caseload.

4    **Q.**   And when you learned that those were the two

5    positions that were available, what was your reaction?

6    **A.**   Well, I didn't know what they could do with 430

7    people on your caseload, and their response was that,

8    well, you take the top 25 and do the best you can.  I

9    didn't see that as being productive and so I settled

10   for the sex offender caseload.

11   **Q.**   And at some point, were you notified that you

12   would be offered a position?

13   **A.**   Yes, sir, I was.

14   **Q.**   How did that happen?

15   **A.**   I received a phone call from an administrator at

16   the Department of Corrections.  They said that they

17   wanted to hire me for the sex offender caseload.

18   **Q.**   What was your response?

19   **A.**   I told them I needed -- I'd like to have a couple

20   of days to think about it.

21   **Q.**   And how did that all work out?

22   **A.**   They said they needed an immediate answer, but I

23   said I couldn't give an immediate answer so they gave

24   me a day.

25   **Q.**   And then what happened?

1  **A.**   The next day I called them and said I would take

2  the position, but they wanted me to start immediately.

3  And I told them I couldn't start immediately because I

4  had obligations to Gateway.  I had clients and I had

5  staff that I was supervising, that I would need two

6  weeks notice for Gateway.

7  **Q.**   Did they work out a solution to allow you to do

8  that?

9  **A.**   They worked out a solution that the Department of

10  Human Resources at the DOC, they hired me, they put me

11  on a two-week leave and then I was able to transition

12  from Gateway effectively to the Department of

13  Corrections.

14  **Q.**   So you then became a probation officer for sex

15  offenders?

16  **A.**   Sex offender caseload, yeah.

17  **Q.**   Can you explain -- and about when was that, sir?

18  **A.**   Around April 2004.  April 19th, 2004 was the hire

19  date, but then it was two weeks later that I actually

20  started.

21  **Q.**   Can you explain what training you had for that

22  position.

23  **A.**   They call it NEO training, new employee

24  orientation.  And they went through all the procedures

25  for the Department of Corrections but what they hired

1  me for because I had a lot of previous training on sex

2  offenders, plus I had worked with sex offenders and

3  their victims as well in the past.

4  **Q.**   You said you worked with sex offenders.  Can you

5  explain that?

6  **A.**   When I was working with a lot of the aggressive

7  adolescent males, some of them had been sexually abused

8  so they were victims, obviously.  Some of those who

9  were victims reacted -- what they call reacted, they

10  had sex with someone else and they became offenders.

11  **Q.**   Did you have training to deal with both children

12  who had been sexually abused and those who were

13  reactive to their abuse?

14  **A.**   Yes.  Starting even at Eckert Foundation right up

15  through there were various training sessions from

16  various organizations on how to deal with their trauma.

17  **Q.**   Have you had any training, either before or after

18  you became a probation officer dealing with child

19  pornography?

20  **A.**   When I was at Kent County, starting with Kent

21  County and moving forward, I had training regarding

22  child pornography including two sessions with the

23  FBI -- well, with an FBI agent.  One was conducted at

24  the Newport Naval Base, sponsored by the NCIS, which is

25  Naval Criminal Investigative Services, that actually

1    showed child pornography and then a second one by the

2    same FBI agent at a different location.  But there were

3    multiple trainings throughout my career at various

4    agencies.

5    **Q.**    Now, are you still a probation officer?

6    **A.**    Yes, I am, but I'm on administrative leave until

7    this situation gets corrected.

8    **Q.**    You've been on administrative leave basically

9    since this case started?

10   **A.**    Correct.

11   **Q.**    Did you spend your entire career working as a

12   probation officer working with the sex offender

13   caseload?

14   **A.**    Yes, I did.

15   **Q.**    And were you a probation officer on the day of

16   your arrest?

17   **A.**    Yes, I was.

18   **Q.**    Do you remember what that day was?

19   **A.**    September 27, 2012.

20   **Q.**    Now, you know Ken Bell, don't you?

21   **A.**    I sure do, yes.

22   **Q.**    You recognized him as one of the witnesses who

23   testified, right?

24   **A.**    Yes, I did.

25   **Q.**    And did you know what his job was before his

1    current job?

2    **A.**   He was head of the ICAC unit at the State Police

3    Office.  The ICAC being the Internet Crimes Against

4    Children Unit.

5    **Q.**   And did you know him professionally over the

6    years?

7    **A.**   Say again?

8    **Q.**   Did you know then Sergeant Bell professionally

9    over the years?

10   **A.**   Yes, I did.

11   **Q.**   In May of 2012, did you send him an e-mail?

12   **A.**   Yes, I did.

13        MR. MANN:  Could I have I think 29, 30 and 31.

14   **Q.**   Now, was this the first e-mail, showing you

15   Exhibit 29, that you sent to Mr. Bell, Sergeant Bell

16   then?

17   **A.**   Yes, it is.

18   **Q.**   And when you sent this e-mail, were you concerned

19   that you wouldn't send information to an incorrect

20   address?

21   **A.**   Yes, I was.

22   **Q.**   Why was that?

23   **A.**   I had some information I believed that was

24   relevant to his job, so to speak, and I wanted to make

25   sure that it didn't go to anybody but him.

1    **Q.**    And where did you send this e-mail from, what

2    e-mail address?

3    **A.**    From my office at the Department of Corrections.

4    **Q.**    It has your name on it?

5    **A.**    Yes, it does, at the top.

6    **Q.**    And you received a response to that e-mail; is

7    that correct?

8    **A.**    Yes, I did.

9    **Q.**    And is this the response that you received?

10   **A.**    Yes, it is.

11   **Q.**    And you know that the heading is on the previous

12   page, right?

13   **A.**    Yes.

14   **Q.**    And after you received this e-mail, did you send

15   Sergeant Bell another e-mail?

16   **A.**    Yes, I did.

17   **Q.**    And this is the second e-mail that you sent

18   Sergeant Bell?

19   **A.**    That is correct.

20   **Q.**    What prompted you to send this e-mail to Sergeant

21   Bell?

22            MR. DONNELLY:  For the record, are we talking

23   about 30?

24            MR. MANN:  We're talking -- pardon me?

25            MR. DONNELLY:  We're on Exhibit 30 now?

1          MR. MANN:  Yes.  Let me rephrase the question.

2     Q.   Exhibit 29 was sent on May 11th, wasn't it, the

3     very first e-mail?

4     A.   The very first one, correct.

5     Q.   This e-mail was sent on the next day, right?

6     A.   Correct.

7     Q.   What prompted you to send these e-mails?

8     A.   I'd been following a website called Azov or

9     actually been on the website called Azov, which we're

10    all very familiar with now.  And to me, it was just

11    fine.  No problem, naturist website.  But then they had

12    moved into a link that led them into an adult porn site

13    called Boy Joy.  And I became very irritated by that

14    because naturist websites do not link into pornography.

15    There's no link between naturism and pornography.  And

16    in one of the statements from the Boy Joy website was

17    that some of the boys, not all but some of the boys

18    that were in the adult pornography site had been

19    previously in the Azov movies.

20          And I became irritated by that.  I was concerned

21    that if they're moving from naturist, perfectly fine,

22    naturist movies into the adult pornography that they

23    would then lapse into probably, maybe possibly grooming

24    these kids to be in something -- well, into the adult

25    pornography or maybe even into child pornography, which

1    I was very concerned about.

2         I lost my signal to the Azov and to the Boy Joy

3    one.  I wasn't able to monitor it.  I didn't want to

4    buy the Internet.  I don't have the Internet.  And I

5    felt that there was something that somebody needed to

6    be monitoring this site in case they did cross the

7    line.

8    Q.   Now, when you were arrested, did you volunteer to

9    Mr. Connelly that you had communicated --

10   A.   At some point he said to me, Did you tell anybody

11   about the Azov site.  And my response was I had sent an

12   e-mail to Sergeant Bell.  I said it was after the fact

13   of having lost the site, which now we understand was

14   closed down.  And then I said, So I don't think it

15   really mattered.

16   Q.   Now, when you sent this e-mail, did you know the

17   Azov site had been closed down?

18   A.   I didn't know it was closed down.  I thought I had

19   lost my -- I did lose my wi-fi signal for all things,

20   and I wasn't able to get back onto it.

21   Q.   At some point, did you suspect the Azov site had

22   been shut down?

23   A.   Yes.  Sometime later I got a wi-fi signal and went

24   back and there was a thing saying that it was

25   unavailable or something, something or other.  And I

1    thought it was maybe shut down at that time.

2    **Q.**    Later you sent the third e-mail?

3    **A.**    Right.  That's when I sent the third e-mail.

4    **Q.**    So in terms of timing, you tried to get the Azov

5    website after you sent this e-mail but before the third

6    e-mail?

7    **A.**    That is correct.

8    **Q.**    And then after you tried to access the site and

9    you couldn't, did you have suspicions about what had

10    happened?

11    **A.**    I thought that maybe my suspicions were correct,

12    that behind the scenes -- there's nothing obviously in

13    either one of the films.  They were both legitimate,

14    the Azov and the Boy Joy ones were -- they were legal,

15    but I was concerned that something was happening behind

16    the scenes.  And if something was happening behind the

17    scenes, then I was hopeful that somebody had caught up

18    with these guys and had done something about it.

19    **Q.**    Now, I want to direct your attention to certain

20    specific parts of this e-mail that's on the screen,

21    okay?

22    **A.**    Correct.  Sure.

23    **Q.**    You talk about discovering a website called Azov?

24    **A.**    Correct.

25    **Q.**    How did you discover Azov?

1    **A.**    I had been perusing the Internet looking for

2    different DVDs, and they were linked in through Amazon.

3    I Googled it.   Googled Amazon.   Amazon linked me into

4    Azov.

5    **Q.**    Then you say, "The only naturist films they have

6    are of nude boys," do you see that?

7    **A.**    Right.

8    **Q.**    Why did you say that?

9    **A.**    Just above it I put down in parentheses -- not

10   parentheses, but I put down that they were European

11   naturist website, quote, unquote, because I was

12   concerned, again, that they had gone from being a pure

13   naturist website into adult pornography and that

14   doesn't happen in naturist sites.   That caused me to

15   reassess what is the real purpose of having boys -- it

16   was fine until that point, but once you get into adult

17   pornography, then it raises a different question about

18   what the purpose of these boys are.

19           So I was concerned then at that point in time

20   that they were focusing on boys and maybe they were

21   grooming them for the purpose of getting them into

22   adult pornography later on.

23   **Q.**    Then you say, "I suspect that they do this to

24   provide an air of legitimacy."   What did you mean by

25   that?

1    **A.**   Right.  So in other words is that they're using

2    Azov, which is the naturist films, and they were using

3    the commercial films to give a sense of respectability

4    to the adult pornography site.

5    **Q.**   At the end of that paragraph you say that, "None

6    of them appear to cross the line into pornography,

7    though I think they definitely flirt with the line."

8    What did you mean by that?

9    **A.**   Right.  The Boy Joy one was the "Barely Legal 18."

10   It's now just as soon as these kids turned 18, it seems

11   -- I'm making assumptions on that.  As soon as they

12   turn 18, then they lapsed into the adult pornography,

13   and it's like they're flirting with the line there.

14        Again, the concern was that if they go into the

15   adult pornography, these kids are in line with being

16   groomed for the adult pornography.  In that grooming

17   process, might they cut that grooming process short and

18   then get into child pornography.  I didn't want that to

19   happen.

20   **Q.**   Then you say in the next paragraph that you

21   believe they will cross the line at some point if they

22   haven't already.  Do you see that?  What did you mean

23   by that?

24   **A.**   Right.  Again, behind the scenes.  Again, there's

25   nothing visible.  Both sites, even the Boy Joy one was

1    absolutely legal.  I want to emphasize that because I

2    don't want to get into any problems with that.  They

3    were both legal sites.  The fact that they linked

4    together a naturist site and an adult site is that if

5    they had crossed the line there was nothing visual in

6    the films themselves but what might be happening in

7    real life behind the scenes when you're not seeing

8    these particular films.

9    **Q.**    You refer to Boy Joy and you refer to it in this

10   e-mail here, right?

11   **A.**    Um-hum.  Yes.

12   **Q.**    And what was Boy Joy?

13   **A.**    Boy Joy was the name of the barely legal adult

14   pornography site.

15   **Q.**    Could you link to that from the Azov website?

16   **A.**    Yes.  That's what sort of irritated me.  If they

17   had put that site separate somewhere and hadn't linked

18   it into the Azov, I wouldn't have probably even known

19   about it.

20   **Q.**    Then you say that you suspect, but you don't have

21   any evidence, that the boys featured in the naturist

22   films are being groomed.  I think that's down here.

23   **A.**    Correct.  Yeah.

24   **Q.**    Is that the same stuff you had been talking about?

25   **A.**    Yeah.  Exactly the same stuff.  They were

1    conditioning them to become adult actors.

2    **Q.**    At the end of this communication, you say that you

3    have a really bad feeling about what may be happening

4    to these boys?

5    **A.**    Correct.

6    **Q.**    What did you mean by that?

7    **A.**    It's the same thing that I said earlier.  There's

8    never a link between naturism and an adult pornography

9    site.  It just doesn't happen.  I've never seen it.

10   I've gone to every naturist site in the world, but it

11   just doesn't happen.  And my concern was I didn't know

12   what to do about it.  Now, I lost my signal.  I was not

13   going to get the Internet.  I couldn't follow these

14   folks.  The best person and the person I trust most in

15   life when it comes to these things was Sergeant Bell,

16   one of the finest people I've ever worked with.  And I

17   felt if anybody knew what to do with this or could do

18   anything about this -- you have to vent to somebody,

19   and he's the guy I would vent to on this.  I would

20   never vent this to anybody else but him because he's

21   the guy who can deal with stuff like this, if anybody.

22   **Q.**    You mean Sergeant Bell?

23   **A.**    Sergeant Bell is a great guy, yeah, he's tops.

24   **Q.**    Now, after you sent this e-mail, you sent the

25   final e-mail to Sergeant Bell?

1    **A.**    Yes.

2    **Q.**    And is that this e-mail?

3    **A.**    Correct.

4    **Q.**    And that was sent a few weeks, about three or four

5    weeks later, right?

6    **A.**    Whenever I got the wi-fi signal back, yeah, at

7    Starbucks.

8    **Q.**    You indicate in that that you borrowed the wi-fi

9    from Starbucks?

10   **A.**    Yes.

11   **Q.**    How were you getting access to the Internet during

12   this time in 2011?  Did you have an Internet connection

13   at your house?

14   **A.**    Yeah.  I had a wi-fi signal that was coming into

15   the house.

16   **Q.**    You didn't pay for wi-fi service?

17   **A.**    I'm not going to pay for the Internet, no.

18   **Q.**    How would you access wi-fi?

19   **A.**    On the computer itself it has an automatic signal

20   that it will pick up any open wi-fi that's in the area.

21   **Q.**    Is that how you accessed the Internet?

22   **A.**    Yeah.  You turn on the computer, and it sends out

23   a signal to capture any wi-fi that may be out there.

24   **Q.**    Now, on the day that you were arrested, where were

25   you living?

1    **A.**    In my home in Coventry.

2    **Q.**    At some point, did law enforcement come to your

3    residence?

4    **A.**    Yes, they did.

5    **Q.**    Do you remember about what time of the day it was?

6    **A.**    It was early morning.

7    **Q.**    Was it just one law enforcement officer?

8    **A.**    There was a team.  A team of people.

9    **Q.**    When they first came into the house, did they tell

10   you why they were there?

11   **A.**    I asked why they were there.  They didn't want to

12   answer that question at that time.

13   **Q.**    Did you fairly quickly move into the backyard?

14   **A.**    Yes, we did.  After about five or ten minutes.

15   **Q.**    And when you got to the backyard, what happened?

16   **A.**    They started to ask me questions, talk to me.  I

17   told them I was not going to answer anything or talk to

18   them until I knew why they were there.

19   **Q.**    Did they tell you?

20   **A.**    Yes.  They were quite cordial at that point, and

21   they said that I was being charged with possession of

22   child pornography.  I said that's false.  It's a false

23   statement.

24   **Q.**    When you said that was false --

25   **A.**    Right.  I don't buy child pornography.

1    **Q.**   And did they amplify their comment that you were

2    being charged with child pornography?

3    **A.**   They said that I had bought Azov films, and I

4    said, Yeah, I did buy Azov films, I said, but they're

5    not child pornography, that they were naturist films.

6    **Q.**   And was all this discussion taking place in the

7    backyard?

8    **A.**   Yes, it was.

9    **Q.**   And who was there besides yourself?  Was

10    Mr. Connelly present?

11    **A.**   Mr. Connelly and Sergeant Scott Kelly.

12    **Q.**   Were they both there the whole time?

13    **A.**   No.  They were in and out, back and forth.

14    **Q.**   Now, you saw various invoices introduced earlier

15    in this trial that had your signature on them, right,

16    or initials, I think, right?

17    **A.**   Yes, I did.

18    **Q.**   Did you initial those invoices, sir?

19    **A.**   Yes, I did.

20    **Q.**   And did Mr. Connelly or his associate ask you

21    where the Azov videos were?

22    **A.**   They either asked or I volunteered.  I know I told

23    them where they were, absolutely.

24    **Q.**   At some point -- all this is taking place in the

25    backyard, right, sir?

1   **A.**    That's correct.

2   **Q.**    At some point, were you asked for access to your

3   personal e-mail account?

4   **A.**    Yes, I was.

5   **Q.**    And did you give it to them?

6   **A.**    Yes, I did.

7   **Q.**    Did you have to give them a password or something?

8   **A.**    There was a password, yes.

9   **Q.**    Just a normal password?

10  **A.**    Yes.

11  **Q.**    At some point -- you've seen the PowerPoint that

12  was introduced?

13  **A.**    The PowerPoint, yes.

14  **Q.**    You've seen that document?

15  **A.**    Yes.

16  **Q.**    At some point, were you asked about whether you

17  were working on a presentation, or did that subject

18  come up somehow?

19  **A.**    It came up.  I said, Yeah, the only reason I had

20  the Azov was for the presentation.

21  **Q.**    Did you volunteer that you were working on a

22  presentation?

23  **A.**    Yes, I did.

24  **Q.**    And in that context, was there also some

25  discussion about a movie called "The Dancing Boys of

1    Afghanistan"?

2    **A.**    Yes, there was.

3    **Q.**    What was that discussion?

4    **A.**    I mentioned that Azov was only a small portion of

5    the materials that I was gathering for the

6    presentation.  And I had mentioned that one of the most

7    recent films that I had purchased was called "The

8    Dancing Boys of Afghanistan."  It was a Public

9    Broadcasting System movie about child trafficking in

10   Afghanistan.  And I just gave that as an example.  I

11   got tons of material for the presentation.  It's not

12   just Azov.  And I actually said to them I think every

13   police officer should see it.  And they went and they

14   got it.

15   **Q.**    When you told them about your presentation, did

16   you tell them whether or not you had obtained

17   permission from the Rhode Island -- let me finish the

18   question -- if you obtained permission from the Rhode

19   Island Department of Probation?

20   **A.**    They asked if I had, and I said I had not.

21   **Q.**    And did you tell them why you had not obtained

22   permission?

23   **A.**    No.  There was no need to.  It was in the very

24   initial stages of being developed.  If I was even going

25   to go through the Department of Corrections, it would

1   have been much later on.  As we heard earlier, it's

2   like ten days before you put the presentation on.  I

3   didn't have a presentation at that point in time.

4   Plus, I could have done it out of my own professional

5   license and I actually didn't have to do it under a

6   license at all.  Anybody can do a presentation if they

7   want to.  But it was in the very, very initial stages

8   of development.

9   **Q.**   Was there any discussion about nudism while you

10  were in the backyard?

11  **A.**   Yeah.  It came up I guess because the films are

12  nudists films.  I am a nudist.  I live a nudist

13  lifestyle.

14  **Q.**   And did you give them any details about the way

15  you lived your lifestyle as a nudist?

16  **A.**   I mentioned I had a site up in Connecticut and

17  that I'd spend weekends there when I could get a chance

18  during warmer weather.

19  **Q.**   At some point, was there a discussion about

20  whether you were concerned about boys in the Azov

21  Films -- let me back up.

22      Are you familiar with the term "grooming" in

23  terms of the kind of work that you do?

24  **A.**   Yes.

25  **Q.**   Can you tell us what that is?

1    **A.**    It means you condition a child to feel comfortable

2    with their environment, with their setting, with the

3    people that are there.  And then when that child feels

4    comfortable, safe and secure and trusts the people that

5    are with them, then they lapse into encouraging the

6    child to do behaviors the child shouldn't be doing or

7    isn't healthy for the child.

8    **Q.**    Did you say at some point that you were concerned

9    about boys in the Azov films being groomed?

10    **A.**    I had mentioned that earlier, yes.

11    **Q.**    And did you say that to the officers?

12    **A.**    Yes, I did.

13    **Q.**    And why was that, sir, for the same reasons as you

14    set forth in the letter to Ken Bell?

15    **A.**    Right.

16    **Q.**    E-mail to Ken Bell, excuse me.

17    **A.**    Right.  Part of the conversation was that I had

18    sent the letter to Ken Bell.  I'm not sure exactly

19    where it was in the conversation, but it came up.  I

20    said, Yeah, I did have concerns they started this adult

21    porn site and that some of the kids from the Azov films

22    were allegedly into the adult site.  And I was

23    concerned because there's no link, again, between

24    naturism and adult pornography, that some of these kids

25    were being groomed to enter into adult pornography.

1  **Q.**   Did you at some point say that the Azov Films may

2  have crossed the line?

3  **A.**   If it went into the adult pornography and if these

4  kids were being groomed for that purpose, was there

5  like a shortcut where these kids were being groomed and

6  they decided to lapse into some kind of adult

7  pornography -- I mean, child pornography or something

8  like that, behind the scenes or whatever.

9  **Q.**   Was there some discussion while you were in the

10  backyard about the producers of Azov going to jail or

11  something like that?

12  **A.**   By that time it had been established the site had

13  been closed down.  I inquired if something had happened

14  behind the scenes.  Things, again, you don't see in the

15  films but maybe there was something going on behind the

16  scenes where these kids might have been harmed or

17  persuaded to do things they shouldn't be doing.  The

18  indication I had was that that had occurred.  I said,

19  well -- I asked if the guys were in prison that had

20  produced the films.  And my understanding is that they

21  were.  And I said, Well, that's good.  You know,

22  they're bad guys.  If they've hurt those kids, they're

23  bad guys and they should be in jail.

24  **Q.**   Now, when you said, "If they hurt these kids,"

25  were you referring to producing the Azov films?

1    **A.**   No.   Not producing the Azov Films, not producing

2    the Boy Joy films, but if there were things behind the

3    scenes, that there was another layer -- they talked

4    about a second layer of films that I didn't get into,

5    didn't find out about, don't know what it's all about.

6    If those second layer of films were -- or even if they

7    weren't but there was something going on and even maybe

8    in a different forum where these kids were involved

9    either -- well, say child pornography or if they were

10   doing something even -- you know, I didn't even think

11   about it until now but child prostitution or something

12   like that, I don't know.   Something bad behind the

13   scenes anyways, nothing to do with the Azov films and

14   nothing to do with the Boy Joy films.

15   **Q.**   Did you have a discussion with Mr. Connelly about

16   one of the Azov films that is in evidence that involved

17   a boy and a chicken?

18   **A.**   Yes, I did.

19   **Q.**   Piece of chicken?

20   **A.**   Yes.

21   **Q.**   And what was that discussion, sir?

22   **A.**   You know, I was -- I guess we were both getting a

23   little frustrated because to me Azov films are naturist

24   films.   They were saying there's pornography.   I said,

25   Just tell me one film where there's anything that's

1    sexual or illegal in it.  And Mr. Connelly mentioned,

2    well, the kid sat on some chicken.  And I said, Well,

3    he sat on some chicken.  I said, It's rude, crude

4    obnoxious, maybe ridiculous.  I'll give that.  And

5    maybe inappropriate.  I'll give that.  I said, But it's

6    definitely not sex and it's not illegal.  And I

7    repeated, Can you tell me anything, any film that has

8    anything sexual in it.

9    **Q.**   Let me just focus on -- I'm sorryf?

10   **A.**   I said, Or illegal.  And he didn't respond.

11   **Q.**   Did you think at that point that the movie

12   involving the young boy and the piece of chicken was

13   pornographic?

14   **A.**   Oh, no.  Absolutely not.

15   **Q.**   Did you think it was sexual at all?

16   **A.**   No.  That's not sex.

17   **Q.**   Did you tell Mr. Connelly that you felt the

18   children in the Azov films were being exploited?

19   **A.**   I never remember using that term.  I remember

20   saying that I was concerned that they might be being

21   groomed for the purpose of adult pornography.

22   **Q.**   So you acknowledge that you were concerned about

23   the fear that they might be being groomed?

24   **A.**   I was definitely concerned about the kids.  For

25   sure.

1    **Q.**    Now, did you purchase films from Azov, sir?

2    **A.**    Yes, I did.

3    **Q.**    And do you know about how long back Azov was in

4    existence?

5    **A.**    The catalog went back to about 2005.

6    **Q.**    How did you come into contact with the Azov

7    website?

8    **A.**    When I mentioned earlier I had Googled Amazon, on

9    Amazon I was looking for whatever I was looking for at

10   the time, I actually don't remember, but it linked into

11   Azov and that's how I discovered it.  And it had an

12   Amazon discount.

13   **Q.**    Did you buy things from Azov?

14   **A.**    Yes, I did.

15   **Q.**    For what period of time approximately?

16   **A.**    From October of 2010 to April 2011.

17   **Q.**    Were there any indications when you were buying

18   from Azov from the website that made you think that

19   they were other than a naturist website?

20   **A.**    None.

21   **Q.**    Did you have any indications that it was a safe

22   site?

23   **A.**    Yes, I did.

24   **Q.**    What were those, sir?

25   **A.**    There were multiple reasons.  They had their

1    introductory, which we've all seen. They had the

2    history of naturism, which we've all seen. It was an

3    open website. They had contact information. There was

4    no hiding anything. It went back to 2005. If

5    something was illegal, it wouldn't be around since

6    2005. That's for sure. There was just a beaucoup of

7    stuff there, looked just like any other naturist

8    website that I've seen.

9    **Q.** Was there anything secretive about the way you

10   ordered materials off the website?

11   **A.** None whatsoever. As a matter of fact, just the

12   opposite. I wanted people to know where I go on the

13   Internet. If you go on the Internet, everybody knows

14   where you are. You might as well be sitting in

15   downtown Providence with your computer because

16   everybody knows where you are when you're on the

17   Internet. I absolutely wanted everyone to know exactly

18   where I went, exactly where I bought, and I brought it

19   exactly to my home so there could be no question about

20   where I went on that website. I absolutely didn't want

21   anybody thinking I went anywhere and purchased anything

22   that I didn't purchase on the Internet.

23   **Q.** You heard either Sergeant Krawczyk or Mr. Ross

24   from the Toronto Police Department say that the website

25   blocked certain police addresses from accessing the

1    website.  Did you have any idea of that, sir?

2    **A.**    None.  I had no problem getting onto that site

3    whatsoever.

4    **Q.**    You had no idea that they were blocking law

5    enforcement?

6    **A.**    It was as easy as getting on any other naturist

7    website.

8    **Q.**    Is the process similar to as when you went onto

9    Amazon or something like that?

10   **A.**    It was right through Amazon, same as any other

11   website.

12   **Q.**    Was there discounts for certain materials on the

13   website?

14   **A.**    Yeah.  It was an Amazon discount.  They ran

15   specials every now and then.

16   **Q.**    Now, you've seen before the trial today the

17   various invoices that were introduced into evidence --

18   **A.**    Yes.

19   **Q.**    -- in this case, haven't you?

20   **A.**    Yes, I have.

21   **Q.**    And you've reviewed copies of those, haven't you,

22   sir?

23   **A.**    Yes, I have.

24   **Q.**    You don't dispute that you bought these various

25   films through Azov, do you?

1    **A.**    Absolutely not, no.

2    **Q.**    Did you in preparation for your testimony at some

3    point figure out about how many titles you'd ordered

4    from Azov?

5    **A.**    My total was 69.  I know that's different than the

6    prosecution's where they had that double order but -- I

7    didn't double order, but if they want to dispute it,

8    I'm not going to dispute it.  I don't care.  It's not

9    that big a difference.  But my total was 69.

10   **Q.**    Would you agree that there's a second order for

11   six that appears duplicative?

12   **A.**    There were six that were duplicate one day to the

13   next.  That seems to me just to be an error.

14   **Q.**    One way or the other, you ordered either 69 or 75?

15   **A.**    At least 69.  If they want to say 75, I'm not

16   going to argue over the difference.

17   **Q.**    And were all of those films that you ordered from

18   Azov, Azov production films or were some of them

19   produced by other people?

20   **A.**    Some were what I call commercial because they were

21   other films.

22   **Q.**    Did you calculate before coming in here how many

23   of those films you bought were not from Azov?

24   **A.**    Roughly 21.

25   **Q.**    Would that be 21 out of the 69?

1    **A.**    That's correct.

2    **Q.**    If you included the 75, would it be a higher

3    number that were not from Azov?

4    **A.**    Yes.  I didn't figure from that number, though.

5         MR. MANN:  Let me just return these three

6    exhibits.

7    **Q.**    Well, the two duplicative ones were the ones for

8    November 5th.  Do you see that one, sir?

9    **A.**    No, I don't see it.

10   **Q.**    Do you see it now, sir?

11   **A.**    Yes, I see it now.

12   **Q.**    November 6th, right, sir?

13   **A.**    Correct.

14   **Q.**    And November 5th has seven and November 6th has

15   six, right?

16   **A.**    Correct.

17   **Q.**    And is it fair to say that the six on November 6th

18   are also on the invoice for November 5th?

19   **A.**    That is correct, yes.

20   **Q.**    And out of those six, how many of those six were

21   Azov productions?

22   **A.**    The last two, "Barefooted" and "Capital Fellows."

23   **Q.**    So four were not, right?

24   **A.**    Four were not.

25   **Q.**    So it would be fair to say that based on your

1  previous numbers that if you had 69 individual titles,

2  it was 21 that were not Azov but if you included the

3  75, it would be 25, right?

4  **A.**   I guess that would be true, yes.

5  **Q.**   On the date of your arrest, had you opened all the

6  Azov films that you had ordered?

7  **A.**   No, I had not.

8  **Q.**   Do you know about how many you had not opened?

9  **A.**   There were 13 in the hard cases, and about 4 in

10  the white envelopes.

11  **Q.**   Was Azov the only place you bought DVDs from, sir?

12  **A.**   I buy DVDs from a lot of places.

13  **Q.**   Do you have any estimate of the size of your total

14  DVD collection on the date of your arrest?

15  **A.**   I would say at the minimum would be 500 and go up

16  from there, for sure.

17  **Q.**   What types of films did you buy, sir?

18  **A.**   I bought all kinds of films, mostly horror films

19  because they're the cheapest, but comedy, drama, lots

20  of documentaries about the various wars and stuff and

21  about different events in history besides the wars.

22  Travel movies.  Sci-fi is my favorite.

23  **Q.**   Did you also buy naturist films?

24  **A.**   Yes, I did.  Yes, I did.

25  **Q.**   What is a naturist film?

1   **A.**    Naturist films are nude recreation involved of all

2   ages, from infant to grandparents.

3   **Q.**    Did you buy -- what are coming-of-age films?

4   **A.**    Coming-of-age films are adolescents that are in

5   trouble, that they have difficult lives.  And the films

6   depict -- a lot of them are true-life stories of youth

7   who have had difficulty growing up, and they call them

8   coming-of-age.  It's usually teenagers.

9   **Q.**    Did you buy educational films?

10  **A.**    Yes, I did.

11  **Q.**    What types of educational films did you buy?

12  **A.**    On human growth.

13  **Q.**    Pardon?

14  **A.**    On human growth.

15  **Q.**    Why on that subject?

16  **A.**    I wanted information for the presentation.  When

17  you do a presentation you don't just do the

18  psychological stuff.  Whenever you do a presentation

19  that involves thought, you also bring in issues of

20  physiology because you have to elimination the

21  physiology as an issue before you start dealing with

22  the mental health issues.

23  **Q.**    When you purchased these films from Azov, can you

24  describe the process that you used?

25  **A.**    I used the regular Internet process where you

1    order online, you use your credit card, and they send

2    it to you in the mail.

3    **Q.**    Whose name was the credit card in?

4    **A.**    Mine.

5    **Q.**    Did you get a monthly bill for the credit card?

6    **A.**    Yes, I did.

7    **Q.**    Where was that bill mailed to?

8    **A.**    Sent to my home.

9    **Q.**    The Azov films that you ordered, where did you

10   have those mailed to?

11   **A.**    To my home.

12   **Q.**    Under who's name?

13   **A.**    My name.

14   **Q.**    Did you take any steps at all to conceal your

15   identity when ordering these films?

16   **A.**    Absolutely none.

17   **Q.**    Had you also purchased naturist films from other

18   producers than Azov?

19   **A.**    Yes, I had.

20   **Q.**    Can you identify any of the other producers from

21   whom you purchased naturist films, sir?

22   **A.**    There was one I think that was mentioned earlier.

23   It was "Russian Bare," B-A-R-E.  "Euro-vid," E-U-R-O

24   dash V-I-D, and "Odess."

25   **Q.**    Can you briefly summarize or describe the contents

1    of the naturist films you bought from those?

2    **A.**    Again, it's nude recreation from infant to

3    grandparents, all aspects of life.  Naturist lifestyle

4    is basically recreation without clothes.

5    **Q.**    Did these films have just young -- do these films

6    have just boys and young boys, or did they have other

7    people in them, too?

8    **A.**    The majority of them had families.

9    **Q.**    Were they nude?

10    **A.**    Yes.

11    **Q.**    When you bought films from other distributors, how

12    did you do that?

13    **A.**    Same process as the ones from Azov.  I used my

14    credit card.  Sometimes they were ordered through --

15    there's a magazine called "Internaturally," which

16    actually has gone out of business.  But they had a

17    catalog there, too, so that would be through the mail.

18    "Russian Bare" was through the same process as Azov.

19    **Q.**    Did you view all the films you purchased?

20    **A.**    Not all, no.

21    **Q.**    Why not?

22    **A.**    I overbuy.

23    **Q.**    Pardon?

24    **A.**    I overbuy.  Something is on sale I'll buy it and

25    then hold onto it until some further point.

1   **Q.**   Why did you purchase -- let me back up.

2         Were the Azov Films' naturist films you

3   purchased different than some of the other naturist

4   films?

5   **A.**   These again were primarily was all boys.

6   **Q.**   Why did you purchase Azov films, sir?

7   **A.**   Because I wanted something that was non-sexual,

8   that I felt the Azov films were all male, which is

9   totally non-sexual in my world, and it provided the

10  visual imagery that I wanted for the presentation.

11        And if I had used the commercial films that I

12  already had, they're more intense because they're

13  dealing with the trauma of children and I didn't want

14  the intensity to be in the film that led into the

15  conversation and presentation.  I wanted the

16  conversation to be intense, not the film that was

17  introducing the topic for conversation.  And the Azov

18  films obviously provided that.

19  **Q.**   Why not use some of the naturist films you already

20  had?

21  **A.**   There were three films from the family films where

22  the men went one place and the women went another

23  place.  When the men went one place, it was all male,

24  but there wasn't the variety of activities.  There

25  wasn't the consistency of the participants as far as

1    who they were and things like that where Azov had the

2    all-male films, which again to me is very neutral.

3    They had a variety of activities.  Some of the

4    participants went from when they were young, say, I

5    don't know, 6, 8, whatever, until 12, 14 or something

6    like that, and gave a flow to the film so that could be

7    shown later on in the presentation.

8    Q.    Did you make a conscious decision not to include

9    in your presentation films that depicted nude women or

10   nude girls?

11   A.    I wanted to stay away from that.  I wanted the

12   conversation to be about the topic that was being

13   presented; and unfortunately, society has stereotyped

14   nude females in a sexual way.  And I was concerned that

15   if I used nude females, it would become about sexual

16   issues not about the issues that I wanted to be

17   discussed within the film.  I didn't want any sexual

18   content within the film itself.

19   Q.    When you sort of were initially conceiving this

20   idea of a presentation, was it in response to questions

21   you had been asked?

22   A.    Yes, it was.

23   Q.    Can you explain that.

24   A.    I've been around a long time.  I've been around in

25   social rehab for 30 years.  And when people find out

1   especially that I worked with sex offenders, there are

2   two main questions that they always ask.  One is how

3   could any adult on the face of the planet look at a

4   child and see them in a sexual way.  And number two is

5   with all we know about predators in our society, how

6   can they keep finding victims.  And this is the

7   persistent questions that come up over and over again,

8   and this is what, to me, the audience wants to know.  I

9   felt that if I'm going to do a presentation, I have to

10  answer their questions first and then present the

11  information that I think is relevant for them to

12  protect themselves and to get to know themselves as

13  well.  This is a multifaceted presentation.  It wasn't

14  just about Azov.  It wasn't just about the initial part

15  of the presentation.

16  **Q.**   What type of -- the format for your presentation

17  was going to be a PowerPoint; is that correct?

18  **A.**   That's correct.

19  **Q.**   And how did you think the Azov films would help

20  you make the presentation in response to these

21  questions?

22  **A.**   In addition to the first two questions that are

23  asked of me quite often, there is a general interest

24  among the people I work with, I work with some very

25  intense law enforcement, CPIs and other folks.

1    **Q.**   What is a CPI?

2    **A.**   I'm sorry.  Child protective investigator, which

3    is usually DCYF or some version of that in other

4    states.  So they work for DCYF.  If there's an assault

5    on a child, they go out just like a lot of police

6    officers.  They see the bloody bodies.  They see the

7    horrors that happen to children in person.  And they

8    have a lot of questions about things as well as to how

9    to get to this point, what could have been done to

10   prevent this from happening, and I try to provide that

11   information on an individual basis but I really wanted

12   to do it on a global basis so there were more people at

13   one time rather than just doing one person at a time.

14        And in answer to your question also, one of the

15   questions they commonly ask is about child pornography.

16   And you can't see child pornography, I'm just telling

17   you right now, it's impossible, you cannot do that.

18        I was hopeful that through presentation through

19   Azov, which is totally legal, totally non-sexual films,

20   that I might be able to help bridge the gap, so to

21   speak, between what is good nudity, what is bad nudity.

22   There's good touch, bad touch.  Good nudity, bad

23   nudity.  By showing the good nudity I might be able to

24   present to the audience what it is not.  By showing

25   them what it is not, you cannot show them what it is

1    but you can show them what it is not in a very subtle

2    way, then they can have better focus on what it may be.

3    That's my thinking on it.  Whether it was going to

4    happen or not, that was my thinking on that particular

5    part.

6         And the Azov films, again, being all male,

7    totally non-sexual, I didn't think we'd have a problem

8    with that.

9    **Q.**   Now, you didn't view Azov as child pornography,

10   did you?

11   **A.**   Absolutely not, no.

12   **Q.**   But you don't deny that some people try to access

13   child pornography through the Internet?

14   **A.**   I would imagine that as they do for any child,

15   anywhere, they would try to do that for these films as

16   well.

17        THE COURT:  Mr. Mann, would this be a good time

18   to take a break?  I just don't know where you are.

19        MR. MANN:  This would be a good time to take a

20   break, Judge.

21        THE COURT:  Okay.  Very good.

22        So ladies and gentlemen, let's take our morning

23   break.  You'll find a snack in the jury room waiting

24   for you.  Please keep in mind all the instructions I've

25   given you many times.  I'll try not to repeat them

1    anymore but you know what they are.  And Charlie will

2    show you out.  We'll take about ten minutes.

3         (Proceedings out of the presence of the jury as

4    follows:)

5         THE COURT:  We'll be in recess for ten minutes.

6         (Recess.)

7         THE COURT:  Counsel, I'm handing down the

8    revised jury instructions so that if we get to that

9    point shortly, which I think we may, you have them.

10        Are we ready to bring the jury back in?

11        MR. DONNELLY:  Your Honor, if I could address

12   one more time the jury instruction that's on the record

13   that the Government objected to, would the Court be

14   open to any more argument on that based on the

15   Defendant's direct examination thus far, the constant

16   references to it's perfectly legal and the like?

17        THE COURT:  I may.  I'm thinking about it.  And

18   I'll take that up with counsel before we get to the

19   point where I charge the jury.

20        MR. DONNELLY:  Thank you, your Honor.

21        THE COURT:  So let's bring the jury in.

22        (Proceedings in the presence of the jury as

23   follows:)

24        THE COURT:  Welcome back, ladies and gentlemen.

25        And Mr. Mann, you may continue with your

1    examination.

2              MR. MANN:  Thank you.

3    **Q.**   Mr. Silva, how far -- at the time of your arrest,

4    how far along were you in completing your proposed

5    presentation?

6    **A.**   I was at the very initial stages of the

7    presentation.

8    **Q.**   And were there reasons why you weren't further

9    along?

10   **A.**   Yes.  I had obligations at work that prevented me

11   from spending more time on the presentment.

12   **Q.**   When did you do most of the work on the

13   presentation?

14   **A.**   Nights and weekends.

15   **Q.**   Did you ever ask permission from your employer?

16   **A.**   For --

17   **Q.**   To work on this presentation?

18   **A.**   No, I did not.  No.

19   **Q.**   Why not?

20   **A.**   It had nothing to do with the Department of

21   Corrections.

22   **Q.**   In addition to purchasing the DVDs from Azov, did

23   you download certain materials from the Azov web page?

24   **A.**   They had previews and things like that, yes.

25   **Q.**   Were they similar to the things we've seen?

1    **A.**    Yes.

2    **Q.**    Did you ever distribute any of the Azov materials

3    you had with anyone?

4    **A.**    No, I did not.

5    **Q.**    Did you ever share them with anyone?

6    **A.**    No, I did not.

7    **Q.**    Now, you've seen I think it's Exhibit 34, the

8    PowerPoint presentation that was introduced, right?

9    **A.**    The PowerPoint presentation, yes.

10   **Q.**    You created that, right?

11   **A.**    Yes, I did.

12   **Q.**    About how many slides -- let me back up.

13       There were multiple versions on your computer in

14   the thumb drive when it was seized, right?

15   **A.**    Correct.

16   **Q.**    The largest one had about 33 slides on it?

17   **A.**    Correct.

18   **Q.**    How many slides did you anticipate would

19   eventually be in the completed presentation?

20   **A.**    I anticipated it would be a minimum of about a

21   hundred.

22   **Q.**    When did you first begin working on this

23   presentation?

24   **A.**    I've been gathering material for 30 years.  I made

25   a determination in 2009 to do something about it and

1    started actively working on it probably around like

2    October 2010.

3    **Q.**   What made you decide that you wanted to start

4    working on such a presentation?

5    **A.**   In 2009, I turned 55.  And once a year I do a

6    self-assessment.  I reviewed my life.  I stop

7    everything.  I reviewed my life.  Where am I, who am I,

8    am I being the person I'm supposed to be, where am I

9    going, how am I doing on my goals.

10         When I turned 55, I realized that I wasn't very

11   happy, that I lost my sense of humor, that my child

12   dream of winning the lottery and saving the world was

13   not going to happen.  There was a lot of death around

14   me, people I knew, people I didn't know.  Some people

15   were retiring, actually, too.  So I got in touch with

16   my own mortality.  So I figured I needed to do

17   something to correct that situation.  I'm not getting

18   religious on you because it's not a religious thing,

19   but used the Serenity Prayer, the things you have

20   control over, the things you don't have control over,

21   things you need to know the difference.

22         And from that I decided, if I count the scouting

23   time, I had 40 years of experience roughly to share

24   with people, working with a population nobody wants to

25   work with, people don't want to talk about them, they

1    don't want to hear about them, they don't want to see

2    them.  That includes the kids.  That includes the kids.

3    So I had a unique perspective on things because I work

4    with people nobody else does.  And I got tremendous

5    information from these individuals as to how things

6    could have been different for them, how it might be

7    different for others.

8         So I came to the conclusion the best thing for

9    me to do was not to teach at a university, not to write

10   a book and not to go back into private practice, but to

11   do a seminar, do a training that I could share this

12   30, 40 years worth of information, get it out there,

13   you save the world and I'm going to go travel.  So

14   that's how it all came about, and that's how I decided

15   to do the presentation.

16   **Q.**   About when did you first start using the

17   PowerPoint tool as a method to sort of format this?

18   **A.**   Starting somewhere in late 2009, maybe, again,

19   October -- excuse me.  Into 2010, October 2010, I was

20   gathering information, putting it on paper and then I

21   got the PowerPoint format itself, the actual

22   PowerPoint.  Apparently -- I didn't know it myself but

23   it came up around July of 2011.  I'm comfortable with

24   that because I don't know when I got the actual

25   PowerPoint itself, and then I started to implement the

1    stuff that I had compiled onto the computer into the

2    PowerPoint presentation.

3    **Q.**    Was there an initial targeted audience for this

4    presentation?

5    **A.**    Yes, there was.  I had targeted -- I had played

6    with it.  It's different on the screen that you'll see,

7    but I had targeted law enforcement that does primarily

8    in the field of sex offenders and CPIs because they

9    definitely deal with sex offenders and their victims.

10   And I felt they were the people that would benefit from

11   it most.

12   **Q.**    Did you anticipate producing other presentations

13   for other audiences based in part on the materials in

14   the first presentation?

15   **A.**    Absolutely.  As I mentioned earlier, the 40 years

16   of experience that I had wasn't just with sex offenders

17   and their victims.  I had worked with families, with

18   schools, a whole variety of people.  And I definitely

19   was going to use the core material.  This is the big

20   one.  And there's core material within that

21   presentation that I could extrapolate out of that and

22   do trainings, not on this, different kind of training,

23   but beneficial for parents, for clinicians, for

24   teachers, for correctional officers and actually for

25   people that are in prison, believe it or not, had

1    things that I wanted to deal with them from my

2    experience as a probation officer so when they get out

3    they might be able to do some things differently.  All

4    my presentations were not going to be about the sex

5    crimes, the stuff like that.

6    **Q.**    How did the Azov Films fit into this?

7    **A.**    This particular one?

8    **Q.**    And in general.

9    **A.**    There weren't going to be any other presentations.

10   Azov was strictly for this population because they work

11   in this field.  The officers and the CPIs, they deal

12   with a world that you hopefully will never, ever, ever

13   see.  It's a dark, dark place that we work in.

14          And Azov is nowhere near concerning to these

15   folks.  Where it fit as I mentioned earlier is that it

16   helps address some of the things that they were talking

17   about and you have a visual catalyst to a conversation.

18   I'm a visual learner.  A lot of people learn visually.

19   And this gave you a basic insight into the different

20   topics that were at hand.  Gives you a visual

21   connection.  It's basic, it's innocent, and it's

22   natural.  The birth of a conversation.  I don't want to

23   get philosophical, but I thought that was pretty cool.

24          And then from that, those conversation were to

25   go into a larger conversation that goes to the very

1    dark places of our society.

2         And then in the second phase of the

3    presentation, we were going to address those things as

4    to how to correct those things and prevent them with

5    their children, their children.  Because while they're

6    taking care of you and me, they're neglecting their own

7    kids.  You need to know that.  Okay?

8         And then the third part of that was going to be

9    where I'd address them, the officers in the room.  You

10   cannot protect your children if you do not know who you

11   are, what your biases are, what your blind spots are

12   and the things that you're not willing to see.  It goes

13   outside of your bubble of safety.  That happens for

14   officers as well.  Okay?

15        So it's a multi-phase thing.  By using the Azov

16   Films, there's no women in it, there's no females.  It

17   stayed out of the sexual realm.  If I used some of the

18   commercial films, if you think about the movie "Kids"

19   or "Prince of Tides," those are very intense movies.

20   They're very intense.  And I'm not into that kind of

21   intensity.  I don't want the intensity in the movie.  I

22   want the intensity in the conversation.  I believe that

23   Azov had that nice, calm, subtle way of getting into

24   the conversation.

25        MR. MANN:  I'd ask this be marked Defendant's D

1      for identification.

2              THE CLERK:  D.

3              MR. MANN:  D.

4              (Defendant's Exhibit D for ID.)

5   **Q.**   I want to show you what's been marked Defendant's

6   D for identification, sir.  Do you recognize what that

7   is?

8   **A.**   Yes, I do.

9   **Q.**   What is that?

10  **A.**   It's the presentation that I had to the point that

11  I had developed it at the time of my arrest.

12  **Q.**   Is that the same presentation --

13             MR. MANN:  If I could have Exhibit 34.

14  **Q.**   Are the slides the same as on Exhibit 34, sir?

15  **A.**   They appear to be the same with the addition of

16  the footnotes.

17  **Q.**   What is the difference between the exhibit you're

18  looking at and Exhibit 34?

19  **A.**   Below the item that would be on the screen itself

20  are my notes, my personal notes as to the conversation

21  that was going to take place about those particular

22  topics.  Some people call them bullets, some people

23  call them triggers.

24  **Q.**   Were those notes on the presentation on the

25  computer when your computer and thumb drive were

1   seized?

2   **A.**   Yes, they were.

3         MR. MANN:  I'd move Exhibit D as a full exhibit.

4         MR. DONNELLY:  No objection, your Honor.

5         MR. MANN:  Your Honor, I made a motion to

6   introduce Exhibit D as a full exhibit.  I don't think

7   the Government has an objection.

8         THE COURT:  D?  Is there any objection?

9         MR. DONNELLY:  No, your Honor.

10         THE COURT:  D will be admitted in full.

11         (Defendant's Exhibit D admitted in full.)

12   **Q.**   I want to show you some of these slides and walk

13   our way through some of this presentation, okay, sir?

14   **A.**   Sure.

15   **Q.**   This is the first page, right?

16   **A.**   That is correct.

17   **Q.**   And was there a reason you were emphasizing the

18   male gender?

19   **A.**   Yes.  Again, the title and address is one of the

20   questions that are asked of me by a multitude of

21   people, and I wanted to emphasize just on the male

22   gender because the vast majority of people that I

23   worked with were males.  I did work with females, but

24   you could even do a 90/10 split, mostly males.  And I

25   didn't want to get into the females end of things

1   because I think it would have got -- there would be

2   some mention of it, but the emphasis is going to be on

3   the males because that's my specialty.

4   **Q.**   Now, the second slide, that one says something

5   about Red Pill Productions.  What does "Red Pill

6   Productions" refer to, sir?

7   **A.**   I want to apologize to the prosecution because

8   hopefully they didn't spend a lot of time on this.  I

9   made this up.  This is kind of a joke screen, in a

10  sense, that on the Red Pill Productions,

11  Unincorporated, there's no such thing.  I made that up.

12  It refers to "The Matrix."  Because besides these Azov

13  films, there were going to be other films that were not

14  of coming-of-age, but there was going to be "The

15  Matrix," there was going to be "The Simpsons," there

16  was going to be "South Park."  There was going to be a

17  whole bunch of films in here as well as "Dateline" and

18  news stories and so forth.

19       But anyways, the Red Pill Productions refers to

20  "The Matrix."  In "The Matrix," the movie, if you

21  haven't seen it, it won't make a lot of sense to you,

22  but Morpheus is handing Neo two pills.  You take the

23  blue pill, you go back, you live the life you're

24  living now, totally naive about anything that's going

25  on.  You take the red pill, you see the world as it is.

1      Once you see the world as it is, there isn't any going

2      back.  And even though this was for law enforcement,

3      and CPIs, some might be new.  And they need to know,

4      I'm not joking around about this stuff, there's going

5      to be some hardcore things in here.  I've seen some

6      horrible things in life that I was going to present.  I

7      was assuming I was going to get some stuff back from

8      the audience as well and there was going to be a

9      hardcore discussion.  Okay?

10          Once you get into that kind of discussion, you

11     can't say I don't want to notice it anymore, because

12     one you know it, you know it and you're in it.  Okay?

13          So it's kind of giving an indication something

14     is coming up here.  If you're not prepared for it, you

15     should kind of leave now.

16     **Q.**   What did "Ambush Bay" mean?

17     **A.**   "Ambush Bay" means this.  As I mentioned earlier,

18     in order to, I believe, to educate people is that first

19     you have to answer their questions.  If you answer

20     their questions, then you have their respect.  That's

21     the two questions I mentioned earlier about how could

22     any adult see any child as a sexual object, which the

23     short answer to that is you can't.  If you don't, you

24     cannot do that.  It's impossible.  And the second one

25     being that how do they continue to find victims when we

1    know they're out there.  That's primarily what this is

2    about, this presentation.

3          But I want them to know things that they haven't

4    asked.  Again, I know that a lot of officers get

5    divorces.  I know a lot of officers' children get into

6    trouble and so forth.  While they're protecting us,

7    their children are at risk.  I want to help them become

8    aware of that because they're so busy, they're married

9    to their jobs.  They can't be married to their jobs and

10   have a family, too.  They've got to just take care of

11   their family.

12         The second phase was going to be the things we

13   know about what these bad guys are doing, how do we

14   counter that with our children.

15         And the third part, you can't do that

16   efficiently with your children if you don't know who

17   you are.  Okay?  So the ultimate part of this whole

18   presentation is not about the guy seducing kids, it's

19   not about protecting your children.  It's about who you

20   are, that person in that audience, who are you and what

21   are you doing and what are your limitations based on

22   your blind spots that would prevent you from protecting

23   your own child.  That's who I really care about in that

24   audience is the officer, take care of yourself so you

25   can take care of your children, so you can prevent the

1    predators from getting to your child.  That's the

2    ambush part.  Okay?

3    **Q.**    On Slide 3, first of all, do you see the note

4    below that?

5    **A.**    Yes.

6    **Q.**    Just in general, the difference between this and

7    Exhibit 34 is the existence of these notes?

8    **A.**    Say again?

9    **Q.**    Is the difference between this Exhibit D and --

10   **A.**    The notes below are different, yes.

11   **Q.**    This one has the notes in it, right?

12   **A.**    Correct.

13   **Q.**    And those notes were -- now, was this a slide that

14   you were going to change?

15   **A.**    That's the one I was going to change, yeah.  I

16   kept changing the presentation.  As you know, there

17   were four different versions.  I had come to the

18   conclusion I was just going to do law enforcement and

19   CPIs because I think they're in the dark part of

20   dealing with society that I felt safe that wasn't going

21   to traumatize anybody in that group.

22   **Q.**    The fourth slide indicates people you were not

23   going to invite.  Why were you not going to invite

24   certain people?

25   **A.**    Simply because, again, this was going to be a very

1    intense conversation.  I don't have vanilla stuff here.

2    This was going to be a hardcore presentation with

3    hardcore information.  For example, where it says at

4    the bottom there are people still dealing with their

5    own victimization.  You cannot come to a presentation

6    like this and not be traumatized by it if you have not

7    taken care of your own issues so they should not be

8    coming.  And survivors are people who have come to

9    terms with their own victimization.  Obviously, they

10   could come to a presentation like this and not be

11   traumatized by it.

12         The others, again, they're not into the dark

13   world as far as the law enforcement is and CPIs are,

14   and I wanted to try this out very much so with a safer

15   crowd of people, people who are not going to walk away

16   from there being any worse off because of what they've

17   seen and heard.

18   Q.   Now, many of these slides are self-explanatory,

19   aren't they, sir?

20   A.   I would say, so, yes.

21   Q.   Can we jump forward now to Slide Number 9.  Can

22   you tell me what that slide is.

23   A.   This is the core concept that was going to go from

24   this particular presentation to every one of the other

25   presentations.  If anything happened within the

1    presentation, this is what had to happen.  If this

2    didn't occur, the entire presentation was lost.  This

3    was going to be about an hour-long discussion about how

4    we develop psychologically.  Again, this is not about

5    the physical.  There's nothing physical in this

6    presentation.  It's about the thought process, how we

7    think, the psychological blocks that we have, how we

8    can recognize them and how we can overcome them.

9         And part of that, again, is where you have the

10   basic physiologies how you grow up as a human body.

11   There's also the average norm.  There's no such thing

12   as normal anymore.  There's average normal.  How people

13   develop intellectually.  And its starts off -- we start

14   off in an emotional state, responding to things and

15   then we transition like a DNA through adolescence.  If

16   you had the terrible twos, wait until you get to the

17   turbulent teens because they are really a handful.

18        And we always talk about the physical.  They

19   have a psychological development happening there, too.

20   And that psychological development is where the

21   intelligence, which was the secondary response when

22   they are younger is now struggling to become the

23   primary response to stimulus.  And it is quite

24   turbulent for them.  They're losing their childhood.

25   They haven't quite gained their adulthood yet, and

1    there's a real transition that happens.  I deal with a

2    lot of adults.  There was going to be various versions

3    of this.  I have worked with a lot of adults who have

4    not made that transition to the intelligence being the

5    primary response to their situation, and it has to be

6    very difficult lives.  So this was going to be an

7    extremely intense presentation about the different

8    aspects of that is how we move in our lives from me to

9    we and take on more of a global concept in our lives.

10   And it's of extreme importance for your children, and

11   it's also for the officers that are involved as well as

12   the guys that are predators.  That was an extremely

13   important part of this presentation.  If nothing else,

14   that had to be done right.

15   Q.   I want to jump forward to Slide 11, just briefly.

16   Slide 11, first, what are you talking about in Slide

17   11?

18   A.   Well, again, this was an initial slide.  And the

19   reason I put that top one, I actually got that from a

20   different presentation and that's an adult concept,

21   that the body's largest sex organ, some people might

22   dispute it, but it's the skin.  Okay?  And that is not

23   a child concept.  Okay?  A child's skin is not sexual

24   to a child.  Okay?  Children use their skin the same

25   way they use all their other senses is to interact with

1    the world.  And it's the concept that's being distorted

2    where now children and adults' perspectives are

3    supposedly being the same and that is not correct.

4         What is happening is that when we're growing

5    up -- I know when I was growing up you have to have

6    human touch.  I can't tell you how important that is.

7    And now we've gone from good touch, bad touch to no

8    touch.  I think it's extremely dangerous in the way

9    we're raising our children today.  We don't have any

10   positive interactions with other people physically, and

11   I think that leaves them vulnerable to the bad guys.

12        And there's a whole bunch of examples about how

13   that's being challenged in our society, and kids

14   becoming more and more untouched.  They're becoming the

15   untouchables.  Okay?

16        And at the bottom, there's a reference to the

17   Azov film, which would involve wrestling.  Boys

18   wrestle, girls hug.  That's just kind of a basic

19   concept, but again it goes from good touch, bad touch

20   to no touch.

21   **Q.**   Now, the prosecution, I think, referenced this

22   particular picture.

23   **A.**   Correct.

24   **Q.**   Why did you use that picture?

25   **A.**   It's very simple, very basic but also brings out

1    the point that I wanted to bring out.  This is actually

2    from 1887.  It's May Bridge or White Bridge or

3    something like that.  It's actually a series.  They're

4    in textbooks actually for kids where he did a series of

5    films or shots, stills, where a boy would start running

6    or an adult, or whoever.  He did thousands of these,

7    and he would just film them as they went along.  He was

8    the precursor to movies.

9        And I've used this concept many times just to

10   kind of wake people up.  I've been in trainings and

11   I've said to people the natural state of a child is

12   nude.  And they go, Ahh.  And because you don't want to

13   talk about it and they go, That's true.  I said, Yeah,

14   it's a concept we can't address in our society.  And I

15   said, We have no place in our society for children to

16   be nude legally or safely anymore and yet it's the

17   natural state of a child.  Plus the issue with this is,

18   too, is that some people actually believe that a

19   clothed child is safer than a nude child, which is not

20   true.  And we're distorting the reality of the

21   situation as it exists with children.  And there's a

22   bigger conversation, obviously, about this, about how

23   the bad guy could come in and take advantage of our

24   fear of dealing with that particular issue.

25   Q.   I'm jumping ahead to Slide 22.  There's a

1    reference in the footnotes here to Azov necklaces and

2    bracelets.  What was that about?

3    **A.**   And this is another place where Azov comes up

4    later on actually.  That's my footnote for later on,

5    you see that screen later on.  Where this would come

6    into play is that the Azov characters went to a

7    particular location.  They've all got bracelets.

8    They're extremely happy about being part of a special

9    group.  They all had their bracelets.  There was a

10   great enjoyable activity and it was going to emphasize

11   in the conversation about how important it is for kids

12   to belong to something special.  And the emphasis is a

13   strong desire to belong to something special that again

14   can be used against them if it's not done

15   appropriately.

16   **Q.**   Now, you have a Slide 24 that's very short.

17   **A.**   Let me explain that.

18          THE COURT:  Wait.  Wait.  Let Mr. Mann finish

19   his question then you can answer.

20          THE DEFENDANT:  Thank you, sir.

21   **Q.**   Can you explain this slide.

22   **A.**   I apologize for interrupting.

23          Yeah.  Again, this is very basic things.  This

24   is more of a teaser frame.  Girls are not denser or

25   simpler or anything than boys when it comes to being

1     seduced.  Really get that message across.  Okay?

2          What this means was it's a reference to that

3     society has aided the bad guy in sexualizing teenage

4     females or young females.  And that's a fact, that

5     society is really sexualizing females in our society.

6     They're doing half the work of the perp, and I don't

7     really think we're paying close attention to how we're

8     doing that to the young women in our society, so that

9     women are becoming more vulnerable with the help of

10    society.

11    **Q.**   I want to show you briefly Slide 26.  I just want

12    you to notice there are a lot of footnotes on that

13    slide, aren't there, sir?

14    **A.**   That's correct, yes.

15    **Q.**   And in fact, they go over to the next page, don't

16    they?  They're all on this page but the printed part

17    would be on the second page, isn't it?

18    **A.**   Yes.

19    **Q.**   Do you see it now, the second page?

20    **A.**   Yes.

21    **Q.**   So my question to you is that just in general, why

22    did you have a slide, for example, like this with so

23    many different notes?

24    **A.**   Again, the slide was just the beginning of the

25    presentation.  The presentation was not about the

1    slides.  It was the ensuing conversation.  And this

2    part of the footnotes is to what would be done orally,

3    not visually in the presentation.  There are some

4    references like there was the movie "Doubt" in there.

5    **Q.**    I want to show you I think it's Slide 30.  Slide

6    30 has a number of references to Azov.  Do you see

7    those?

8    **A.**    Yes, I do.

9    **Q.**    Can you explain what Slide 30 was all about?

10   **A.**    This was just a film that had the concepts that

11   were mentioned earlier.  This would either be shown in

12   unison with them or after discussion, however it was

13   going to take place.  Again, this was the very

14   beginning of the whole process of developing these 33

15   slides.  We were still going to take a long time to get

16   there.  But I had designated each one of these topics

17   discussed earlier and added a few more and the various

18   movies that were going to be shown to get the visual

19   stimulus to get the mind thinking and get the catalyst

20   for the conversation going.  Mostly Azov, as I

21   mentioned, it was not a frivolous thing that Azov was

22   going to be in here.  They were definitely going to be

23   into the presentation, and there's a reference to some

24   of the coming-of-age films that weren't that intense.

25   **Q.**    Can you explain, for example, the first Azov

1    reference is "The Egor."

2    **A.**    As I mentioned earlier --

3    **Q.**    Can you explain what that one is?

4    **A.**    Yes, I can.  As I mentioned earlier, some of the

5    family naturist films had some just all male films but

6    they were not consistency of character that we find in

7    Azov.  Azov goes from the same character from when he's

8    6 until he's 12 or 14.  They've been around a long

9    time, apparently, and they provide that continuity of

10   flow.  And "Egor" was going to be part of a

11   conversation of -- this was going to actually end up in

12   a conversation about street gangs, just so you know.

13   So we start off with the Azov film.  He starts off

14   young.  He's fine with his lifestyle.  He's fine with

15   everything.  A lot of kids might not be into a naturist

16   lifestyle.  He certainly is.  He's happy with it, and

17   he's doing well.

18       If you take that to the negative after we get

19   into the conversation with law enforcement and so

20   forth, you end up in a conversation as how do kids end

21   up in gangs.  And there are other issues, too.

22       So it's the subtle way you get the basic

23   innocent, natural way of getting into a conversation

24   about something that's really dark down the line.  And

25   then of course the next part of the presentation, we'd

1    be talking about what can we do to prevent that

2    happening so we get the kids young, we develop them to

3    where we want them to be.

4    **Q.**    How did the Azov film particularly relate to the

5    first example, the "Egor" example?

6    **A.**    The what, please?

7    **Q.**    How did the Azov films relate particular to the

8    "Egor," the first for example?

9    **A.**    That's what I mentioned.  "Egor" was from young to

10   old.  He'd been around for a long time in films.

11   **Q.**    Not going through all of these, take the second

12   one, "Bait Boy," what's the relationship with Azov?

13   **A.**    The "Bait Boy" one?

14   **Q.**    Yes.

15   **A.**    "Bait Boy" is again where -- that's my term, just

16   so you know, is what one boy helps another boy in this

17   case feel comfortable with being with a new crowd,

18   being in new surroundings, whatever, and helps him

19   acclimate to the situation, whatever, the environment.

20   And of course that is used by bad guys, some of the

21   examples down below is where people used kids to lure

22   other kids in for sexual gratification.

23   **Q.**    The wrestling one, what was the point of the

24   wrestling one?

25   **A.**    I had mentioned earlier the wrestling was part of

1    the whole process.  We all need to be touched.  Girls

2    hug; boys wrestle.  And in wrestling now comes from

3    again where you had the good touch, you had bad touch

4    and now we're into no touch.

5    **Q.**   Let's skip down to the one where you have "What

6    the hell, Azov."  What were you referencing?

7    **A.**   That's the chicken movie right there, you know.

8    And the chicken movie is about the shock effect.

9    Anybody who has worked with kids, if you have a kid and

10   you haven't had this happen yet, it happens with

11   teachers, clinicians and a lot of other people as well,

12   parents in particular, boys will shock you.  Okay?

13   They will shock you.  I think girls will do it, too,

14   but we're talking about boys.  We're going to keep a

15   male focus, if that's all right.  I'm not trying to

16   exclude women but we'll keep it a male focus.  Boys

17   will shock you.  And if you're not prepared for it,

18   then you will react probably in a way you shouldn't do

19   that.

20        What this extrapolates into is intense

21   conversations about what is happening in our society in

22   the United States where this kid is sitting on a

23   chicken being totally gross, really getting it out

24   there, he's really being disgusting and really shocking

25   the audience at what he's doing.  In the United States,

1    shock in the United States from teenagers, and think

2    about what's been happening aside, I'm not going to

3    give a whole lot of examples, relates to sex and

4    violence.  That's what's happening in our society.

5    There's tons of samples out there as to how our kids

6    are shocking us with those behaviors.  And we're in a

7    real bad place in our society when it comes to shock

8    and awe.  And I think there needs to be intense

9    conversation as to how can we get that under control,

10   how can we meet this need in a more appropriate manner

11   where we don't end up having kids doing sexual things

12   on the Internet and kids doing sexual things to others

13   and kids shooting up schools and things like that.

14   There's a lot of shock and awe.

15          And on the teacher end, just so you know, this

16   is the dark end on the teacher and parent.  And the big

17   thing is don't panic.  You know, when kids do shocking

18   things, just don't panic and don't overreact.

19   Q.   There's a reference in the footnote, "Play Azov

20   introduction to their product."

21   A.   Yeah, I want to make sure that, again, reinforcing

22   that these are naturist films.  I was going to be

23   editing the films.  I was very concerned about when I

24   initially did it, I didn't want to be sued by Azov.  I

25   didn't want to be sued by some other side of this, any

1    of these other folks.  I'm using a lot of commercial

2    films, "Dateline," newspaper articles, advertisements.

3    I'm not paying any royalties to anybody, okay?

4         As part of this, too, as I said, I want to

5    reinforce that even though I edited things in a certain

6    way, and they may look a certain way that maybe I

7    didn't intend them to look, these are naturist films.

8    They've been severely edited.  They've been manipulated

9    to some extent.  They may look like something they

10   shouldn't look like.  That's not the intention.  And

11   through that introduction, I just wanted to show that

12   that's where they started off.  If they ended up

13   someplace different, that would be my apologies.

14   **Q.**   Now, you said that you were a nudist, right?

15   **A.**   Correct.

16   **Q.**   What is nudism?

17   **A.**   Nudism is recreation without clothes.

18   **Q.**   What is naturalism?

19   **A.**   Just another word for nudism.

20   **Q.**   How long have you been a nudist?

21   **A.**   Since 1995.

22   **Q.**   Do you belong to any nudist associations?

23   **A.**   Yes.  The AANR, which is the American Association

24   for Nude Recreation.

25   **Q.**   You already told us you own land in a nudist park.

1   **A.**   Well, it's a site.  I don't own the land, but it

2   is a site that I own in Connecticut, yeah.

3   **Q.**   Would you say that you enjoy watching nudist or

4   naturist films?

5   **A.**   Yes.

6   **Q.**   You bought a lot of Azov films, right?

7   **A.**   Correct.

8   **Q.**   Did you ever think that any of the images in those

9   films or the photo packs that came with them were child

10  pornography?

11  **A.**   No, I did not.

12  **Q.**   Did you ever think they were lascivious?

13  **A.**   No.

14  **Q.**   Did you ever find sexual pleasure in viewing any

15  of these photos or films?

16  **A.**   Absolutely not.

17  **Q.**   Another question I should have asked earlier.  You

18  talked about being involved in Scouts for about ten

19  years?

20  **A.**   Correct.

21  **Q.**   Did you ever go back to the scouting?  Why not?

22  **A.**   When I was working for Eckert there, when you're

23  the director of the program you live on the property.

24  And then program director, too, and program specialist,

25  and group -- the supervisor, that you actually live on

1    property.  You're there 365 days a year, 24 hours a

2    day.  You're dedicated to that program.  When I left

3    that program, there were people I encountered in the

4    community who asked -- you know, we have discussions

5    about scouting and things that we did.  They'd ask me

6    to get back in the program.  I said, yeah, to me it was

7    like a second job when I was in it and I spent a lot of

8    time on it and I just never wanted to do it again.

9    It's just too time-consuming.  I did my time and that's

10   it, you know.

11   **Q.**   Finally, sir, prior to this charge here, have you

12   ever been charged or convicted of any crime?

13   **A.**   No, sir, I have not.

14        MR. MANN:  Thank you.

15        That completes my direct examination, your

16   Honor.  I just have to return these exhibits to the

17   clerk.

18        THE COURT:  All right.  Thank you, Mr. Mann.

19        MR. MANN:  I think I did move it, yes, D was

20   full.

21        THE COURT:  You did.  Thank you.

22        Mr. Donnelly, your cross-examination.

23        MR. MANN:  Thank you, your Honor.

24        <u>**CROSS-EXAMINATION BY MR. DONNELLY**</u>

25   **Q.**   Mr. Silva, you were a probation officer close to

1   14 years -- excuse me, close to ten years?

2   **A.**   Correct.

3   **Q.**   And during that time you talked a little bit about

4   your work with Detective Bell, correct?

5   **A.**   Correct.

6   **Q.**   Would it be fair to say that during that time you

7   also worked with prosecutors, local law enforcement

8   officials besides just the state police?

9   **A.**   That is correct.

10  **Q.**   Did you go out on home visits with other law

11  enforcement officers besides Sergeant Bell?

12  **A.**   Absolutely, yes, sir.

13  **Q.**   And basically, you've been working with sex

14  offenders your entire time as a probation officer?

15  **A.**   Yes, I have.

16  **Q.**   And you've worked with people -- when we say "sex

17  offenders," people charged with rape of adults; is that

18  correct?  First degree sexual assault under Rhode

19  Island law?

20  **A.**   Yes.  Any kind of crime.

21  **Q.**   Okay.  Would that include working with people who

22  had been convicted of child pornography offenses?

23  **A.**   Yes.

24  **Q.**   And so you're familiar with the laws that govern

25  sexual assault and child pornography; is that right?

1    **A.**    Yes.

2    **Q.**    Now, as you told Mr. Mann, as far as the Azov

3    films, you didn't do that with anybody else, correct,

4    as far as ordering Azov films?  You did it all by

5    yourself?

6    **A.**    I did it all by myself.

7    **Q.**    Paid for it with your credit card, correct?

8    **A.**    Correct.

9    **Q.**    And I'm not sure I understood what you were saying

10   on direct so I might have to ask you to repeat some

11   things here, but you bought these Azov films, is it

12   your testimony today that you were doing research and

13   that's why you bought the Azov films?

14   **A.**    I never used the word "research."  It's very

15   important.  I'm glad you asked that question.  I did

16   not use the word "research."  For 30 years I've been

17   compiling information and gathering information.

18   Research would have been taken care of later on.  Once

19   I had the format done, I knew what I was going to do

20   within the presentation, the materials within that

21   presentation have to be validated and that's when the

22   research would be done.

23   **Q.**    So to try again, you bought the Azov films why?

24   **A.**    To be part of the presentation.

25   **Q.**    And approximately how many of these Azov films

1    that feature nothing but naked boys, how many of those

2    did you buy?

3    **A.**   I think we already discussed that.  I think, what

4    did we say -- I had 21 out of 69.  You can debate that

5    if you want.

6    **Q.**   Go with your number, 69.

7    **A.**   I'll go 48.  I'll go 48.  And then if you want to

8    add a couple that we mentioned earlier, that would be

9    fine.

10   **Q.**   And in addition to the Azov films, you bought

11   other films through the Azov Films website, correct?

12   **A.**   Correct.

13   **Q.**   I think on direct examination you characterized

14   those as coming-of-age films; is that correct?

15   **A.**   Yes.

16   **Q.**   Would it be fair to say that all of those films

17   involved minors in one way or the other in the leading

18   roles?

19   **A.**   I would say in the leading role, probably, yes.

20   **Q.**   And would it be fair to say that all of those

21   films depict minors in one state or another of nudity?

22   **A.**   I can't say all of them did, but it's a

23   possibility, very good possibility.

24        MR. DONNELLY:  If I could, Ms. Anderson, and

25   Nisshy, if we can bring up the computer, Government's

1    Exhibit 21.

2    Q.   I'd like to review the invoices with you, if I

3    could, Mr. Silva.

4         MR. DONNELLY:   If we could go to page one of

5    Government Exhibit 21, please.

6    Q.   And do you remember this film?

7    A.   I saw it one time but --

8    Q.   Why did you buy this one?

9    A.   This was about a youth, if I recall correctly, who

10   was supposed to go to summer camp.  And instead of

11   going to summer camp he stayed home and he had his own

12   little adventure about things.

13   Q.   We can agree that this is your first purchase from

14   Azov Films on October 14, 2012; is that right?

15   A.   I would say so.

16   Q.   What's that?

17   A.   I'd say yes.

18        MR. DONNELLY:   And if we could go to page three

19   of this exhibit, please, Ms. Anderson.

20   Q.   You had a couple of cancelled orders; is that

21   right, Mr. Silva?

22   A.   Yes.

23   Q.   You've reviewed these invoices, right?

24   A.   Hum?

25   Q.   There were two cancelled invoices?

1    **A.**    I believe so, yeah.

2    **Q.**    And going to the next one where you actually

3    purchased an item, this movie is called "Tom and Lola,"

4    right?

5    **A.**    Yes.

6    **Q.**    And that film is about basically two kids who have

7    a disease and are living in some kind of bubble

8    environment; right?

9    **A.**    I think that's correct, yeah.

10   **Q.**    And they appear nude throughout the whole movie;

11   is that right?

12   **A.**    I think maybe so, yes.

13        MR. DONNELLY:   If we could go to page five,

14   please.

15   **Q.**    Would you agree with me, Mr. Silva, that you

16   purchased -- you had several orders before you

17   purchased your first Azov Film production?

18   **A.**    Yes.

19   **Q.**    This is one of them here.  Does this particular

20   invoice bear any videos from Azov Films?

21   **A.**    Yes.  "Barefooted" and "Capital Fellows."

22   **Q.**    Would you characterize those films,

23   "Barefooted"and "Capital Fellows" as similar to all the

24   others we saw with large portions of those videos being

25   of naked boys?

1    **A.**    Yes.

2    **Q.**    The other films that appear here, you've heard

3    Mr. Mann asking some of the law enforcement witnesses

4    about the concept of child erotica?

5    **A.**    Yes.

6    **Q.**    Would you characterize some of these other

7    purchases you made, "Tender Cousins," "Les Diables,"

8    "Daydreams of Youth," would you characterize some of

9    those as child erotica?

10   **A.**    Absolutely not, no.  That would not be my

11   definition.

12          MR. DONNELLY:  Could we go to page 7, please.

13   **Q.**    Now, on November 11, 2010, you made purchase of a

14   movie called "ATV Adventure," right?

15   **A.**    Right.

16   **Q.**    And that's an Azov film?

17   **A.**    Yes, it is.

18   **Q.**    Why did you purchase this particular film, video?

19   **A.**    Whatever was in that particular video at that time

20   I thought would be consistent with the possibility of

21   being in the presentation, I'm sure.

22   **Q.**    What was it that was in there that you would think

23   would be good for the presentation?

24   **A.**    I haven't memorized all these films.  Most of them

25   I've seen one time and fast-forwarded through them so

1    I'm not sure -- again, this would be the different

2    films that were going to be in the presentation.  It

3    changed several times.

4    **Q.**   And on this particular one, can we agree that you

5    paid extra to get the photo DVD?

6    **A.**   Yes, it is.

7    **Q.**   Right there?

8    **A.**   Yes, right there.  Yes.  Yep.

9    **Q.**   That was on November 11th, Veterans Day.

10        MR. DONNELLY:  Can we go to page eight, the next

11   page, please.

12        And on this date, two weeks later, can we agree

13   that you bought at least two more Azov films?

14   Referring you to the first one listed, "FKK

15   Waterlogged."  We watched that one, so you remember

16   that one, right?

17   **A.**   Is that the one we had here?  I don't know the

18   names --

19   **Q.**   You know it was, Mr. Silva.

20   **A.**   Don't tell me what I know.  I didn't memorize the

21   different ones by the different names.  If we showed it

22   here, I'm fine with that.  I'm not challenging anything

23   on that.  The "Freedom of Summer" and "The Climber"

24   also I believe are Azov films.

25   **Q.**   You remember the video with the boy massaging the

1    other boy with oil on his back?

2    **A.**   That's fine.  Yeah.  Sure.

3    **Q.**   Okay.  And now, how come you purchased "FKK

4    Waterlogged" on this date?

5    **A.**   On that particular date?

6    **Q.**   Yeah.

7    **A.**   It says it was a Black Friday sale.  I'm sure it

8    was on sale.

9    **Q.**   But why that particular video?

10   **A.**   It was probably on sale.

11   **Q.**   Does the fact that when you read in the write-up

12   on that that it talked about how one was a masseuse and

13   would --

14   **A.**   I don't think that was the overriding factor, no.

15   **Q.**   You bought a second Azov DVD on this day, correct?

16   **A.**   The "Freedom of Summer."  Talking about the Azov,

17   yes.

18   **Q.**   How about "Scenes from Crimea, Volume 6"?

19   **A.**   Oh, yes.  I'm sorry.  Correct.  I didn't see that

20   one.

21   **Q.**   If you bought an Azov film for your presentation,

22   "FKK Waterlogged," why did you buy "Scenes from Crimea,

23   Volume 6"?

24   **A.**   When I'm doing a presentation, I don't have

25   exactly in mind exactly what film is going to fit in

1    one place.  Like you, but in a different manner, I

2    intended to crop these films.  My take on things is, is

3    that if you have this many films and you use this much

4    of the film, that's probably what's going to happen in

5    a presentation.  If you want my perspective on it, my

6    thinking was this, whether you want to believe it or

7    not, is I know that when things are cropped that they

8    take up a lot less space than the entire presentation.

9          For example, if you have a National Geographic

10   spread in the magazine, you have five pictures.  Those

11   five pictures come from, according to the documentary I

12   saw, from 10,000 to 50,000 pictures and you get those

13   five pictures.

14         I was taking elements from each one of these

15   particular films.  I didn't know what they were all

16   about until I got them.  I knew they were on sale.  I

17   knew they were cheap enough to buy them for what I was

18   willing to do, and I was going to take parts of each

19   one or none from some of these things.  I did not have

20   the entire sequence figured out at that point.  We were

21   at the very preliminary stage of this presentation.

22   You're asking me to give you a final product.  I didn't

23   have the final product as I mentioned over and over

24   again.  We were in the preliminary phase of the

25   presentation.

1    **Q.**   So your next step upon getting these would be to

2    view them with the prospect of cropping them for your

3    presentation?

4    **A.**   At some point in time, yes.

5    **Q.**   Okay.  And what films from October 2010 until the

6    present day have you cropped for your presentation?

7    **A.**   I hadn't cropped those particular ones because I

8    was trying to get the other films in, actually one film

9    that I couldn't even get in was the "Nattelek," we

10   didn't show the entire presentation but there was one

11   that was a commercial film called "Nattelek," or

12   something to that effect.  I couldn't get that into the

13   machine.  I'm not good with computers.  When I had time

14   during that very busy year that I was working at work,

15   I was very dedicated to the issues that were going on

16   there, I would periodically stop and try and get

17   something going on in this presentation.

18        The one thing I was trying to get in was the

19   "Nattelek" film.  I could not get that film into that

20   computer.  There was no way I could get any other films

21   into that computer at that time without getting that

22   one in.  I also had set aside some films in a sequence

23   that I had wanted to get in there and that sequence has

24   been lost since the films were taken.  So you

25   interrupted the process and then you want me to give

1  you the finished product.  I don't think -- I obviously

2  cannot do that.

3  **Q.**   Are you saying "you" to me?

4  **A.**   No.  I'm saying the Government.  Not you

5  personally.  I apologize.  I'm not saying you

6  personally.  They came in.  They interfered with the

7  process that I was in.

8  **Q.**   The Government by executing a search warrant and

9  arresting you interrupted the process of your editing

10  and cropping; is that correct?

11  **A.**   Of the entire presentation, not just that.

12  **Q.**   Okay.  Can we agree that the answer to my question

13  two of the questions ago to how much cropping did you

14  do is none?

15  **A.**   I wouldn't say that's fair.  I did do some

16  cropping on the different films but they weren't

17  cropped out of the film.  In other words, I identified

18  certain sections of certain films that were going to be

19  cropped for the purpose of being in the presentation.

20  They weren't cropped out of the film, which is what I

21  thought you were talking about, onto the presentation

22  or to any place else because I am not that computer

23  literate.  I couldn't even get the "Nattelek" film into

24  the computer.  Had I got the "Nattelek" film into the

25  computer, there's a very good possibility a good number

1   of those films would have already been into the

2   presentation.

3   **Q.**   So the fact that you couldn't copy -- you were

4   just trying to copy a film onto your computer?

5   **A.**   That's what I was trying to do.

6   **Q.**   The fact that you couldn't do that prevented you

7   from trying the process on all the other DVDs?

8   **A.**   How could I process the others?  I couldn't get

9   the first one in.

10  **Q.**   "Chronicle of a Boy Alone," this non-Azov film,

11  what is that about?

12  **A.**   I'm not sure.  I can't remember all these films.

13  It's been over a year or two ago since I've seen that

14  one.

15  **Q.**   Did you buy that one because it had a lengthy nude

16  skinny-dipping scene by many boys?

17  **A.**   Oh, no.  No.  That's the one where the kid was in

18  like a reform school or something like that.  That was

19  more about the trauma experienced by the kid, not

20  anything about -- I'm not as intense about nudity as

21  you are.

22  **Q.**   Okay.  On November 25th, Mr. Silva, we've

23  purchased "Barefooted," "Capital Fellows," talking

24  about up to November 25, "ATV Adventure," "FKK

25  Waterlogged" and "Scenes from Crimea, Volume 6."

1    MR. DONNELLY:  If we could go to page nine of

2  Government Exhibit 21.

3  **Q.**  Approximately a week later on Thursday, December

4  2nd, 2010, you purchased at least two more Azov films,

5  correct?

6  **A.**  Yes.

7  **Q.**  "Vladik Remembered, Volume 1, Two-Disk Set."  You

8  remember seeing that one in the courtroom, right?

9  **A.**  Yes, I did.

10  **Q.**  And "After-School Break"?

11  **A.**  Um-hum.  (Affirmative.)

12  **Q.**  We didn't see "After-School Break," right?

13  **A.**  No, we didn't.

14  **Q.**  That's about naked boys, too, I assume?

15  **A.**  All the Azov films were about naked boys.

16  **Q.**  After buying those first five films, why did you

17  need to buy "Vladik Remembered, Volume 1"?

18  **A.**  "Vladik Remembered, Volume 1" I think is an

19  extremely important film because that kid is dead.  And

20  part of the presentation was going to be a number of

21  scenes about this particular young man and now he's

22  dead.  I think that had an important part in the

23  presentation.  I don't know which section that was

24  going to be in because again I had a long thing here,

25  but I knew I wanted to fit that in?

1    **Q.**   Are you testifying that you knew he was dead when

2    you ordered it?

3    **A.**   It's "Vladik Remembered," yeah.  Yeah.  He was

4    dead.

5    **Q.**   And how did you know he was dead?

6    **A.**   There was an article or -- when the write-ups or

7    something, he had died in a car crash or something.

8    **Q.**   Okay.  So one of these boys is gone, right?

9    **A.**   Um-hum.  (Affirmative.)

10   **Q.**   So you wanted to purchase this video for that

11   reason?

12   **A.**   I thought that it had an important part -- that

13   particular one I wanted to do a special presentation on

14   him somewhere within the context of the presentation,

15   yes, and I wanted to reference at the end of that he

16   has passed away.  I thought it was very relevant.

17   **Q.**   Did you find out he was dead by visiting any other

18   websites?

19   **A.**   By visiting any other websites?  When I first went

20   onto Azov, I didn't know what Azov was and I didn't

21   know what it stood for so I did Google Azov, and there

22   was two things that I recall.  One said that it was a

23   region of the Ukraine and the second one was there was

24   a memorial book for this kid, this child.  I call

25   children kids.  I apologize.

1      MR. DONNELLY:  Okay.  Can we go to the next

2   page, please, Kelly, page 10.

3   Q.   You ordered a non-Azov film on December 5th, 2010;

4   is that right?

5   A.   Um-hum.  (Affirmative.)

6   Q.   "La Luna" from 1979?

7   A.   Um-hum.  (Affirmative.)

8   Q.   What's that about?

9   A.   If I recall correctly, and I don't want to be held

10   accountable for this because it's been two or three

11   years since I've seen this, and I've only seen it one

12   time, I believe that was about a brother and sister who

13   were in foster care and the brother was trying to take

14   care of the sister.

15   Q.   Do you remember this being in a film about a

16   mother engaging in incest with her adolescent son?

17   A.   No, I don't remember that actually.

18      MR. DONNELLY:  Now, if we could go to page 11,

19   please.

20   Q.   Here we are on December 18th, and you bought at

21   least one Azov film that day, right?

22   A.   Correct.

23   Q.   How many of these are Azovs?

24   A.   I'd say the second one, and then the next to last

25   one.

1  **Q.** Okay. "Black Sea 2.0" and "The Angler."

2  **A.** Correct.

3  **Q.** Why did you buy "Black Sea 2.0"?

4  **A.** Simply because I was buying Azov Films. As I said

5  before, I didn't know the content of the films until

6  you get them. Like I said before, I was just gathering

7  information. I was gathering DVDs. After I got the

8  DVDs, at some point in time I would sort them out,

9  decide where they fit into the presentation, edited

10 them and put them into the presentation.

11 **Q.** And of course, you deny being sexually attracted

12 to young boys, right, sir?

13 **A.** Absolutely, sir, I do. And I feel offended by

14 that question.

15 **Q.** I'm sure.

16    MR. MANN: Your Honor, I ask the "I'm sure" be

17 stricken.

18    THE COURT: I'll strike the comment.

19    MR. DONNELLY: If we could go to the next page,

20 please, Ms. Anderson.

21 **Q.** And you bought Azov films on Christmas Eve,

22 December 24th of 2010, less than a week after the last

23 purchase, correct?

24 **A.** Sure.

25 **Q.** And are the last two the Azov films on this one?

1    **A.**    Yes.

2    **Q.**    "Boy Fights 27 Pugilistic Pals" and "Slam Dunk,"

3    why did you buy these two videos?

4    **A.**    Well, you'd have to be at that time.  You're

5    asking me two years later or three years later how I

6    bought those particular ones.  But beginning with

7    probably part of a sequencing or just whatever is

8    happening or whatever activities are occurring in the

9    film.  I didn't buy any of these for any special reason

10   other than the "Vladik" one when the boy was deceased.

11   **Q.**    Excuse me?

12   **A.**    I said I did not buy these for any special reason.

13   I just bought them because they were there.  You see

14   this one was on Christmas sale.  They're on sale.  I

15   buy them.  The price is fine.  I don't care.  I buy

16   them.  Gather the information, sort it out later on.

17   The only one I bought that had any special reason to it

18   that I can recall was the "Vladik" one because I really

19   thought there was a need to put some kind of a special

20   part of the presentation regarding him.

21        MR. DONNELLY:  Could we go to page 13, please.

22   **Q.**    "Puppy Dog Tails," the last one, that's an Azov

23   film, right?

24   **A.**    Yes, it is.

25   **Q.**    Lots of naked boys?

1    **A.**    Yes, sir.

2         MR. DONNELLY:  Could we go to page 14, please.

3    **Q.**    New Year's Day, you bought quite a few Azov films

4    that day, right?

5    **A.**    Yes, I did.

6    **Q.**    "Boy Fight 28," "Bucharest Holiday," "Black Sea,"

7    "Boys Portfolio" --

8    **A.**    Um-hum.  (Affirmative.)

9    **Q.**    -- and so on.  We see there, now you went to

10   "Vladik Remembered, Volume 2," correct?

11   **A.**    Um-hum.  (Affirmative.)  Correct.

12   **Q.**    The second to last one.

13   **A.**    Yes.

14   **Q.**    Why did you feel the need to buy "Vladik

15   Remembered, Volume 2"?

16   **A.**    Because, again, these films were going to be

17   edited.  I didn't know what the editing was going to

18   be.  I hadn't got into the editing process; and when I

19   got into the editing process, this was just more

20   material for that particular part of the presentation.

21   **Q.**    Did you have specific purposes for your

22   presentation like "Vladik Remembered, Volume 1" has

23   this particular photo; "Vladik Remembered, Volume 2"

24   was going to have this particular photo?  Is that why

25   you purchased these?

1    **A.**    I don't understand the concept, what you're even

2    talking about.  I've already explained why I was going

3    to put them in there.  It wasn't even going to be about

4    Azov.  I wasn't even going to mention Azov in the

5    presentation.  I was going to show the various clips

6    that I would have edited out of the different DVDs, and

7    I was going to reference them in accordance to the

8    concepts that were being discussed within the

9    presentation.  And then at one point in time, whatever

10   topic it was, and I think this is important to

11   understand, maybe because it's my own in touch with

12   mortality, kids die, too.  And there was going to be

13   some kind of concept in there in that presentation

14   about the mortality of children and --

15   **Q.**    So you weren't going to use Azov in the

16   presentation, mention Azov?  Did I hear that correctly?

17   Is that what you just said?

18   **A.**    The only way Azov was going to be mentioned in

19   there was most likely going to be in the bibliography.

20   Actually, I was going to show the introduction to it at

21   some point as well.

22   **Q.**    Didn't we just look at an entire slide where 9 out

23   of 11 or 12 of the films listed on one your slides that

24   you created had referenced Azov?

25   **A.**    This is again where you said that was the initial

1      slide.  Again, you want to finish a presentation.  When

2      that slide came up, it wasn't going to say --

3      **Q.**    I don't want to finish anything, Mr. Silva.

4      **A.**    You're trying to twist things here.  I'm going to

5      keep reminding you of what the truth is.  The truth of

6      the matter is when that slide came up, it wasn't going

7      to say Azov.  It was going to say "Wrestling."  It was

8      going to say, "Bait Boy."  It was going to say whatever

9      the other topic might be.  The "Azov" was not going to

10      be there.  The "Nattelek" was not going to be there.

11      The "For a Lost Soldier" was not going to be on the

12      screen.  The topic was going to be on the screen.

13          That was a reference for me when it came time to

14      edit those films into that particular concept that I

15      would be using an Azov film or I'd be using a

16      commercial film.

17      **Q.**    Now, despite buying all these other Azov films,

18      the truth of the matter is, if we can go to the next

19      page, page 15, is that on January 17th, a couple of

20      weeks after New Year's, you bought two more Azov films,

21      right?

22      **A.**    Correct.

23      **Q.**    And in fact, one of them was one we saw here,

24      "Paul and Calin's Home Video," right, remember that?

25      **A.**    Um-hum.  (Affirmative.)

1  **Q.**  And on this occasion for the second time, you

2  bought the bonus photo DVD.  Do you agree with that?

3  **A.**  Sure.

4  **Q.**  And why did you buy the bonus photo DVD that day?

5  **A.**  It was probably cheap.  Because it was cheaper to

6  buy it that way.  And I wasn't sure if I was going to

7  be using action video throughout the presentation.

8  There was possibly going to be an opportunity to show

9  some individual slides as well.  I didn't have that

10  down pat.  It was cheap enough.  It was part of a

11  package deal.  It went along with it.  I thought it was

12  reasonable, and I bought it.

13  **Q.**  Did you buy it because it gave you a still image

14  of these naked boys sitting with their legs splayed and

15  their genitals prominently featured?

16  **A.**  No.  I didn't buy it for that reason.

17  **Q.**  Did you have particular reasons as to the videos

18  that are listed there, why you bought those for your

19  presentation?

20  **A.**  I was still gathering information.  I hadn't got

21  the format down.

22       MR. DONNELLY:  The next page, please.

23  **Q.**  We were just on January 17th.  Five days later,

24  January 22, you buy another Azov DVD set called "FKK

25  Ranch," right?

1    **A.**    Correct.

2    **Q.**    More about naked boys?

3    **A.**    Sure.  They're all about naked boys.

4          MR. DONNELLY:  And if we could go to the next

5    page, please, page 17.  Thank you.

6    **Q.**    Here we are now on February 15th of 2011, and here

7    actually you buy nothing but Azov films, right?

8    **A.**    Correct.

9    **Q.**    Would you agree with me that pretty much from this

10    date until you stopped buying films from azovfilms.com

11    you bought nothing but Azov Film Productions?

12    **A.**    I'll take your word for that.

13    **Q.**    This is the day you bought the chicken cupcake

14    video, right, "Cutting Room Floor"?

15    **A.**    Um-hum.  (Affirmative.)

16    **Q.**    On this date also, referring you right here,

17    Mr. Silva, you bought a bonus photo DVD, correct?

18    **A.**    Correct.

19    **Q.**    Why did you buy the still images from that video?

20    **A.**    As I've explained numerous times to you already, I

21    wasn't sure if I was going to use action film or stills

22    or both.  The editing process hadn't taken place yet.

23    **Q.**    Okay.  Earlier I asked you about a movie called

24    "Boy Fights 27."  Here we have "Boy Fights 28" and "Boy

25    Fights 2."  Why did you buy those?

**A.**    Same answer I've given to you throughout the

process.  I hadn't finished the editing process,

gathering information.  I know when you take this much

information, you break it down into that much

information.  The more information you have this way,

the more depth you can have here, the more precise

you're going to be when you edit it.

**Q.**    And is it your testimony to this jury -- now,

we're into late February.  You started buying Azov

films, I think your first one was either late October

or early November.  We're into late February at this

point, two, three, four months later, whatever it is.

So you know exactly what's on these Azov films.  You've

watched some of the ones that you previously purchased,

correct?

**A.**    Um-hum.  (Affirmative.)

**Q.**    You know exactly what they're all about, right?

**A.**    When you say "watch them," a lot of them were

fast-forwarded, but, yes, I have an idea what's in

there, correct.

**Q.**    Is it your testimony here today that you watched

the videos the way we did in court at four-speed?

**A.**    I watched a good portion at least double speed.

These things are boring as all get out, for sure.

**Q.**    That's your testimony.  Did you ever watch them at

1    regular speed?

2    **A.**   Sure did.  Some of them I did.  Absolutely.  And

3    then even the ones I fast-forwarded, sometimes there

4    were parts I watched at regular speed.

5         MR. DONNELLY:  Could we go to page 18, please.

6    **Q.**   And here we have two more Azov films, "Water Boys"

7    and "The River Escape"?

8    **A.**   Um-hum.  (Affirmative.)

9    **Q.**   That's on February 25?

10   **A.**   Um-hum.  (Affirmative.)

11   **Q.**   And I'm going to assume that there's no

12   particularized reason why you bought those.

13   **A.**   Just gathering the information, to see what we can

14   come up with so we can put it in the presentation.

15   **Q.**   And as we've talked about, you've watched these

16   films as they've come in.  Not all of them, but --

17   **A.**   That's not true.  Yes.

18   **Q.**   Not all of them, but you've watched them.  You

19   know what's on them.  You know what they're about.

20   **A.**   I watched some of them, yes, that's correct.

21        THE COURT:  One at a time.

22        MR. DONNELLY:  I'm sorry.

23   **Q.**   Are you testifying today that you were gathering

24   different bits of information as you went from "Boy

25   Fights 22" to "Boy Fights 23" or whatever it is, after

1    you watched those, did you say, "I got two different

2    things out of that movie"?

3    **A.**   I hadn't watched them all, as you know.

4    **Q.**   Did you get it out of any of them?

5    **A.**   Say what you said again, because I'm not even sure

6    what you're talking about anymore.

7    **Q.**   You keep saying that you bought these because each

8    one you were going to use the information from those

9    DVDs.

10   **A.**   No.  No.  No.  If you want to go back, we'll

11   check.  I said either it was use some information from

12   these; I may have used none of the information from

13   some of these films.  I did not know the exact content

14   of it.  You're assuming I got these, I opened them and

15   watched them right away.  There were 13 left, as we

16   talked about, that I hadn't watched plus some others in

17   sleeves.

18   **Q.**   Thirteen unopened that you didn't watch, right?

19   **A.**   Right.

20   **Q.**   How many were opened?

21   **A.**   The rest of them --

22   **Q.**   Forty something, right?

23   **A.**   Well, whatever.  It wasn't 40 something.  Are you

24   talking about Azov or are you talking all the films?

25   **Q.**   Just Azov films.

1  **A.**   If you take 13 away from 48, it's not forty

2  something.

3  **Q.**   Okay.  I apologize.  Whatever your number is, it's

4  enough.

5  **A.**   It's enough.  It's plenty.

6  **Q.**   And you're watching some of these as they come in,

7  right?

8  **A.**   I'm watching some of them, but you're assuming I'm

9  watching them all as they come in.  Some of them would

10  just go in a pile until later on when I had the

11  opportunity to edit them.  And you're assuming that

12  I've watched every one of these when they came in and

13  that is absolutely false.

14  **Q.**   I'm just trying to give us one example of a piece

15  of information that's different from one of these

16  videos to the other that would help you in your

17  presentation.

18  **A.**   We didn't know what that was until the

19  presentation was --

20  **Q.**   One of the reasons you don't know what it was is

21  these kids are speaking Romanian, right?

22  **A.**   There are some subtitles to it, just so you know.

23  As a matter of fact, the dialogue was very promising in

24  it where they had the interview process where the kids

25  were saying their mothers were aware of what they were

1    doing.

2    **Q.**   You had subtitles there?

3    **A.**   Yep.  We had subtitles.  We saw that.

4    **Q.**   Were there subtitles anywhere else in these

5    videos?

6    **A.**   Yes, there were.

7         MR. DONNELLY:  We're almost done with this.  So

8    if we could just go to the next page, please.

9    **Q.**   And here, on March 7th, you buy "Raw Rewind,"

10   correct?

11   **A.**   Correct.

12   **Q.**   And we saw some of that, I think?

13   **A.**   Yes.  I believe we did.

14   **Q.**   And "Boy Fights 26"?

15   **A.**   Um-hum.  (Affirmative.)

16   **Q.**   Did that give you any different information than

17   all the other "Boy Fights" or any of these other Azov

18   films?

19   **A.**   The answer is the same.  Once I became committed

20   to using Azov films in the presentation, I began to buy

21   Azov films.  As you saw, I bought the coming-of-age

22   films first.  They were more informative to me,

23   educational to me, and I used those in my work

24   practice, the coming-of-age films.  And then when I

25   committed myself to using the Azov films within the

1    presentation, I started buying the Azov films.  I

2    didn't know the exact content.  I was buying as many I

3    felt that was practical, which was I overbought.  The

4    minute I overbought -- I overbuy everything so this is

5    not new in my life.  I had not edited them.  I had not

6    seen them when they came in.  They went in a pile for

7    the most part.  Eventually, I was going to get to the

8    point where I could edit them all, come up with the

9    story line that I wanted to, come up with the exact

10   films that I wanted to for the exact concepts, run my

11   presentation, and then I was going to put them into the

12   presentation and they would have flowed.  There would

13   be no discussion about this.  You'd see exactly how

14   they fit into the presentation in what I think would

15   have been a phenomenal event.

16          MR. DONNELLY:  One moment, please, your Honor.

17          THE COURT:  Yes.

18          (Pause.)

19   Q.   Now, you mentioned about how you didn't -- you

20   weren't going to buy the Internet, access to the

21   Internet?

22   A.   That's correct.

23   Q.   You're single, correct?

24   A.   That's correct.

25   Q.   Do you have any children?

1    **A.**    No, I do not.

2    **Q.**    So living alone at this house, right -- is it your

3    parents' house or something like that, or is that your

4    house?

5    **A.**    It's my house.

6    **Q.**    Okay.  What I meant is did it come from family?

7    **A.**    I bought it.

8    **Q.**    And was there a reason why you didn't buy Internet

9    access?

10   **A.**    I think Internet should be free.

11   **Q.**    Okay.  And so in fact, when you said you told

12   Detective Bell in the e-mail you sent him "I have a

13   weak wi-fi signal sometimes" --

14   **A.**    No. I said lost my wi-fi.

15   **Q.**    "I lost my wi-fi."  And you would sit in your

16   house, and you had a wi-fi signal that you were able to

17   get onto, correct?

18   **A.**    That's correct.

19   **Q.**    And you know today whose wi-fi signal that was,

20   right?

21   **A.**    They claim it was a neighbor's, but, you know,

22   that name never came up on my --

23   **Q.**    Do you know the neighbor?

24   **A.**    I know him.  Yes, I do.

25   **Q.**    Mr. Ritchotte, I think is his name?

1    **A.**    I just call him Al.

2    **Q.**    Did you know the IP address on your orders from

3    Azov went to his wireless router?

4    **A.**    I absolutely did not know that.  The day that

5    Mr. O'Connor told me I had used the neighbor's wi-fi, I

6    told him that I did not know that I had done that

7    because it never showed up in my -- I don't know

8    computers, but I had never seen anything saying that I

9    was using his.  I'm not saying it didn't happen, but it

10   was a shock to me when he told me it was my neighbor's.

11   **Q.**    Whose wi-fi did you think you were using while you

12   sat at home?

13   **A.**    Ironically, there was a Tim Horton's at the end of

14   the street.  I don't know how wi-fi works, but when I

15   went to Starbucks and I used theirs, that was actually

16   in West Warwick, when I came home it was still on my

17   computer and it said Starbucks on it.

18        And the only thing I could figure since wi-fi I

19   don't think goes that far, down at the end of my --

20   down at the end of the road a bit, there was a Tim

21   Horton's.  And the Tim Horton's had a wi-fi.  So I

22   said, well, they must be using the same signal as the

23   other guys.  I don't know anything about wi-fi except

24   you can go there and get it for free.  On my computer

25   it still said Starbucks.  On the left-hand side it said

1    Starbucks.  I figured I was getting it from Tim

2    Horton's.  Okay?  That's what I thought.  They came in

3    and said, Nope, you're not getting it from there;

4    you're getting it from your neighbor.  And I was

5    startled.  I absolutely was startled.  I swear to God I

6    did not know it was his signal.

7          But like I said, when I open my computer it has

8    a radar, it goes out, it picks up the closest wi-fi

9    signal.

10   Q.    And it asks you if you want to connect to a

11   certain network, right?

12   A.    It connects automatically.

13   Q.    But you knew you were getting Internet from

14   somewhere else besides your own house, right?

15   A.    Yeah.  I didn't have anything in my house, yeah.

16   Q.    And you certainly had never gone to your neighbor

17   and asked for his authorization?

18   A.    I absolutely did not.  Nope.  Didn't even know I

19   was using his.  How could I ask?

20   Q.    Now, in your June 3rd e-mail to Sergeant Bell, you

21   congratulated him for taking the Azov Films website

22   down, right?

23   A.    Yes, I did.

24   Q.    Now, when did you first become aware that the

25   website was down?

1    **A.**   When I went back to look for it the second time at

2    Starbucks.  I lost it at the house.  I lost my wi-fi.

3    I lost everything.  It wasn't just them.  And then to

4    -- I was going to get the wi-fi.  I was not going to

5    get the Internet.  Then after I sent the alleged doc to

6    Sergeant Bell, I went to Starbucks at some point later

7    on.  They weren't there.  They had that screen that was

8    mentioned earlier about something, error or something.

9    And I figured maybe there was something going on behind

10    the scenes, and maybe they did take them down and maybe

11    Sergeant Bell had something to do with it.

12    **Q.**   And so your reason for not buying your own

13    Internet access and using others, you said you think it

14    should be free?

15    **A.**   It's supposed to be, yeah.

16    **Q.**   And that had nothing to do with trying to conceal

17    your own activity from anybody else?

18    **A.**   I didn't conceal my activity from anybody else.

19    **Q.**   Because you made a big statement on direct

20    examination how you want everybody to know exactly

21    where you went on the Internet.

22    **A.**   Absolutely.

23    **Q.**   But if anybody -- you know about Internet protocol

24    addresses and how they go to a geographical address,

25    correct?

1    **A.**    No.  I don't know.  I don't know any of that

2    stuff.  Don't say I know that stuff.

3    **Q.**    Well, I'm asking you.  Is it your testimony you

4    don't know about that?

5              THE COURT:  One at a time.  One at a time.

6    **A.**    All I know is -- all I know is there's a wi-fi

7    signal out there.  You can pick it up for free.  I

8    don't know anything about all this other stuff you're

9    talking about.

10   **Q.**    And you're a state probation officer working with

11   child sex offenders, correct?

12   **A.**    Yes, I am.

13   **Q.**    Who have computer issues, correct?

14   **A.**    I don't deal with computer issues.  Sergeant Bell

15   has already dealt with that.

16   **Q.**    You help enforce or notify the police if there's a

17   violation of the court's conditions about computer use

18   by your clients, right?

19   **A.**    No.  That's done by ICAC.  Sergeant Bell is very

20   clear that it's ICAC that does the computers.

21   Probation officers do not.

22   **Q.**    So if you do a home visit just to see if somebody

23   is there, not for computer reasons, and you see that

24   one of your clients has child pornography up on his

25   computer, you don't notify anybody?

1    **A.**   Well, if that had happened, yes, I would have.

2         MR. DONNELLY:   Could we bring up Government

3    Exhibit 30, please, page one.

4    **Q.**   And this is your -- I know it's hard to read here.

5    You recognize this as being your e-mail to Mr. Bell?

6    **A.**   Yes.

7    **Q.**   And would it be fair to say here that in this

8    e-mail of May 12th, 2011, you're trying to explain to

9    Ken Bell that Azov is a bad website?

10   **A.**   I didn't say Azov was a bad site.  That's a false

11   statement.  I'm saying it is not a bad site.  I'm not

12   even saying that the Boy Joy is a bad website.  I'm

13   saying you don't connect the two.  Naturism does not

14   link into adult pornography.  If the Boy Joy site had

15   not been linked into the Azov site, if it had just

16   cropped up somewhere else, I would never have known

17   about it; I would never have had a problem with the

18   situation.

19   **Q.**   And Boy Joy is all male pornography --

20   **A.**   What I saw was all male.

21   **Q.**   -- that depicts graphic sexual acts?

22   **A.**   It's adult pornography.

23   **Q.**   Were you ever concerned about that, that that

24   might violate the obscenity laws?

25   **A.**   No.  That was adult.  It was adult.  Because I've

1   dealt with the barely legal stuff when we did some of

2   the investigations with ICAC before.  These kids had

3   the barely legal 18-year-olds.  There's another site

4   that I mentioned in the presentation that we didn't

5   show you.  I don't think I'll mention it, but there's

6   another site that the guy was on this was very similar

7   to that.  I know it's legal because we weren't able to

8   prosecute on barely legal 18.  If they're 18, they're

9   18.  That's the way it goes.

10        MR. DONNELLY:  Can you blow up the second

11   paragraph, the one that begins "FYI."  The next two

12   paragraphs will be fine.

13   Q.   Now, here you're saying, "I'm not saying Azov" --

14   you just testified that you said, "I wasn't trying to

15   tell them Azov was a bad website," but then you go on

16   to tell him that "They claim to be European naturists;

17   however, it's all of nude boys."

18   A.   Correct.

19   Q.   That bothered you?

20   A.   It bothered me in the sense that I said early --

21   I've already answered this -- as I said earlier, what

22   bothered me was is that I had no problem with Azov

23   before Boy Joy showed up.  When the Boy Joy showed up,

24   it gave me a different perspective on what was

25   happening with these boys.  There's nothing in Azov

1    that was illegal or immoral or anything else like that.

2    It was fine.  My concern was now the emphasis was on

3    boys, and they said in the advertisement where it was

4    for the Boy Joy that some, not all the boys that were

5    in Azov, were in the adult films but some had -- I

6    don't want to say graduated, but moved into the adult

7    films that were also represented in Azov.

8         So that was my concern is now it's not -- I

9    mean, the big question was going to come up is, is it

10   illegal for you to groom -- and I don't know the answer

11   to this -- a child to do something as an adult.  That's

12   up for -- that's a major discussion.  I don't know.

13   Q.   Mr. Silva, is it your testimony here today that

14   you weren't trying to cover your tracks with this

15   e-mail, right?

16   A.   This e-mail was private to Sergeant Bell.  I even

17   said this had nothing to do with anything.

18   Q.   What do you mean "private"?

19   A.   What I'm saying is I only communicate with him.  I

20   work in a very, very dark field.  You don't know what

21   goes on out there.  You don't know the things that I've

22   dealt with.  I have dealt with the darkest part of

23   society no one wants to go into.

24        MR. DONNELLY:  Your Honor, could the witness be

25   directed to answer the question without lecturing.

1        THE COURT:  Time out here a second.

2        So just answer the questions that you're asked.

3        THE WITNESS:  Okay.  I'm sorry, your Honor.

4        THE COURT:  Reask your question.

5        THE WITNESS:  Thank you, your Honor.

6        MR. DONNELLY:  Could I have it read back.

7        (Pending question read by the reporter.)

8    **A.**   To directly answer, as you recall, the first

9    e-mail I sent I wanted to make sure went directly to

10   him.  He's my confidant.  He's the person I trust most

11   when it comes to certain issues in my life.  Sergeant

12   Bell is one of the most fantastic human beings I've

13   ever seen in my life, the most top professional people.

14   I trust him.  I need someone that I can confide in.  I

15   can't live in a bubble.

16        I could not do anything about these particular

17   films.  I had no idea what to do about them.  If there

18   was something going on behind the scenes with these

19   kids, I had no way of addressing it.  I cleared my

20   conscience by saying, well -- it's probably a selfish

21   thing, but I really believed if anybody could do

22   anything about it, it would be Sergeant Bell.  He's a

23   top pro.  I sent the information to him.  I stated what

24   my concerns were.  I stated very clearly that I don't

25   want to get sued.  I don't want anybody saying that I

1    said this.  There's nothing wrong with Azov.  There's

2    nothing wrong with Boy Joy, but when you connect the

3    two I have concerns there might be a grooming process

4    that's taking place where these boys are being groomed

5    to be in the adult films, which I'm not sure is --

6    that's flirting with the line.  I was concerned if

7    they're doing that, if they're now transformed into

8    these adults films --

9  **Q.**  Mr. Silva, I was just asking you what you meant by

10   the word "private."

11  **A.**  I'm just saying.  Okay.

12  **Q.**  Now, you had this great relationship with Ken

13   Bell, correct?

14  **A.**  He's a great guy.

15  **Q.**  And you didn't confide in him.

16       MR. DONNELLY:  Could we see the whole page

17   again.

18  **Q.**  You didn't confide in him that you had purchased

19   Azov products, correct?

20  **A.**  It had nothing to do with it.

21  **Q.**  Why wouldn't you tell him that?

22  **A.**  Why would I?

23  **Q.**  You didn't tell him you spend $1,589 at that

24   website.

25  **A.**  Why is that his business?  I had no problem with

1    the Azov site itself.

2    **Q.**    You can tell from this e-mail you had no problems.

3    **A.**    Excuse me.  You keep trying to twist -- I have a

4    feeling you keep trying to twist things away from the

5    truth of the matter.  The truth of the matter is I had

6    no problem with the Azov site, and I had no problem

7    with the Boy Joy site.  I had a problem with linking

8    the two.  If somebody bought Azov, fine.  If somebody

9    bought Boy Joy, fine.  They're both fine.  They're

10   legal.  They're non-sexual.  They're fine.  They are

11   what they are.  But I don't think they should be linked

12   together.  They made the link, Azov and Boy Joy did,

13   between the two.  I didn't make that link.  That link

14   is what caused me to reflect back on the Azov films,

15   that even though those films themselves are absolutely

16   fine, that something might be happening behind the

17   scenes.  I did not know what to do.  I felt very

18   helpless about that.  I didn't know who to contact, so

19   I contacted the person I knew had the most skill when

20   it came to the Internet, and that was Sergeant Bell,

21   one of the best people I've ever met in my life.

22   **Q.**    All right.  I'd like to turn to your presentation.

23   How many presentations have you done in your ten-year

24   career?

25   **A.**    This is it.  This was going to be the big one.

1    **Q.**    This was the big one, right?

2    **A.**    That said, this was my legacy right here.

3    **Q.**    So you had never actually done a presentation in

4    the ten years that you were a State of Rhode Island

5    probation officer?

6    **A.**    Absolutely not, nope.

7    **Q.**    And you agree with the testimony of Ms. Imbriglio

8    that you never sought permission to research this

9    matter?

10   **A.**    Absolutely not.

11   **Q.**    And never sought permission to get -- to make the

12   presentation?

13   **A.**    Didn't need to do it.  Didn't do it.

14   **Q.**    And is it your testimony that you -- in this

15   future big presentation, you were not going to be

16   representing yourself as a probation officer?

17   **A.**    Absolutely not.  And there's a reason for that,

18   too.

19   **Q.**    Did you ever speak to anybody that you worked with

20   about the fact that you were buying these Azov films

21   and you had this presentation in mind?

22   **A.**    I didn't speak to anything about buying Azov

23   films, but people would constantly say to me, You need

24   to go back to private practice part-time, you need to

25   teach at a university, you need to write a book.  I

1    didn't say that.  This came from other people.  Whether

2    you want to believe it or not, that's a fact.

3    **Q.**   Did you ever --

4    **A.**   And periodically I would say to the people -- you

5    asked the question.  Periodically I would say to the

6    folks is that I'm not going to do those things.  I want

7    to do something on a grander scale.  I have this

8    dynamite presentation that I should be working on but

9    I'm not.  I need to motivate myself.  I don't want to

10   do things on an individual basis, small scale anymore.

11   I want to get it all out there so I can do my mea culpa

12   of the information I have so that I can get on with my

13   life so I can travel and I can be happy again.  That's

14   what it was about.

15   **Q.**   Okay.

16   **A.**   I keep saying it over and over again to you.

17   **Q.**   And so the answer to the question of if I asked

18   you did you tell anybody in the Department of

19   Corrections that you were working on this big

20   presentation, the answer is?

21   **A.**   No.

22   **Q.**   Okay.  You had a direct supervisor, Jean Embrey.

23   Did you tell her?

24   **A.**   Absolutely not, no.

25   **Q.**   And do you agree with Mr. Psyllos, who was here,

1  who said your PowerPoint was created in July of 2011?

2  No reason to dispute that?

3  **A.**   I have no reason to dispute that.  The film

4  version of it, yes.  Not the part that was on paper, of

5  course.

6  **Q.**   What do you mean "the film version"?

7  **A.**   Well, in other words, I didn't just sit there that

8  day and put it on the PowerPoint.  I had prepared the

9  information to put into the PowerPoint.  I didn't just

10  PowerPoint it.  I got the PowerPoint when I felt I had

11  enough material to start the PowerPoint presentation to

12  put it on I call it film.  You know, onto the slides.

13  **Q.**   Did you do any actual research for this

14  presentation?

15  **A.**   I don't want to use the word "research."  I had

16  been gathering information for 30 years.  Actually,

17  probably 40 if you want to count the times when I was a

18  scout leader.  Constantly gathering articles,

19  "Dateline" things, "60 Minutes."  I had boxes of videos

20  from different programs, different stories related to

21  the development and protection of children.  So the

22  research I would say is a false word to use, not an

23  accurate word.  Research would come in --

24  **Q.**   When you say "false," you mean when you said that

25  to Inspector --

1    **A.**   I'll say this.  I was not doing research.

2    **Q.**   Let me ask the question.  When you told Inspector

3    Connelly you were doing research for a presentation for

4    work --

5    **A.**   Oh, no.  That's a false statement right there.  I

6    did not say I was doing research for work.  What I said

7    was I was gathering information.  I'm very careful

8    about using that word "research" because it's not

9    something I had done yet.  I was gathering information

10   for a presentation for law enforcement, CPIs.  I never

11   said I was using it for work because there's a good

12   possibility I was never going to use it for work.  I

13   was going to either use it under my license, I can use

14   it under my own name.

15       I can't say I was never going to tell DOC about

16   it, but I didn't have to notify them about it until I

17   had a presentation and I had to notify them ten days

18   before that.

19       But when you mentioned the word "research,"

20   which you seem to be kind of hung up on, when I got to

21   the research phase of this, I was going to have to hire

22   an intern to assist with this, because I do not know

23   how to do that effectively.  What would take me a year

24   to find on the Internet would probably take an intern a

25   few minutes.  So I was actually going to spend more

1    money on this rather than the Azov films.

2         And then I was also going to put on --

3         THE COURT:  Wait.  Let Mr. Donnelly ask another

4    question.

5         THE WITNESS:  Thank you, your Honor.  I have a

6    tendency -- I'm just irritated.

7    **Q.**   We can agree that you didn't do any scholarly

8    research for this, correct?

9    **A.**   Scholarly research in saying the information I had

10   might be scholarly, but I didn't go back and verify to

11   see if that information was still valid.

12   **Q.**   Scholarly meaning reading from experts in the

13   field, that sort of thing.

14   **A.**   Definitely.  I've been to many, many seminars.

15   Those seminars have many, many documents that you get

16   from them.  So yes, it has scholarly information.

17   **Q.**   The documents you mentioned were "Dateline," "60

18   Minutes," that kind of thing?

19   **A.**   There's so much stuff that I had.  I didn't

20   mention it all, but yes, I've been to numerous

21   seminars.  We said that earlier in the interviews and

22   this conversation here that I happened to have here,

23   that part of that was I've been to a lot of trainings.

24   From those trainings you get materials.  I had boxes of

25   those materials.  It was not sorted out.  That was

1    going to be part of the sorting process.  When you use

2    that information from the previous trainings, you have

3    to document where you got the information but you also

4    have to research to see if that information is still

5    relevant.  I had not got to the research phase.

6           MR. DONNELLY:  Your Honor, we have an electronic

7    copy of Defendant's Exhibit D, if we can bring it up.

8           THE COURT:  All right.

9           MR. DONNELLY:  Ms. Anderson -- we've covered

10   some of these slides -- if we could go to Slide 12, I

11   think it would be.  And go to the slide show, if we

12   could.

13   Q.   Now, this was your slide, your words, right?

14   A.   Um-hum.  (Affirmative.)

15   Q.   And were you trying to sort of bring the sort of

16   nudist/naturist philosophy into the presentation?

17   A.   I would imagine there's a subtle part of that, but

18   I was really addressing the fear that we have about

19   nudity.

20          MR. DONNELLY:  Next slide, please.

21          One moment, please.

22   Q.   And "The natural state of the child is..."  the

23   next slide is, this is the picture you told us about,

24   you chose this to show us -- you wanted to start a

25   discussion about nudity of children?

1   **A.**   Initially it's a statement of fact that that gets

2   the shock effect going.  I've already done this to

3   other people; and even in trainings I've said, well,

4   you know the natural state of a child is nude.  It's

5   always like when you talk about nudity in our world

6   it's like you got to shut down, close your eyes, you

7   know, hear, see no evil, that kind of stuff.  We have

8   to understand that's the natural state of a child.  We

9   impose adult standards on children.  When we look at

10  children and we see things, we put our standards onto

11  them, and we say you should be clothed when a kid

12  says -- we condition them to make our comfort level.

13  The bad guys understand the natural state of a child is

14  nude.  Okay?  And they will use that against us if

15  we're not aware of that.  Okay?

16       If we make nudity evil, and it may have some

17  underpinnings of naturism because I know how it's not

18  dangerous, then we make our children more vulnerable to

19  these bad guys.  Clothing does not protect a child.

20  You've got to very much understand that.  It does not.

21  We do not protect our children simply because they're

22  wearing clothes.

23       MR. DONNELLY:  Could we go to Slide 26, please.

24       Mr. Mann, I think this slide had some extensive

25  notes.  Do you need the notes brought up?

1          MR. MANN:  I'd defer to the Government.

2     **Q.**  I wanted to ask you -- you recall this slide,

3     Mr. Silva?

4     **A.**  Yes, I do.

5     **Q.**  The second bulleted point says, "If the

6     perpetrator's manipulations fail, he will simply take

7     the child and if this means killing the entire family"?

8     **A.**  Correct.

9     **Q.**  Is that part of your research?

10    **A.**  That was an article that came -- or a news program

11    that was on TV about a guy who came across state lines.

12    He was traveling past a home.  He saw the children

13    playing in their bathing suits in front of the house,

14    became obsessed with them.  He waited until nighttime.

15    He went in and shot the entire family.

16          Sorry.  This is not for you.  Okay?  I'm sorry,

17    but this -- you know, shot the entire family.  Took the

18    boy, took the girl, had sex with the boy, didn't like

19    it, killed the boy and kept the girl.

20    **Q.**  And where did that take place?

21    **A.**  Out the West Coast somewhere.  I had to research

22    that and get that article back up.

23          MR. DONNELLY:  Could we go to Slide 30, please.

24    **Q.**  You recall this slide, your testimony on this?

25    **A.**  Sure.

1  Q.  Are you referring here -- each time it says "Azov"

2  in this bulleted list, were you referring to a

3  particular Azov film?

4  A.  At one time I had particular films listed in

5  there.  Like you have the "Egor" one in there, I had

6  different ones in there.  It kept changing, kept

7  changing.  So I didn't have the flow that I wanted to

8  so I just took it all out and put "Azov" in there.

9      When it came up, this is what you asked earlier,

10  when it came up all you would see is "Caretaking,

11  Selecting a Victim, Starting Them Young, Bait Boy,

12  Wrestling" and so forth.  All these other things would

13  not have been there.  Even like "Live" wouldn't have

14  been there and "Nattelek" at the top wouldn't have been

15  there.

16  Q.  And you created this PowerPoint in July of 2011,

17  some time after you found out that the Azov website was

18  down?

19  A.  Correct.

20  Q.  And it would be testimony today you didn't create

21  the PowerPoint again just to cover your tracks about

22  your purchases from Azov?

23  A.  The PowerPoint was not used to cover any tracks.

24  I had no tracks to cover.

25      MR. DONNELLY:  Can we go to Slide 32, please.

1    **Q.**    This is one we did not explore on direct

2    examination.  You recall this slide, right?

3    **A.**    Yes, I do.

4    **Q.**    These are your words?

5    **A.**    I wrote those down, yeah.  They're not my words.

6    These are the sites that I went to, yeah.

7    **Q.**    These are sites you went to?

8    **A.**    When you talk about research, this is part of the

9    research, if you want to call it.  On the site Twinks,

10   T-W-I-N-K-S, the one I was not going to tell you about,

11   okay, this --

12        THE COURT:  I think the question was -- I forgot

13   what the question was.

14        Could you read the question back.

15        (Pending question read by the reporter.)

16        THE COURT:  So are those your words?  That was

17   the question, are those your words?

18   **A.**    What do you mean by "my words"?

19   **Q.**    Well, who typed up this slide?

20   **A.**    I typed them up.

21   **Q.**    And you went to a site called "Milk Boys"?

22   **A.**    Well, I went to the site Twinks, which linked into

23   Milk Boys and Boy Love News, yes.

24   **Q.**    Okay.  And what's "Twinks" about?

25   **A.**    Twinks is we had done -- well, the ICAC person did

1   it, an investigation into one of our probationers and

2   he had gone to this particular site along with some

3   other sites.  I didn't know what Twinks meant, to tell

4   you the truth.  I still don't think I really know.  But

5   it was a site that I think had young men on it that

6   were younger than 18 but because it said it was an

7   adult, there was nothing the authorities could do about

8   it.  And so part of this is -- again, I'm talking to

9   police officers, what else is out there.  Well, Twinks

10  is out there.  If you want to see what real child

11  pornography looks like -- this wasn't for you, it's for

12  them -- this is as close as you're going to get to it

13  is this particular site.  While I was at that site,

14  they had other things that linked in.  And something

15  that's very scary out there is your kids know about

16  these sites.  There are sites out there --

17          MR. DONNELLY:  Your Honor, I'd --

18          THE WITNESS:  I'm sorry, your Honor.

19          THE COURT:  Just try to focus on the questions.

20          THE WITNESS:  I am sorry.  There's so much

21  information.  I apologize.  There's so much information

22  you need to know.

23          THE COURT:  Okay.  Stop.  Stop.  Just listen to

24  the questions and try to answer the questions put to

25  you.

1    THE WITNESS:  Thank you, your Honor.  I'll try

2    to do that.

3    **Q.**    Tell us about why you wrote down on this slide

4    "Boy Love News."

5    **A.**    It was one of the links that was incorporated into

6    the Twinks site.  I had never heard of it in my entire

7    life.  I had never heard of Milk Boys.  So before you

8    ask on that, never heard of it.  Very informative about

9    this.

10   **Q.**    How frequently did you go to these websites?

11   **A.**    I know I tried to find -- a long time I tried to

12   find Twinks because I was looking up Twinkies, which

13   wasn't right.  And I don't think I spent a lot of time

14   on it, on any one of those.

15   **Q.**    Boy Love News you're quite familiar with, though,

16   right?

17   **A.**    I'm not quite familiar with any either one of

18   these.  All I can tell you is that one of them had --

19   there was like news bulletins on boys, and there was

20   another one where you could -- they could link up

21   with -- the way I guess they put it was gay boys can

22   link up with men in your area.  Don't worry about it.

23   We got good guys out there that are going to link up

24   with you.  Something to that effect.

25   **Q.**    Did you go to Boy Love News so that you could find

1    news about the investigation of Azov Films?

2    **A.**   I did not, no.

3    **Q.**   Did you go to Boy Love News -- you're denying that

4    you went to it quite a bit, Mr. Silva?

5    **A.**   I don't know how often I went to that.  I know it

6    was part of the -- I only remember going one time.

7    **Q.**   Were you linked to it from a site called "Boy

8    Wickie"?  Are you familiar with that site?

9    **A.**   I thought I came in it from Twinks.

10   **Q.**   Are you familiar with Boy Wickie?

11   **A.**   I am not familiar with Boy Wickie.

12   **Q.**   Or other boy-lover websites?

13   **A.**   I'm not familiar with them, no.

14   **Q.**   Would you deny that you went to the Boy Love News

15   website some 28 times?

16   **A.**   I would say that would be most -- if it's there,

17   it's there, but if I went to Boy Love News that many

18   times, it would have to be while I was looking for

19   Twinks.

20        MR. DONNELLY:  Could I have one moment, please,

21   your Honor.

22        THE COURT:  Yes.

23        (Pause.)

24   **Q.**   Now, several times on direct you said, Mr. Silva,

25   that the Azov films were perfectly legal and naturist

1    or nudist films; correct?

2    **A.**    Correct.

3    **Q.**    And can we agree that in the films that form the

4    charged videos in this case, that those films -- we

5    don't see any families, correct?

6    **A.**    Correct.

7    **Q.**    We don't see any moms?

8    **A.**    Correct.

9    **Q.**    We don't see any dads?

10    **A.**    Correct.

11    **Q.**    We don't see any sisters?

12    **A.**    That's correct.

13    **Q.**    We don't even see any organized sporting activity,

14    right?  We don't see volleyball, baseball?

15    **A.**    No, there are some of them that do.  Some of the

16    films did have organized sports and activities.  The

17    ones you showed --

18    **Q.**    Not much, right?

19    **A.**    Huh?

20    **Q.**    Not much?

21    **A.**    Not in the ones you showed.

22    **Q.**    How about the ones your own lawyer showed?

23    **A.**    Which ones were they?  The ones he showed --

24    **Q.**    He showed them all.

25    **A.**    Those are the ones that you had, right?  My lawyer

1    showed the films that you put into evidence.  Is that

2    correct?

3         THE COURT:  You don't ask him questions.  He

4    asks you questions.

5         THE WITNESS:  I'm just trying to get

6    clarification of what he's talking about.

7         THE COURT:  Do you want to pursue that?

8    **Q.**   We can agree that you had some nudist films that

9    you had obtained in your house, right?

10   **A.**   Correct.

11   **Q.**   And the ones that were not Azov films had family

12   activities with full families, like you said, from

13   young to old, right?

14   **A.**   Correct.

15   **Q.**   And they're at nudist resorts and that sort of

16   thing, correct?

17   **A.**   Sometimes, yes.

18   **Q.**   But as far as these Azov films, there's no

19   families present, right?

20   **A.**   No families.

21   **Q.**   There's no plot to the story, right, to these

22   films?

23   **A.**   Plot, I don't know what you mean by "plot."  It's

24   the same as all the other naturist films.  They don't

25   have a plot either.  I mean, they have a theme.  The

1      theme is a naturist lifestyle.

2             MR. DONNELLY:  Nothing further.

3             THE COURT:  Thank you, Mr. Donnelly.

4             Mr. Mann, do you have some cross-examination?

5             MR. MANN:  A little bit, yes.

6             THE COURT:  How long do you expect?

7             MR. MANN:  Five, ten minutes?  Maybe not even

8      that long.

9             THE COURT:  That's fine.  Come on up.

10            Ladies and gentlemen, you know that I had you

11     order lunch because I was not sure about whether we

12     would be getting the case to you for deliberations

13     before lunch or after, and it's obvious that we're

14     going to get the case to you after lunch.

15            So your lunch is waiting for you in the jury

16     room.  I want to complete the examination of the

17     witness before you have your lunch.  We'll probably

18     have a shortened lunch hour since we bought the lunch

19     for you.  We'll shorten the lunch hour and then come

20     back and do what we need to do after lunch.  All right?

21            Go ahead, Mr. Mann.

22            **REDIRECT EXAMINATION BY MR. MANN**

23     **Q.**   In the cross-examination, there was reference to a

24     film called "Nattelek," or something?

25     **A.**   "Nattelek," yes.

1    **Q.** That's referenced to the PowerPoint, right? What

2    is that?

3    **A.** It's a commercial film. That film was going to be

4    used to demonstrate -- there aren't that many female

5    sex offenders, the theory being is that adult female

6    sex offenders use caretaking as the mechanism for

7    molesting children. In this particular film, there is

8    no molestation of the child, just so you know, but

9    there was a caretaking scene that you could see was

10    very representative if a person wanted to cross the

11    line they could have crossed the line and very easily

12    seduced the young man that was in the film.

13    It was very well done and very representative of

14    how if a woman wanted to, because we're always talking

15    about guys, have to talk about women sometimes, if a

16    woman wanted to molest the child, this child through

17    the caretaking process it would have been very easy to

18    do it.

19    **Q.** You were asked about what your role was as a

20    probation officer with respect to searching computers.

21    Do you remember that line of questioning, sir?

22    **A.** Yes.

23    **Q.** You were the probation officer for sex offenders,

24    right?

25    **A.** Yes, I was.

1    **Q.**   Did you have any authority to search a computer in

2    your capacity as a probation officer?

3    **A.**   No, I did not.

4    **Q.**   If you saw something suspect on a computer that

5    happened to be on when you walked into a house --

6    first, did that ever happen?

7    **A.**   No.  They don't -- if there's a knock on the door,

8    they're turning off their computer.

9    **Q.**   Did you have any authority to tell them to turn on

10   their computer?

11   **A.**   I did not.

12   **Q.**   Was there an established protocol for what you

13   were supposed to do if you had suspicions about an

14   offender's use of a computer?

15   **A.**   I would contact ICAC.

16   **Q.**   And ICAC was what?

17   **A.**   Internet Crimes Against Children.

18   **Q.**   And who would then conduct the search of the

19   computer?

20   **A.**   It would either be the state police or somebody

21   trained by them that would go out with the probation

22   officer.  We'd actually have to get consent, just so

23   you know.  We can't just walk in and get their computer

24   and open it up.  We have to get consent.

25   **Q.**   Or if you didn't get consent, would you have to

1    use a sworn law enforcement official?

2    **A.**    We would have to get some kind of a warrant or

3    something.  I mean, there has to be grounds for the

4    warrant, obviously, not just suspicion.  I mean, there

5    would have to be some --

6    **Q.**    You never participated in the actual search of the

7    computer?

8    **A.**    Never in ten years.

9    **Q.**    I thought you started to answer a question about

10    why you were not going to make this presentation as a

11    probation officer.  Was there a reason you were not

12    going to make the PowerPoint presentation as a

13    probation officer?

14    **A.**    Yes.  Because whenever you have any kind of nudity

15    or anything like that, I'm not naive, you're going to

16    get -- you can get challenged.  There are lots --

17    remember what I said earlier, no politically correct

18    people?  Because politically correct people have a

19    tendency to cause difficulties when it comes to nudity

20    in films and things like that.

21        I looked at DOC.  I don't always like what's

22    going on there, but I want to protect them as well.  I

23    wanted this on me, on my license or on me personally so

24    there would be nobody else involved.  If there was any

25    kind of a challenge to these films because of the

1    nudity, then they would have to come and talk to me

2    about it.  No one else would be involved.  And I bought

3    these -- I said earlier, I bought these films.  I put

4    in the presentation that I am solely responsible for

5    the contents of that presentation.  If there's any

6    problems with it, you come talk to me.  You don't talk

7    to DOC.  You don't talk to anybody else.  You come talk

8    to me.  Here we are.

9    **Q.**   When you used the Internet, do you know what an IP

10   address is?

11   **A.**   If I'm using my computer, what that says is that

12   my computer has an address to it so when I went to Azov

13   or somewhere else it would show it was on my computer.

14   **Q.**   Did you use wi-fi in an attempt to conceal who you

15   were when you were on the computer?

16   **A.**   Absolutely not.

17   **Q.**   Did you always use the same address when you used

18   your home computer, same e-mail address?

19   **A.**   Same e-mail address, absolutely, yeah, it's

20   gerald.silva@home.

21          MR. MANN:  Nothing further.  Thank you.

22          THE COURT:  Thank you, Mr. Mann.

23          Is there any recross, Mr. Donnelly?

24          MR. DONNELLY:  No, your Honor.  Thank you.

25          THE COURT:  All right.  Mr. Silva, your

1       testimony is complete.  You may step down.  Thank you.

2             Counsel, would you come up for a moment.

3             (Sidebar conference off the record.)

4             THE COURT:  Ladies and gentlemen, it's 12:45.

5       What I think we will do after consulting with

6       counsel -- first of all, Mr. Mann, do you have any

7       further witnesses?

8             MR. MANN:  No, your Honor.  Defense rests.

9             THE COURT:  Thank you.  So the defense has

10      rested.  What we'll do at this point is we'll take our

11      lunch hour.  There's a couple things I need to take up

12      with the attorneys that you don't need to be in the box

13      for.  Your lunches that you ordered are in the jury

14      room.  I'm sorry.  I just learned that the alternates

15      didn't get to order lunch so I didn't know that until a

16      few minutes ago, and the reason for that is that often

17      once everything is completed the alternates are

18      discharged and so I think everyone thought that that

19      was going to happen when they took those orders.  So

20      you're welcome to steal any other jurors' lunch that

21      you think you can get away with, or to go out and buy

22      something or to share.  Whatever you want to do.

23            But I think we'll take 45 minutes.  And ladies

24      and gentlemen, you don't have to eat in the jury room

25      across the hall.  You can go downstairs.  You can just

1    go for a walk.  You can do what you want, just like you

2    would on any other lunch hour.  It's just we're going

3    to have a short lunch hour, okay?

4         So 45 minutes would put us back here at 1:30.

5    And the reason I'm doing all of this this way is to get

6    you this case this afternoon so you can start

7    deliberating.  That's what I'm trying to get to and I

8    think we have a good shot at doing that.  All right?

9         So just keep in mind all of my instructions, no

10   discussions about the case, no deliberating until you

11   get it for deliberation this afternoon.

12        Have a good lunch, 45 minutes.

13        (Proceedings out of the presence of the jury as

14   follows:)

15        THE COURT:  All right.  We do have to do a

16   couple of things on the record before we take our

17   break.  I've handed you a draft instruction that would

18   go at the end of the section on "Knowingly" and would

19   be placed at the top of page 12 above the definition of

20   the word "received."  That way we wouldn't have to

21   reprint all the instructions, all the pagination would

22   remain the same, and I would just substitute the new

23   page 12 for the old page 12.

24        Do either of you have -- is that satisfactory to

25   you?

1      MR. DONNELLY:  Yes, your Honor, thank you.

2      THE COURT:  Mr. Mann, do you have an objection

3   to this instruction?

4      MR. MANN:  I absolutely do.  I think that this

5   instruction conflicts with the instructions that deal

6   with the elements of the offense, both for Counts I

7   through VI and Count VII.  And it conflicts because

8   what Counts I through VI require is that the defendant

9   knowingly received a visual depiction, that the

10  depiction involved the use of a minor engaging in

11  sexually explicit conduct, and that he knew the

12  depiction was of that conduct and he knew that at least

13  one other person was a minor.

14      Now what this says is this.  This takes away the

15  knowledge requirement, Judge.  What it says is that all

16  the Defendant had to know was that he was seeing a

17  visual depiction.  Doesn't even say he has to see a

18  visual depiction, but even if it did say that, it

19  doesn't say that he had to see a visual depiction and

20  that he knew it was of sexually explicit conduct.

21  That's what it does, Judge.  It takes away that element

22  of the offense.

23      Your instruction says the Defendant did not have

24  to know that the visual depiction was of sexually

25  explicit conduct.  And I think that the element

1   explicitly requires that.  I think this, in fact, takes

2   that element away.

3          THE COURT:  Let's just be clear.  What the

4   instruction says is that the Government is not required

5   to prove that the Defendant knew or correctly

6   understood the law of child pornography, but only that

7   he knew factually what he was doing, right?

8          MR. MANN:  I think what the statute requires

9   is --

10          THE COURT:  So you're saying you think, I want

11   to be clear, your position is that the Defendant's

12   possible ignorance of the law is a defense to the

13   crime.  That's essentially what I think you're saying.

14          Put it this way.  The Defendant has testified

15   that he believes, he said this over and over, that

16   there's nothing wrong with the Azov site, there's

17   nothing wrong with the Azov films.  If the jury

18   determines that that is incorrect as a matter of fact,

19   that is, that these are visual depictions of a

20   lascivious nature, they're sexually explicit, right, if

21   they determine that, then what you're saying is -- and

22   the Government has proven that, you're saying that his

23   misunderstanding of that is a defense.

24          MR. MANN:  We haven't debated about whether it

25   would have to be a reasonable misunderstanding or not

1    or anything like that, but there is a mens rea

2    requirement to this statute.  And the mens rea

3    requirement is embraced in the requirement of the

4    knowingly requirement, Judge.  And he has to have known

5    that he was seeing sexually explicit conduct.

6         THE COURT:  Let me just -- if the jury says this

7    is sexually explicit and he says, well, I don't think

8    so, I don't think it's sexually explicit, then he's not

9    guilty because he disagrees with the jury.

10        MR. MANN:  The Government can certainly argue

11   that they should disbelieve the Defendant.  The

12   Government can certainly argue that all the inferences

13   point to the contrary, that he knew he was importing

14   sexually explicit material.  They can argue all of

15   that, but they still have to prove that he knew it was

16   sexually explicit conduct, Judge.  And I think that's

17   an absolute defense that he has.  Now, they can say

18   that that defense is gibberish; and if you had a case,

19   for example, where the pictures depicted young kids in

20   explicit sexual activity, the first four list of things

21   that are excluded by the statute, I don't think there

22   would be much of a dispute.

23        I don't think a defendant could stand up here

24   and argue I didn't know it was sexually explicit

25   conduct if you had intercourse with a six-year-old.

1    But you have this case and I think the Government has

2    to prove in this case that he knew that there was

3    sexually explicit conduct and this is a borderline

4    case.

5         THE COURT:  How does one know that?

6         MR. MANN:  Well, the same way one knows any

7    other state of mind of the defendant.  Courts always

8    instruct that we don't have an X-ray of the defendant's

9    mind, something like that.  You're to determine the

10   defendant's state of mind the same way you determine

11   any other fact by making all the reasonable inferences,

12   considering all the testimony.  So they can consider

13   all that and they can look at what the record is and

14   the jury can say, yes, he did know, his denials are

15   just nonsense; or the jury can say, no, the Government

16   didn't prove that.  His simple denial isn't enough.

17   It's all the evidence in the record.

18        But what this statute requires, and it's clearly

19   in your instruction on page ten, and it's also, just so

20   the record is absolutely clear, Judge, I think that

21   this whole argument applies not to just Counts I

22   through VI, Judge, but it also applies to Count VII

23   because --

24        THE COURT:  I agree with that.

25        MR. MANN:  I just want to make clear that the

1     elements are essentially the same for I through VI and

2     VII except that Count VII is possession and Count VI is

3     receipt, I through VI are receipt.

4          And you spell out the elements for Count VII on

5     page 18 and it's the same knowledge requirement with

6     respect to those counts.  So I just want to make that

7     technical point.

8          I think that -- and part of the argument here is

9     that if this isn't an element of this offense, then if

10    the Government doesn't have to prove that he knew that

11    he either received or possessed this material and that

12    he knew it involved a visual depiction of sexually

13    explicit conduct, if the Government didn't have to

14    prove that, Judge, it almost becomes a strict liability

15    law and what saves the statute in view of many of the

16    courts that have examined it, I would submit, from a

17    vagueness challenge is the fact that there is a mens

18    rea requirement, mens rea requirement being the

19    knowingly.

20         I think that what the proposed instruction does

21    is take that mens rea requirement out of the statute.

22    I think it conflicts with the requirement of

23    "knowingly" spelled out for all seven counts and at the

24    very minimum so confuses the jury with conflicting

25    instructions that they'll misunderstood what the

1    Government's obligation is.

2          I think I can make a closing argument that says

3    -- I think I'm absolutely entitled to make a closing

4    argument that says not only do you have to prove that

5    it was lascivious, but you have to prove that the

6    Defendant knew it was lascivious.

7          THE COURT:  I disagree with that.  Maybe I'm

8    wrong about the law, but I don't think you can make

9    that closing argument.  I don't think the Government

10   has to prove that he knew to a certainty that a jury

11   would conclude that this was lascivious.

12         MR. MANN:  We're verging into the next questions

13   that I'm going to have, which are what can I say in my

14   closing argument.  Because if the Court is saying that

15   all the Government has to prove is that in fact he

16   downloaded these pictures, or received these pictures,

17   I'm sorry, that he received or possessed these

18   pictures, I'll just have to address that in my closing

19   argument.  It seems to me what the Court is saying

20   is --

21         THE COURT:  I guess the difference is maybe more

22   precisely between belief and knowledge.  All right?

23   And you're, in my view, conflating and the Defendant in

24   his testimony has conflated belief with knowledge as if

25   belief equals knowledge.  Belief doesn't equal

1   knowledge.  The Defendant can have a belief that is

2   wrong.  He can have a belief that is deliberately

3   ignorant.  Those beliefs don't acquit him of the

4   charges.  Knowledge is something that is objective and

5   is factual.  That's what we've been told by the cases.

6   The jury decides factually what is sexually explicit.

7        Now, what you're saying is and what the

8   Defendant seems to be saying and you want to argue is

9   if he believed these films not to be sexually explicit

10  that the Government has failed to prove the knowledge

11  requirement.  And I believe that is an incorrect

12  statement of the law.

13        MR. MANN:  I'm not saying that, though.

14        THE COURT:  Well, that's what's coming out.

15        MR. MANN:  I'm saying something I think is close

16  to that, but not that.  It's not what he believes.  I'm

17  saying that based on this record that the Government

18  has to prove that he had knowledge that it was

19  lascivious in the facts of this case and that they can

20  try and make that argument from all the evidence in

21  this case.  They are clearly making the argument that

22  the PowerPoint was a coverup.  They're clearly making

23  an argument that he has a predilection for young boys.

24  That's apparent from the cross-examination, Judge.  I

25  can go on with what I anticipate some of their

1    arguments to be.

2         They can argue that his whole statement is

3    unbelievable and that he clearly had knowledge that he

4    was receiving or possessing lascivious material.  I

5    think just as equally clearly I should be able to argue

6    that he didn't have knowledge that he was receiving or

7    possessing lascivious material.  And the jury is going

8    to have to base that determination on all the facts not

9    just on what he said.  I mean, it's commonplace for the

10   prosecution to say, "I don't believe the defendant."

11        But I think if the Court gives this instruction,

12   you're saying that all the Government has to prove is

13   in effect that he had -- that he didn't accidentally

14   receive these packages in the mail, and he didn't

15   accidentally receive these images.  I don't think

16   that's what the law says at all.  I think this

17   knowledge requirement says it has to be something more

18   than by accident, mistake and other inadvertent

19   reason --

20        THE COURT:  Let's be clear.  I struck the

21   sentence that was in the instructions in your motion,

22   the one sentence description that was there before,

23   that the Government doesn't have to prove that the

24   Defendant knew what he did was against the law.  That's

25   essentially what it said.  I tried to make it more

1    moderate.  But some instruction needs to be given,

2    given the Defendant's testimony.

3         He stated over, and over, and over again that

4    this website and these are legal.  That's what he has

5    said, and he said it about 25 times.  That's in my view

6    a statement of his belief but that's not a statement of

7    an objective fact.  That's for the jury to decide.  And

8    that's all this instruction tries to do is draw a

9    distinction between his belief and the objective fact.

10        MR. MANN:  This instruction says the Government

11   is not required to prove that the Defendant knew or

12   correctly understood the law of child pornography, only

13   that he knew factually what he was doing.

14        Well, factually, the question is did he receive

15   a package, did the package have pictures in it or

16   images in it.

17        THE COURT:  Well, that sentence could be taken

18   out.  It could begin with "If the Defendant incorrectly

19   believed."

20        MR. MANN:  If that sentence were taken out, I

21   think I would be free to argue that the Government has

22   to prove that he knew that the images involved the use

23   of a minor engaging in sexually explicit conduct.  And

24   it's obviously no secret that I'm going to argue that

25   he didn't know that.

1          THE COURT:  Would you be satisfied with this

2     instruction if I took the first sentence out?

3          MR. MANN:  Could I have just a moment to think

4     about this, Judge.

5          It's better without that sentence, but I still

6     object to it because it becomes a comment on the

7     Defendant's testimony, and there is no need for a

8     comment on the Defendant's testimony.

9          The Government is free, Judge, to argue to their

10    heart's content that they should disbelieve the

11    Defendant.  I suspect that they are going to argue that

12    the jury should disbelieve the Defendant, Judge, but I

13    don't think the Court should be commenting on the

14    Defendant's testimony which the rest of this in effect

15    is.  We shouldn't be focusing on what he believes.  The

16    question is did he have knowledge.  I agree knowledge

17    is different than belief.  The Government can argue

18    that he clearly had knowledge, and I know they're going

19    to argue that.  I'm going to argue to the contrary, and

20    that's a question of fact for the jury.

21         THE COURT:  It's not a comment on the

22    Defendant's testimony.  I'm trying to help the jury.

23    That's what jury instructions are supposed to do.  The

24    jury may have -- look at all the argument that's going

25    on amongst us.  The jury needs to be able to figure

1    this out.

2         Do you want to say anything, Mr. Donnelly?

3         MR. DONNELLY:  No, your Honor.  I have no

4    objection to the original instruction as proposed by

5    the Court or the one the Court just brought down.

6         THE COURT:  All right.  Well, I think you've

7    more than placed your objection on the record.  I'll

8    think about it over the next half hour.  I'm going to

9    make a decision about what to put in there, but

10   something needs to be said that clarifies this issue

11   and I think that this instruction does it in a fairly

12   simple and non-offensive way.

13        MR. MANN:  I have another request, Judge.  I

14   want a little more time.  Not much, maybe another half

15   hour at some point before I start making the closing.

16        I mean, we're going to have about 20 minutes

17   during this lunch break and then you're going to go

18   into instructing the jury.

19        THE COURT:  I mean, you've known you're going to

20   close today.

21        MR. MANN:  Oh, I knew we were going to close

22   today, but there's a lot to respond to.  We just had

23   the Defendant on the stand for the whole morning.  I'm

24   going to juggle my closing a little bit, not much, but

25   I'm going to juggle a little bit of what I've outlined.

1          THE COURT:  You've got to use your lunch hour to

2     do that.  That's the best I can do for you.  I'll give

3     you a few more minutes besides the half hour since

4     we've been arguing about this for a while, but that's

5     what you get.  I'm not going to delay it an hour.

6     We're going to go into closings right after the

7     instructions, which will start as soon as the evidence

8     is completed.

9          Okay?  We'll be in recess.

10          (Lunch recess.)

11          THE COURT:  I've had the clerk hand you a new

12     page 12 for the final instructions.  So I'd ask that

13     you substitute that page for page 12 that's in there.

14     I've taken the first sentence out of the draft

15     instruction I gave you previously, and I reversed the

16     order of the sentences so that it emphasizes that it's

17     for the jury to decide whether the material meets the

18     definition of sexually explicit conduct and then the

19     sentence that if the Defendant incorrectly believed

20     what does and does not constitute child pornography

21     that does not relieve him of responsibility so long as

22     the Government has proven the elements I outlined

23     above.

24          I've considered your objection, Mr. Mann.  I

25     think you said you thought it was commenting on the

1    testimony.  I disagree with that.  I think it's a very

2    mild instruction given what the instructions previously

3    were, which I took out, and given the Defendant's

4    testimony.  And I don't believe it's commenting.  I

5    think it's just clarifying.  But I note your objection

6    and I don't want to reargue it now.

7         MR. MANN:  I understand your ruling.  I'm going

8    to have to make it when you make the final

9    instructions.  I just want -- can I get a little

10   guidance on what I can say during my closing and not

11   say on the knowledge point?

12        THE COURT:  Sure.

13        MR. MANN:  What I intend to argue or what I had

14   intended to argue was that the Government had to prove

15   that Mr. Silva received the visual depiction, that he

16   knew it was sexually explicit conduct and that it

17   involved a minor, and then I was going to argue that

18   there were multiple reasons why the Government couldn't

19   prove that he did this knowingly.

20        Now, as I read your instruction, I can still

21   make that kind of argument.

22        THE COURT:  I think that's fine.  The only thing

23   I think you can't do is argue that you heard Mr. Silva

24   say he didn't believe this was child pornography or

25   sexually explicit; so therefore, he could not have

1    knowingly --

2         MR. MANN:  That's not in my argument.

3         THE COURT:  So I think that's where the line is,

4    and I don't think you're making that argument.

5         MR. MANN:  I don't think I am.  I think it's a

6    line.  I do argue that it's absurd to think that he

7    would do this given his history and all that, but I

8    think I can still make that kind of argument under your

9    instruction.

10        THE COURT:  Sure.  I think that's right.

11        MR. MANN:  Thank you.

12        THE COURT:  Mr. Donnelly, do you have some

13   rebuttal?

14        MR. DONNELLY:  We considered over lunch time and

15   I listened to Mr. Mann's objection to it and I

16   sustained his objection.  We're ready to move forward

17   without it.

18        THE COURT:  I'll leave now.

19        All right.  Mr. Mann?

20        MR. MANN:  At some point, I just have to renew

21   my motion.

22        THE COURT:  I think given what Mr. Donnelly has

23   said, you should renew now.

24        MR. DONNELLY:  The Government has no rebuttal.

25        MR. MANN:  So the defense renews its motion for

1    a judgment of acquittal under Rule 29, and unless the

2    Court objects, I will incorporate by reference the

3    arguments I made at the close of the Government's case

4    and rely on those arguments.  I think the arguments are

5    the same in support of my motion for a judgment of

6    acquittal.

7         THE COURT:  Okay.  Very well.  And I'll deny the

8    motion for the reasons previously stated.

9         I think we're ready to bring the jury in.

10        (Proceedings in the presence of the jury as

11   follows:)

12        THE COURT:  Welcome back, ladies and gentlemen.

13   I hope you enjoyed lunch.  I hope our alternate jurors

14   found lunch.  And I've been discussing matters with

15   counsel.  And as you heard before lunch the Defendant

16   rested his case, and the Government has determined that

17   it has no rebuttal testimony so both sides have now

18   rested and it's time for me to give you instructions on

19   the law that will govern your deliberations and then

20   we'll move directly to closing arguments by counsel and

21   you'll have this case for deliberation shortly.  All

22   right?

23        So at this time it's my duty to instruct you on

24   the law that is applicable to this case.  You must

25   accept the rules of law that I give to you and you must

1  apply them to the facts in this case as you find those

2  facts to be.

3      Now, in applying the law that I'm about to

4  explain to you in these instructions, you must consider

5  the instructions as a whole.  You should not choose one

6  part and disregard another.  You must accept and apply

7  the law as I give it to you in its entirety.

8      You must accept and apply the rules of law that

9  I give you whether you agree with them or not.  It

10  would be a violation of the oath that you took as

11  jurors to base a decision on any version of the law

12  other than that contained in my instructions, just as

13  it would be a violation of that oath to return a

14  decision based on anything other than the evidence in

15  this case.

16      It is not up to you to decide what the law is or

17  what the law should be.  Your duty is to apply the law

18  as I explain it to you.

19      Now, I see some of you reaching for your

20  notebooks; and I just want to say you're free to take

21  notes while I give these instructions, but I do want to

22  tell you that I provide a written copy of my

23  instructions to go into the jury room with you.  So I

24  don't want you panicking at some point while I'm saying

25  something that's rather complex that you have to write

1    it all down.  You'll have a written copy of these

2    instructions to help guide you during your

3    deliberations.  But still feel free to take notes on

4    anything you wish to take notes on.

5        So as I told you at the beginning of the trial,

6    the Defendant is presumed to be innocent of the

7    accusations against him.  This presumption of innocence

8    remains with the Defendant unless and until the

9    Government presents evidence satisfying you beyond a

10   reasonable doubt that the Defendant is guilty.  The

11   presumption of innocence is sufficient to require a not

12   guilty verdict unless you find that such evidence has

13   been presented.

14       If you find that the Government has proven the

15   Defendant guilty beyond a reasonable doubt, the

16   presumption of innocence disappears and is of no

17   further avail to him; however, until that time, the

18   presumption remains with the Defendant.

19       Now, I'm going to shortly explain to you the

20   offenses with which the Defendant is charged and the

21   elements that the Government must prove in order to

22   establish that the Defendant is guilty of those

23   offenses.

24       In order for the Government to prove the

25   Defendant guilty of an offense, it must convince you

1   beyond a reasonable doubt that it has proved each and

2   every element of that offense.  Possibilities or even

3   probabilities are not sufficient.

4        If the Government fails to prove any one or more

5   elements of the offense beyond a reasonable doubt, you

6   must find the Defendant not guilty of that particular

7   offense.

8        On the other hand, if you are convinced beyond a

9   reasonable doubt that all elements of the offense with

10  which the Defendant has been charged have been proven,

11  then you should find the Defendant guilty of that

12  offense.

13       Bear in mind that the requirement that the

14  Government prove every element of the offense with

15  which the Defendant is charged does not mean that the

16  Government is required to prove every statement

17  contained in the indictment.  What it means is that the

18  Government must prove facts sufficient to prove all of

19  the elements of the offense with which the Defendant is

20  charged as I explain them.

21       Now, as I have said, the burden is upon the

22  Government to prove beyond a reasonable doubt that the

23  Defendant is guilty of the charges made against him.

24  It is a strict and heavy burden, but it does not mean

25  that the Defendant's guilt must be proved beyond all

1    possible doubt.  It does require that the evidence

2    exclude any reasonable doubt concerning the Defendant's

3    guilt.

4         Now, a reasonable doubt may arise not only from

5    the evidence produced but also from the lack of

6    evidence.  Reasonable doubt exists when, after weighing

7    and considering all of the evidence, using reason and

8    common sense, jurors cannot say that they have a

9    settled conviction of the truth of a charge.  Of

10   course, a defendant is never to be convicted on

11   suspicion or conjecture.  If, for example, you view the

12   evidence in the case as reasonably permitting either of

13   two conclusions, one that the Defendant is guilty as

14   charged and the other that the Defendant is not guilty,

15   then you will find the Defendant not guilty.

16        It is not sufficient for the Government to

17   establish a probability, even though a strong one, that

18   a fact charged is more likely to be true than not true.

19   That is not enough to meet the burden of proof beyond a

20   reasonable doubt.

21        On the other hand, there are very few things in

22   this world that we know with absolute certainty, and in

23   a criminal case the law does not require proof that

24   overcomes every possible doubt.

25        So in concluding my instruction on the burden of

1    proof then, I'm instructing you that what the

2    Government must do in order to meet its heavy burden is

3    to establish the truth of each part of the offenses

4    charged by proof that convinces you and leaves you with

5    no reasonable doubt and thus satisfies you that you can

6    consistently with your oath as jurors base your verdict

7    upon it.

8         Now, if you so find as to the charges against

9    the Defendant, then you'll return a verdict of guilty

10   on those charges.  If on the other hand you think there

11   is reasonable doubt about whether the Defendant is

12   guilty of the offense, then you must give the Defendant

13   the benefit of that doubt and find the Defendant not

14   guilty of that offense.

15        You're going to have in the jury room with you

16   the indictment in order to remember the precise charges

17   against the Defendant.  I'm going to remind you once

18   again that the indictment is nothing more than an

19   accusation.  It should not be considered as evidence of

20   guilt.  It may not even be the basis of an inference of

21   guilt.  All that it does is bring this matter before

22   you for a determination, and beyond that it has no

23   significance whatsoever.  It merely sets forth the

24   elements of the offenses which the Government must

25   prove beyond a reasonable doubt.

1          Now, you will note that the indictment charges

2     that the offenses in this case were committed in or

3     about a certain date.  The proof need not establish

4     with certainty the exact date of the alleged offenses.

5     It is sufficient if the evidence in the case

6     establishes beyond a reasonable doubt that the offenses

7     were committed on a date that is reasonably near the

8     date alleged.

9          The indictment in the case charges the

10    Defendant, Gerald J. Silva, with seven counts.

11         Counts I through VI charge the Defendant with

12    receipt of child pornography, that Defendant knowingly

13    received child pornography.  Count VII charges the

14    Defendant with possession of child pornography, that

15    is, that the Defendant knowingly possessed child

16    pornography.

17         As I have told you each of these offenses has

18    essential elements.  To find the Defendant guilty of an

19    offense, you must find that the Government has proven

20    each of the essential elements of that offense beyond a

21    reasonable doubt.

22         I'm going to explain the elements of each

23    offense and specific definitions in a little more

24    detail in a moment.

25         Now, keep in mind as you consider the charges

1   against the Defendant that a separate offense is

2   charged in each of the counts of the indictment.  Each

3   offense, and the evidence which applies to it, should

4   be considered separately by you and you should return

5   separate verdicts as to each count.  And you will have

6   with you a verdict form, and I'll talk about that in a

7   moment, which gives you each count separately.

8          So first let me address the specific elements of

9   Counts I through VI, that is the counts of receipt of

10  child pornography.

11         Counts I through VI of the indictment charge the

12  Defendant with receipt of child pornography.  It is a

13  federal crime for anyone to receive child pornography

14  that has been mailed or moved in interstate or foreign

15  commerce.  Title 18 of the United States Code, Section

16  2252(a)(2) provides in relevant part:  Any person who

17  knowingly receives any visual depiction using any means

18  or facility of interstate or foreign commerce if such

19  visual depiction involves the use of a minor engaging

20  in sexually explicit conduct shall be guilty of an

21  offense.

22         In order for the Defendant to be found guilty of

23  receiving child pornography, the Government must prove

24  each of the following elements beyond a reasonable

25  doubt:  First, that the Defendant knowingly received a

1      visual depiction by mail or in interstate commerce or

2      foreign commerce by any means; second, such visual

3      depiction involved the use of a minor engaging in

4      sexually explicit conduct; third, the Defendant knew

5      that such visual depiction was of sexually explicit

6      conduct; fourth, the Defendant knew that at least one

7      of the persons engaged in sexually explicit conduct

8      under such visual depiction was a minor.

9           Now I am going to instruct you as to the

10     specific meaning of some of the words and phrases that

11     I've been using in these instructions.  In these

12     instructions, the word "knowingly" means that an act

13     was done voluntarily and intentionally and not because

14     of mistake or accident.  You may consider evidence of

15     the Defendant's words, acts or omissions along with all

16     other evidence in deciding whether the Defendant acted

17     knowingly.

18          The offenses of receipt of child pornography

19     charged in Counts I through VI and possession of child

20     pornography charged in Count VII require that the

21     Government prove that the Defendant acted with

22     knowledge.  This means that the Government must prove

23     beyond a reasonable doubt that the Defendant was

24     conscious and aware of the nature of his actions, and

25     that the surrounding facts and circumstances as

1    specified in the elements of those offenses as I have

2    outlined them and that he did not act because of

3    ignorance, mistake or accident.

4          In deciding whether the Defendant acted with

5    knowledge, you may consider evidence about what he

6    said, what he did and what he failed to do, how he

7    acted and all the other facts and circumstances shown

8    by the evidence that may prove what was in the

9    Defendant's mind at that time.

10          It is for you, the jury, to decide whether the

11    material received and possessed by the Defendant meets

12    the definition of sexually explicit conduct.  If the

13    Defendant incorrectly believed what does and does not

14    constitute child pornography, that does not relieve him

15    of responsibility as long as the Government has proven

16    the elements that I've outlined above.

17          Now, to receive something simply means knowingly

18    to accept or to take possession of something.  The term

19    "visual depiction" includes data stored on a disk such

20    as a DVD which is capable of conversion into a visual

21    image.

22          The term "interstate and foreign commerce" is

23    the movement of property between different states or

24    between the United States and a place outside of the

25    United States.  The term "minor" means any person under

1    the age of 18 years.

2         Now, the term "sexually explicit conduct" as

3    that term is used in Counts I through VII of the

4    indictment includes any one of the five categories of

5    conduct, whether actual or simulated, including the

6    lascivious exhibition of the genitals of any person.

7         As I told you at the beginning of the case, this

8    case does not involve Categories 1 through 4, which I

9    listed for you at the beginning of the case and I don't

10   need to repeat now.  This case involves Category 5, the

11   lascivious exhibition of the genitals of any person.

12        Now, nudity alone is not enough to make an image

13   child pornography.  The law requires lascivious

14   exhibition of the genitals.  Whether an image of the

15   genitals constitutes a lascivious exhibition requires a

16   consideration of the overall content of the material.

17        In considering the overall content of the image,

18   you may but you are not required to consider the

19   following factors:  First, whether the genitals are the

20   focal point of the image; second, whether the setting

21   of the image is sexually suggestive, for example, a

22   location that is generally associated with sexual

23   activity; third, whether the child is depicted in an

24   unnatural pose or inappropriate attire, considering the

25   age of the child; fourth, whether the child is fully or

1   partially clothed or nude; fifth, whether the image

2   suggests sexual coyness or a willingness to engage in

3   sexual activity; sixth, whether the image appears

4   intended or designed to illicit a sexual response in

5   the viewer.

6       An image need not involve all of these factors

7   to constitute lascivious exhibition.  It is for you to

8   decide what weight or lack of weight to be given to any

9   of the factors that I just listed.  You may conclude

10  that they are not applicable given the facts of this

11  case and this list of factors is not intended to be

12  comprehensive, and you may consider other factors

13  specific to this case from the evidence that was

14  presented at trial and that you find to be relevant.

15      Now, Count VII regards the possession of child

16  pornography.  Title 18 of the United States Code,

17  Section 2252(a)(4)(B) makes it a federal crime for any

18  person to knowingly possess any material that contains

19  a visual depiction that has been shipped or transported

20  in interstate or foreign commerce by any means if the

21  production of such visual depiction involved the use of

22  a minor engaging in sexually explicit conduct and the

23  visual depiction is of such conduct.

24      To find the Defendant guilty of Count VII, the

25  Government must prove the following elements beyond a

1    reasonable doubt:  First, that the Defendant knowingly

2    possessed any materials that the Defendant knew

3    contained a visual depiction of a minor engaged in

4    sexually explicit conduct; second, the Defendant knew

5    the visual depiction contained in the materials showed

6    a minor engaged in sexually explicit conduct; third,

7    the Defendant knew that production of such visual

8    depiction involved use of a minor engaging in sexually

9    explicit conduct; and fourth, that the visual depiction

10   had been either, A, mailed, shipped or transported in

11   interstate commerce, or B, produced using material that

12   it had been mailed, shipped or transported in

13   interstate or foreign commerce.

14        The Government is not required to prove that

15   each of the previously stated elements has been proved

16   beyond a reasonable doubt as to each and every image or

17   video that was introduced into evidence.  The

18   Government is only required to make this showing with

19   respect to one image or video.

20        Now, I've already instructed you on the meaning

21   of a number of different terms in connection with

22   Counts I through VI, and those definitions are also

23   applicable to Count VII.  Those terms are "knowingly,"

24   "visual depiction," "interstate and foreign commerce,"

25   "a minor" and "sexually explicit conduct."  Those terms

1    have the same meaning as applied to Count VII as they

2    do to Counts I through VI as I just said.

3         I'm now going to instruct you on the meaning of

4    the term "possession."  For purposes of this case, "to

5    possess" or "possession" means to exercise authority,

6    dominion or control over something.

7         Now, although you have heard evidence that the

8    Defendant had multiple images or videos of -- just one

9    moment.

10        Counsel, come up.

11        (Sidebar conference.)

12        THE COURT:  I think I need to add the words "Of

13   the Government charges is child pornography" because

14   that sounds like I'm stating it is child pornography.

15        MR. DONNELLY:  That's fine, Judge.

16        MR. MANN:  Thank you.

17        MR. DONNELLY:  Thank you.

18        (End of sidebar conference.)

19        THE COURT:  Let me begin that last instruction

20   again.

21        Although you have heard evidence that the

22   Defendant had multiple images or videos of what the

23   Government charges is child pornography as I've defined

24   that for you in these instructions, the Government is

25   not required to prove that all of the images in

1    evidence constitute child pornography.  Rather, the

2    Government will have proved what is necessary for a

3    finding of guilty if it proves beyond a reasonable

4    doubt that the Defendant acted as charged with respect

5    to any one depiction of child pornography so long as

6    you, the jury, agree unanimously as to which depiction

7    or depictions meet the required elements.

8         Therefore, as long as you find beyond a

9    reasonable doubt that the Defendant knowingly acted

10   with respect to at least one image or video and that

11   the other elements of the offense have been proved

12   beyond a reasonable doubt, you may find the Defendant

13   guilty.

14        So now that you know what it is that the

15   Government must prove and what the standard of proof is

16   to be applied, the next question is how do you

17   determine whether the Government has proved these

18   things beyond a reasonable doubt.

19        Obviously, you must make the determination

20   solely from the evidence that is before you, and from

21   all reasonable and legitimate inferences to be drawn

22   from that evidence.  The evidence that's properly

23   before you consists of the testimony of witnesses, the

24   exhibits that I have admitted into evidence and any

25   stipulations, although I believe there have not been

1    any stipulations in this case.  So it is the testimony

2    of witnesses and the exhibits that have been admitted

3    into evidence.

4        Now, from the evidence you may draw whatever

5    conclusions are reasonable under the circumstances.

6    The evidence that is before you does not include the

7    following:  Comments and statements by attorneys,

8    answers given by witnesses which I ordered stricken and

9    ordered you to disregard, documents or other

10   photographs or other items which may have been referred

11   to but have not been admitted into evidence.  Since

12   they are not proper evidence, you should not speculate

13   or guess as to what they may say or show, and you may

14   not consider them except to the extent that and for

15   purposes that they may have been read or shown to you

16   during the course of the trial.  And finally, anything

17   you may have seen or heard outside this courtroom about

18   the events in question or the participants in this case

19   are not evidence.

20       Now, you were permitted to take notes during the

21   course of the trial; however, you should remember that

22   not everything you write down is necessarily exactly

23   what was said and that your notes are not evidence.

24   Thus, when you return to the jury room to discuss this

25   case, do not assume simply because something appears in

1   somebody's notes that it necessarily took place in

2   Court.  Instead, it is your collective recollection and

3   memory that must control as you deliberate upon a

4   verdict.

5        Now, you have heard evidence that the Defendant

6   made statements in which the Government claims that he

7   admitted certain facts.  It is for you to decide,

8   first, whether the Defendant actually made the

9   statement; and second, if so, how much weight to give

10   the statement.

11        In making those decisions, you should consider

12   all of the evidence about the statement including the

13   circumstances under which it may have been made and any

14   facts or circumstances tending to corroborate or

15   contradict the version of events described in the

16   statement.

17        As to the testimony of witnesses, your principal

18   task is to determine the credibility of the witness or

19   witnesses and the weight that you will give to the

20   testimony of each.  In making that determination, there

21   are a number of factors that you may consider.  One,

22   the opportunity or lack of opportunity for the witness

23   to acquire the knowledge of the facts about which the

24   witness testified.  In other words, was the witness in

25   a position to have accurately perceived the facts that

1   the witness related to you.

2         Second, the reliability or unreliability of the

3   witness's memory.  In other words, did the witness have

4   a clear recollection of what happened or was the

5   witness's memory cloudy or uncertain or unclear.

6         Third, the witness's appearance on the stand.

7   Did the witness appear to be a person who was telling

8   the complete and unadulterated truth, or did it appear

9   that the witness was slanting things one way or

10  another, consciously or unconsciously.

11        Fourth, the probability or improbability of the

12  witness's testimony.  Did what the witness had to say

13  sound reasonable or plausible, or did it appear to be

14  highly unlikely or implausible.

15        And fifth, whether the witness had anything to

16  gain or lose from the outcome of this case.  In other

17  words, was the witness totally impartial, or did the

18  witness have some stake in the outcome or some reason

19  to favor one side or the other.

20        Now, in evaluating the testimonial evidence,

21  remember that you are not required to believe something

22  to be a fact simply because a witness has stated it to

23  be a fact and no one has contradicted what the witness

24  said.

25        If in the light of all the evidence you believe

1     the witness is mistaken or testified falsely or that he

2     or she is proposing something that is inherently

3     impossible or unworthy of belief, then you may

4     disregard that witness's testimony even in the absence

5     of any contradictory evidence.

6          You should also bear in mind that it is not the

7     number of witnesses testifying on either side of a

8     particular issue that determines where the weight of

9     the evidence lies, rather it's the quality of the

10    witness's testimony that counts.

11         Thus, just because one witness testifies on one

12    side of an issue and another witness testifies on

13    another side does not necessarily mean that you must

14    consider the evidence to be evenly balanced.  If you

15    feel that one of the witnesses was more credible than

16    another for whatever reason, you may find that the

17    weight of the evidence lies on the side of the first

18    witness.

19         Similarly, just because there may be more

20    witnesses testifying on one side of an issue than on

21    another does not mean the weight of evidence lies in

22    the favor of the greater number of witness.  Once

23    again, it is the credibility or the quality of the

24    testimony that determines where the weight of the

25    evidence lies.

1          Now, the fact that a witness may have been

2     employed by a law enforcement agency does not by itself

3     mean that you should give that witness's testimony any

4     greater or any lesser weight simply because of that

5     fact.  You should assess the credibility and testimony

6     of such witnesses by applying the same factors as you

7     would with respect to any other witness.

8          Also, the mere fact that this case is brought in

9     the name of the United States of America does not

10    entitle the prosecution in the case to any greater

11    consideration than that accorded to the Defendant.  By

12    the same token, it does not mean that the prosecution

13    is entitled to any less consideration.  All parties,

14    whether Government or individuals, stand as equals

15    before the Bar of justice.

16         Now, in addition to assessing credibility, the

17    credibility of witnesses and the weight to be given to

18    their testimony, you should also evaluate the exhibits,

19    which you will have with you in the jury room.  You can

20    examine them and consider them carefully; however, bear

21    in mind that merely because an exhibit has been

22    admitted into evidence does not mean that you're

23    required to accept it at face value.  Like the

24    testimony of a witness, the significance of an exhibit

25    or the weight you attach to it will depends on the

1    evaluation of that exhibit in light of all the facts

2    and the circumstances of the case.

3        Now, certain videos that may have been of a

4    disturbing nature have been admitted into evidence.

5    You may feel that these are not pleasant images to look

6    at.  You should not let these images affect your

7    emotions to the prejudice of the Defendant.  Your

8    verdict must be based on a rational and fair

9    consideration of all the evidence and not on passion or

10   prejudice against the Defendant, the Government, or

11   anyone else that is connected with this case.

12       Now, as I mentioned to you earlier, you may

13   consider only the evidence that's properly before you;

14   however, that does not mean that in determining the

15   facts you are limited to the statements of the

16   witnesses or the contents of the exhibits.  In reaching

17   your conclusions, you are permitted to draw from the

18   facts that you find have been proved such reasonable

19   inferences that seem justified in light of your

20   experience, inferences or deductions or conclusions

21   that reason and common sense lead you to draw from the

22   facts that have been established by the evidence in the

23   case.  Such evidence, as you recall, is sometimes

24   called circumstantial evidence.  To put it another way,

25   the facts that may be proved either by direct -- a fact

1    may be proved by either direct evidence or

2    circumstantial evidence.  Direct evidence you'll recall

3    includes such things as the testimony of an eyewitness

4    who personally observed the fact in question or a

5    photograph or a document of the actual thing that is

6    described.  Circumstantial evidence consists of a proof

7    of a series of facts or circumstances from which the

8    existence or non-existence of another fact may be

9    reasonably inferred.  Now, the law makes no distinction

10   between the weight to be given to direct and

11   circumstantial evidence; however, it does require that

12   any fact required to convict the Defendant be proved

13   beyond a reasonable doubt.

14         Now, although the Government is required to

15   prove the Defendant guilty beyond a reasonable doubt,

16   the Government is not required to present all possible

17   evidence related to the case or to produce all possible

18   witnesses who might have some knowledge about the facts

19   of the case.  As I said to you many times, it is up to

20   you to determine what the facts of the case are.  You

21   should not interpret anything that I have said or done

22   during the course of this trial as expressing an

23   opinion on my part as to what the facts of the case

24   are.  I have not intended to express any such opinion

25   to you, and you should not be concerned about what my

1    opinions are regarding the facts of the case.  That is

2    a matter for you alone to decide.

3         Now, neither bias in favor of any person or any

4    cause or prejudice against any person or cause nor

5    sympathy of any kind should be permitted to influence

6    you during the course of your deliberations.  All that

7    any party here is expected or entitled to expect from

8    you is a verdict that is based on your fair, scrupulous

9    and conscientious examination of the evidence that is

10   before you and your application of the law as I have

11   explained it to you.

12        Now, in order to return a verdict in this case,

13   all 12 of you must agree as to what that verdict will

14   be.  You cannot return a verdict of either guilty or

15   not guilty against the Defendant unless your decision

16   is unanimous.  Therefore, there are two things that you

17   should keep in mind during the course of your

18   deliberations.  On one hand, you should listen

19   carefully as to what your fellow jurors have to say,

20   and you should be open-minded enough to change your

21   opinion if you become convinced that you were

22   incorrect.

23        On the other hand, you must recognize that each

24   of you has an individual responsibility to vote for the

25   verdict that you believe is the correct one based on

1    the evidence that has been presented and the law as I

2    have explained it.  Accordingly, you should have the

3    courage to stick to your opinion even though some or

4    all of the other jurors may disagree with you, as long

5    as you have listened to their views with an open mind.

6         Now, when you begin your deliberations, you

7    should elect one member of the body to serve as your

8    foreperson.  The foreperson will preside over your

9    deliberations and will speak for you here in court.

10   You will then discuss the case with your fellow jurors

11   and reach an agreement if you can do so.  Your verdict

12   must be unanimous.  Each of you must decide the case

13   for yourself, but you should do so only after you've

14   considered all the evidence, discussed it fully with

15   the other jurors and listened to the views of your

16   fellow jurors.  Do not be afraid to change your opinion

17   during the course of the deliberations if the

18   discussion persuades you that you should, and do not

19   come to any decision just because the other jurors

20   think it is right.

21        Now, if it becomes necessary for you to

22   communicate during your deliberations with me, you may

23   send a note through the marshal, signed by the

24   foreperson.  No member of the jury should ever attempt

25   to contact me except by a signed writing, and I will

1  communicate with any member of the jury on anything

2  concerning this case only in writing or here in open

3  court.

4       Now, if any reference that I have made or that

5  counsel has made or makes in their arguments to any

6  matters of evidence, if it does not coincide with your

7  own recollection, it is your recollection which should

8  control during your deliberations.

9       Now, occasionally jurors want to rehear

10  testimony.  I want you to understand that in a

11  relatively short trial like this that generally your

12  collective recollection should be sufficient for you to

13  be able to deliberate effectively.  However, if you

14  feel you need to rehear testimony, I'll consider your

15  request.  Just keep in mind that this is a

16  time-consuming and somewhat difficult process.  So if

17  you think you need this, consider your request

18  carefully and be as specific as possible.

19       As I mentioned earlier, I prepared a verdict

20  form for you, and you'll have that verdict form with

21  you in the jury room.  So after you've reached a

22  unanimous verdict, your foreperson will fill that form

23  out, sign it and date it, and then advise the Court

24  through the marshal that you are ready to return to the

25  courtroom.

1          And finally, as I told you, I have prepared a

2     copy of these instructions, which I'll be giving to

3     you, to assist in your deliberation.

4          So that ladies and gentlemen, completes my

5     instructions to you on the law.  Mr. Donnelly will now

6     give you closing argument on behalf of the Government

7     followed by Mr. Mann's closing argument and then

8     Mr. Donnelly has the last word with rebuttal argument,

9     if he wishes, because the burden of proof, as you know,

10    rests with the Government.

11         So Mr. Donnelly, are you ready?

12         MR. DONNELLY:  Yes, I am, your Honor.

13    Thank you very much.

14         MR. MANN:  Your Honor, are you going to hear us

15    later on issues?

16         THE COURT:  Yes.

17         MR. MANN:  Thank you.

18         MR. DONNELLY:  May it please the Court,

19    Mr. Mann, ladies and gentlemen of the jury, good

20    afternoon.

21         We're not here today because the Defendant

22    possessed and received pictures of boys skinny-dipping

23    on a beach.  We're not here today because of mere

24    nudity.  We're definitely not here because the

25    Defendant is a nudist.  We're here today because, as

1    Judge Smith just explained to you, it's against the law

2    to receive and to possess child pornography.  And as

3    Judge Smith just explained, we're here because it

4    violates those laws just the same way as if you had

5    pictures of sexual intercourse and other forms of

6    sexual activity.  It's against the law to receive and

7    possess images that depict the lascivious exhibition of

8    the genitals.

9         So we're here today because from October of

10   2010, until April of 2011, on more than 20 occasions,

11   how ever you count it, this Defendant accessed the

12   Internet on countless occasions, and on those 20-plus

13   occasions went to the Azov Films website and made up

14   his mind knowing exactly what he was doing to purchase

15   these images of these naked boys, these lascivious

16   pictures of these young boys.

17        We know that once he got them, he watched them.

18   And after watching them, they remained in his

19   possession up until the day he ran into Inspector

20   Michael Connelly.  That's the date of the execution of

21   the search warrant, September 27, 2012.

22        So that led to the indictment you have before

23   you in this case.  So first, I'd like to thank you.  At

24   the beginning during my opening statement I asked you

25   all if you could just pay close attention to the

1    evidence.  It hasn't been easy for you at times.  We

2    recognize that.  But you did pay close attention.  It's

3    going to help you immeasurably in your deliberations.

4    This isn't a complex case, and I don't think I need to

5    use a lot of your time this afternoon, but if you'll

6    bear with me I'd like to take just a few moments to

7    give you the Government's understanding of the evidence

8    in this case.

9         Use your common sense.  You don't have to leave

10   it at the courthouse door.  The Judge told you about

11   the burden of proof in this case.  In a free country it

12   should be on the Government.  It is.  We gladly accept

13   it.  But remember what he said, also, that we're a

14   country and a Government of humans and, therefore, we

15   can't know anything beyond all doubt.  And so the

16   burden of proof, yes, is on the Government to prove the

17   elements of the offenses beyond a reasonable doubt but

18   not beyond all doubt.

19        As the Judge instructed you, consider each

20   count.  You will have for your assistance -- I think we

21   have it hidden back here, but you'll get Government's

22   Exhibit 32, the big summary chart, you'll have that to

23   help you.  The Judge is going to give you a verdict

24   form where the videos that are charged for each count

25   are specified for you.

1          You will also see in the indictment that dates

2     are charged, and it will say in or about or on or

3     about.  You're going to see a table in the indictment

4     for Counts I through VI that tell you what video was

5     charged in this case as well as the approximate date

6     received.  The reason in the law is that dates don't

7     have to be exact.  You can understand in this case we

8     know when the orders were placed with Azov Films.  We

9     know they were put into the United States after being

10    shipped from Canada in international commerce.  They

11    were placed into the United States mails but the exact

12    date when the Defendant received any of these is

13    something that we can't know today.

14         The Judge told you that the Government must

15    prove that the Defendant committed these offenses

16    knowingly.  Part of the consideration of that element,

17    the knowledge element, is that the Defendant did not

18    act by accident or mistake.

19         The Defendant here, folks, as you know, is not

20    being charged with the possession of one video he

21    happened to order.  He's not being charged with any of

22    the unopened videos.  You heard some testimony from

23    Inspector Connelly and even the Defendant today that

24    around 13 of the videos he ordered were not opened.

25    None of those are before you as specific videos under

1    the charges.

2          But you have to ask yourself now that you know

3    what's in these videos that once you get that first

4    one, don't you stop?  Once you get the second one,

5    don't you say, "Oh, they're all the same"?  But no, he

6    went on a third, a fourth, a fifth, a sixth time.

7    Knowledge.  Knowingly.

8          Look through Exhibit 28.  That's the catalog

9    with the descriptions of each film.  You know, they

10   don't come right out and say about some of the lewd

11   scenes we all saw in this case.  They hint at it.  They

12   tell you how sweet the boys are.  And you ask yourself,

13   as I asked you to ask during the opening statement,

14   lascivious or lawful?

15         You'll remember there was testimony today when

16   you are considering whether there was knowledge in this

17   case, this is the invoice from December 2nd of 2010,

18   remember "Vladik Remembered, Volume 1"?  I think we

19   looked at some clips from that particular exhibit.  If

20   you buy that on December 2nd, you remember some of the

21   scenes that were in there, why do you go ahead and buy,

22   this is the long list of New Year's Day purchases the

23   Defendant made that also included "Vladik Remembered,

24   Volume 2."  If you don't know that these videos contain

25   child pornography, why do you go back to the well

1     again, and again, and again.  It's because he knew, he

2     liked it for whatever reason, and wanted it.  That's

3     why we're here today.

4           One of the elements in this case will be that

5     the materials were put in the U.S. mails.  So that's

6     why it seemed meaningless at the time but we put in the

7     envelopes for you.  We have to prove beyond a

8     reasonable doubt that these items either came to the

9     Defendant in interstate or foreign commerce, which I

10    think we did as well; that they went from Canada, you

11    recall, to upstate New York outside of Buffalo and then

12    were put in the U.S. mails to the Defendant's house.

13          Now, the Judge instructed you on the idea of

14    sexually explicit conduct.  He explained to you the

15    word, how you use -- some factors you can use to

16    consider the word "lascivious."  It's a common sense

17    word, I'd suggest to you.  Not a common word.  Not one

18    that we all use in everyday speech perhaps, but just

19    what you think it means is what it means, is are these

20    pictures for lewd and lustful purposes.  I ask you,

21    what other purposes is there for all these things that

22    he possessed?

23          As you consider that, though, it's not the

24    intent of the subjects that you should be considering

25    but the intent of those who designed these images.  You

1    might see the boys having fun, smiling.  They might not

2    know what's going on around them.  They might not know

3    why these things were being produced.  But what about

4    the people who designed these images?  That's one of

5    the factors the Judge gave you.  Are these images

6    designed for a lascivious purpose?

7         I told you at the beginning of this case that

8    you would -- through the Defendant's actions, you would

9    get a glimpse into the international market in child

10   pornography, how the Azov Films website was serving

11   tens of thousands of customers throughout the world.

12   And we were privileged in this case to hear from some

13   highly-skilled law enforcement professionals from both

14   sides of the border.  You'll recall Toronto Police

15   Service Detective Paul Krawczyk, who told you that

16   after doing some preliminary investigation he obtained

17   a search warrant for the Azov Films business premises,

18   going there on September 1st of 2011.  You should have

19   a picture of the Azov Films building up on your screens

20   right now.  You recall that they went around back and

21   executed the search warrant through that garage door.

22        What did they find there?  They found an entire

23   production studio for these videos.  You heard

24   testimony how they received raw footage from the

25   Eastern European countries where these boys were being

1    filmed and how a production studio was set up inside.

2    Remember there was some testimony about even

3    sound-proofing material was put on the walls, and how

4    after that raw footage was converted into digital

5    films, those digital films were served on the large

6    servers at Azov Films.

7           You also heard that once those digital copies of

8    the films were on the large servers, large computers,

9    how they had sort of industry grade DVD burners on

10   scene where they could pump out DVD after DVD, which

11   was then put in some slick packaging with artwork on

12   the boxes and textural material describing what's on

13   the boxes and, of course, you get a good overview of

14   the scope of the operation if the testimony did not

15   establish that for you.  And you'll remember, lastly,

16   that the bright, young computer investigator from the

17   Toronto Police Service, Matthew Ross, how he testified

18   about how he and his computer team were in charge of

19   trying to figure out to map out where the computers

20   were.  I hope you were impressed with how careful they

21   were with the evidence and how you can be assured that

22   when they made that exact bit-for-bit digital image of

23   the Azov Films server and they passed that on to

24   American investigators that you can rely on the

25   evidence you have in this case.  Certainly the

1    Defendant is not disputing it.

2         But you'll recall from Matthew Ross's testimony

3    how he'd said "I unplugged the Azov Films server from

4    the wall, from the Internet on May 1st of 2011, at

5    approximately 9:00 p.m."

6         And you heard from Mr. Ross, as well as from

7    Mr. Psyllos, the American postal computer analyst,

8    state that when once a website is disconnected from the

9    Internet and you try to go to it you can try and type

10   it in, they'll be a record of you trying to do that, as

11   Mr. Psyllos found on the Defendant's computer, you'll

12   find a record of it but once you tried to go on the

13   website that you're just going to get an error message.

14   Who cares about that?  Well, we care about it because

15   seeing those error messages, and even the Defendant

16   referred to it today, you know something's wrong.

17   Might be something innocent.  We've all probably tried

18   to go to websites and we get these error messages that

19   something is down.  But that something's wrong, I

20   submit to you, ladies and gentlemen, you can consider

21   whether it went into the Defendant's mind and whether

22   he started thinking, wait a minute, I go to this site

23   all the time and I went a few days ago.  It's down.  I

24   went again.  It's down.  What's happening here?  What

25   should I do about it?  I've made all these purchases.

1      Well, I'd submit to you that fear sets in and

2    might have set in on the Defendant.  The reason why I

3    submit that to you is that we know that -- we know it

4    from the e-mail to Ken Bell the Defendant sent where he

5    says, Oh, the website is down.  It's gone.  We know

6    that at the latest he knew about this on June 3rd.  But

7    even in the Defendant's testimony he couldn't pinpoint

8    a date, but he seemed to say it was some time earlier

9    than that.  And I'd submit to you, ladies and

10   gentlemen, that he knew the website was down.  He knew

11   there was a problem.  He surmised that law enforcement

12   might have caused the taking down of this website.  I

13   submit to you that's the state of the evidence and that

14   explains his weird e-mails to Ken Bell where he talks

15   about what an awful website Azov Films is and how

16   they're -- they depict themselves as naturists, a

17   naturist website, but whoa, all the videos they're

18   selling are naked boys.  Like that's an awful thing.

19        He tried to explain it away today, his language

20   in those e-mails.  He tried to explain it away today by

21   saying that, Well, what I meant from this is bah, bah,

22   bah, bah, bah, bah, bah.  Does that explanation make

23   sense to you?  He was trying to get one over on Ken

24   Bell, to tell him and so there would be a record of him

25   telling Ken Bell that this is a bad website that

1  exploits young boys and that is grooming them for

2  future adult pornographic films.

3      He might have been right about that, but he was

4  not truthful with you, I would submit, when he tried to

5  testify today that that was not the message he was

6  sending to Ken Bell.  The e-mail speaks for itself.

7  Look what he has to say.

8      Now, after the shutdown of the Azov Films

9  website, as I mentioned, Toronto Police Service passed

10  on the evidence relating to particularly the American

11  customers to Inspector Brian Bone.  You heard from

12  Inspector Bone who told you that he then had to cull

13  through the evidence.  There were ten thousand plus

14  American customers of Azov Films, and he found the

15  invoices that you have as evidence in this case of the

16  Defendant's purchases and he passed them on to

17  Inspector Connelly.  Inspector Connelly told you, that

18  intern, he got the evidence, did some further

19  investigation and obtained a search warrant for the

20  Defendant's home at 34 Morris Street in Coventry.

21      We know the Defendant lives there alone and,

22  well, I guess these pictures speak for themselves as

23  far as the organization of the belongings in the house.

24  But we know that most of the evidence in this case came

25  from the Defendant's video room.  I'd submit to you you

1    look at the easy chair there with the TV, this

2    Defendant -- you had to suffer through these movies at

3    quadruple and double and quadruple speed when Mr. Mann

4    played them all for you.  I'd submit to you he tried to

5    say he was watching them at fast speed.  Use your

6    common sense.  He was sitting in that chair enjoying

7    these films and not at quadruple speed.

8         Azov Films were found during the execution of

9    the search warrant throughout the Defendant's house.

10   We know he had a DVD player, a TV to watch them on.

11   And Inspector Connelly told you about finding the room

12   in this condition and searching through the stuff in

13   there to find the Azov Films that were scattered

14   throughout the room.  Hardly, by the way, the organized

15   research project that the Defendant tried to sell you.

16        The computer the Defendant used to buy these

17   videos was found in the house and -- found in this

18   room, excuse me, the Toshiba laptop that you heard

19   about from Mr. Psyllos.

20        You know, a word on that.  The Defendant told

21   you today about how he doesn't know much about

22   computers and he's not really good with them.  You

23   know, you'll have to decide what value this topic and

24   his testimony has for you, but ask yourself this.  Is

25   this a guy who doesn't know how to use a computer?

1    He's accessing somebody else's wi-fi, one of his

2    neighbors, perhaps.  He goes down to Starbucks, he goes

3    to Panera Bread or Tim Hortons, or whatever it is, and

4    accesses the Internet that way.  Why?  Because he's

5    ignorant?  No.  Because he knows he can get it off

6    somebody else for free, and he doesn't want to pay for

7    it.  I'd submit to you he also knows that that would

8    stop the trail, an investigative trail back to his

9    computer.

10           We already talked about the mailings.  Several

11    of those were found in the house.

12           A word on the child pornography.  The Court

13    instructed you about this word "lascivious."  And

14    sorry, folks, but I have to just quickly show you a

15    couple of the images that we had in the evidence in

16    this case.  But the Judge gave you six factors to

17    consider in this case in determining whether that word

18    "lascivious" has been proven, whether these images are

19    or if they're merely nude pictures.  Obviously, this

20    isn't the baby in the bathtub type picture.

21           First factor, are the genitals the focal point?

22    Now, maybe on one or two occasions you might have seen

23    scenes where the cameraman focused in on the crotch

24    area of one of these young boys.  There wasn't a lot of

25    zooming in.  But what you do see, these images I would

1    submit to you, were just obsessed with these boys'

2    genitals, to make sure that they were always visible

3    and that the boys did things to make them more visible

4    to the leering men who watched these videos.

5         You remember in the first video we showed you,

6    it's called "FKK Waterlogged."  Remember the boys

7    sitting, doing sit-ups on the bed, their genitals right

8    across the middle of the picture.  Prior to that, one

9    of the boys still had his underwear on.  There was an

10   unmistakable erection in the picture.  These images

11   were just obsessed with the genitals of the boys.

12   Maybe a more helpful factor, the settings.  Where did

13   these pictures take place?  Were they at the volleyball

14   court at the nudist resort with moms and dads around?

15   Of course not.  They were always inside; or if outdoors

16   at private places outside, a beach perhaps, where

17   nobody else is around.  There's no adults, there's no

18   moms, there's no dads, there's no family setting.  The

19   settings are beds, are mattresses.

20        In one of the last things you saw, you saw the

21   boy at high speed, Mr. Mann played it, a boy in the

22   blow-up pool putting oil all over his body and spinning

23   around.  Why?  For somebody else's pleasure.

24        You saw, as far as other settings, saunas,

25   showers, pools settings.  Consider it.

1    Unnatural poses.  You remember the child in the

2    chair, the naked boys in this Lotus position when you

3    ask yourself about the positions these kids were put

4    in.  That was from "Vladik Remembered, Volume 1."  It's

5    Exhibit 2.  We showed you the clip.  You saw it again

6    when Mr. Mann played it.  The boy sitting in the chair

7    and then he gets upside down, does like a headstand and

8    then he puts his feet together.  And the camera then

9    really did zoom in on his genitals and anal area.

10   Lawful or lascivious?

11   Remember the wrestling scenes you saw in several

12   of the videos.  Why is it that the boys' legs always

13   seemed to get wrapped around the other kid's head,

14   crotches near faces.  And I'm sorry I have to argue

15   this way, folks.

16   You know, on two occasions you heard evidence

17   that along with the videos the Defendant bought DVD

18   photo bonus disks.  I asked him today why did you buy

19   those.  "Oh, they were on sale."  Come on.  I'd submit

20   to you a good place to start in your deliberations

21   might be those exhibits because go to them and ask

22   yourself is this just mere nudism?  Just to run through

23   a few of them, folks, I apologize, but I think it's

24   necessary.  Lawful or lascivious?

25   Why do you need those still images?  Why do you

1    even order them?

2         One of the other factors, are the children fully

3    clothed or nude and is it a natural thing considering

4    the age of the child.  Is this the way that 12, 13,

5    14-year-olds behave?  Mr. Silva would have you believe

6    that in his PowerPoint, the natural state of the child.

7    Do you believe that?  Really?  Is it a natural state

8    for two or three boys to hop in a shower?  Obviously,

9    it's natural for a naked person to hop in a shower but

10   then two or three 12- or 13-year-old boys, is that what

11   they do naturally?  And then do they take down a bottle

12   of shampoo, put some in their hands, or soap, and rub

13   it all over the boy in the shower with them?  Natural

14   pose?  I don't think so.

15        You'll remember the scene, one of the first

16   scenes we showed you from Exhibit 1, "FKK Waterlogged,"

17   where the older boy takes oil and puts it on the back

18   of the younger boy and rubs him up and down his back

19   right down to the top of his buttocks.  Lawful or

20   lascivious?  There's just no explanation for it, no

21   lawful explanation for it.

22        Designed, sadly, for men who like this kind of

23   thing.  That might be something that's new to you in

24   this case, but I'd submit to you the evidence shows

25   that, sadly, it's a real thing.  There are people like

1    the Defendant out there who like this stuff, who want

2    it and will spend a lot of money on it.  This isn't

3    nudism.  We all sat through the indoctrination on

4    naturism and nudism.  That was on the slides.  But as

5    I've said, there's no families here.  It's just kids

6    being, in the words of the Defendant, exploited,

7    groomed.

8          Now, the Defendant testified.  It's going to be

9    up to you decide what to do with his testimony.  You

10   can consider it against the prior statements and

11   behavior he's engaged in.  I would submit to you that

12   his testimony like his statements to Inspector

13   Connelly, like his e-mails to Ken Bell, the PowerPoint

14   he came up with, it's all designed to cover his tracks,

15   all designed to be a smoke cloud to come up with some

16   explanation as to why he took his money and spent it on

17   these things time and again.

18         And as you consider his testimony, consider who

19   he is.  This isn't an uneducated person.  He's smart.

20   He's educated in the system.  He works with

21   prosecutors, police officers like Ken Bell all the

22   time.  He works with child protection people.  So this

23   is a person who knows the system.

24         We know that for most of his career right from

25   getting out of high school he's wanted to be around

1    young boys.

2         And so as you consider his testimony, consider

3    his demeanor, how he appeared on the witness stand as

4    the Judge's instruction suggested.  And ask yourself

5    did it make sense to you.  Did it make sense, his claim

6    that these are all legal and these are just boys being

7    boys.

8         And you have to ask yourself, maybe a good

9    starting point, is his credibility about his

10   presentation.  We know that his PowerPoint wasn't

11   created until after he knew, and we know he knew on

12   June 3rd from that e-mail to Ken Bell and we know that

13   the earliest date he started working on this, the

14   PowerPoint to end all PowerPoints, the presentation to

15   end all presentations, the big one, even though he had

16   never done a presentation before, he didn't start

17   working on it until July 9th of 2011.

18        He was worried, folks.  And you'll have all

19   those slides to go through.  Go through them.  Ask

20   yourself if they make sense.  Ask yourself if those are

21   the work of a person who has had all these years of

22   experience working with sexual offenders.  You'll find

23   some statements that are perfectly truthful and common

24   sense from this area.  There's nothing scholarly about

25   it.  And half of them are just weird, like the natural

1        state of the child is nude.

2            You notice that he couldn't tell us at all how

3        the dozens of Azov films that he purchased, opened and

4        watched, how any of them advanced the ball on the

5        preparation of his presentation.  So consider that when

6        you evaluate the Defendant's credibility.

7            He tells you that -- excuse me.  One other

8        factor Judge Smith said you could consider is the

9        Defendant's interests or any witness's interests,

10       whether it's Inspector Connelly, the Defendant or

11       anybody, you consider whether they have something to

12       lose or gain in this case.  You consider that as you

13       evaluate the Defendant's testimony as well.  But ask

14       yourself if he's doing research, and Inspector Connelly

15       testified -- my recollection is that Inspector Connelly

16       testified that the Defendant told him that he was

17       preparing -- he got the wrong idea, Inspector Connelly,

18       "I'm preparing a presentation for work."  If that was

19       true, why is he spending $1,589 of his own personal

20       money, why is he using his own private g-mail address

21       instead of going through the normal processes of his

22       employer.

23           Well, got to come up with an explanation for

24       that, and he gave you his explanation this morning

25       during his testimony.  Well, folks, I'd submit to you

1   that the Defendant wasn't doing research.  He was just

2   pursuing his own sexual gratification.  Why didn't he

3   tell Ken Bell?  He tells Ken Bell all these things

4   about how awful this website is.  They're putting on

5   airs of legitimacy.  They're grooming young men to

6   enter into the world of adult porn.  He tells Ken Bell

7   all this stuff and never tells his good friend that he

8   purchased dozens of these videos?  Never tells him that

9   he spent 1500 bucks on this website?  See, he didn't

10  tell Ken Bell the truth, and I'd submit to you he

11  didn't tell you the truth today.  He's covering his

12  tracks.

13       So as you consider this case, I'd submit to you

14  he's covering his tracks and it shows something to you.

15  It's called a consciousness of guilt.

16       This case isn't complicated, folks.  The

17  Defendant was collecting child pornography, the kind he

18  obviously liked.  When he got caught, came up -- when

19  Azov got caught and when he got caught, he came up with

20  false explanations.  This shows that consciousness of

21  guilt.  And I'd submit to you that that's the one thing

22  you should agree with him about, his guilt.

23       So I thank you for your attention, and I'd ask

24  you to find this Defendant guilty of all the counts of

25  the indictment.  Thank you.

1           THE COURT:  Thank you, Mr. Donnelly.

2           Mr. Mann.

3           MR. MANN:  Your Honor, ladies and gentlemen,

4      Mr. Donnelly and Mr. Silva, Mr. Connelly, this is my

5      opportunity to make a presentation to you on behalf of

6      Mr. Silva.  Like Mr. Donnelly, I want to thank you for

7      sitting through this trial.  All of us who do trials

8      are appreciative of what jurors go through and we're

9      grateful to you for participating in the system.

10           In a moment, I'll get into the evidence and all

11      that, but make no mistake about it, there's an

12      overarching issue in this case.  Are these images

13      lascivious or not?  I think you were told at the

14      beginning of the trial by the Court that that was going

15      to be the issue.  It is the issue.  There are some side

16      issues that I'll get into.  Mr. Donnelly got into them,

17      but the issue is are these images lascivious.  And I

18      guess I part company with the Government right at the

19      beginning.  Not only am I going to argue that they're

20      not lascivious, but I'm going to ask you to look at

21      these images not necessarily from your own perspective

22      but from the perspective of someone who is a nudist

23      because that is one of the issues in this case.

24           Many of you may have found these images

25      unacceptable, distasteful, inappropriate.  Many of you

1    may have even found them repulsive, but that's not the

2    question before you.  The question before you is:  Are

3    they lascivious?  Mr. Silva is a nudist.  He told you

4    he was.  There's no real dispute he's a nudist.

5    Mr. Donnelly doesn't say he made that up.  That wasn't

6    an excuse that he made up to cover his tracks.  He

7    clearly was a nudist.  And I would suggest to you that

8    these films are nudist films.  They may be at some

9    level in-your-face nudist films.  Most of us when we

10   have something thrown in our face don't like it.  Even

11   if we agree with it, we don't like it.  If we disagree

12   with it, we like it even less I would suggest to you.

13          You have to get over all that, I would argue to

14   you, and ultimately look at these films and say to

15   yourself at some level are they lascivious.  And we'll

16   go through the guidance the Court gave you as to what

17   constitutes lascivious and what it isn't but more what

18   it is.  And also the fact that the Court said you can

19   consider other factors, and I'm going to suggest to you

20   some other factors.  And also that you need to consider

21   these materials in context.

22          Before I get there, though, I want to touch

23   base, first, with a fundamental point that animates

24   this case.  It's a criminal case, and it's different

25   than other types of decision-making that most of you

1    have probably gone through in your life. Most of the

2    situations where you had to make a decision, you get a

3    body of information and you decide what's more likely

4    than not. Your kid comes home late. You ask your kid,

5    "Where have you been?" The kid gives you an excuse or

6    an explanation. You decide is it likely true or

7    likely not true. And that's the way we make decisions

8    day in and day out in life.

9         This is a criminal case where you make a

10   decision in a different way. You make a decision based

11   on whether the Government has proven its case beyond a

12   reasonable doubt. I hope that at the end of this case

13   you will be persuaded -- I hope that you'll be

14   persuaded that these films were not lascivious, that

15   they were not lascivious, that they were nudist films.

16   And I hope that when we go through the factors you'll

17   come to that conclusion, but it is not Mr. Silva's

18   burden to convince you that these films are not

19   lascivious. It's the Government's burden to prove to

20   you beyond a reasonable doubt that they are lascivious.

21   It's not his burden to prove to you that they're not.

22   It's the Government's burden to prove that they are.

23        So if you're in a position of equipoise, so to

24   speak, and if -- if there's a robust debate about

25   whether they're lascivious or not lascivious, then I

1    would submit to you the Government has failed in its

2    burden of proof.  I'm hopeful that when we get done

3    with this you'll be persuaded that these are nudist

4    films, not lascivious films, but I want to emphasize

5    that it's not Mr. Silva's burden.

6          What I now want to do is go through some of the

7    witnesses in the case to see what they contribute to

8    the assessment of this case, but let's be frank, we can

9    go through all the witnesses but at the end of the day

10   the first step in this analysis is going to be the

11   DVDs.  You're going to have to think about what's on

12   those DVDs, what's on those tapes.

13         The first witness the Government presented was

14   Sergeant Krawczyk.  He told you that there was an

15   arrest in Toronto.  He told us that Azov had lots and

16   lots of customers but, miraculously, he didn't know;

17   and Mr. Ross, the computer constable from Toronto

18   didn't know; and Mr. Bone, the U.S. expert didn't know

19   how many visitors there were to the website at all.  We

20   know there were lots.  We know there were lots because

21   we know there were over 10,000 customers.

22         I think Mr. Krawczyk told us also that they had

23   been selling in 90 countries.  He said that they'd been

24   in existence for five or six years and they operated as

25   any other website, like an Amazon.

1          Well, then at some point either with him or

2     Mr. Ross there was the discussion about, well, they're

3     not quite like every other website because they block

4     certain people from gaining access like law enforcement

5     agencies.  But the person who said that also

6     acknowledged that there's no way a normal visitor to

7     the website would ever know that.

8          This was, from all appearances, an above-board

9     legitimate website that operated, as Sergeant Krawczyk

10    said, like Amazon.  It wasn't one of these things where

11    you used a fake name.  It wasn't a peer-to-peer network

12    sharing like Napster or Livewire or one of those

13    things.  This was a website that was operating from all

14    appearances just like any other public website.  You

15    used a credit card, and I think they said it functioned

16    like Amazon.

17         Mr. Ross, the computer constable from Toronto,

18    really didn't tell us much more than what we've already

19    talked about with respect to what's relevant to this

20    case although there were pretty pictures of all the

21    computers and the servers and the burners that they had

22    in Toronto.  And that proves that it was a big deal in

23    Toronto, but in a lot of ways what that does is it goes

24    again to prove that this, from all appearances, was a

25    legitimate operation.

1          Mr. Bone, the postal inspector who was in charge

2     of this case in the United States, told us there were

3     over 10,000 U.S. customers.  He didn't know what "FKK"

4     meant.  And he verified and he told us basically when

5     he looked at the invoices, I think he was the first one

6     who looked at these invoices, that Mr. Silva had used

7     his own name and all that sort of stuff.  By the way,

8     the reason we asked about FKK, if you look at the

9     history of nudism that's on many of these videos, I

10    don't think it's on all of them, it's on many of these

11    videos, you'll see that in one of those videos they

12    describe that "FKK" stands for a German word that is

13    related to nudism in German, and they have a definition

14    of it there.

15          What Mr. Bone begins to do is he says, Look, you

16    know, we had these invoices and they identified Gerald

17    Silva.  How?  Because he used his name and he used his

18    address.  That's how.

19          One of the sort of tensions in this case is that

20    the Government says, Oh, Mr. Silva made up this whole

21    thing about the PowerPoint, did all this stuff to cover

22    his tracks.  In one of the arguments I wants to make to

23    you throughout this case is Mr. Silva did everything

24    completely above-board.  He used his name.  He used his

25    address.  He used his regular e-mail.  He could not

1    have been more above-board about what he was doing.

2    And if he ever thought for a single second that what he

3    was doing was getting child porn, I submit to you, he

4    wouldn't have gone about doing it this way, by going on

5    a public website where he had to know there would be a

6    record of what he did, where he used his own name, his

7    own address, his own e-mail, his own telephone number.

8         I thought Mr. Donnelly hinted at the fact that

9    he was using wi-fi because it wouldn't give his

10   Internet address.  I would suggest to you it doesn't

11   matter whether you give your Internet address or not.

12   What he gave was all the identifying information about

13   himself from start to finish.  This was a man who has

14   been in the field, depending upon how you count it, 30

15   or 40 years depending on whether you count the Boy

16   Scout time or not.  Not quite that, but at the time of

17   the arrest maybe 28 to 38 years.

18        He's in the field and the Government wants you

19   to believe that he knowingly picks up child pornography

20   not once, not twice, but makes 22 orders using his own

21   name.  I would submit to you that that is inherently

22   absurd that he would do it so much out in the open,

23   particularly somebody who has been in law enforcement

24   by that point for seven or eight years.

25        What else does Mr. Bone tell us?  Mr. Bone in a

1    lot of ways confirms -- many of the Government

2    witnesses in a lot of ways confirm Mr. Silva's point of

3    view because they confirm that he's telling the truth.

4    They confirm that he used his own name.  They confirmed

5    that he used his own identity.  That's what they do.

6    They don't prove anything to the contrary at all.

7         Mr. Psyllos was the local computer person.  He

8    told us that Mr. Silva had access to the Azov site or

9    tried to access the Azov site for a couple of years,

10   but he didn't know how often.  He told us about the

11   PowerPoint document.  He told us that it had been

12   created on four different dates, and he explained the

13   creation date was just the date on which it first

14   appears in that directory.  But pretty much Mr. Silva

15   confirmed for you in his testimony today that, yes, it

16   probably was the summer of 2010, I think it was, when

17   he first created that and that was because that's when

18   he got the PowerPoint.

19        Now, the next witness I think was Mr. Connelly.

20   I'll come back to him a second.

21        They then called Christine Imbriglio, the

22   Department of Corrections employee.  And I guess she

23   was called to prove that it was a rouse that Mr. Silva

24   was creating this PowerPoint, that it was all

25   make-believe because he never got permission from the

1    Department of Corrections.  But I would say to you,

2    you'll have the Department of Corrections policies

3    there, but more important you'll have her testimony.

4    And the thrust of her testimony was, I think, and it's

5    my recollection, you'll have to sort of assess it on

6    your own, two things.  One was that if it didn't deal

7    with the Department of Corrections, you didn't need

8    permission; and two, if you're going to make a

9    presentation, you have to give them ten days notice.

10   So we were nowhere in a position where even if

11   Mr. Silva was going to do it as a DOC employee that he

12   had to give them notice.

13        Then the Government called Ken Bell.  You know,

14   look, both sides cull out of the evidence what we can.

15   And the Government takes a look at the Ken Bell e-mails

16   and says, Look at this long e-mail, look at the doubts

17   Mr. Silva expressed about the Azov website.  He did

18   express doubts.  He was concerned about what was

19   happening.  He explained to you why he was concerned

20   about what was happening.  Even Ken Bell didn't know by

21   May 11th or 12th when he got those e-mails, and maybe

22   even by later in June when he got the final e-mail,

23   that the Azov website had been shut down.

24        But what the Government doesn't focus on is

25   there's an e-mail back from Ken Bell after the first

1    e-mail where Mr. Silva says, "Give me your address; I

2    wants to make sure I'm sending this to the right

3    person," where Mr. Bell says to Mr. Silva, "You guys

4    could probably teach the course," because there's also

5    a little colloquy in there about going to a seminar.

6    And what does that tell you?  It tells you a couple of

7    things.  It gives you an insight as to how Ken Bell

8    views Mr. Silva.  It gives you an idea that he has a

9    positive view of him.  It gives you an idea that

10   Mr. Bell sees Mr. Silva is experienced in this field,

11   knows what he's talking about, and it completely

12   buttresses the whole point I would like to make to you

13   that it's absurd to think Mr. Silva would go ahead and

14   buy child porn in his own name, make 22 purchases

15   knowing all that he knows.  It just doesn't make any

16   sense, I would submit to you.

17         And the notion that he then creates this whole

18   artificial world to explain this away is even more

19   fantastical, I would suggest to you.

20         The Government's view appears to be that the

21   e-mails to Ken Bell and the PowerPoint were all a rouse

22   to create an explanation for his possession of the Azov

23   tapes.  First of all, none of that explains why when he

24   does all this he uses his own name.

25         The Government says, Oh, he didn't tell Mr. Bell

1    about his purchasing the Azov tapes.  Why would he

2    contact Mr. Bell at all if he thought -- and bring his

3    name into the picture if he thought he was doing

4    something wrong with the Azov tapes?

5          There's another point I would just make, and

6    I'll sort of try and anticipate the Government's

7    response.  The Government says, well, by this point, by

8    the time he sends the e-mail to Ken Bell, he knows that

9    Azov's been arrested, that they've executed the warrant

10   and that he knows he's on notice then and he's just

11   trying to cover his tracks.  The Government's point

12   also is that while he's trying to cover his tracks, he

13   keeps all this Azov material and he keeps it probably

14   for I think about a year-and-a-half or so under the

15   Government's theory after he supposedly knows it's

16   child porn.

17         Now, the Government is going to come back and

18   say, well, he knew that he couldn't erase the computer

19   records, the fact that he ordered these things.  No, he

20   couldn't.  That's absolutely true, but that goes back

21   to the first question, why would he ever, why would

22   Gerald Silva, a probation officer in the sex offender

23   unit, ever order something that he thought was child

24   pornography using his own name, sending it to his own

25   address.  It just makes no sense at all.

1          And you know that he knows a fair amount about

2     this not just because he's given you some insight into

3     who he is by his own testimony, but because Ken Bell in

4     the e-mail back -- this is where we're talking about

5     which parts of these e-mails do we emphasize -- Ken

6     Bell says, "You and Heidi could probably teach the

7     course," Heidi being his work partner.

8          I want to talk a little bit about Mr. Connelly's

9     testimony.  Mr. Connelly talked about what happened

10    when he went to the house and he effectuated the arrest

11    and all, but let's talk about some of the other things

12    he also talked about.

13          First, there's no dispute really about the vast

14    majority of what happened when they got to the house.

15    Mr. Connelly says Mr. Silva gave him a bunch of

16    information.  Mr. Silva says I gave Mr. Connelly a

17    bunch of the information.  Not only did I give him the

18    information about buying from Azov, I gave him access

19    to my account.  I signed the form that they could have

20    access to my e-mail account.  I told them about the

21    presentation.  I told him about the Ken Bell letters.

22          Everybody seems to agree on both sides that

23    Mr. Silva was totally candid with Mr. Connelly about

24    all this stuff.  There are some differences in

25    recollection, apparently, about what happened at these

1    meetings, but I would submit to you at the end of the

2    day they basically say, we came there, we asked him

3    questions, he answered our questions and he told us

4    everything he had done, including the fact that he was

5    a nudist, too.

6         What else does Mr. Connelly tell us?  He talks

7    about the difference between child pornography and

8    erotica, and he said both dealt with sex and all that

9    but that child erotica was a little bit different.  He

10   talked about whether there was a plot or a story line

11   and these things.  He talked about how the pictures

12   were formed, things like that.

13        Then he said to us -- and let me back up for a

14   second.  The Government has to prove to you that these

15   films constitute a lascivious exhibition of the

16   genitals.  It's not enough for them to prove to you

17   that, at least if you accept Mr. Connelly's definition,

18   that they were child erotica.  It's not enough to prove

19   that they were offensive.  It's not enough to prove

20   that they were disturbing to you.  It's that they were

21   whatever the term "lascivious" means, and you've got

22   these guideposts that we're going to come to in a few

23   minutes.

24        Mr. Connelly said there was no plot in the Azov

25   films, but there was a story line in a lot of the Azov

1    films.  There were story lines about following the

2    actors.  They're not different than I would submit than

3    travel logs or anything else, except that people were

4    nude here.

5          What's different about these pictures is that

6    the boys were nude.  And we have to overcome, if we're

7    going to look at this objectively, I would submit to

8    you, a couple of things.  For probably many, many

9    people, maybe not all of us, but for many, many people,

10   we're not used to seeing people nude.  It's just not

11   the way it is in this country.  It might be different

12   in some places, but we're not used to it.

13         The second thing we ought to be upfront about,

14   and I would implore you to put aside when you get to

15   deliberations is we're not used to seeing nude boys.

16   And it would be pretending that there's -- it would be

17   ignoring a pink elephant in the room to not say that

18   there's a problem with homophobia in our society.

19         All I can ask of you is to put all that aside

20   when you try and make an assessment about whether or

21   not these films are nudist films generated out of

22   Eastern Europe or whether they're lascivious.

23         Most of the films you can see just about all of

24   the boys.  Now, obviously if you're seeing the front of

25   the boy, you can't see the back; and if you're seeing

1    the back of the boy, you can't see the front, but these

2    are not films where all you see is a woman's breasts or

3    a boy's genitals.  You see the whole boy in virtually

4    all of the picture.  When you see them on the bed doing

5    sit-ups, you see all of the boy.  You see the boys'

6    faces in virtually every depiction unless their back

7    happened to be turned to you.  I would suggest to you

8    that that is very different than what you would expect

9    if you were looking at just lascivious films.

10           Mr. Connelly acknowledged, I don't think there's

11   any dispute, there's no sexual intercourse in these

12   films, but it's more than that, I would suggest to you.

13   There's just no sex in these films.  There are boys

14   playing around naked.

15           One other comment I'd like to just mention

16   briefly that Mr. Connelly made, I asked him if he had

17   an opinion about two films.  One was "Pool Buddies," I

18   think the other was "Mountain Men."  He said he had

19   seen them briefly, but he'd have to review them in more

20   detail to have an opinion as whether they were erotica

21   or pornography.  You can't tell just from looking at

22   the cover of these films what they are, I would suggest

23   to you.

24           The final witness, of course, was Mr. Silva.  I

25   know you just heard him this morning and I don't intend

1    to spend a lot of time on his testimony, but I do want

2    to make certain points to you about his testimony.

3        Maybe the biggest point is the Government says,

4    oh, he's making this all up.  There's his video room.

5    He liked to sit there and relax and watch videos.

6        Since he was 18 years old, and he's 59 now, he

7    has done some of the tough work in our community.  He

8    has worked with the Boy Scouts.  He worked at Camp

9    Eckert or the Eckert Foundation.  It was Camp E Huntee.

10   He worked at Kent County Mental Health.  He works at

11   Gateway, and then he works as a probation officer with

12   sex offenders, working with some of the most difficult

13   populations that we have in this state.  He dedicates

14   his life to that and has almost 40 years of service

15   working with that population right now.  Never once

16   before this event has he been charged with anything or

17   convicted of anything.  He tells you that and it's

18   uncontradicted in the record.

19       He has a reason for looking at these materials.

20   He tells you that he wants to leave a legacy.  He's

21   putting in an enormous amount of time.

22       On the one hand on the one level -- he probably

23   doesn't want me to say this.  At one level, it doesn't

24   matters why he had these material.  On one level, it

25   just matters were they or were they not lascivious, and

1    I would suggest to you that they were not lascivious

2    and I'll go into the reasons in just a second.

3         But look at who he is and it does apply to the

4    question of what type of knowledge he had.  Look at who

5    this person is, look at what he's done over 40 years.

6    It's sort of remarkable, I would suggest to you, that

7    when you work with that field that somebody hasn't said

8    something about you before this.  He's never been

9    charged, much less convicted, of anything else.  He's

10   had a stellar record of working with the toughest

11   people our society can produce.

12        And now, the Government comes in and says here's

13   some films.  There's no sex in the films -- you know,

14   when I say there's no sex, not only is there no sexual

15   intercourse, there's no masturbation in the films,

16   there's no oral sex, there's nothing except nudity I

17   would suggest to you.

18        So when you think about Mr. Silva, think about

19   what he's done and think about whether it makes any

20   sense that this man suddenly when he's 57, or something

21   like that, decides to go off the deep end and start

22   ordering in his own name child pornography and turn

23   everything he's built and done for the last 35 or close

24   to 40 years upside down.

25        I want to talk about the exhibits briefly.  The

1    postal packing, there's no dispute that it was mailed

2    in interstate commerce and that it was mailed to

3    Mr. Silva.  The Miranda rights form and the consent to

4    search online, they just established that Mr. Silva

5    cooperated from the beginning and didn't conceal

6    anything from the Government.  They support his

7    decision.  They don't contradict it.

8         The receipts from Azov that were introduced in

9    evidence that we've gone through, they verify, again,

10   that he didn't conceal his identity.  He signed the

11   date that he was arrested.  It wasn't even a matter of

12   thinking about what's best for me.  He signed them, he

13   acknowledged them without any debate.

14        The pictures of his home, yeah, it doesn't look

15   like "Home Beautiful."  It also was clear that he

16   wasn't concealing anything, I would submit to you.

17   Surely nobody is suggesting he be convicted because his

18   home was a little messy.

19        The pictures of the search in Toronto just had

20   no bearing, I would submit, on whether Mr. Silva is

21   guilty of anything.

22        The e-mails, they just again establish that

23   Mr. Silva used his own identity.  The screen shots of

24   the catalogs, if you look at those screen shots, and

25   you've got them in evidence that tell you what's

1    supposed to be in these videos give you more of a

2    picture than what the Government would lead you to

3    believe.  Some of these kids played again and again.

4    There were followings of these people.  It wasn't a

5    "War and Peace" trilogy or a novel, but there was a

6    story and there was some people followed particular

7    actors.

8         The DOC policies, I submit, the Department of

9    Corrections policies support more than undermine

10   Mr. Silva's position.  The chart that the Government

11   introduces basically connects which DVDs go to which

12   allegations.

13        The notion that this PowerPoint is invalid

14   because Mr. Silva didn't tell people about it and sort

15   of the implication was he had to tell the people at the

16   Department of Corrections I would suggest is undercut

17   by the DOC policy and Ms. Imbriglio's own testimony.

18   Even beyond that, he had no obligation to tell anybody

19   what he was working on.  So he's working on it.

20   There's no doubt that he had been working on it for a

21   while, and you can take a look at the slides.  They

22   obviously took a lot of work to produce.

23        So now I want to turn to what I think is sort of

24   the critical issue in this case.  I'm going to move a

25   little bit because I have a couple of notes that I'd

1    like to put up for you.

2          The issue is were the images lascivious.  Isn't

3    that really the heart of this case?  I apologize for

4    moving back here, but I hope that putting a little bit

5    up here you can follow my argument a little bit with

6    respect to this.

7          First, you have to consider the overall content

8    of the material.  You'll see that in the instructions.

9    The Court identified six factors which can be

10   considered.  The Court didn't say these were the

11   exclusive factors, but they said these are six factors

12   that you could consider.  The first one was:  Are the

13   genitals the focal point of the image?  Now, obviously,

14   this is my shorthand way of trying to argue this.  One

15   is I would say to you there were no zoom shots of the

16   genitals.  There just weren't.  In fact, there were

17   some zoom shots of faces occasionally, but they didn't

18   zoom in just on the genitals.  You could see the

19   genitals in most of the pictures but they didn't zoom

20   in on the genitals.  You almost always saw the whole

21   person.  Usually the face was visible.  So the notion

22   that -- you didn't see hours and hours of just the

23   genitals.  What you saw was video showing pictures of

24   these kids and, yeah, the genitals were visible, but it

25   wasn't just zooming in on the genitals.

1          Now, another fact the Court said you could

2     consider was is the situation -- is the setting

3     sexually suggestive.  Not only is there no sex, actual

4     sex, there are no sex toys, there are no condoms,

5     there's no dim lighting.

6          The demeanor of the boys.  When you look at

7     these videos, and I submit you can't get it out of just

8     looking at a single shot, almost uniformly the demeanor

9     of the boys in these videos was playful, laughing,

10    smiling.  It was what you would expect out of young

11    boys.  And if they had clothes on, you wouldn't think a

12    thing of these videos.  You would think they were just

13    videos of kids horsing around, whether it's in the

14    shower, in a pool, on the beach or on a train trip.

15    What makes everybody who is not used to nudism pause is

16    that these boys didn't have clothes on.  But otherwise,

17    these films would be remarkably unremarkable to create

18    a bad phrase.  I mean, they were just normal films, I

19    would suggest you.

20         And when you look at how these boys were

21    reacting, maybe they could have coached the boys for a

22    scene or two.  But look at the totality of these films,

23    and what you see is the boys consistently laughing and

24    smiling.  And that's the opposite of a sexually

25    suggestive scene.  Even the scenes where the boys were

1    on the bed or in the train bunks, in the bunks on the

2    train I would suggest you see boys horsing around.  You

3    don't see them sort of snuggling together in a train

4    bunk or something like that.  You see them fooling

5    around, playing in a bunk on a train.  You see them

6    playing on the bed, but you don't see sex.  You do see

7    a massage maybe a few different times, but I would

8    suggest to you Mr. Donnelly says the massage went right

9    down to the bottom of the boy's back, not just about to

10   the buttocks line.  Well, that's right.  The massage

11   didn't go to sexual area.  That's the whole point.  The

12   massage was not sexual.  Not every massage is sexual.

13   A massage certainly could be sexual but the massages

14   that you saw were not.  They were not of the genitalia.

15   They were not sexual.  You didn't see him rubbing the

16   buttocks, you didn't see him rubbing the genitals.  You

17   saw a massage of the back.  Surely we can't say that

18   every massage of the back becomes a sexual event.

19          The food scenes, the word I used was silly.  I

20   think there are other ways you could describe the food

21   scenes including gross and sort of at a certain age you

22   may think food fights are beyond silly, they're

23   disgusting and why do them.  But whatever they are, I

24   would argue, they are not sexual.  How anybody could

25   infer sex from that food scene I would suggest to you

1     is a real stretch.  It just wasn't about sex.

2           Those were two of the factors that we've talked

3     about.

4           The Court also said you could consider whether

5     the child was in an unnatural pose or inappropriate

6     attire.  None of these were posed shots.  I mean, we've

7     all seen posed shots, mostly with adults.  The "Sports

8     Illustrated" shots, we know what a posed shot is for

9     sexual purposes.  You don't even have to go to that.

10    You can go to all the ads that Calvin Klein runs, or I

11    think Mr. Connelly mentioned the Speedo bathing suits.

12    We know what a posed shot is.  You didn't see posed

13    shots there.  You didn't see boys modeling their

14    genitals, closing their genitals, things like that.

15          Inappropriate attire.  You can make something

16    more sexual by putting these boys in things like tight

17    Speedo trunks and trying to highlight their genitalia.

18    It's your recollection that controls, but certain many

19    of the boys when they were in bathing suits had regular

20    bathing suits on and some had apparently smaller

21    bathing suits on.  What I would suggest to you is that

22    what you did not see was posed shots.  You saw the kids

23    playing around and, as I said to you, I think if you

24    saw these kids with clothes on you would think nothing

25    of it.

1      You look at another criteria that the Court

2  mentioned was, was the child fully or partially clothed

3  or nude.  Well, clearly the boys in this case were

4  nude, but also clearly nudity is not enough.  You need

5  something more than mere nudity to establish

6  lasciviousness.  I think you'll see that in the

7  instructions; you heard that in the instructions.

8      These are nudist films.  Of course the boys

9  would be nude.  It would be sort of like contradictory

10  if the boys weren't nude.  Of course they're going to

11  be nude.  They're nudist films.

12      Now, some of you might say to yourself, I object

13  to nudist films, but that's not the issue.  You have an

14  absolute right to say I don't like nudist films, I

15  don't ever want to see nudist films.  I don't like the

16  nudism movement.  You have that total right.  But you

17  don't have the right to convict Mr. Silva because he

18  received or possessed nudist films.

19      Another factor is whether or not the images

20  suggest sexual coyness or a willingness to engage in

21  sexual activity.  And there again, I would suggest that

22  what you saw was the boys playing.  You didn't see

23  anything suggesting sexual coyness or a willingness to

24  engage in sexual activity.  There just wasn't anything

25  like that, I would suggest.

1    Then finally, whether the image appears intended

2    to elicit a sexual response in the viewer.  I would

3    suggest that the better view of these movies, these

4    videos is that they're nudist not that they're designed

5    to elicit a sexual response.  There was nothing in

6    these movies except the nudity that would be a basis

7    for inferring sexuality.  There were so many more

8    things that could have been done.  We've all seen ads,

9    we've all seen movies where with or without nudity

10   there's a suggestion of sex, and that wasn't what you

11   had in these cases.  I think what you had was

12   12-year-old, 8-year-old, 16-year-old boys playing

13   around.

14        Now, those are six factors the Court identified.

15   The Court also said there are other factors that you

16   could consider.  I want to suggest to you what some of

17   those other factors are.

18        First, there are no scenes of adults having

19   contact with the kids.  There's no sex between these

20   boys and anybody, much less any situation where you've

21   got adults using these kids for sexual purposes.  You

22   don't see these boys and adults massaging each other or

23   anything like that.  Adults just aren't in these film.

24   You see youths playing with youths.

25        The vast majority of this footage was

1    group-oriented.  There wasn't a romantic scene.  And

2    when there wasn't a group, you had a boy with a

3    chicken, for example.  I would say to you that whatever

4    it was, it wasn't sex.

5         The videos all seemed to come from Eastern

6    Europe, and I would encourage you, you'll have as

7    exhibits the cases in which these videos came in.  Take

8    a look at these cases.  They'll give you more, I

9    submit, of an understanding or a feel of the fact that

10   these were nudist videos.

11        There was clearly some sound but not at a higher

12   speed.  The point that I wanted to bring to your

13   attention, the nudity didn't appear to be an issue with

14   the boys.  Remember how the boys acted among

15   themselves.  Mr. Donnelly talked about the shower

16   scene.  Think about the scenes where the boys are

17   dressing or undressing.  The boys don't focus on each

18   other's genitalia.  They don't seem awkward about that.

19   They seem to be horsing around, but you don't see them

20   staring at each other's genitalia.  You don't see them

21   staring at each other when they're dressing or

22   undressing.  You see them doing things in the shower

23   and throwing water on each other while in the shower.

24   No different, I would submit, that probably happens in

25   locker rooms in high schools and colleges all around

1    the country.  But you didn't see any focus just on the

2    genitalia there.  What I would suggest to you is what

3    these films depict is European nudism.

4         And the last video that we saw, you remember we

5    had a problem with one of the videos and it ended up

6    being the last one we saw.  You saw the interviews of

7    the boys.  Not all boys, but three boys gave

8    interviews.  You saw subtitles.  Think about those

9    interviews.  Those interviews, I would submit to you,

10   shed more light on what was going on.  These kids who

11   were enjoying themselves, nobody could coach those kids

12   in that maybe in saying the words but not in the acting

13   and appearing the way they did.  This doesn't reflect

14   the exploitation of children in these films, I would

15   suggest to you, and interviews of boys having a good

16   time, talking about what movie they were seeing, things

17   like that.

18         The movies did have both an introduction about

19   the legality of the movies and some of the movies had

20   this history of nudism.  I think those are factors that

21   you can consider, I would urge you to consider.  That's

22   how these movies were being marketed, not as child porn

23   but as part of nudism.  And look at that history of

24   nudism if some of you have questions.  It's not

25   terribly long.  We went through it once, but it talks

1    about the whole history of nudism mostly in Europe and

2    the United States, mentions of India, I think, and a

3    few other places.  But I would submit to you that it is

4    instructive for us.

5         The way these films were marketed, they were

6    marketed through the Web in a very above-board fashion.

7    It's not like you had to go to a dreary bookstore, not

8    like you had to use some file sharing network like

9    Napster or LimeWire to access these things.  You got

10   them like any other product you would get on the

11   Internet.

12        I would argue to you that if there were a single

13   word to describe these films it would not be "sexual."

14   It would be "boring."  And in the end, Mr. Connelly

15   said that one of the factors that you could consider

16   was the end goal of the user.  One of the pieces -- and

17   I think the Court told you that you can consider the

18   evidence that's been produced or not been produced.  I

19   asked Mr. Silva if he'd ever used these films for

20   sexual pleasure.  He denied it.  Not only did he deny

21   it, you've no evidence of that.  There's not a single

22   clip suggesting -- of him doing anything sexual or with

23   respect to these films.  There's not a single clip or

24   anything suggesting that Mr. Silva in any way was using

25   these films for a sexual purpose.

1          What the Government has is a lot of videos of

2     nude boys, but that gets back to the fact, I would

3     submit to you, that it's just nudity and nothing more.

4          Now, I ask you to look -- I'm sure you listened

5     closely to the Judge's instructions.  Look at them,

6     you'll have them there, about the Government's

7     requirement to prove knowledge.  The Government has an

8     obligation not only to prove that these materials were

9     lascivious, and I submit to you that they haven't.  I

10    submit to you they can't.  But they also have to prove

11    that Mr. Silva knowingly received them.  One argument

12    I've already made is it's just absurd to think that

13    Mr. Silva given his background would now suddenly at

14    age 57 or so, after a career of commitment, go into

15    child pornography.  And if he did do that, to suggest

16    that he would do it in his own name and his own home --

17    I mean Boy Scouts from 18 to 28; Eckert from about 28

18    to 35; Kent County Mental Health Center from about 35

19    to 40; Gateway from about 40 to 49, and since that time

20    a probation officer.  And you can be sure that at each

21    of those jobs when he moved around, somebody checked

22    him, somebody vetted him, somebody looked into his

23    background, and somebody had wanted to know was this

24    somebody appropriate we could hire to work with kids or

25    finally when we get to the Department of Corrections

1   that could work with the Department of Corrections.

2   And each time he gets hired by somebody new to work

3   with a difficult population.  And now all of a sudden

4   he changes stripes at age 57?

5           It's also just absurd, I would suggest to you --

6   first I would suggest to you it's absurd to think that

7   he would change stripes at age 57.  There's just no

8   basis for it.  There's nothing else, you have nothing

9   in this record to suggest that he's involved with child

10  pornography except his possession of a bunch of nudist

11  videos.  You don't have him acting out on these videos.

12  You don't have videos of him doing anything.  You don't

13  have any evidence of his contact with any kids.  You

14  don't have anything at all except the Government going

15  into his house based not on something that he did here,

16  but based on the fact that they got a list of people

17  who were customers and that he was one of over 10,000

18  customers in this country on the website.  And then

19  based on that list they go into his house and they

20  seize a bunch of films that are nudist films.  And

21  they're nudist films.  That's what they are, I would

22  suggest to you.  Take a look at these criteria.

23          That's the argument I would make on his behalf.

24  But even if you think the worst of him and you think

25  somehow or another he has gone over to the other side

1   or something, it's just absurd to think that somebody

2   who is in law enforcement who is supervising people who

3   are sex offenders is then going to start to go into the

4   child pornography field in such an above-board way

5   using every bit of his own identity, his own house, his

6   own name, his own e-mail, everything.

7          Finally, of course, the Government has to

8   prove -- they have to prove, in any event, that these

9   images were lascivious.  And for all the reasons I've

10  just tried to go through with you, I would submit to

11  you that they are not lascivious.

12         I've talked to you a little bit about the fact

13  that Mr. Silva is a nudist, that these came out of a

14  nudist community.  I would argue to you that what you

15  really saw was nudist films.  Now, there's all this

16  back and forth about why did Mr. Silva create this

17  PowerPoint, why did he send a letter to Ken Bell, all

18  that sort of stuff.  Look at the PowerPoint, ladies and

19  gentlemen.  It took some real work to do that.  It's

20  not a finished product.  Mr. Silva testified to you

21  clearly that he expected it to be much more.  But it

22  seems like an awfully strange way to make up an

23  explanation for why you possess child pornography to

24  make a whole PowerPoint that references the Azov stuff.

25         When you look at the PowerPoint, particularly if

1    you look at the notes on the PowerPoint but also some

2    of the slides, you'll see references to Azov Films.

3         I would submit to you that that PowerPoint is

4    exactly what Mr. Silva told you it is, it's the

5    beginning of his effort to leave a legacy.  But beyond

6    all that, beyond all that, the question is always has

7    the Government proven beyond a reasonable doubt that

8    these films are lascivious.  The lascivious issue

9    governs each of the seven counts.  In other words,

10   there's no difference in the definition of

11   "lasciviousness."  It applies equally to all the

12   counts.  If you find that these videos were not

13   lascivious, then Mr. Silva is simply not guilty.

14        I just want to respond briefly to a few of the

15   comments that Mr. Donnelly made.  He talked about the

16   video of the three boys in the shower.  I would suggest

17   to you that what's remarkable about that -- not

18   remarkable but when you look at that shot, what you see

19   is three boys in the shower.  You don't see them

20   focusing on each other's genitalia.  You see them

21   horsing around in a shower.  As I said to you, I would

22   submit to you that that's what takes place in boys

23   locker rooms.  There wasn't even any towel snapping or

24   anything like that.  It was just playing around with

25   the shower and aiming the water.  And even that wasn't

1    focused on the genitalia.  That's what these films

2    were.  They were not focused on the genitalia.

3          There was a reference to Mr. Silva's interest in

4    the case.  Of course he has an interest in the case.

5    He spent 37 or 38 of the years of his life, now almost

6    40 dedicated to helping, as I said, in working with the

7    most difficult people in our community.  And it would

8    be naive to say he doesn't have an interest in the

9    case.  But what I would submit to you is also take into

10   account his background, take into account who he is

11   when you assess did he knowingly receive and possess

12   child pornography.

13         In the end, you really have to just look at the

14   DVDs.  You have to think about whether Mr. Silva had

15   knowledge, but you basically have to look at the DVDs,

16   and I challenge you to find more than nudity in the

17   DVDs.  What there is, is nudity and a lot of nudity.

18   If I have offended people by playing these videos

19   yesterday, or whenever it was, I think it was yesterday

20   or the day before yesterday, I apologize.  You'll have

21   the videos back there.  If you want to look at more of

22   them, you can.  The point is you have to look at these

23   things in an overall content sort of way.  And when you

24   look at these, simply looking at a two-minute snippet,

25   I would suggest to you, is not enough.  If you look at

1    these videos as a whole, what you see is hours and

2    hours of video and no sex.  Simply no sex.  Just lots

3    and lots of nudity.  That's what you see.  And there

4    has to be more than mere nudity.  You don't see

5    intercourse.  You don't see masturbation.  You don't

6    see rubbing in the genitalia.  You don't see oral sex.

7    You don't see any sex at all in these movies.  All you

8    see, I submit to you, is nudity.  And I hope that

9    persuades you that these films are not lascivious.

10         But finally I would say to you even if you are

11   not persuaded that these films are not lascivious, at

12   least I submit to you the Government has failed to

13   prove to you that they are lascivious.  And if you're

14   not sure they they're lascivious, whether you like

15   these films or not, whether you like what Mr. Silva did

16   or not, whether you agree with his lifestyle or not, if

17   you're not sure -- and look.  Look at his lifestyle.

18   We can stereotype all we want, but we can't convict

19   everybody of possession of child pornography because of

20   their work with Boy Scouts or because they're a man

21   working with young men.  That's the stereotype that you

22   cannot fall into.  He shouldn't be punished for

23   spending a lifetime working with young people.  He

24   should at least be recognized for the contribution he

25   gave when you're getting to making the assessment of

1    reasonable doubt.  And if in the end, even if we

2    haven't persuaded you that these movies are not

3    lascivious, I would urge you that the Government surely

4    hasn't persuaded you that they are.  And if they

5    haven't persuaded you that they are, and if you're not

6    sure, that you've got some doubt about whether they're

7    lascivious or not, then you have to acquit.  And for

8    that I'm asking you to acquit him of all charges.

9    Thank you very much.

10              THE COURT:  Thank you, Mr. Mann.

11              Mr. Donnelly, do you have any rebuttal argument?

12              MR. DONNELLY:  A few minutes, your Honor.

13              Folks, just a few minutes of your time just to

14   try to address some of the points Mr. Mann just made.

15              He went through on the ELMO some of the factors

16   he wants you to think about.  When you have time to

17   deliberate on this case and you'll have the Judge's

18   instructions, there are those six factors, the first

19   six factors you're not required to find any of those if

20   you don't want to.  There's certainly no minimum.

21   Certainly not all six of them need to be agreed upon by

22   you.  They're just guides to help you determine whether

23   you agree or not that these pictures are lascivious.

24              And Mr. Mann pointed out a lot of things that we

25   don't dispute.  You can say a million times, well,

1    there's no sex, there's no sex, there's no sex.  Well,

2    Congress made it illegal to possess pictures, yes, of

3    graphic sex, but also of the lascivious exhibition of

4    the genitals.

5         So we go around in a big circle but we're back

6    at the question and you have to ask yourself as you

7    consider that, again, sorry if this is new for many of

8    you, but there are certainly normal sexual desires out

9    there and there's abnormal sexual desires out there.

10   And I think here you're seeing abnormal sexual desire,

11   and you have to see these pictures in light of that,

12   not in light of what those boys think.  I told you in

13   my opening argument that those boys, they might be

14   genuinely thinking they're having fun.  Who knows?

15   Skinny Eastern European kids, who knows where their

16   heads are at?  Who knows what road they've come down to

17   get in front of those cameras for whoever is taking

18   those pictures?  We don't know.  But what we do know is

19   that you can look at those pictures and see that

20   they're intended and designed to please somebody.  You

21   don't buy those videos because they give you

22   information about this or that.  You buy them because

23   you like them.  That's why you buy several dozen of

24   them, because you're hooked on them.

25        I suggested to you in my opening argument, go to

1    Exhibit 5A.  You know what you can do?  You can also go

2    to the other photo disk he bought, Exhibit 7A.  That's

3    the one with the chicken and the cupcakes.  And ask

4    yourself, he bought the video, ha-ha, is that boys will

5    be boys having fun?  And that's why I'm sorry we showed

6    you that particular clip with the boy sitting on the

7    chicken, you know.  And whatever weird sexual thought

8    is going on in the makers of these films, I submit to

9    you that that's what's going on in those pictures.

10   Look at the rest of them.  Look how they're cropped and

11   framed.  Why do you buy those?  Why do you keep those?

12   Is this a normal website operating like Amazon?  Might

13   have looked a little bit like it.  Took your credit

14   card just like Amazon does.  Why is a normal website

15   blocking law enforcement from accessing it?  Look at

16   the products they advertise on there.  Boy Joy porno

17   site.  Normal website or lascivious website?

18        The Defendant's presentation, I think Mr. Mann,

19   I don't know if I heard it right or he slipped, said

20   his presentation began being created in 2010.  July

21   9th, 2011, creation date of the earliest PowerPoint.

22        And he put in an enormous amount of time, 30

23   years of experience went into this PowerPoint.  Come

24   on.  You've used PowerPoint.  Probably many of you

25   have.  If you've used it, he got 33 slides.  You'll

1    have them.  Thirty-three by the time that Inspector

2    Connelly runs into him, gets his laptop pursuant to the

3    search warrant and Mr. Psyllos finds those PowerPoints.

4    There's 33 slides.  Enormous work?  There's no

5    research.  There's no citation to authority.  There's

6    no citation to psychologists and workers in the field.

7    No citations to the National Centers for Missing and

8    Exploited Children.  Nothing.  It's like a free-form,

9    free-thinking thing you could do in an afternoon.  He

10   did it because the website had been shut down and an

11   explanation had to be made.

12        Now, did he behave against his own self-interest

13   holding onto those videos?  I can't explain that to

14   you.  He certainly didn't explain it to us.  We do know

15   though that -- and I ask you again to go back to

16   Government's Exhibit 30, the e-mail to Ken Bell.  Read

17   it carefully and say to yourself, okay.  I've got a guy

18   over here buying dozens of these Azov films, opening

19   them up and watching them.  Ask yourself, is that the

20   same guy that's in this e-mail?  Spend a few minutes on

21   it.  The answer is no.  Completely different guy.  The

22   guy in the e-mail is false.  The guy behind and

23   enjoying the videos, that's the guy behind this case.

24        Mr. Mann put in his factors, the disclaimers,

25   the history of nudism.  Do you think it makes it legal

1    if you put a little sign up at the beginning of your

2    child porn video that, well, folks, the United States

3    Supreme Court and Canadian Supreme Court looked at this

4    and bah, bah, bah, bah, bah, all been found perfectly

5    above-board.  Do you think that makes a difference?  It

6    makes a difference to you.  You decide.  Why do you put

7    that there?  It's just cover, more cover.

8         You heard Inspector Bone and Detective Krawczyk

9    from Canada say they're not aware of any U.S. and

10   Canadian Supreme Court decisions.  I think that strikes

11   your common sense.  There's no Supreme Court decisions

12   out there saying this stuff is legal.

13        THE COURT:  Let's wind it up.

14        MR. DONNELLY:  Thank you, your Honor.

15        One last point, and I can't ignore it.  Mr. Mann

16   raised it.  He said the pink elephant in the room, we

17   can't ignore it, is homophobia.  There's no pink

18   elephant in this room.  The Government could care less

19   about the sexual orientation of anybody.  It's about

20   pedophilia, sexual pleasure by looking at naked

21   children in different settings and in different ways.

22        Return a verdict of guilty.  Thank you.

23        THE COURT:  Thank you, Mr. Donnelly.

24        Okay.  Ladies and gentlemen, you've heard my

25   instructions, you've heard the attorneys' closing

1    arguments.  It's now time for you to go to the jury

2    room and to deliberate on the case.

3          The first thing I'm going to do is swear the

4    marshal before we send you into the jury room.

5          (Marshal sworn.)

6          THE COURT:  All right.  And also at this time,

7    ladies and gentlemen, I'm going to dismiss our two

8    alternate jurors.  I do want to thank you for your

9    service.  Alternate jurors are the unsung heros of

10   trial.  You go through the entire trial but then you

11   don't get to deliberate.  I'm sorry about that, but you

12   provide an enormous service simply by being here at the

13   ready at any time there is the need, and often there

14   is.  So I'm going to let you two go at this time.

15   Thank you for your service.  Hopefully you've acquired

16   somebody's phone number or something to find out when

17   the jury reaches a verdict what that verdict is.  Of

18   course, if you don't, you can all call the Court and

19   they'll let you know.  All right?  So Charlie will give

20   you directions.  Thank you very much, gentlemen.

21         (Alternates dismissed.)

22         THE COURT:  Okay, ladies and gentlemen, Charlie

23   is going to show you to the jury room.  In a few

24   moments, the exhibits will be brought into the room as

25   well as my written instructions and the verdict form.

1    Just get settled and Charlie will tell you in just a

2    moment that you can start deliberating.  I just need to

3    do one thing with the attorneys before you actually

4    start.  All right?

5           Charlie, would you show the jury into the jury

6    room.

7           (Proceedings out of the presence of the jury as

8    follows:)

9           THE COURT:  Mr. Mann, if you could quickly

10   reiterate your objections.  You don't need to restate

11   your arguments.

12          MR. MANN:  I'll just incorporate all my prior

13   arguments.  On page 12 of the instructions, you gave an

14   instruction that says:  "It is for you, the jury, to

15   decide whether the material received" -- I'm sorry,

16   Judge.  I may have the wrong page.  "It is for you, the

17   jury, to decide whether the material received or

18   possessed by the Defendant meets the definition of

19   sexually explicit conduct.  If the Defendant

20   incorrectly believed what does and does not constitute

21   child pornography, that does not relieve him of the

22   responsibility as long as the Government has proven the

23   elements I outlined above."

24          I'll incorporate my prior arguments, note

25   briefly that I believe it's a comment on the

1   Defendant's testimony and also diminishes the

2   Government's burden with respect to proving knowledge.

3         I also object, Judge, on page 27 of your

4   instructions you told the jury that in paragraph five

5   of the instruction on witness credibility, "whether the

6   witness had anything to gain or lose from the outcome

7   of this case.  In other words, was the witness totally

8   impartial or did the witness have some stake in the

9   outcome or some reason to favor one side or the other."

10  I object to that as highlighting the Defendant's

11  testimony, as being a comment on the Defendant's

12  testimony, and I would submit that that violates the

13  instructions of the **United States versus Dwyer**, 843 Fed

14  2d, 60 and would just incorporate my prior arguments.

15        THE COURT:  All right.  Are there any other

16  objections to any of the instructions?

17        MR. MANN:  Only those two, Judge.  And all of

18  those were argued previously.

19        THE COURT:  Yes.  Okay.

20        Charlie, you may tell the jury to begin

21  deliberations.

22        Any objections to the verdict form?

23        MR. DONNELLY:  No, your Honor.

24        MR. MANN:  No, your Honor.

25        THE COURT:  Any objection to the instructions

1    being sent in to the jury?

2         MR. DONNELLY:  No, your Honor.

3         MR. MANN:  Not to them being sent in, no.

4         THE COURT:  Charlie, the verdict form and the

5    instructions.  The exhibits will be in momentarily.

6         MR. MANN:  May I just ask, your Honor, your

7    Honor caught a --

8         THE COURT:  I made the change.  It's typewritten

9    in and I've substituted the page.

10        MR. MANN:  Thank you.

11        THE COURT:  So now if counsel could come forward

12   and review the exhibits.

13        (Recess taken at 4:10 p.m.)

14        THE COURT:  We're on the record.  I understand

15   the jury has reached a verdict.  Charlie, if you could

16   show the jury in.

17        (Proceedings in the presence of the jury as

18   follows:)

19        THE COURT:  Ladies and gentlemen, I understand

20   you reached a verdict.  Juror Number 9, I understand

21   you were the foreperson?

22        THE JUROR:  Yes.

23        THE COURT:  Please stand and hand the verdict to

24   the marshal.

25        Ms. G██████, could you just stand up for a

1    moment.  Is this a unanimous verdict of the jury?

2         THE JUROR:  Yes, it is.

3         THE COURT:  You could sit down.

4         I am now going to pronounce the verdict and

5    publish the jury's verdict to the courtroom.

6         In the matter of the United States versus Gerald

7    Silva, as to Count I of the indictment, receipt of

8    child pornography, with respect to product ID Number

9    70246, "BF v2.0 FKK Waterlogged," we, the jury, find

10   the Defendant guilty.

11        As to Count II of the indictment, receipt of

12   child pornography with respect to product ID Number

13   70127, "Vladik Remembered, Volume 1," we, the jury,

14   find the Defendant guilty.

15        As to Count III of the indictment, receipt of

16   child pornography with respect to product ID Number

17   70132, "Vladik Remembered, Volume 2," we, the jury,

18   find the Defendant guilty.

19        As to Count IV of the indictment, receipt of

20   child pornography with respect to product ID 70248, "BF

21   v2.0, Paul and Calin's Home Video, Bucharest;" and BF

22   v2.0 Paul and Calin's Home Video Photo DVD," we, the

23   jury, find the Defendant guilty.

24        As to Count V of the indictment, receipt of

25   child pornography with respect to product ID 70249,

1     "Cutting Room Floor, Vlaviu;" and "Cutting Room Floor,

2     Vlaviu, Photo DVD," we, the jury, find the Defendant

3     guilty.

4          As to Count VI of the indictment, receipt of

5     child pornography with respect to product ID 70296,

6     "Raw Rewind, Volume 2," two disks, we the jury find the

7     Defendant guilty.

8          And as to Count VII of the indictment,

9     possession of child pornography with respect to product

10    ID Number 70188, "FKK Ranch, Party Games," and product

11    ID number 70194, "Scenes from Crimea, Volume 1," we,

12    the jury, find the Defendant guilty.

13         Now, do you wish to have the jury polled?

14         MR. MANN:  Yes, please.

15         THE COURT:  All right.  I'm now going to poll

16    the jury.

17         Juror Number 1, is this your verdict?

18         THE JUROR:  Yes.

19         THE COURT:  Juror Number 2, is this your

20    verdict?

21         THE JUROR:  Yes.

22         THE COURT:  Juror Number 3, is this your

23    verdict?

24         THE JUROR:  Yes.

25         THE COURT:  Juror Number 4, is this your

1     verdict?

2              THE JUROR:  Yes.

3              THE COURT:  Juror Number 5, is this your

4     verdict?

5              THE JUROR:  Yes.

6              THE COURT:  Juror Number 6, is this your

7     verdict?

8              THE JUROR:  Yes.

9              THE COURT:  Juror Number 7, is this your

10    verdict?

11             THE JUROR:  Yes.

12             THE COURT:  Juror Number 8, is this your

13    verdict?

14             THE JUROR:  Yes.

15             THE COURT:  Juror Number 9, is this your

16    verdict?

17             THE JUROR:  Yes.

18             THE COURT:  Juror Number 10, is this your

19    verdict?

20             THE JUROR:  Yes.

21             THE COURT:  Juror Number 11, is this your

22    verdict?

23             THE JUROR:  Yes.

24             THE COURT:  Juror Number 12, is this your

25    verdict?

1    THE JUROR:  Yes.

2    THE COURT:  Thank you, ladies and gentlemen.

3    The clerk will file the verdict form.

4    All right.  Mr. Silva, I'm going to set

5    sentencing down in this matter for Friday, May 16th,

6    2014, at 9:30 a.m.

7    In the meantime, the Office of Probation will be

8    preparing a Presentence Investigation Report that I

9    will use for purposes of sentencing.  I want to

10   encourage you to cooperate fully with the probation

11   officer in the preparation of that report so that I may

12   have all the information that I need in order to

13   conduct sentencing in this matter.

14   All right.  State your positions with respect to

15   remand of the Defendant.

16   MR. DONNELLY:  Yes, your Honor.  As the Court

17   knows, there's a presumption that a defendant being

18   convicted by a jury of a serious felony like this

19   should be remanded, detained.  In this particular case,

20   the Government acknowledges the Defendant has been out

21   on bail pending these proceedings, but because of the

22   potential sentence that he is facing, perhaps a serious

23   period of incarceration, the Government believes that

24   that would create an unreasonable risk of flight with

25   this particular Defendant.  The Government is also

1    concerned about the Defendant's, for lack of a better

2    term, mental state that this verdict might cause on

3    him; and based even on his testimony here today about

4    his state of mind, the Government believes that it's a

5    concern that everybody will remain safe if he's

6    remanded.  Thank you.

7          THE COURT:  Thank you.

8          Mr. Mann?

9          MR. MANN:  I object.  He's been on bail for a

10   long period of time.  There's been no incident of

11   misbehavior or anything like that while he's been on

12   bail.  He's got strong ties to the community.  He owns

13   a home here, and his brother is here.  I think a second

14   brother is here, too.  He's got no record whatsoever,

15   Judge.  There's nothing at all to indicate either a

16   danger to himself or to others based on the period of

17   time that he's been released.  I would urge the Court

18   to continue him on the same release.  Pretrial services

19   will monitor him, obviously.  They keep close tabs on

20   him.  It just seems to me it's counter-intuitive that

21   he would go off and do something now, Judge.  He's been

22   aware of what was going on for a long time.

23         THE COURT:  All right.  These are difficult and

24   close calls, Mr. Silva.  I have consulted with your

25   probation officer.  He said you've been compliant with

1    conditions of pretrial release; however, you are facing

2    a long sentence and I know you know that.  I am going

3    to order that you be detained pending sentencing.

4    Mr. Mann knows that he will have the ability to file a

5    motion to reconsider that and I'll consider that

6    motion; but for all the reasons stated by the

7    Government, I think the better decision is to order you

8    to be detained pending sentencing so I'm going to ask

9    the marshal to do that.

10          Ladies and gentlemen, your work here is

11   completed so I'm going to dismiss you at this time.  I

12   am going to ask that Charlie show you back into the

13   jury room for a moment.  I just want to come in and

14   personally thank you for your service now that the

15   trial is over.  We'll have you on your way home very

16   shortly.

17          Charlie, will you show them into the jury room.

18          (Jurors dismissed.)

19          THE COURT:  So ladies and gentlemen, we'll be in

20   recess.

21          (Court concluded at 5:15 p.m.)

22

23

24

25

C E R T I F I C A T I O N

       I, Anne M. Clayton, RPR, certify that the foregoing is a true and correct copy of the transcript originally filed with the clerk on September 16, 2014, and incorporating redactions of personal identifiers in accordance with the Judicial Conference policy. Redacted characters appear as a black box in the transcript.


/s/ Anne M. Clayton

_____
Anne M. Clayton, RPR


September 16, 2014

_____
Date